# EXHIBIT 1

**LOAN AGREEMENT**

Dated as of June 8, 2018

Between

**THOR PALMER HOUSE HOTEL & SHOPS LLC**,
as Borrower

and

**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**,
as Lender

# **TABLE OF CONTENTS**

Page

ARTICLE I – DEFINITIONS; PRINCIPLES OF CONSTRUCTION ..................................1
    Section 1.1    Definitions...................................................................1
    Section 1.2    Principles of Construction..................................................40

ARTICLE II – GENERAL TERMS ..................................................................41
    Section 2.1    Loan Commitment; Disbursement to Borrower ................................41
        2.1.1    Agreement to Lend and Borrow ........................................41
        2.1.2    Single Disbursement to Borrower.......................................41
        2.1.3    The Note, Mortgage and Loan Documents...............................41
        2.1.4    Use of Proceeds......................................................41
        2.1.1    Components of the Loan ...............................................41
    Section 2.2    Interest Rate ..........................................................42
        2.2.1    Interest Rate .........................................................42
        2.2.2    Interest Calculation ..................................................42
        2.2.3    Determination of Interest Rate.........................................42
        2.2.4    Additional Costs .....................................................45
        2.2.5    Default Rate .........................................................45
        2.2.6    Usury Savings ........................................................45
        2.2.7    Interest Rate Cap Agreement ..........................................45
    Section 2.3    Loan Payment ........................................................48
        2.3.1    Monthly Debt Service Payments; Amortization Payment...................48
        2.3.2    Payments Generally ..................................................49
        2.3.3    Payment on Maturity Date.............................................49
        2.3.4    Late Payment Charge.................................................50
        2.3.5    Method and Place of Payment .........................................51
    Section 2.4    Prepayments ..........................................................51
        2.4.1    Voluntary Prepayments................................................51
        2.4.2    Mandatory Prepayments ..............................................52
        2.4.3    Prepayments After Default ............................................52
        2.4.4    Extension Prepayment ................................................52
        2.4.5    Application of Prepayments to Components ..............................53
    Section 2.5    Release of Property ....................................................53
        2.5.1    Release of Property Upon Payment in Full...............................53
    Section 2.6    Lockbox Account/Cash Management ....................................53
        2.6.1    Lockbox Account.....................................................53
        2.6.2    Cash Management Account ............................................55
        2.6.3    Payments Received under the Cash Management Agreement ................55
    Section 2.7    Withholding Taxes ....................................................55

ARTICLE III – CONDITIONS PRECEDENT ......................................................59
    Section 3.1    Conditions Precedent to Closing........................................59

ARTICLE IV – REPRESENTATIONS AND WARRANTIES ...................................59
   Section 4.1   Borrower Representations...........................................................................59
      4.1.1      Organization.........................................................................................59
      4.1.2      Proceedings.........................................................................................59
      4.1.3      No Conflicts........................................................................................60
      4.1.4      Litigation.............................................................................................60
      4.1.5      Agreements..........................................................................................60
      4.1.6      Title.....................................................................................................60
      4.1.7      Solvency..............................................................................................61
      4.1.8      Full and Accurate Disclosure.............................................................61
      4.1.9      ERISA.................................................................................................62
      4.1.10    Compliance.........................................................................................62
      4.1.11    Financial Information.........................................................................63
      4.1.12    Condemnation.....................................................................................63
      4.1.13    Federal Reserve Regulations..............................................................63
      4.1.14    Utilities and Public Access.................................................................63
      4.1.15    Not a Foreign Person..........................................................................64
      4.1.16    Separate Lots......................................................................................64
      4.1.17    Assessments........................................................................................64
      4.1.18    Enforceability.....................................................................................64
      4.1.19    No Prior Assignment..........................................................................64
      4.1.20    Insurance.............................................................................................64
      4.1.21    Use of Property...................................................................................64
      4.1.22    Certificate of Occupancy; Licenses...................................................64
      4.1.23    Flood Zone..........................................................................................65
      4.1.24    Physical Condition..............................................................................65
      4.1.25    Intentionally Omitted..........................................................................65
      4.1.26    Leases.................................................................................................65
      4.1.27    Survey.................................................................................................66
      4.1.28    Inventory.............................................................................................66
      4.1.29    Filing and Recording Taxes...............................................................66
      4.1.30    Special Purpose Entity/Separateness..................................................66
      4.1.31    Management Agreement......................................................................68
      4.1.32    Illegal Activity....................................................................................69
      4.1.33    No Change in Facts or Circumstances; Disclosure............................69
      4.1.34    Investment Company Act....................................................................69
      4.1.35    Embargoed Person..............................................................................69
      4.1.36    Principal Place of Business; State of Organization............................69
      4.1.37    Environmental Representations and Warranties.................................69
      4.1.38    Cash Management Account.................................................................71
      4.1.39    Operating Lease..................................................................................72
      4.1.40    REA.....................................................................................................72
      4.1.41    Class L Deduction...............................................................................72
      4.1.42    Taxes...................................................................................................72
      4.1.43    Anti-Corruption..................................................................................72
      4.1.44    PIP......................................................................................................73

Section 4.2      Survival of Representations ............................................................73

ARTICLE V – BORROWER COVENANTS ....................................................................73
Section 5.1      Affirmative Covenants ....................................................................73
    5.1.1      Existence; Compliance with Legal Requirements .............................73
    5.1.2      Taxes and Other Charges .............................................................74
    5.1.3      Litigation ........................................................................................75
    5.1.4      Access to Property ..........................................................................75
    5.1.5      Notice of Default ............................................................................75
    5.1.6      Cooperate in Legal Proceedings .....................................................75
    5.1.7      Perform Loan Documents ...............................................................75
    5.1.8      Award and Insurance Benefits .......................................................76
    5.1.9      Further Assurances ........................................................................76
    5.1.10     Principal Place of Business, State of Organization..........................76
    5.1.11     Financial Reporting ........................................................................77
    5.1.12     Business and Operations .................................................................80
    5.1.13     Title to the Property ........................................................................80
    5.1.14     Costs of Enforcement .....................................................................80
    5.1.15     Estoppel Statement .........................................................................81
    5.1.16     Loan Proceeds .................................................................................81
    5.1.17     Performance by Borrower ...............................................................81
    5.1.18     Confirmation of Representations .....................................................81
    5.1.19     Environmental Covenants ...............................................................81
    5.1.20     Leasing Matters ..............................................................................83
    5.1.21     Alterations .......................................................................................85
    5.1.22     Operation of Property .....................................................................86
    5.1.23     Embargoed Person ..........................................................................86
    5.1.24     Operating Lease ..............................................................................87
    5.1.25     REA ..................................................................................................87
    5.1.26     Class L Deduction ...........................................................................87
    5.1.27     Collective Bargaining Agreement ...................................................88
    5.1.28     License Agreement ..........................................................................88
    5.1.29     Quality Assurance Standards ..........................................................88
    5.1.30     Payment of Obligations ..................................................................88
    5.1.31     Taxes ................................................................................................88
Section 5.2      Negative Covenants ........................................................................88
    5.2.1      Operation of Property .....................................................................89
    5.2.2      Liens .................................................................................................89
    5.2.3      Dissolution ......................................................................................89
    5.2.4      Change In Business .........................................................................89
    5.2.5      Debt Cancellation ...........................................................................90
    5.2.6      Zoning ..............................................................................................90
    5.2.7      No Joint Assessment ......................................................................90
    5.2.8      Intentionally Omitted .....................................................................90
    5.2.9      ERISA ..............................................................................................90
    5.2.10     Transfers ..........................................................................................91
    5.2.11     Operating Lease ..............................................................................97

ARTICLE VI – INSURANCE; CASUALTY; CONDEMNATION; ..........................................98
    Section 6.1    Insurance..........................................................................................98
    Section 6.2    Casualty..........................................................................................102
    Section 6.3    Condemnation..................................................................................102
    Section 6.4    Restoration......................................................................................103

ARTICLE VII – RESERVE FUNDS ...............................................................................107
    Section 7.1    Required Repairs.............................................................................107
        7.1.1      Deposits..........................................................................................107
        7.1.2      Release of Required Repair Funds.....................................................108
    Section 7.2    Tax and Insurance Escrow Fund .......................................................108
    Section 7.3    Replacements and Replacement Reserve.............................................109
        7.3.1      Deposits to Replacement Reserve......................................................109
        7.3.2      Disbursements from Replacement Reserve Account.............................110
        7.3.3      Performance of Replacements...........................................................111
        7.3.4      Failure to Make Replacements..........................................................113
        7.3.5      Balance in the Replacement Reserve Account ....................................114
    Section 7.4    Amortization Reserve Fund ..............................................................114
        7.4.1      Deposits to Amortization Reserve Fund.............................................114
        7.4.2      Disbursements from Amortization Reserve Fund.................................114
    Section 7.5    Excess Cash Flow Reserve Fund .......................................................114
        7.5.1      Deposits to Excess Cash Flow Reserve Fund......................................114
        7.5.2      Release of Excess Cash Flow Reserve Funds......................................115
    Section 7.6    Intentionally Omitted ......................................................................115
    Section 7.7    Reserve Funds, Generally .................................................................115

ARTICLE VIII – DEFAULTS .......................................................................................116
    Section 8.1    Event of Default..............................................................................116
    Section 8.2    Remedies........................................................................................119
    Section 8.3    Remedies Cumulative; Waivers........................................................120

ARTICLE IX – SPECIAL PROVISIONS........................................................................121
    Section 9.1    Securitization..................................................................................121
        9.1.1      Sale of Notes and Securitization.......................................................121
        9.1.2      Securitization Costs.........................................................................123
        9.1.3      Loan Components............................................................................123
        9.1.4      Loan Components............................................................................123
    Section 9.2    Securitization Indemnification..........................................................124
    Section 9.3    Exculpation....................................................................................127
    Section 9.4    Matters Concerning Manager ...........................................................130
    Section 9.5    Servicer.........................................................................................130

ARTICLE X – MISCELLANEOUS................................................................................131
    Section 10.1    Survival.........................................................................................131
    Section 10.2    Lender's Discretion..........................................................................131
    Section 10.3    Governing Law ...............................................................................131
    Section 10.4    Modification, Waiver in Writing .......................................................132

Section 10.5    Delay Not a Waiver ....................................................................133
Section 10.6    Notices .....................................................................................133
Section 10.7    Trial by Jury .............................................................................134
Section 10.8    Headings ...................................................................................134
Section 10.9    Severability ...............................................................................134
Section 10.10   Preferences ...............................................................................134
Section 10.11   Waiver of Notice .......................................................................135
Section 10.12   Remedies of Borrower ...............................................................135
Section 10.13   Expenses; Indemnity .................................................................135
Section 10.14   Schedules Incorporated ..............................................................137
Section 10.15   Offsets, Counterclaims and Defenses ..........................................137
Section 10.16   No Joint Venture or Partnership; No Third Party; Beneficiaries ...................137
Section 10.17   Publicity ...................................................................................137
Section 10.18   Waiver of Marshalling of Assets .................................................138
Section 10.19   Waiver of Counterclaim .............................................................138
Section 10.20   Conflict; Construction of Documents; Reliance ............................138
Section 10.21   Brokers and Financial Advisors ..................................................138
Section 10.22   Prior Agreements ......................................................................139
Section 10.23   Joint and Several Liability .........................................................139
Section 10.24   Certain Additional Rights of Lender (VCOC) ..............................139
Section 10.25   Acknowledgement and Consent to Bail-In of EEA Financial
                Institutions ...............................................................................139

## <u>SCHEDULES AND EXHIBITS</u>

Schedule I        –        Rent Roll

Schedule II       –        Required Repairs – Deadlines for Completion

Schedule III      –        Organizational Chart of Borrower

Schedule IV      –        PIPs

Schedule VI      –        Retail Parcel

Schedule VII     –        Office Parcel

Schedule VIII    –        Litigation

Schedule IX      –        Insurance

Schedule X       –        Lease Exceptions and Warranties


Exhibit A                 Tax Compliance Certificates

Exhibit B                 O&M Program

## LOAN AGREEMENT

**THIS LOAN AGREEMENT**, dated as of  June 8, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between **JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**, a banking association chartered under the laws of the United States of America, having an address at 383 Madison Avenue, New York, New York 10179 ("**Lender**"), and **THOR PALMER HOUSE HOTEL & SHOPS LLC**, a Delaware limited liability company, having an address at c/o Thor Equities, LLC, 25 West 39th Street, New York, New York 10018 ("**Borrower**").

## W I T N E S S E T H:

**WHEREAS**, Borrower desires to obtain the Loan (as hereinafter defined) from Lender; and

**WHEREAS**, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined).

**NOW THEREFORE**, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## ARTICLE I – DEFINITIONS; PRINCIPLES OF CONSTRUCTION.

Section 1.1    **Definitions.**  For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Acceptable Counterparty**" shall mean a counterparty to the Interest Rate Cap Agreement (or the guarantor of such counterparty's obligations) that (a) has and shall maintain, until the expiration of the applicable Interest Rate Cap Agreement, (i) a long-term unsecured debt rating of not less than "A+" by S&P and a short-term senior unsecured debt or counterparty rating of at least "A-1" from S&P, (ii)(x) a long-term unsecured debt or counterparty rating of not less than "A1" from Moody's and a short-term senior unsecured debt or counterparty rating of at least "P1" from Moody's or (y) if no short-term debt rating exists, a long-term senior unsecured debt or counterparty rating of at least "A1" from Moody's, and (iii) if any the Securities or any class thereof in any Securitization are rated by Fitch, a long-term unsecured debt rating of at least "A" by Fitch (and not on "Rating Watch Negative") and short-term unsecured debt rating of at least "F1" (if rated by Fitch) (and not on "Rating Watch Negative") or (b) is otherwise acceptable to the Approved Rating Agencies, as evidenced by a Rating Agency Confirmation to the effect that such counterparty shall not cause a downgrade, withdrawal or qualification of the ratings assigned, or to be assigned, to the Securities or any class thereof in any Securitization.

"**Additional Insolvency Opinion**" shall mean a non-consolidation opinion letter delivered in connection with the Loan subsequent to the Closing Date reasonably satisfactory in customary form and substance to Lender and, following a Securitization, satisfactory in form and substance to the Approved Rating Agencies, and from counsel reasonably acceptable to Lender and, following a Securitization, the Approved Rating Agencies.

"**Affiliate**" shall mean, as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

"**Affiliated Manager**" shall mean any Manager in which Borrower or Guarantor has, directly or indirectly, any legal, beneficial or economic interest.

"**Agent**" shall mean Wells Fargo Bank, National Association, or any successor Eligible Institution acting as Agent under the Cash Management Agreement.

"**Amortization Payment**" shall have the meaning set forth in Section 2.3.1(b) hereof.

"**Amortization Payment Date**" shall have the meaning set forth in Section 2.3.1(b) hereof.

"**Amortization Reserve Account**" shall have the meaning set forth in Section 7.4.1 hereof.

"**Amortization Reserve Fund**" shall have the meaning set forth in Section 7.4.1 hereof.

"**Annual Budget**" shall mean the operating budget, including all planned Capital Expenditures, for the Property prepared by Borrower in accordance with Section 5.1.11(e) hereof for the applicable Fiscal Year or other period.

"**Anti-Corruption Obligation**" shall have the meaning set forth in Section 4.1.43 hereof.

"**Approved Annual Budget**" shall have the meaning set forth in Section 5.1.11(e) hereof.

"**Approved Rating Agencies**" shall mean each of S&P, Moody's, Fitch, Morningstar, DBRS and Kroll or any other nationally-recognized statistical rating agency which has been approved by Lender and designated by Lender to assign a rating to the Securities.

"**Assignment of Interest Rate Cap Agreement**" shall have the meaning set forth in Section 2.2.7(a) hereof.

"**Assignment of Management Agreement**" shall mean that certain Assignment of Management Agreement, Subordination of Management Agreement and Non-Disturbance and Attornment Agreement, dated as of the date hereof, among Lender, Mezzanine Lender, Operating Lessee, Mezzanine Borrower, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Alternate Rate Index**" shall mean a floating rate index (a) that is commonly accepted by market participants in CMBS loans as an alternative to the LIBOR Rate Index and (b) that is publicly recognized by the International Swaps and Derivatives Association (ISDA) as an alternative to the LIBOR Rate Index; provided that in no event will the Alternate Rate Index be less than zero.

"**Alternate Rate**" shall mean, with respect to each Interest Period, the per annum rate of interest of the Alternate Rate Index determined as of the Determination Date immediately preceding the commencement of such Interest Period, plus the Alternate Rate Spread for a Component; provided that in no event will the Alternate Rate be less than zero. Notwithstanding the foregoing, in no event shall the interest rate for the Alternate Rate Loan be less than the LIBOR Rate Floor plus the Spread under the LIBOR Rate Loan.

"**Alternate Rate Loan**" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon the Alternate Rate.

"**Alternate Rate Spread**" shall mean, in connection with any conversion of the Loan from (A) a LIBOR Rate Loan to an Alternate Rate Loan, with respect to any Component, the difference (expressed as the number of basis points) of (a) the LIBOR Rate Index plus the Spread applicable to such Component as of the Determination Date for which the LIBOR Rate Index was last applicable to the Loan *minus* (b) the Alternate Rate Index as of such Determination Date, and (B) a Prime Rate Loan to an Alternate Rate Loan, with respect to any Component, the difference (expressed as the number of basis points) of (a) the LIBOR Rate Index plus the Spread applicable to such Component as of the Determination Date for which the LIBOR Rate Index was last applicable to the Loan minus (b) the Alternate Rate Index as of the Determination Date that the Prime Rate Index was last applicable to the Loan; provided, however, that in either such case, if such difference is a negative number, then the Alternate Rate Spread shall be zero; provided, further however, that (i) if the Loan is an Alternative Rate Loan immediately prior to the commencement of the second Extension Option the Alternative Rate Spread for each Component will be increased by fifteen (15) basis points for the Interest Period applicable to the Payment Date in July, 2021 and each Payment Date thereafter, and (ii) if the Loan is an Alternative Rate Loan immediately prior to the commencement of the third Extension Term, the Alternative Rate Spread for each Component will be increased by an additional fifteen (15) basis points for the Interest Period applicable to the Payment Date in July, 2022 and each Payment Date thereafter.

"**Applicable Rate**" shall mean (i) the LIBOR Rate for so long as the Loan is a LIBOR Rate Loan, (ii) the Alternate Rate for so long as the Loan is an Alternate Rate Loan or (iii) the Prime Rate for so long as the Loan is a Prime Rate Loan.

"**Applicable Spread**" shall mean (i) the Spread for so long as the Loan is a LIBOR Rate Loan, (ii) the Alternate Rate Spread for so long as the Loan is an Alternate Rate Loan or (iii) the Prime Rate Spread for so long as the Loan is a Prime Rate Loan.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation.

"**Bail-in Action**" shall have the meaning set forth in Section 10.25 hereof.

"**Bail-in Legislation**" shall have the meaning set forth in Section 10.25 hereof.

"**Bankruptcy Action**" shall mean with respect to any Person (a) such Person filing a voluntary petition under the Bankruptcy Code or any other Federal, state, local or foreign bankruptcy or insolvency law; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code or any other Federal, state, local or foreign bankruptcy or insolvency law or soliciting or causing to be solicited petitioning creditors for any involuntary petition against such Person; (c) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal, state, local or foreign bankruptcy or insolvency law; (d) such Person consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for such Person or any portion of the Property; or (e) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due or to take action in furtherance of any of the foregoing.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, 11 U.S.C. §101, et seq., as the same may be amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights or any other Federal, state, local or foreign bankruptcy or insolvency law.

"**Basic Carrying Costs**" shall mean, for any period, the sum of the following costs: (a) Taxes, (b) Other Charges and (c) Insurance Premiums.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and permitted assigns.

"**Breakage Costs**" shall have the meaning set forth in Section 2.2.3(h) hereof.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York, New York, or the place of business of the trustee under a Securitization (or, if no Securitization has occurred, Lender), or any Servicer or the financial institution that maintains any collection account for or on behalf of any Servicer or any Reserve Funds or the New York Stock Exchange or the Federal Reserve Bank of New York is not open for business.

"**Capital Expenditures**" shall mean, for any period, the amount expended for items capitalized under GAAP and the Uniform System of Accounts (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"**Capital Renewals Budget**" shall mean, for so long as Hilton Manager is the Manager, the "Capital Renewals Budget" required to be delivered pursuant to Section 4.02.1(a) of the Management Agreement.

"**Cash Management Account**" shall have the meaning set forth in Section 2.6.2 hereof.

"**Cash Management Agreement**" shall mean that certain Cash Management Agreement, dated as of the date hereof, by and among Borrower, Operating Lessee, Mezzanine Borrower, Lender, Mezzanine Lender and Agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Cash Sweep Event**" shall mean (a) the occurrence of an Event of Default; (b) the occurrence of any Bankruptcy Action of Borrower, Operating Lessee, Mezzanine Borrower or Manager; (c) the occurrence of a Debt Yield Trigger Event, (d) the occurrence of a Mezzanine Loan Default and (e) the occurrence of a Hilton Trigger Event.

"**Cash Sweep Event Cure**" shall mean (a) if the Cash Sweep Event is caused solely by the occurrence of a Debt Yield Trigger Event, the achievement of the Required Cure Debt Yield for two (2) consecutive fiscal quarters, (b) if the Cash Sweep Event is caused by an Event of Default, a cure of such Event of Default as determined by Lender in its reasonable discretion; provided, that, if Lender has accelerated the Loan filed a motion to appoint a receiver or commenced foreclosure proceedings, Lender may elect to accept such cure in its sole discretion, (c) if the Cash Sweep Event is caused by a Mezzanine Loan Default, if the Mezzanine Lender shall have accepted a cure by the Mezzanine Borrower of such Mezzanine Loan Default or otherwise waived such Mezzanine Loan Default and shall not have otherwise accelerated the Mezzanine Loan, moved for a receiver or commenced foreclosure proceedings, (d) if the Cash Sweep Event is caused by a Bankruptcy Action of Manager, if Borrower replaces the Manager with a Qualified Manager under a Replacement Management Agreement within ninety (90) days of such Bankruptcy Action (regardless of the term of any such Replacement Management Agreement); or (e) if the Cash Sweep Event is caused solely by the occurrence of a Hilton Trigger Event: either (I) Hilton Manager has agreed in writing to continue to manage the Property until a Qualified Manager replaces Hilton Manager or (II) Borrower has entered into a Replacement Management Agreement with a Qualified Manager pursuant to the terms hereof (which Replacement Management Agreement shall be acceptable regardless of its term); provided, however, that, such Cash Sweep Event Cure set forth in this definition shall be subject to the following conditions, (i) no Event of Default shall have occurred and be continuing under this Agreement or any of the other Loan Documents, (ii) a Cash Sweep Event Cure may occur no more than a total of two (2) times in the aggregate during the term of the Loan, and (iii) Borrower shall have paid all of Lender's reasonable out-of-pocket expenses actually incurred in connection with such Cash Sweep Event Cure including, reasonable attorney's fees and expenses. In no event shall a Cash Sweep Event Cure occur with respect to any Cash Sweep Event caused in whole or in part by a Bankruptcy Action of Borrower, Mezzanine Borrower or Operating Lessee.

"**Cash Sweep Period**" shall mean each period commencing on the occurrence of a Cash Sweep Event and continuing until the earlier of (a) the Payment Date next occurring following the related Cash Sweep Event Cure, or (b) until payment in full of all principal and interest on the Loan and all other amounts payable under the Loan Documents in accordance with the terms and provisions of the Loan Documents.

"**Casualty**" shall have the meaning set forth in Section 6.2 hereof.

"**Casualty Consultant**" shall have the meaning set forth in Section 6.4(b)(iii) hereof.

"**Casualty Retainage**" shall have the meaning set forth in Section 6.4(b)(iv) hereof.

"**Cause**" shall mean, with respect to an Independent Director, (a) acts or omissions by such Independent Director that constitute systematic and persistent or willful disregard of such Independent Director's duties, (b) such Independent Director has been indicted or convicted for any crime or crimes of moral turpitude or dishonesty or for any violation of any Legal Requirements, (c) such Independent Director no longer satisfies the requirements set forth in the definition of "Independent Director", (d) the fees charged for the services of such Independent Director are materially in excess of the fees charged by the other providers of Independent Directors listed in the definition of "Independent Director" or (v) any other reason for which the prior written consent of Lender shall have been obtained.

"**Class L Deduction**" shall mean that certain Class L Real Estate Tax Deduction granted with respect to the Property on June 4, 2009 by the City of Chicago Commission on Chicago Landmarks.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Component**" shall mean, individually, any one of Component A, Component B, Component C, Component D, Component E, Component F or Component HRR and "**Components**" shall mean, collectively, Component A, Component B, Component C, Component D, Component E, Component F and Component HRR.

"**Component A**" shall mean the component of the Loan designated as "A" in Section 2.1.5 hereof.

"**Component B**" shall mean the component of the Loan designated as "B" in Section 2.1.5 hereof.

"**Component C**" shall mean the component of the Loan designated as "C" in Section 2.1.5 hereof.

"**Component D**" shall mean the component of the Loan designated as "D" in Section 2.1.5 hereof.

"**Component E**" shall mean the component of the Loan designated as "E" in Section 2.1.5 hereof.

"**Component F**" shall mean the component of the Loan designated as "F" in Section 2.1.5 hereof.

"**Component HRR**" shall mean the component of the Loan designated as "HRR" in Section 2.1.5 hereof.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any material part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any material part thereof.

"**Condemnation Proceeds**" shall have the meaning set forth in <u>Section 6.4(b)</u>.

"**Connection Income Taxes**" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise <u>Section 2.7</u> Taxes or branch profits <u>Section 2.7</u> Taxes.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.  "Controlled" and "Controlling" shall have correlative meanings.

"**Covered Rating Agency Information**" shall have the meaning set forth in <u>Section 10.13(d)</u> hereof.

"**DBRS**" means DBRS, Inc., and its successor-in-interest.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums (including, but not limited to, any Spread Maintenance Payment and/or Breakage Costs) due to Lender in respect of the Loan under the Note, this Agreement, the Mortgages or any other Loan Document.

"**Debt Service**" shall mean, with respect to any particular period of time, the scheduled interest payments due under this Agreement and the Note.

"**Debt Yield**" shall mean, as of any date of determination, the percentage obtained by dividing:

(a)    Net Operating Income (excluding interest on credit accounts and using annualized expenses for any recurring expenses not paid monthly (e.g., Taxes and Insurance Premiums)) for the then trailing twelve (12) month period, without deduction for  amounts paid to the Reserve Funds (other than the Replacement Reserve Fund or Manager-Held Reserve Deposits for Replacements), <u>less</u>  monthly deposits into (x) the Replacement Reserve Fund and (y) any Manager-Held Reserve Deposits for Replacements, in each case for the then trailing twelve (12) month period; and

(b)    the sum of the outstanding principal balances of (i) all of the Components of the Loan and (ii) the Mezzanine Loan.

"**Debt Yield Trigger Event**" shall mean, any time where the Debt Yield, as determined by Lender on the last day of any calendar month is, less than (a) if determined on any date that is prior to the commencement of the first Extension Option, six and one half percent (6.50%); (b) if

determined on any date that is on or after the commencement of the first Extension Option but prior to the commencement of the second Extension Option, six and three quarters percent (6.75%), (c) if determined on any date that is on or after the commencement of the second Extension Option but prior to the commencement of the third Extension Option, seven percent (7.00%), and (d) if determined on any date that is on or after the commencement of the third Extension Option, seven and one quarter percent (7.25%).

"**Default**" shall mean the occurrence and continuance of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (a) the Maximum Legal Rate or (b) five percent (5%) above the Interest Rate otherwise applicable to each Component.

"**Determination Date**" shall mean, (i) with respect to any Interest Period that occurs while the Loan is a LIBOR Rate Loan, the date that is two (2) London Business Days prior to the first day of such Interest Period, (ii) with respect to any Interest Period that occurs while the Loan is a Prime Rate Loan or an Alternate Rate Loan, the date that is two (2) Business Days prior to the first day of such Interest Period.

"**Disclosure Documents**" shall mean, collectively, any written materials used or provided to any prospective investors and/or the Rating Agencies in connection with any public offering or private placement in connection with a Securitization (including, without limitation, a prospectus, prospectus supplement, private placement memorandum, offering memorandum, offering circular, term sheet, road show presentation materials or other offering documents, marketing materials or information provided to prospective investors), in each case in preliminary or final form and including any amendments, supplements, exhibits, annexes and other attachments thereto.

"**EEA Financial Institution**" shall have the meaning set forth in Section 10.25.

"**EEA Member Country**" shall have the meaning set forth in Section 10.25.

"**EEA Resolution Authority**" shall have the meaning set forth in Section 10.25.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (a) an account or accounts (or subaccounts thereof) maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts (or subaccounts thereof) maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity that has a Moody's rating of at least "Baa3" and which, in the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000.00 and subject to supervision or examination by federal and state authority, as applicable.  An Eligible Account shall not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean either (a) a depository institution or trust company insured by the Federal Deposit Insurance Corporation, the short-term unsecured debt obligations or commercial paper of which are rated at least "A-1+" by S&P and "P-1" by Moody's in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of Letters of Credit and accounts in which funds are held for more than thirty (30) days, the long-term unsecured debt obligations of which are rated at least "A+" by S&P and "Aa3" by Moody's), or (b) JPMorgan Chase Bank, National Association, provided that the rating by S&P and the other Approved Rating Agencies for the short term unsecured debt obligations or commercial paper and long term unsecured debt obligations of the same does not decrease below the ratings set forth in subclause (a) hereof.

"**Embargoed Person**" shall mean any person, entity or government subject to trade restrictions under U.S. law, including, but not limited to, The USA PATRIOT Act (including the anti-terrorism provisions thereof), the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701, et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder including those related to Specially Designated Nationals and Specially Designated Global Terrorists, with the result that the investment in Borrower, Operating Lessee or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan made by the Lender is in violation of law.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Law**" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Substances, relating to liability for or costs of Remediation or prevention of Releases of Hazardous Substances or relating to liability for or costs of other actual or threatened danger to human health or the environment. Environmental Law includes, but is not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including but not limited to Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act. Environmental Law also includes, but is not limited to, any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law: (a) conditioning transfer of property upon a negative declaration or other approval of a Governmental Authority of the environmental condition of the Property; (b) requiring notification or disclosure of Releases of Hazardous Substances or other environmental condition of the Property to any Governmental Authority or other Person, whether or not in connection with transfer of title to or interest in property; (c) imposing conditions or requirements in

connection with permits or other authorization for lawful activity; (d) relating to nuisance, trespass or other causes of action related to the Property; or relating to wrongful death or personal injury resulting from environmental conditions or exposure to Hazardous Substances; or (f) property or other damage in connection with any environmental condition or use of Hazardous Substances at the Property.

"**Environmental Liens**" shall have the meaning set forth in <u>Section 5.1.19</u> hereof.

"**Environmental Report**" shall have the meaning set forth in <u>Section 4.1.37</u> hereof.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and the rulings issued thereunder.

"**ERISA Affiliate**" shall mean any Person that for purposes of Title IV of ERISA is a member of the Borrower's, Operating Lessee's or Guarantor's controlled group, under common control with the Borrower, Operating Lessee or Guarantor, within the meaning of Section 414 of the Code.

"**ERISA Event**" shall mean shall mean (a) the occurrence with respect to a Plan of a reportable event, within the meaning of Section 4043 of ERISA, unless the 30-day notice requirement with respect thereto has been waived by the Pension Benefit Guaranty Corporation (or any successor) ("**PBGC**"); (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan, pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of the Borrower, the Operating Lessee, the Guarantor, or any ERISA Affiliates in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by the Borrower, the Operating Lessee, the Guarantor, or any ERISA Affiliates from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions set forth in Section 430(e) of the Internal Revenue Code or Section 303(k)(1)(A) and (B) of ERISA to the creation of a lien upon property or assets or rights to property or assets of the Borrower, the Operating Lessee, the Guarantor, or any ERISA Affiliates for failure to make a required payment to a Plan are satisfied; (g) the termination of a Plan by the PBGC pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, a Plan; (h) any failure by any Plan to satisfy the minimum funding standards, within the meaning of Sections 412 or 430 of the Internal Revenue Code or Section 302 of ERISA, whether or not waived; (i) the determination that any Plan is or is expected to be in "at-risk" status, within the meaning of Section 430 of the Internal Revenue Code or Section 303 of ERISA or (j) the receipt by the Borrower, the Operating Lessee, the Guarantor, or any ERISA Affiliate of any notice concerning the imposition of liability with respect to the withdrawal or partial withdrawal from a Multiemployer Plan or a determination that a Multiemployer Plan is, or is expected to be "insolvent" (within the meaning of Section 4245 of ERISA), in "reorganization" (within the meaning of Section 4241 of ERISA) or in "endangered" or "critical status" (within the meaning of Section 432 of the Internal Revenue Code or Section 305 of ERISA).

"**EU Bail-in Legislation Schedule**" shall have the meaning set forth in <u>Section 10.25</u> hereof.

"**Event of Default**" shall have the meaning set forth in <u>Section 8.1(a)</u> hereof.

"**Excess Cash Flow**" shall have the meaning set forth in the Cash Management Agreement.

"**Excess Cash Flow Reserve Account**" shall have the meaning set forth in <u>Section 7.5</u> hereof.

"**Excess Cash Flow Reserve Fund**" shall have the meaning set forth in <u>Section 7.5</u> hereof.

"**Exchange Act**" shall have the meaning set forth in <u>Section 5.1.11(k)</u> hereof.

"**Exchange Act Filing**" shall mean a filing pursuant to the Exchange Act in connection with or relating to a Securitization.

"**Excluded Taxes**" shall mean any of the following <u>Section 2.7</u> Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) <u>Section 2.7</u> Taxes imposed on or measured by net income (however denominated), franchise <u>Section 2.7</u> Taxes, and branch profits <u>Section 2.7</u> Taxes, in each case, (i) imposed as a result of Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such <u>Section 2.7</u> Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding <u>Section 2.7</u> Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to <u>Section 2.7</u>, amounts with respect to such <u>Section 2.7</u> Taxes were payable either to such Lender's assignor or participating Lender immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) <u>Section 2.7</u> Taxes attributable to such Lender's failure to comply with <u>Section 2.7(e)</u> and <u>(d)</u> any U.S. federal withholding <u>Section 2.7</u> Taxes imposed under FATCA.

"**Extension Option**" shall have the meaning set forth in <u>Section 2.3.3(b)</u> hereof.

"**Extension Prepayment Amount**" shall mean the amount necessary, when applied to prepay each of the Loan and the Mezzanine Loan pursuant to <u>Section 2.4.4</u> hereof, to cause the Debt Yield to equal or exceed the Required Extension Debt Yield.

"**Extraordinary Expense**" shall have the meaning set forth in <u>Section 5.1.11(f)</u> hereof.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(i) of the Code.

"**FF&E**" shall mean furniture, fixtures, and equipment, including but not limited to individual rooms, lobby, floor coverings (carpet and pad, floor tiles), window coverings (mini blinds/drapes), multi-purpose rooms, dining rooms, interior repainting, windows, doors, plumbing fixtures (water heaters, sinks, tubs, toilets), kitchen equipment, the water fountains, administrative areas, furniture, and other related equipment required to maintain the quality and life of the property and improvements thereto, to include major capital improvements such as roof replacement, parking lot maintenance, heating, ventilation and air conditioning and other extraordinary exterior replacements or repairs that are necessary over time to uphold the structural integrity of the asset as originally designed, constructed or improved.

"**First Extended Maturity Date**" shall mean, following an exercise by Borrower of the first Extension Option described in Section 2.3.3(b) hereof, June 9, 2021, or such other earlier date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**Foreign Benefit Arrangement**" shall mean any employee benefit arrangement mandated by non-U.S. law that is maintained or contributed to by Borrower, Guarantor or any ERISA Affiliate.

"**Foreign Lender**" means a Lender that is not a U.S. Person.

"**Foreign Plan**" shall mean each "employee benefit plan" (within the meaning of Section 3(3) of ERISA) that is not subject to U.S. law and is maintained or contributed to by the Borrower, the Guarantor or any ERISA Affiliate.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (foreign, federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Grantor Trust**" shall mean a grantor trust as defined in Subpart E, Part I of Subchapter J of the Code, that holds the Note or a portion thereof.

"**Gross Income from Operations**" shall mean all sustainable income and proceeds (whether in cash or on credit, and computed on an accrual basis), other than Operating Rent, received by Borrower, Operating Lessee or Manager for the use, occupancy or enjoyment of the Property, or any part thereof, or received by Borrower, Operating Lessee or Manager for the sale of any goods, services or other items sold on or provided from the Property in the ordinary course of the operation of the Property, including without limitation: (a) income and proceeds received from rental of rooms, meeting, conference and/or banquet space within the Property

including any parking revenue; (b) all income and proceeds received from food and beverage operations and from catering services conducted from the Property even though rendered outside of the Property; (c) all income and proceeds from business interruption, rental interruption and use and occupancy insurance with respect to the operation of the Property (after deducting therefrom all necessary out-of-pocket costs and expenses incurred in the adjustment or collection thereof); (d) all Awards for temporary use (after deducting therefrom all costs incurred in the adjustment or collection thereof and in Restoration of the Property); (e) all income and proceeds from judgments, settlements and other resolutions of disputes with respect to matters which would be includable in this definition of "Gross Income from Operations" if received in the ordinary course of the Property' operation (after deducting therefrom all necessary costs and expenses incurred in the adjustment or collection thereof); and (f) interest on credit accounts, rent concessions or credits, and other required pass throughs and interest on Reserve Funds; but excluding, (1) gross receipts received by licensees or concessionaires of the Property; (2) consideration received at the Property for hotel accommodations, goods and services to be provided at other hotels, although arranged by, for or on behalf of Borrower, Operating Lessee or Manager; (3) income and proceeds from the sale or other disposition of goods, capital assets and other items not in the ordinary course of the operation of the Property; (4) federal, state and municipal excise, sales and use taxes collected directly from patrons or guests of the Property as a part of or based on the sales price of any goods, services or other items, such as gross receipts, room, admission, cabaret or equivalent taxes; (5) Awards (except to the extent provided in clause (d) above) or Insurance Proceeds (except to the extent provided in clause (c) above); (6) refunds of amounts not included in Operating Expenses at any time and uncollectible accounts; (7) gratuities collected by the employees at the Property; (8) the proceeds of any financing; (9) other income or proceeds resulting other than from the use or occupancy of the Property, or any part thereof, or other than from the sale of goods, services or other items sold on or provided from the Property in the ordinary course of business; (10) any credits or refunds made to customers, guests or patrons in the form of allowances or adjustments to previously recorded revenues; and (11) and payments made to Borrower pursuant to the Interest Rate Cap Agreement and Mezzanine Borrower pursuant to the Mezzanine Interest Rate Cap Agreement.

"**Guarantor**" shall mean (a) Thor Urban Operating Fund, L.P., a Delaware limited partnership, together with its permitted successors and assigns and (b) any replacement guarantor providing a guaranty pursuant to the terms of this Agreement or Section 6.4 of the Guaranty.

"**Guaranty**" shall mean that certain Guaranty and Security Agreement, dated as of the date hereof, executed and delivered by Guarantor in connection with the Loan to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Hazardous Substances**" shall include but are not limited to any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including but not limited to petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables, explosives, mold, mycotoxins, microbial matter and airborne pathogens (naturally occurring or otherwise), but excluding

substances of kinds and in amounts ordinarily and customarily used or stored in similar properties for the purpose of cleaning or other maintenance or operations and otherwise in compliance with all Environmental Laws.

"**Hilton Manager**" shall mean HLT Palmer LLC, a Delaware limited liability company, together with its successors and permitted assigns.

"**Hilton Trigger Event**" shall mean the expiration or sooner termination by any party thereto of the Management Agreement between Borrower and/or Operating Lessee and Hilton Manager.

"**Improvements**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Indebtedness**" of a Person, at a particular date, shall mean the sum (without duplication) at such date of (a) all indebtedness or liability of such Person (including, without limitation, amounts for borrowed money and indebtedness in the form of mezzanine debt or preferred equity); (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations); (d) obligations under letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person or entity, or otherwise to assure a creditor against loss; (g) obligations under PACE Loans; and (h) obligations secured by any Liens, whether or not the obligations have been assumed (other than the Permitted Encumbrances).

"**Indemnified Liabilities**" shall have the meaning set forth in Section 10.13(b) hereof.

"**Indemnified Parties**" shall mean Lender and, its designee, (whether or not it is the Lender), any Affiliate of Lender that has filed any registration statement relating to the Securitization or has acted as the sponsor or depositor in connection with the Securitization, any Affiliate of Lender that acts as an underwriter, placement agent or initial purchaser of Securities issued in the Securitization, any other co-underwriters, co placement agents or co initial purchasers of Securities issued in the Securitization, and each of their respective officers, directors, partners, employees, representatives, agents and Affiliates and each Person or entity who Controls any such Person within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan secured hereby, any Person in whose name the encumbrance created by the Mortgage is or will have been recorded, any Person who may hold or acquire or will have held a full or partial interest in the Loan secured hereby (including, but not limited to, investors or prospective investors in the Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan secured hereby for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including, but not limited to, any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited

to any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

"**Indemnified Taxes**" shall mean (a) <u>Section 2.7</u> Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Indemnifying Person**" shall mean Borrower and Guarantor.

"**Indemnitor Security Account**" shall have the meaning set forth in the Guaranty.

"**Independent Director**" shall mean an individual who has prior experience as an independent director, independent manager or independent member with at least three years of employment experience and who is provided by CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company, Lord Securities Corporation or, if none of those companies is then providing professional Independent Directors, another nationally-recognized company reasonably approved by Lender, in each case that is not an Affiliate of Borrower or Operating Lessee and that provides professional Independent Directors and other corporate services in the ordinary course of its business, and which individual is duly appointed as an Independent Director and is not, and has never been, and will not while serving as Independent Director be, any of the following:

(a)    a member, partner, equityholder, manager, director, officer or employee of Borrower, Operating Lessee or any of their equityholders or Affiliates (other than as an Independent Director of Borrower or Operating Lessee or an Affiliate of Borrower or Operating Lessee that is not in the direct chain of ownership of Borrower or Operating Lessee and that is required by a creditor to be a single purpose bankruptcy remote entity, <u>provided</u> that such Independent Director is employed by a company that routinely provides professional Independent Directors or managers in the ordinary course of its business);

(b)    a creditor, supplier or service provider (including provider of professional services) to Borrower or any of its equityholders or Affiliates (other than a nationally-recognized company that routinely provides professional Independent Directors and other corporate services to Borrower or any of its Affiliates in the ordinary course of its business);

(c)    a family member of any such member, partner, equityholder, manager, director, officer, employee, creditor, supplier or service provider; or

(d)    a Person that controls (whether directly, indirectly or otherwise) any of (a), (b) or (c) above.

A natural person who otherwise satisfies the foregoing definition and satisfies subparagraph (a) by reason of being the Independent Director of a "special purpose entity" affiliated with Borrower or Operating Lessee shall be qualified to serve as an Independent Director of the Borrower or Operating Lessee, <u>provided</u> that the fees that such individual earns from serving as an Independent Director of affiliates of Borrower or Operating Lessee in any given year constitute in the aggregate less than five percent (5%) of such individual's annual

income for that year. For purposes of this paragraph, a "special purpose entity" is an entity, whose organizational documents contain restrictions on its activities and impose requirements intended to preserve such entity's separateness that are substantially similar to those contained in the definition of Special Purpose Entity of this Agreement.

"**Initial Maturity Date**" shall mean June 9, 2020, or such earlier date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Insolvency Opinion**" shall mean that certain non-consolidation opinion letter dated the date hereof delivered by Wachtel Missry LLP in connection with the Loan.

"**Insurance Premiums**" shall have the meaning set forth in Section 6.1(b) hereof.

"**Insurance Proceeds**" shall have the meaning set forth in Section 6.4(b) hereof.

"**Interest Period**" shall mean, in connection with the calculation of interest accrued with respect to each Component for any specified Payment Date, including the Maturity Date, the period commencing on and including the fifteenth (15th) day of the prior calendar month and ending on and including the fourteenth (14th) day of the calendar month in which such Payment Date occurs.

"**Interest Rate**" shall mean the rate at which the outstanding principal amount of the Loan bears interest from time to time in accordance with Section 2.2.3 hereof.

"**Interest Rate Cap Agreement**" shall mean, collectively, one or more interest rate protection agreements (together with the confirmation and schedules relating thereto) acceptable to Lender, between an Acceptable Counterparty and Borrower obtained by Borrower as and when required pursuant to Section 2.2.7 hereof. After delivery of a Replacement Interest Rate Cap Agreement or Substitute Interest Rate Cap Agreement to Lender, the term "Interest Rate Cap Agreement" shall be deemed to mean such Replacement Interest Rate Cap Agreement or Substitute Interest Rate Cap Agreement, as applicable, and such Replacement Interest Rate Cap Agreement or Substitute Interest Rate Cap Agreement, as applicable, shall be subject to all requirements applicable to the Interest Rate Cap Agreement.

"**Investment Grade**" shall mean a rating of not lower than "BBB-" by S&P or its equivalent by the other Rating Agencies.

"**Kroll**" means Kroll Bond Ratings, and its successor-in-interest.

"**Lease**" shall mean any lease, sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) (excluding the Operating Lease) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property by or on behalf of Borrower or Operating Lessee, and (a) every material modification, amendment or other agreement relating to such lease, sublease, subsublease, or other agreement entered into in connection with such lease, sublease, subsublease, or other agreement and (b) every guarantee of the performance and

observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Legal Requirements**" shall mean, all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof, or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower or Operating Lessee, at any time in force affecting Borrower or Operating Lessee, the Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns and, for purposes of Sections 2.2.3(f)(iii) and 2.7, its participants. If the beneficial owner of the Loan for U.S. federal income tax purposes is a REMIC or a Grantor Trust, Lender shall mean the REMIC or Grantor Trust, as applicable.

"**LIBOR Rate Index**" shall mean, with respect to each Interest Period, the rate (expressed as a percentage per annum and rounded up to the next nearest 1/1000 of 1%) for deposits in U.S. dollars, for a one-month period, that appears on "Thomson Reuters ICE LIBOR# Rates – LIBOR01" (or the successor thereto) as of 11:00 a.m., London time, on the related Determination Date. If such rate does not appear on Thomson Reuters ICE LIBOR# Rates – LIBOR01 as of 11:00 a.m., London time, on such Determination Date, LIBOR Rate Index shall be the arithmetic mean of the offered rates (expressed as a percentage per annum) for deposits in U.S. dollars for a one-month period that appear on the Thomson Reuters ICE LIBOR# Rates – LIBOR01 as of 11:00 a.m., London time, on such Determination Date, if at least two such offered rates so appear. If fewer than two such offered rates appear on the Thomson Reuters ICE LIBOR# Rates – LIBOR01 as of 11:00 a.m., London time, on such Determination Date, Lender (or Servicer, on Lender's behalf) shall request the principal London office of any four major reference banks in the London interbank market selected by Lender to provide such bank's offered quotation (expressed as a percentage per annum) to prime banks in the London interbank market for deposits in U.S. dollars for a one-month period as of 11:00 a.m., London time, on such Determination Date for the amounts of not less than U.S. $1,000,000. If at least two such offered quotations are so provided, LIBOR Rate Index shall be the arithmetic mean of such quotations. If fewer than two such quotations are so provided, Lender (or Servicer, on Lender's behalf) shall request any three major banks in New York City selected by Lender to provide such bank's rate (expressed as a percentage per annum) for loans in U.S. dollars to leading European banks for a one-month period as of approximately 11:00 a.m., New York City time on the applicable Determination Date for amounts of not less than U.S. $1,000,000. If at least two such rates are so provided, LIBOR Rate Index shall be the arithmetic mean of such rates. The LIBOR Rate Index shall be determined conclusively by Lender or its agent. Notwithstanding the foregoing, in no event shall the LIBOR Rate Index be less than the LIBOR Rate Floor.

"**LIBOR Rate Floor**" shall mean 1.50% per annum.

"**LIBOR Rate**" shall mean a fluctuating rate per annum equal to the LIBOR Rate Index plus the Spread for each Component; provided, however, in no event shall the LIBOR Rate Index be deemed to be less than the LIBOR Rate Floor.

"**LIBOR Rate Loan**" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon the LIBOR Rate.

"**LIBOR Rate Spread**" shall mean, with respect to any Component, for each Interest Period through (and including) the last Interest Period of the Initial Maturity Date, the Spread for such Component, which amount shall thereafter (i) if the Loan is a LIBOR Rate Loan immediately prior to the commencement of the second Extension Term, be increased by fifteen (15) basis points for the Interest Period applicable to the Payment Date in July, 2021 and each Payment Date thereafter and (ii) if the Loan is a LIBOR Rate Loan immediately prior to the commencement of the third Extension Term, be increased by an additional fifteen (15) basis points for the Interest Period applicable to the Payment Date in July, 2022 and each Payment Date thereafter.

"**License Agreement**" shall mean that certain Temporary License Agreement, between Operating Lessee and Thor Palmer House Office LLC, dated as of December 11, 2009, as amended by that certain First Amendment to Temporary License agreement dated as of December 10, 2012, as further amended by that certain Second Amendment to Temporary License Agreement, dated as of November 12, 2015, as further amended by that certain Third Amendment to Temporary License Agreement, dated as of May 8, 2018, and as may be further amended in accordance with the terms herein.

"**Lien**" shall mean, any mortgage, deed of trust, deed to secure debt, indemnity deed of trust, lien, pledge, hypothecation, assignment, security interest, PACE Loan, or any other encumbrance, charge or transfer of, on or affecting Borrower, Operating Lessee, the Property, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Loan**" shall mean the loan made by Lender to Borrower pursuant to this Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Mortgage, the Environmental Indemnity, the Assignment of Management Agreement, the Guaranty, the Lockbox Agreement, the Cash Management Agreement, the Interest Rate Cap Agreement, the Assignment of Interest Rate Cap Agreement and all other documents and instruments now or hereafter executed and/or delivered by Borrower, Operating Lessee or Guarantor with respect to the Loan, as each of the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Loan-to-Value Ratio**" shall mean, as of the date of its calculation, the ratio of (a) the outstanding principal amount of the Loan as of the date of such calculation to (b) the fair market value of the Property (for purposes of the REMIC provisions, counting only real property and

excluding any personal property or going concern value), as determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust.

"**Lockbox Account**" shall have the meaning set forth in <u>Section 2.6.1</u> hereof.

"**Lockbox Agreement**" shall mean that certain Clearing Account Agreement dated the date hereof among Borrower, Operating Lessee, Lender, Manager and Lockbox Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, relating to funds deposited in the Lockbox Account.

"**Lockbox Bank**" shall mean the clearing bank which establishes, maintains and holds the Lockbox Account, which shall be an Eligible Institution.

"**London Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which commercial banks in London, England are not open for business.

"**Low Season Period**" shall mean each applicable Payment Date in December, January, February, March and April.

"**Management Agreement**" shall mean, the management agreement entered into by and between Borrower or Operating Lessee and Manager, pursuant to which Manager is to provide management and other services with respect to the Property, as the same may be modified by the Assignment of Management Agreement and as the same has been and may be further modified from time to time, or, if the context requires, a Replacement Management Agreement.

"**Manager**" shall mean, individually and/or collectively as the context may require (without duplication), Hilton Manager, or, if the context requires, a Qualified Manager who is managing the Property in accordance with the terms and provisions of this Agreement pursuant to a Replacement Management Agreement.

"**Manager-Held Reserve**" shall mean each reserve fund for payment of Taxes, Insurance Premiums, Operating Expenses FF&E, Replacements or repairs that Manager is required to maintain on behalf of and for the benefit of Borrower or Operating Lessee under the Management Agreement as set forth in the Operating Budget and the Capital Renewals Budget.

"**Manager-Held Reserve Deposit**" shall mean each deposit into a Manager-Held Reserve, provided in each case that Borrower shall have delivered to Lender upon request (i) evidence reasonably satisfactory to Lender in Lender's sole discretion that Manager shall have applied and shall continue to apply such deposit for the purposes for which such deposit is permitted or required to be used under the Management Agreement and (ii) a copy of the Capital Renewals Budget and the Operating Budget for the Property.

"**Maturity Date**" shall mean the Initial Maturity Date or, following an exercise by Borrower of one (1) or more of the Extension Options described in <u>Section 2.3.3(b)</u> hereof, the First Extended Maturity Date, the Second Extended Maturity Date or the Third Extended Maturity Date, as the case may be, or such other date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Mezzanine Borrower**" shall mean Thor Palmer House Holding LLC, a Delaware limited liability company, together with its successors and permitted assigns.

"**Mezzanine Debt Service**" shall mean, with respect to any particular period of time, the scheduled interest payments then due under the Mezzanine Loan.

"**Mezzanine Interest Rate Cap Agreement**" shall mean the "Mezzanine Interest Rate Cap Agreement" defined in the Mezzanine Loan Agreement.

"**Mezzanine Lender**" shall mean JPMorgan Chase Bank, National Association, together with its successors and assigns.

"**Mezzanine Loan**" shall mean that certain loan made as of the date hereof by Mezzanine Lender to Mezzanine Borrower in the original principal amount of $94,300,000.00.

"**Mezzanine Loan Agreement**" shall mean that certain Mezzanine Loan Agreement, dated as of the date hereof, between Mezzanine Borrower and Mezzanine Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified, from time to time.

"**Mezzanine Loan Debt**" shall mean the "Debt", as defined in the Mezzanine Loan Agreement.

"**Mezzanine Loan Default**" shall mean an "Event of Default" under the Mezzanine Loan, as defined in the Mezzanine Loan Agreement.

"**Mezzanine Loan Documents**" shall mean all documents evidencing the Mezzanine Loan and all documents executed and/or delivered by or on behalf of Mezzanine Borrower in connection therewith.

"**Mezzanine Monthly Debt Service Payment Amount**" shall mean an amount equal to the amount of interest accruing on the outstanding principal balance of the Mezzanine Loan for the related Interest Period (as defined in the Mezzanine Loan Agreement).

"**Mezzanine Note**" shall mean that certain Mezzanine Promissory Note, in the original principal amount of $94,300,000.00, made on the date hereof by Mezzanine Borrower in favor of Mezzanine Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified, from time to time.

"**Monthly Debt Service Payment Amount**" shall mean, on each Payment Date, the amount of interest which accrues or will have accrued on each Component of the Loan for the related Interest Period.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Morningstar**" shall mean Morningstar Credit Ratings, LLC, or any of its successors in interest, assigns, and/or changed entity name or designation resulting from any acquisition by Morningstar, Inc. or other similar entity of Morningstar Credit Ratings, LLC.

"**Mortgage**" shall mean, that certain first priority Mortgage, Assignment of Leases and Rents and Security Agreement, dated the date hereof, executed and delivered by Borrower and Operating Lessee to Lender as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Multiemployer Plan**" shall mean a multiemployer plan, as defined in Section 3(37) or Section 4001(a)(3) of ERISA, as applicable, in respect of which the Borrower, Guarantor or any ERISA Affiliate could have any obligation or liability, contingent or otherwise.

"**Multiple Employer Plan**" shall mean a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of the Borrower, Guarantor or any ERISA Affiliate and at least one Person other than the Borrower, Guarantor and the ERISA Affiliates, or (b) was so maintained, and in respect of which the Borrower, Guarantor or any ERISA Affiliate could have liability under Sections 4062-4069 of ERISA in the event such plan has been or were to be terminated.

"**Net Operating Income**" shall mean the amount obtained by subtracting Operating Expenses from Gross Income from Operations.

"**Net Proceeds**" shall have the meaning set forth in Section 6.4(b) hereof.

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 6.4(b)(vi) hereof.

"**Note**" shall mean that certain Promissory Note, dated the date hereof, in the principal amount of $333,200,000.00, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**O&M Program**" shall have the meaning set forth in Section 5.1.19 hereof.

"**Obligations**" shall mean Borrower's obligation to pay the Debt and perform its obligations under the Note, this Agreement and the other Loan Documents.

"**Office Parcel**" shall mean that parcel of real property set forth on Schedule VII hereto.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized officer of Borrower or the general partner, managing member or sole member of Borrower, as applicable.

"**Operating Budget**" shall mean the "Operating Budget" required to be delivered pursuant to Section 4.02.1(a) of the Management Agreement.

"**Operating Expenses**" shall mean, without duplication, the sum of all costs and expenses of operating, maintaining, directing, managing and supervising the Property (excluding, (i) depreciation and amortization, (ii) any Debt Service in connection with the Loan, (iii) any Capital Expenditures in connection with the Property reasonably acceptable to Lender, or (iv) the costs of any other things specified to be done or provided at Borrower's, Operating Lessee's or Manager's sole expense), incurred by Borrower or Manager pursuant to the Management Agreement, or as otherwise specifically provided therein, which are properly attributable to the period under consideration under Borrower's or Operating Lessee's system of accounting, including without limitation: (a) the cost of all food and beverages sold or consumed and of all necessary chinaware, glassware, linens, flatware, uniforms, utensils and other items of a similar nature, including such items bearing the name or identifying characteristics of the hotels as Borrower and/or Manager shall reasonably consider appropriate ("**Operating Equipment**") and paper supplies, cleaning materials and similar consumable items ("**Operating Supplies**") placed in use (other than reserve stocks thereof in storerooms),  Operating Equipment and Operating Supplies shall be considered to have been placed in use when they are transferred from the storerooms of the Property to the appropriate operating departments; (b) salaries and wages of personnel of the Property, including costs of payroll taxes and employee benefits; (c) the cost of all other goods and services obtained by Borrower, Operating Lessee or Manager in connection with its operation of the Property including, without limitation, heat and utilities, office supplies and all services performed by third parties, including leasing expenses in connection with telephone and data processing equipment, and all existing and any future installations necessary for the operation of the Improvements for hotel purposes (including, without limitation, heating, lighting, sanitary equipment, air conditioning, laundry, refrigerating, built-in kitchen equipment, telephone equipment, communications systems, computer equipment and elevators), Operating Equipment and existing and any future furniture, furnishings, wall coverings, fixtures and hotel equipment necessary for the operation of the building for hotel purposes which shall include all equipment required for the operation of kitchens, bars, laundries, (if any) and dry cleaning facilities (if any), office equipment, cleaning and engineering equipment and vehicles; (d) the cost of repairs to and maintenance of the Property other than of a capital nature; (e) insurance premiums for general liability insurance, workers' compensation insurance or insurance required by similar employee benefits acts and such business interruption or other insurance as may be provided for protection against claims, liabilities and losses arising from the operation of the Property (as distinguished from any property damage insurance on the Property building or its contents) and losses incurred on any self-insured risks of the foregoing types, <u>provided</u> that Borrower, Operating Lessee and Manager have specifically approved in advance such self-insurance or insurance is unavailable to cover such risks; (f) all Taxes and Other Charges (other than federal, state or local income taxes and franchise taxes or the equivalent) payable by or assessed against Borrower, Operating Lessee or Manager with respect to the operation of the Property; (g) legal fees and fees of any firm of independent certified public accounts designated from time to time by Borrower (the "**Independent CPA**") for services directly related to the operation of the Property, reasonably acceptable to Lender; (h) the costs and expenses of technical consultants and specialized operational experts for specialized services in connection with non-recurring work on operational, legal, functional, decorating, design or construction problems and activities; <u>provided</u>, <u>however</u>, that if such costs and expenses have not been included in an approved budget, then if such costs exceed $25,000 in any one instance the same shall be subject to the reasonable approval by Lender; (i) all expenses for advertising the

Property and all expenses of sales promotion and public relations activities; (j) the cost of any reservations system, any accounting services or other group benefits, programs or services from time to time made available to properties in the Borrower's or Operating Lessee's system; (k) the cost associated with any retail Leases at the Property; (l) any management fees, basic and incentive fees or other fees and reimbursables paid or payable to Manager under the Management Agreement; and (m) all costs and expenses of owning, maintaining, conducting and supervising the operation of the Property to the extent such costs and expenses are not included above.

"**Operating Lease**" shall mean that certain Lease Agreement between Borrower, as lessor and Operating Lessee, as lessee, as the same has been and may be amended, supplemented, replaced or otherwise modified from time to time in accordance with the provisions hereof.

"**Operating Lessee**" shall mean, collectively, Thor Palmer House Hotel LLC, a Delaware limited liability company and its successors and permitted assigns.

"**Operating Rent**" shall mean all rent and other amounts due to Borrower under the Operating Lease.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Other Connection Taxes**" shall mean <u>Section 2.7</u> Taxes imposed as a result of a present or former connection between Lender and the jurisdiction imposing such <u>Section 2.7</u> Tax (other than connections arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Loan or any Loan Document).

"**Other Obligations**" shall have the meaning as set forth in the Mortgage.

"**Other Taxes**" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar <u>Section 2.7</u> Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such <u>Section 2.7</u> Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**PACE Loan**" shall mean (x) any "Property-Assessed Clean Energy loan" or (y) any other indebtedness, without regard to the name given to such indebtedness, which is (i) incurred for improvements to the Property for the purpose of increasing energy efficiency, increasing use of renewable energy sources, resource conservation, or a combination of the foregoing, and (ii) repaid through multi-year assessments against the Property.

"**Participant Register**" shall have the meaning set forth in <u>Section 9.1.1(f)</u> hereof.

"**Payment Date**" shall mean, with respect to each Component, the ninth (9th) day of each calendar month during the term of the Loan, or if such date is not a Business Day, the immediately preceding Business Day.

"**PBGC**" shall have the meaning assigned to that term in the definition of ERISA Event.

"**Permitted Encumbrances**" shall mean, with respect to the Property, collectively, (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent and/or which are being contested in accordance herewith, (d) Liens that are being contested in good faith and by appropriate proceedings in accordance with the applicable provisions of this Agreement and the other Loan Documents, and (e) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's reasonable discretion, which Permitted Encumbrances in the aggregate do not materially adversely affect the value or use of the Property or Borrower's ability to repay the Loan.

"**Permitted Investments**" shall mean any one or more of the following obligations or securities acquired at a purchase price of not greater than par, including those issued by Servicer, or any certificate administrator under any Securitization or any of their respective Affiliates, payable on demand or having a maturity date not later than the Business Day immediately prior to the first Payment Date following the date of acquiring such investment and meeting one of the appropriate standards set forth below:

      (i)    direct obligations of, or obligations fully guaranteed as to timely payment of principal and interest by, the United States of America, Fannie Mae, Freddie Mac or any agency or instrumentality of the United States of America, the obligations of which are backed by the full faith and credit of the United States of America that mature in one (1) year or less from the date of acquisition; <u>provided</u> that any obligation of, or guarantee by, any agency or instrumentality of the United States of America shall be a Permitted Investment only if such investment would not result in the downgrading, withdrawal or qualification of the then-current rating assigned by each Approved Rating Agency to any Securities as evidenced in writing, other than (a) unsecured senior debt obligations of the U.S. Treasury (direct or fully guaranteed obligations), U.S. Department of Housing and Urban Development public housing agency bonds, Federal Housing Administration debentures, Government National Mortgage Association guaranteed mortgage-backed securities or participation certificates, RefCorp debt obligations and SBA-guaranteed participation certificates and guaranteed pool certificates and (b) Farm Credit System consolidated system-wide bonds and notes, Federal Home Loan Banks' consolidated debt obligations, Freddie Mac debt obligations, and Fannie Mae debt obligations (1) rated at least "A-1" by S&P, if such obligations mature in sixty (60) days or less, or rated at least "AA-", "A-1+" or "AAAm" by S&P, if such obligations mature in 365 days or less and (2)(A) if it has a term of thirty (30) days or less, the short-term obligations of which are rated in the highest short-term rating category by Moody's or the long-term obligations of which are rated at least "A2" by Moody's, (B) if it has a term of three (3) months or less, but more than thirty (30) days, the short-term obligations of which are rated in the highest short-term rating category by Moody's and the long-term

obligations of which are rated at least "A1" by Moody's, (C) if it has a term of six (6) months or less, but more than three (3) months, the short-term obligations of which are rated in the highest short-term rating category by Moody's and the long-term obligations of which are rated at least "Aa3" by Moody's, and (D) if it has a term of more than six (6) months, the short-term obligations of which are rated in the highest short-term rating category by Moody's and the long-term obligations of which are rated "Aaa" by Moody's;

(ii)    federal funds, unsecured certificates of deposit, time deposits, banker's acceptances, and repurchase agreements having maturities of not more than 90 days of any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia, the short-term debt obligations of which are rated (a) "A-1+" (or the equivalent) by S&P and, if it has a term in excess of three months, the long-term debt obligations of which are rated "AAA" (or the equivalent) by S&P, and that (1) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (2) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000, (b) in one of the following Moody's rating categories: (1) for maturities less than one month, a long-term rating of "A2" or a short-term rating of "P-1", (2) for maturities between one and three months, a long-term rating of "A1" and a short-term rating of "P-1", (3) for maturities between three months to six months, a long-term rating of "Aa3" and a short-term rating of "P-1" and (4) for maturities over six months, a long-term rating of "Aaa" and a short-term rating of "P-1", or such other ratings as confirmed in a Rating Agency Confirmation and (c) in one of the following DBRS rating categories:  (1) for maturities less than three months, a short term rating by DBRS of R-1 (high) and (2) for maturities greater than three months, a long-term rating by DBRS of AAA;

(iii)    deposits that are fully insured by the Federal Deposit Insurance Corp. ("**FDIC**");

(iv)    commercial paper rated (a) "A–1+" (or the equivalent) by S&P and having a maturity of not more than 90 days, (b) in one of the following Moody's rating categories:  (i) for maturities less than one month, a long-term rating of "A2" or a short-term rating of "P-1", (ii) for maturities between one and three months, a long-term rating of "A1" and a short-term rating of "P-1", (iii) for maturities between three months to six months, a long-term rating of "Aa3" and a short-term rating of "P-1" and (iv) for maturities over six months, a long-term rating of "Aaa" and a short-term rating of "P-1" and (c) in one of the following DBRS rating categories:  (i) for maturities less than six months, a short-term rating by DBRS of R-1(high) and for maturities greater than six months, a long-term rating by DBRS of AAA;

(v)    any money market funds that (a) has substantially all of its assets invested continuously in the types of investments referred to in clause (i) above, (b) has net assets of not less than $5,000,000,000, and (c) has the highest rating obtainable from S&P and Moody's; and

(vi)    such other investments as to which each Approved Rating Agency shall have delivered a Rating Agency Confirmation.

Notwithstanding the foregoing, "Permitted Investments" (i) shall exclude any security with the S&P's "r" symbol (or any other Approved Rating Agency's corresponding symbol) attached to the rating (indicating high volatility or dramatic fluctuations in their expected returns because of market risk), as well as any mortgage-backed securities and any security of the type commonly known as "strips"; (ii) shall be limited to those instruments that have a predetermined fixed dollar of principal due at maturity that cannot vary or change; (iii) shall only include instruments that qualify as "cash flow investments" (within the meaning of Section 860G(a)(6) of the Code); and (iv) shall exclude any investment where the right to receive principal and interest derived from the underlying investment provides a yield to maturity in excess of 120% of the yield to maturity at par of such underlying investment.  Interest may either be fixed or variable, and any variable interest must be tied to a single interest rate index plus a single fixed spread (if any), and move proportionately with that index.  No investment shall be made which requires a payment above par for an obligation if the obligation may be prepaid at the option of the issuer thereof prior to its maturity.  All investments shall mature or be redeemable upon the option of the holder thereof on or prior to the earlier of (x) three months from the date of their purchase and (y) the Business Day preceding the day before the date such amounts are required to be applied hereunder.

"**Permitted Transfer**" shall mean any of the following:  (a) any transfer, directly as a result of the death of a natural person, of stock, membership interests, partnership interests or other ownership interests previously held by the decedent in question directly or indirectly to the Person or Persons lawfully entitled thereto or a related person for estate planning purposes and (b) any transfer, directly as a result of the legal incapacity of a natural person, of stock, membership interests, partnership interests or other ownership interests previously held by such natural person directly or indirectly to the Person or Persons lawfully entitled thereto or a related person for estate planning purposes.

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall have the meaning set forth in the granting clause of the Mortgage.

"**PIP**" shall mean, any "property improvement plan" or similar plan for alterations, repairs and maintenance of the Property with which Borrower or Operating Lessee is required to comply under the Management Agreement, as such plan may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions of the Management Agreement.

"**Plan**" shall mean a Single Employer Plan, a Multiple Employer Plan or a Multiemployer Plan.

"**Plan Asset Regulations**" shall have the meaning set forth in Section 5.2.9(b)(i) hereof.

"**Policies**" shall have the meaning specified in Section 6.1(b) hereof.

"**Policy**" shall have the meaning specified in Section 6.1(b) hereof.

"**Prepayment Rate**" shall mean the bond equivalent yield (in the secondary market) on the United States Treasury Security that as of the Prepayment Rate Determination Date has a remaining term to maturity closest to, but not exceeding, the remaining term to the Maturity Date, as determined by Lender on the basis of "Statistical Release H.15 (519), Selected Interest Rates," or any successor publication, published by the Board of Governors of the Federal Reserve System, or on the basis of such other publication or statistical guide as Lender may reasonably select. If more than one issue of United States Treasury Securities has the remaining term to the Maturity Date, the "**Prepayment Rate**" shall be the yield on such United States Treasury Security most recently issued as of the Prepayment Rate Determination Date. The rate so published shall control absent manifest error.

"**Prepayment Rate Determination Date**" shall mean the date which is five (5) Business Days prior to the date that such prepayment shall be applied in accordance with the terms and provisions of Section 2.4 hereof.

"**Prime Rate**" shall mean a fluctuating rate per annum equal to the Prime Rate Index plus the Prime Rate Spread for a Component; provided, however, in no event shall the LIBOR Rate Index be deemed to be less than the Prime Rate Floor.

"**Prime Rate Index**" shall mean the annual rate of interest publicly announced by JPMorgan Chase Bank, National Association, in New York, New York, as its base rate, as such rate shall change from time to time. If JPMorgan Chase Bank, National Association, ceases to announce a base rate, Prime Rate Index shall mean the rate of interest published in The Wall Street Journal from time to time as the "Prime Rate." If The Wall Street Journal ceases to publish the "Prime Rate," the Lender shall select an equivalent publication that publishes such "Prime Rate," and if such "Prime Rates" are no longer generally published or are limited, regulated or administered by a governmental or quasi-governmental body, then Lender shall select a comparable interest rate index. Notwithstanding the foregoing, in no event shall Prime Rate Index be less than the Prime Rate Floor.

"**Prime Rate Floor**" shall mean 0.0%.

"**Prime Rate Loan**" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon the Prime Rate.

"**Prime Rate Spread**" shall mean, with respect to any Component, in connection with the conversion of the Loan from a LIBOR Rate Loan to a Prime Rate Loan, the difference (expressed as the number of basis points) of (a) the LIBOR Rate Index plus the Spread for such Component as of the Determination Date for which the LIBOR Rate Index was last applicable to the Loan minus (b) the Prime Rate as of such Determination Date; provided, however, that if such difference is a negative number, the Prime Rate Spread shall be zero ; provided, further, however, that (i) if the Loan is a Prime Rate Loan immediately prior to the commencement of the

second Extension Option the Prime Rate Spread for each Component will be increased by fifteen (15) basis points for the Interest Period applicable to the Payment Date in July, 2021 and each Payment Date thereafter, and (ii) if the Loan is an Prime Rate Loan immediately prior to the commencement of the third Extension Option, the Prime Rate Spread for each Component will be increased by an additional fifteen (15) basis points for the Interest Period applicable to the Payment Date in July, 2022 and each Payment Date thereafter.

"**Property**" shall mean the parcel of real property, the Improvements thereon and all personal property owned by Borrower and encumbered by the Mortgage, together with all rights pertaining to such property and Improvements, as more particularly described in the granting clauses of the Mortgage and referred to therein as the "Property".

"**Provided Information**" shall mean any and all financial and other information provided at any time prepared by, or on behalf of, Borrower, Operating Lessee, Guarantor and/or Manager.

"**Qualified Manager**" shall mean either (a) Manager; or (b) in the reasonable judgment of Lender, a reputable and experienced management organization (which may be an Affiliate of Borrower) possessing experience in managing properties similar in size, scope, use and value as the Property, provided, that, if reasonably required by Lender, Borrower shall have obtained (i) a Rating Agency Confirmation from the Approved Rating Agencies with respect to the management of the Property by such Person and (ii) if such entity is an Affiliate of Borrower, an Additional Insolvency Opinion.

"**Qualified Transferee**" shall mean a Special Purpose Entity which is wholly owned and Controlled by:

(a)     a pension fund, pension trust or pension account that (i) has total real estate assets of at least $600,000,000, (ii) is managed by a Person who controls at least $600,000,000 of real estate assets, and (iii) is regularly engaged in the business of owning or operating commercial properties or making investments in commercial real estate; or

(b)     a pension fund advisor who (i) immediately prior to such Transfer, controls at least $600,000,000 of real estate assets and (ii) is acting on behalf of one or more pension funds that, in the aggregate, satisfy the requirements of clause (a) of this definition; or

(c)     an insurance company which is subject to supervision by the insurance commissioner, or a similar official or agency, of a state or territory of the United States (including the District of Columbia) (i) with a net worth, as of a date no more than six (6) months prior to the date of the transfer, of at least $250,000,000, (ii) who, immediately prior to such transfer, controls real estate assets of at least $600,000,000, and (iii) who is regularly engaged in the business of owning or operating commercial properties or making investments in commercial real estate; or

(d)     a corporation organized under the banking laws of the United States or any state or territory of the United States (including the District of Columbia) (i) with a combined capital and surplus of at least $250,000,000, (ii) who, immediately prior to such Transfer, controls real

estate assets of at least $600,000,000, and (iii) who is regularly engaged in the business of owning or operating commercial properties or making investments in commercial real estate; or

(e)      any Person who is regularly engaged in the business of owning or operating commercial properties or making investments in commercial real estate (i) with a long term unsecured debt rating from the Approved Rating Agencies of at least Investment Grade or (ii) who (A) owns or operates full-service hotels (i.e. hotels offering services similar to the services provided at the Property) with at least an aggregate of 4,000 rooms, (B) has a net worth, as of a date no more than six (6) months prior to the date of such transfer, of at least $250,000,000 and (C) immediately prior to such transfer, controls real estate assets of at least $600,000,000.

"**Qualified Transferee's Principals**" shall mean collectively, (A) Qualified Transferee's managing members, general partners or principal shareholders and (B) such other members, partners or shareholders which directly or indirectly shall own a fifty-one percent (51%) or greater economic and voting interest in Qualified Transferee.

"**Rate Conversion**" shall have the meaning set forth in Section 2.2.7(g) hereof.

"**Rating Agencies**" shall mean each of S&P, Moody's, Fitch, Morningstar, DBRS, Kroll or any other nationally recognized statistical rating agency, which has assigned a rating to the Securities.

"**Rating Agency Confirmation**" shall mean, collectively, a written affirmation from each of the Approved Rating Agencies that the credit rating of the Securities given by such Approved Rating Agency of such Securities immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Approved Rating Agency's sole and absolute discretion. In the event that, at any given time, no Approved Rating Agency has elected to consider whether to grant or withhold such an affirmation and Lender does not otherwise have an approval right with respect to such event, then the term Rating Agency Confirmation shall be deemed instead to require the written reasonable approval of Lender based on its good faith determination of whether the Approved Rating Agencies would issue a Rating Agency Confirmation, provided that the foregoing shall be inapplicable in any case in which Lender has an independent approval right in respect of the matter at issue pursuant to the terms of this Agreement.

"**REA**" shall mean that certain Palmer House Hotel, Chicago, Illinois, Reciprocal Easement and Operating Agreement, dated as of December 11, 2006 by and between Borrower, Thor Palmer House Office LLC and Thor Palmer House Retail LLC, as the same has been and may further be amended, restated, replaced or otherwise modified from time to time.

"**Register**" shall have the meaning set forth in Section 9.1.1(e) hereof.

"**Related Entities**" shall have the meaning set forth in Section 5.2.10(e) hereof.

"**Release**" of any Hazardous Substance includes but is not limited to any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Substances.

"**Remediation**" includes but is not limited to any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance, any actions to prevent, cure or mitigate any Release of any Hazardous Substance, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Substances.

"**REMIC Trust**" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note or a portion thereof.

"**Rents**" shall mean, all rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or Operating Lessee or their respective agents or employees from any and all sources arising from or attributable to the Property, and proceeds, if any, from business interruption or other loss of income or insurance, including, without limitation (and without duplication), all Operating Rent, hotel receipts, revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower or any operator or manager of the hotel (including, without limitation, Operating Lessee) (including, without limitation, from the rental of any, guest rooms or other space, halls, stores, and offices, and deposits securing reservations of such space, but excluding any income from the Retail Parcel), license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges, vending machine sales and proceeds, if any, from business interruption or other loss of income insurance.

"**Replacement Interest Rate Cap Agreement**" shall mean, collectively, one or more interest rate protection agreements, acceptable to Lender, from an Acceptable Counterparty with terms identical to the Interest Rate Cap Agreement except that the same shall be effective as of the date required in Section 2.2.7(c); provided that to the extent any such interest rate protection agreements do not meet the foregoing requirements, a "Replacement Interest Rate Cap Agreement" shall be such interest rate protection agreements approved in writing by the Approved Rating Agencies with respect thereto.

"**Replacement Management Agreement**" shall mean, collectively, (a) either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement, or (ii) a management agreement with a Qualified Manager,

which management agreement shall be reasonably acceptable to Lender in form and substance, provided, with respect to this subclause (ii), Lender, at its option, shall have obtained a Rating Agency Confirmation from the Approved Rating Agencies with respect to such management agreement and (b) an assignment of management agreement and subordination of management fees substantially in the form then used by Lender (or of such other form and substance reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Manager at Borrower's expense.

"**Replacement Reserve Account**" shall have the meaning set forth in Section 7.3.1 hereof.

"**Replacement Reserve Fund**" shall have the meaning set forth in Section 7.3.4 hereof.

"**Replacement Reserve Monthly Deposit**" shall mean an amount equal to the sum of (a) the greater of (i) four percent (4%) of Gross Income from Operations for the calendar month that is two (2) calendar months prior to the calendar month in which the applicable deposit to the Replacement Reserve Fund is to be made and (ii) the aggregate monthly amount required to be reserved for payment of the cost of Replacements under the Management Agreement for such period, and (b) the aggregate amount required to be reserved by Borrower or Operating Lessee under each PIP (if any) for such period. Notwithstanding the foregoing, provided that Borrower is maintaining (or causing Operating Lessee to maintain) the Property in accordance with the requirements of the Management Agreement (as determined by Manager) and the Loan Documents (as reasonably determined by Lender), the amount of the Replacement Reserve Monthly Deposit shall be reduced by the aggregate amount of Manager-Held Reserve Deposits required to be deposited by Borrower or Operating Lessee in a Manager-Held Reserve for Replacements or PIP for such period pursuant to and in accordance with the Capital Renewals Budget delivered pursuant to the Management Agreement, to the extent that Lender shall have received evidence reasonably satisfactory to Lender that Borrower or Operating Lessee shall have made such deposit.

"**Replacements**" shall mean FF&E, replacements and repairs required to be made to the Property and Improvements.

"**Required Cure Debt Yield**" shall mean a Debt Yield, as determined by Lender, equal to or exceeding (a) if determined on any date that is prior to the commencement of the first Extension Option, six and three quarters percent (6.75%), (b) if determined on any date that is on or after the commencement of the first Extension Option but prior to the commencement of the second Extension Option, seven percent (7.00%), (c) if determined on any date that is on or after the commencement of the second Extension Option but prior to the commencement of the third Extension Option, seven and one quarter percent (7.25%), and (d) if determined on any date that is on or after the commencement of the third Extension Option, seven and one half percent (7.50%).

"**Required Extension Debt Yield**" shall mean a Debt Yield, as determined by Lender, equal to or exceeding eight and one half percent (8.50%) in connection with the commencement of the third Extension Option.

"**Required Repair Account**" shall have the meaning set forth in <u>Section 7.1.1</u> hereof.

"**Required Repair Fund**" shall have the meaning set forth in <u>Section 7.1.1</u> hereof.

"**Required Repairs**" shall have the meaning set forth in <u>Section 7.1.1</u> hereof.]

"**Reserve Funds**" shall mean, collectively, the Tax and Insurance Escrow Fund, the Replacement Reserve Fund, the Required Repair Fund, the Amortization Reserve Fund, the Excess Cash Flow Reserve Fund and any other escrow fund established by the Loan Documents.

"**Restoration**" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation, with such alterations as may be reasonably approved by Lender.

"**Restricted Party**" shall mean collectively, (a) Borrower, Operating Lessee, Mezzanine Borrower, Guarantor, and any Affiliated Manager and (b) any shareholder, partner, member, non-member manager, any direct or indirect legal or beneficial owner of, Borrower, Operating Lessee, Mezzanine Borrower, Guarantor, any Affiliated Manager or any non-member manager but, with respect to clause (b), excluding any shareholders or owners of stock or equity interest that are publicly traded on any nationally or internationally recognized stock exchange that are not Affiliates of Borrower, Guarantor or Operating Lessee.

"**Retail Parcel**" shall mean that parcel of real property more particularly described in <u>Schedule VI</u> hereto.

"**S&P**" shall mean Standard & Poor's Ratings Services.

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, assignment, transfer, encumbrance, pledge, grant of option or other transfer or disposal of a legal or beneficial interest, whether direct or indirect.

"**Satisfactory Search Results**" shall mean the results of credit history check, litigation, lien, bankruptcy, judgment and other similar searches with respect to the applicable transferee and its applicable affiliates, in each case, (i) revealing no matters which could reasonably be expected to have a material adverse effect on Borrower's financial condition, the value of the Property or Net Operating Income; (ii) demonstrating that any transferee is not an Embargoed Person and (iii) yielding results which are otherwise acceptable to Lender in its reasonable discretion.

"**Second Extended Maturity Date**" shall mean, following an exercise by Borrower of the second Extension Option described in <u>Section 2.3.3(b)</u> hereof, June 9, 2022, or such other earlier date after the exercise of the second Extension Option on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Section 2.7 Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Securities**" shall have the meaning set forth in <u>Section 9.1</u> hereof.

"**Securities Act**" shall have the meaning set forth in <u>Section 9.2</u> hereof.

"**Securitization**" shall have the meaning set forth in <u>Section 9.1</u> hereof.

"**Servicer**" shall have the meaning set forth in <u>Section 9.5</u> hereof.

"**Severed Loan Documents**" shall have the meaning set forth in <u>Section 8.2(c)</u> hereof.

"**Similar Law**" shall have the meaning set forth in <u>Section 4.1.9(b)</u> hereof.

"**Single Employer Plan**" shall mean a single employer plan, as defined in Section 3(41) or Section 4001(a)(15) of ERISA, as applicable, that (a) is maintained for employees of the Borrower, Guarantor or any ERISA Affiliate and no Person other than the Borrower, Guarantor and the ERISA Affiliates, or (b) was so maintained, and in respect of which the Borrower, Guarantor or any ERISA Affiliate could have liability under Sections 4062-4069 of ERISA in the event such plan has been or were to be terminated.

"**Special Purpose Entity**" shall mean a limited partnership or limited liability company that, since the date of its formation and at all times on and after the date thereof, has complied with and shall at all times comply with the following requirements unless it has received prior consent to do otherwise from Lender or a permitted administrative agent thereof, and, while the Loan is securitized, a Rating Agency Confirmation from each of the Approved Rating Agencies, and an Additional Insolvency Opinion, in each case:

    (i)    is and shall be organized solely for the purpose (A) in the case of Borrower acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property, entering into and performing its obligations under the Loan Documents with Lender, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing or (B) in the case of Operating Lessee leasing the Property pursuant to the Operating Lease and managing and operating the Property and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

    (ii)    has not engaged and shall not engage in any business unrelated to the activities set forth in paragraph (i) of this definition;

    (iii)    (A) has not owned, directly or indirectly any real property other than (1) in the case of Borrower, the Property, the Office Parcel and the Retail Parcel and (2) in the case of Operating Lessee, its leasehold interests in the property, and (B) shall not own, directly or indirectly any real property other than (1) in the case of Borrower, the Property and (2) in the case of Operating Lessee, its leasehold interests in the Property;

    (iv)    (A) at no time has had any assets other than (1) in the case of Borrower, the Property, the Office Parcel and the Retail Parcel, and personal property necessary or incidental to its ownership and operation of the Property and (2) in the case of Operating

Lessee, its leasehold interest in the Property, and (B) does not have and shall not have any assets other than (1) in the case of Borrower, the Property and personal property necessary or incidental to its ownership and operation of the Property and (2) in the case of Operating Lessee, its leasehold interest in the Property;

(v)     has not engaged in, sought, consented or permitted to and shall not engage in, seek, consent to or permit (A) any dissolution, winding up, liquidation, consolidation or merger, to the fullest extent permitted by law or (B) any sale or other transfer of all or substantially all of its assets or any sale of assets outside the ordinary course of its business, except as permitted by the Loan Documents;

(vi)     shall not cause, consent to or permit any amendment of its limited partnership agreement, articles of organization, certificate of formation, operating agreement or other formation document or organizational document (as applicable) with respect to the matters set forth in this definition;

(vii)     if such entity is a limited partnership, has and shall have at least one general partner and has and shall have, as its only general partners, Special Purpose Entities each of which (A) is a single-member Delaware limited liability company, (B) has two (2) Independent Directors, and (C) holds a direct interest as general partner in the limited partnership of not less than 0.5%;

(viii)     reserved;

(ix)     if such entity is a limited liability company (other than a limited liability company meeting all of the requirements applicable to a single-member limited liability company set forth in this definition of "Special Purpose Entity"), has and shall have at least one (1) member that is a Special Purpose Entity, that is a single-member limited liability company, that has at least two (2) Independent Directors and that directly owns at least one-half-of-one percent (0.5%) of the equity of the limited liability company;

(x)     if such entity is a single-member limited liability company, (A) is and shall be a Delaware limited liability company, (B) has and shall have at least two (2) Independent Directors serving as managers of such company, (C) shall not take any action requiring the unanimous affirmative vote of the managing member and the Independent Directors and shall not cause or permit the members or managers of such entity to take any action requiring the unanimous affirmative vote of the managing member and the Independent Directors unless two (2) Independent Directors then serving as managers of the company shall have consented in writing to such action, and (D) has and shall have either (1) a member which owns no economic interest in the company, has signed the company's limited liability company agreement and has no obligation to make capital contributions to the company, or (2) two natural persons or one entity that is not a member of the company, that has signed its limited liability company agreement and that, under the terms of such limited liability company agreement becomes a member of the company immediately prior to the withdrawal or dissolution of the last remaining member of the company;

(xi)    has not and shall not (and, if such entity is (a) a limited liability company, has and shall have a limited liability agreement or an operating agreement, as applicable, or (b) a limited partnership, has a limited partnership agreement, that, in each case, provide that such entity shall not) (1) to the fullest extent permitted by applicable law, dissolve, merge, liquidate, consolidate; (2) sell all or substantially all of its assets; (3) amend its organizational documents with respect to the matters set forth in this definition without the consent of Lender; or (4) without the affirmative vote of two (2) Independent Directors of itself or the consent of a Principal that is a member or general partner in it, take any Bankruptcy Action;

(xii)    has at all times been and shall at all times endeavor to remain solvent and has paid and shall endeavor to pay its debts and liabilities (including, a fairly-allocated portion of any personnel and overhead expenses that it shares with any Affiliate) from its assets as the same shall become due, and has maintained and shall endeavor to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (in each case, to the extent there exists sufficient cash flow from the operations of the Property to do so provided, that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions or loans to Borrower);

(xiii)    has not failed and shall not fail to correct any known misunderstanding regarding the separate identity of such entity and has not identified and shall not identify itself as a division of any other Person;

(xiv)    has maintained and shall maintain its bank accounts, books of account, books and records separate from those of any other Person and, to the extent that it is required to file tax returns under applicable law, has filed and shall file its own tax returns, except to the extent that it is required by law to file consolidated tax returns;

(xv)    has maintained and shall maintain its own records, books, resolutions and agreements;

(xvi)    has not commingled and shall not commingle its funds or assets with those of any other Person and has not participated and shall not participate in any cash management system with any other Person;

(xvii)    has held and shall hold its assets in its own name;

(xviii)    has conducted and shall conduct its business in its name or in a name franchised or licensed to it by Manager or an entity other than an Affiliate of itself or of Borrower, except for business conducted on behalf of itself by another Person under a business management services agreement that is on commercially-reasonable terms, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

(xix)    (A) has maintained and shall maintain its financial statements, accounting records and other entity documents separate from those of any other Person; (B) has

shown and shall show, in its financial statements, its asset and liabilities separate and apart from those of any other Person; and (C) has not permitted and shall not permit its assets to be listed as assets on the financial statement of any of its Affiliates except as required by GAAP or the Uniform System of Accounts; provided, however, that (i) any such consolidated financial statement contains a note indicating that the Special Purpose Entity's separate assets and credit are not available to pay the debts of such Affiliate and that the Special Purpose Entity's liabilities do not constitute obligations of the consolidated entity and (ii) such assets shall also be listed on the Company's balance sheet;

(xx)    has paid and shall pay its own liabilities and expenses, including the salaries of its own employees, if any, out of its own funds and assets, provided there is sufficient cash flow from the Property to do so, and provided further that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions or loans to Borrower, and has maintained and shall maintain a sufficient number of employees, if any, in light of its contemplated business operations;

(xxi)    has observed and shall observe all partnership, corporate or limited liability company formalities, as applicable;

(xxii)    has not incurred any Indebtedness other than in the case of Borrower and Operating Lessee collectively, (i) acquisition financing with respect to the Property; construction financing with respect to the Improvements and certain off-site improvements required by municipal and other authorities as conditions to the construction of the Improvements; and first mortgage financings secured by the Property; and Indebtedness pursuant to letters of credit, guaranties, interest rate protection agreements and other similar instruments executed and delivered in connection with such financings, (ii) unsecured trade payables and operational debt incurred in the ordinary course of business not evidenced by a note, in amounts not to exceed two percent (2%) of the amount of the Loan which liabilities have not been more than sixty (60) days past the due date incurred, and (iii) Indebtedness incurred in the financing of equipment and other personal property used on the Property or (iv) Indebtedness permitted by clause (xxiii) hereof;

(xxiii)    shall have no Indebtedness other than (A) in the case of Borrower (i) the Loan, (ii) liabilities incurred in the ordinary course of business relating to the ownership, operation and leasing of the Property and the routine administration of Borrower and Operating Lessee, in amounts not to exceed, in the aggregate with the liabilities of the Operating Lessee as set forth in clause (B)(i) below, two percent (2%) of the amount of the Loan which liabilities are not more than sixty (60) days past the date incurred, are not evidenced by a note and are paid when due, and which amounts are normal and reasonable under the circumstances, and (iii) such other liabilities that are permitted pursuant to this Agreement and (B) ; and (B) in the case of Operating Lessee, (i) liabilities incurred in the ordinary course of business under the Operating Lease in amounts not to exceed, in the aggregate with the liabilities of Borrower as set forth in

clause (A)(ii) above, two (2%) percent of the amount of the Loan, and (ii) such other liabilities that are permitted pursuant to this Agreement;

(xxiv)    has not assumed, guaranteed or become obligated and shall not assume or guarantee or become obligated for the debts of any other Person, has not held out and shall not hold out its credit as being available to satisfy the obligations of any other Person or has not pledged and shall not pledge its assets to secure the obligations of any other Person, in each case except as expressly contemplated by the Loan Documents with respect to Borrower and Operating Lessee;

(xxv)    has not acquired and shall not acquire obligations or securities of its partners, members or shareholders or any other owner or Affiliate;

(xxvi)    has allocated and shall allocate fairly and reasonably any overhead expenses that are shared with any of its Affiliates, constituents, or owners, or any guarantors of any of their respective obligations, or any Affiliate of any of the foregoing, including, but not limited to, paying for shared office space and for services performed by any employee of an Affiliate;

(xxvii)    has maintained and used and shall maintain and use separate stationery, invoices and checks bearing its name and not bearing the name of any other entity unless such entity is clearly designated as being the Special Purpose Entity's agent;

(xxviii)    has held itself out and identified itself and shall hold itself out and identify itself as a separate and distinct entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower and not as a division or part of any other Person,

(xxix)    has maintained and shall maintain its assets in such a manner that it shall not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxx)    has not made and shall not make loans to any Person and has not held and shall not hold evidence of indebtedness issued by any other Person or entity (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity);

(xxxi)    has not identified and shall not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and has not identified itself and shall not identify itself as a division of any other Person;

(xxxii)    other than capital contributions and distributions permitted under the terms of its organizational documents, has not entered into or been a party to, and shall not enter into or be a party to, any transaction with any of its partners, members, shareholders or Affiliates except in the ordinary course of its business and on terms which are commercially reasonable terms comparable to those of an arm's-length transaction with an unrelated third party;

(xxxiii)    has not had and shall not have any obligation to, and has not indemnified and shall not indemnify its partners, officers, directors or members, as the case may be, in each case unless such an obligation or indemnification is fully subordinated to the Debt and shall not constitute a claim against it in the event that its cash flow is insufficient to pay the Debt;

(xxxiv)    reserved;

(xxxv)    has not had and shall not have any of its obligations guaranteed by any Affiliate except as provided by the Loan Documents with respect to (i) Borrower and Operating Lessee, (ii) the Guaranty and Environmental Indemnity and (iii) guarantees and indemnities relating to prior financings that have been released;

(xxxvi)    has not formed, acquired or held and shall not form, acquire or hold any subsidiary;

(xxxvii)    has complied and shall comply with all of the terms and provisions contained in its organizational documents.

(xxxviii)    has conducted and shall conduct its business so that each of the assumptions made about it and each of the facts stated about it in the Insolvency Opinion, or if applicable, any Additional Insolvency Opinion, are true; and

(xxxix)    has not permitted and shall not permit any Affiliate or constituent party independent access to its bank accounts, except that Thor Equities, LLC has access to the Borrower's and Operating Lessee's bank accounts in its capacity as asset manager and agent for the Borrower and Operating Lessee.

"**Spread**" shall mean, with respect to each Component, (i) for the period commencing on the Closing Date and ending on the First Extended Maturity Date, the following amounts, as the same may be reallocated pursuant to, and in accordance with restrictions and limitations contained in Section 9.1.3, and (ii) in each case, which amount shall be increased by (a) commencing on the second Extension Option, fifteen (15) basis points for the Interest Period applicable to the Payment Date in July, 2021 and each Payment Date thereafter, and (b) commencing on the third Extension Option, an additional fifteen (15) basis points for the Interest Period applicable to the Payment Date in July, 2022 and each Payment Date thereafter:

(a) Component A: 2.1172%

(b) Component B: 2.1172%

(c) Component C: 2.1172%

(d) Component D: 2.1172%

(e) Component E: 2.1172%

(f) Component F: 2.1172%

(g) Component HRR: 2.1172%

"**Spread Maintenance Default Premium**" shall mean an amount equal to the greater of (a) three percent (3%) of the outstanding principal balance of each Component of the Loan and (b) the Spread Maintenance Payment due as of the date of prepayment.

"**Spread Maintenance End Date**" shall mean, the Payment Date occurring in April 9, 2020.

"**Spread Maintenance Payment**" shall mean, with respect to any repayment of the outstanding principal amount of the Loan on or prior to the Spread Maintenance End Date, a payment to Lender in an amount equal to the product of (a) the Applicable Spread, (b) the portion of the Loan being repaid, and (c) a fraction, the numerator of which is the number of days between the date through which interest on the amount being prepaid has been paid in full and the Spread Maintenance End Date and the denominator of which is 360. Notwithstanding the foregoing, with respect to any prepayment made after the Spread Maintenance End Date, the amount of the Spread Maintenance Payment shall be zero.

"**State**" shall mean, the State or Commonwealth in which the Property or any part thereof is located.

"**Strike Price**" shall mean (a) through and including the Initial Maturity Date, 3.25%, (b) commencing upon the commencement of each Extension Term, the lesser of (i) 3.25% and (ii) the annual rate (expressed as a percentage) which, when added to the Spread (or the Prime Rate Spread or the Alternate Rate Spread, as applicable), would result in the Debt Service Coverage Ratio, determined as of the date of the exercise of such Extension Option, based upon the trailing twelve (12) month period immediately preceding such date of determination being equal to or exceeding 1.20:1.00.

"**Substitute Interest Rate Cap Agreement**" shall have the meaning set forth in Section 2.2.7(h) hereof.

"**Survey**" shall mean a survey of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

"**Tax and Insurance Escrow Fund**" shall have the meaning set forth in Section 7.2 hereof.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof.  In no event shall any PACE Loan be considered Taxes for purposes of this Agreement.

"**Tenant**" means the lessee of all or a portion of the Property under a Lease.

"**Third Extended Maturity Date**" shall mean, following an exercise by Borrower of the third Extension Option described in Section 2.3.3(b) hereof, June 9, 2023, or such other earlier date after the exercise of the third Extension Option on which the final payment of principal of

the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Threshold Amount**" shall have the meaning set forth in Section 5.1.21 hereof.

"**Title Insurance Policy**" shall mean the mortgagee title insurance policy issued with respect to the Property and insuring the lien of the Mortgage.

"**Transfer**" shall have the meaning set forth in Section 5.2.10(b) hereof.

"**Transfer Debt Yield Prepayment Amount**" shall mean the amount necessary, when applied to prepay each of the Loan and the Mezzanine Loan pursuant to Section 5.2.10 hereof, to cause the Debt Yield to equal or exceed eight percent (8.00%)

"**Transfer Prepayment**" shall have the meaning set forth in Section 5.2.10(d) hereof.

"**Transferred Property**" shall have the meaning set forth in Section 4.1.37 hereof.

"**Transferred Property Environmental Reports**" shall have the meaning set forth in Section 4.1.37 hereof.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State in which the Property is located.

"**Uniform System of Accounts**" shall mean the most recent edition of the Uniform System of Accounts for Hotels as adopted by the American Hotel and Motel Association.

"**U.S. Obligations**" shall mean non-redeemable securities evidencing an obligation to timely pay principal and/or interest in a full and timely manner that are (a) direct obligations of the United States of America for the payment of which its full faith and credit is pledged, or (b) to the extent acceptable to the Approved Rating Agencies, other "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act of 1940, as amended.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**" shall have the meaning set forth in Section 2.7(e).

"**Write Down and Conversion Powers**" shall have the meaning set forth in Section 10.25.

Section 1.2     **Principles of Construction.**  All references to sections, schedules and exhibits are to sections, schedules and exhibits in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise

specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## ARTICLE II – GENERAL TERMS

Section 2.1    **Loan Commitment; Disbursement to Borrower.**

2.1.1    **Agreement to Lend and Borrow.**    Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan on the Closing Date.

2.1.2    **Single Disbursement to Borrower.**    Borrower may request and receive only one (1) borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.   Borrower acknowledges and agrees that the Loan has been fully funded as of the Closing Date.

2.1.3    **The Note, Mortgage and Loan Documents.**    The Loan shall be evidenced by the Note and secured by the Mortgage and the other Loan Documents.

2.1.4    **Use of Proceeds.**    Borrower shall use the proceeds of the Loan to (a) repay and discharge any existing loans relating to the Property, (b) pay all past-due Basic Carrying Costs, if any, with respect to the Property, (c) make deposits into the Reserve Funds on the Closing Date in the amounts provided herein, (d) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, (e) fund any working capital requirements of the Property and (f) distribute the balance, if any, to Mezzanine Borrower.

2.1.1    **Components of the Loan.**For the purpose of computing interest payable from time to time on the principal amount of the Loan and certain other computations set forth herein, the principal balance of the Loan shall be divided into Components A through HRR.  The principal amount of the Components shall be as follows:

| COMPONENT | PRINCIPAL AMOUNT |
|:---:|:---:|
| A | $125,500,000 |
| B | $28,100,000 |
| C | $25,400,000 |
| D | $28,500,000 |
| E | $54,900.000 |
| F | $54,000,000 |
| HRR | $16,800,000 |

Section 2.2    **Interest Rate.**

2.2.1    **Interest Rate.**  Subject to the provisions of this Section 2.2, interest on the outstanding principal balance of each Component of the Loan shall accrue from (and include) the Closing Date through the end of the last Interest Period at the LIBOR Rate for such Component. Borrower shall pay to Lender on each Payment Date the interest accrued (or to be accrued) on each Component of the Loan for the related Interest Period.

2.2.2    **Interest Calculation.**  Interest on the outstanding principal balance of each Component of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year by (c) the outstanding principal balance.

2.2.3    **Determination of Interest Rate.**  (a)  Subject to the terms and conditions of this Section 2.2.3 the Loan shall bear interest at the LIBOR Rate.  The LIBOR Rate applicable to an Interest Period shall be determined by Lender as set forth herein; provided, however, that the LIBOR Rate Index for the Interest Period commencing on the Closing Date through and including June 14, 2018 shall be the LIBOR Rate Index on the Closing Date, which the parties agree is [_____]%.

(b)    In the event that Lender shall have reasonably determined that by reason of circumstances affecting the interbank Eurodollar market the LIBOR Rate Index cannot be determined as provided in the definition of the LIBOR Rate Index as set forth herein and an Alternate Rate Index has not been established pursuant to Section 2.2.3(c) below, then Lender shall forthwith give notice thereof by telephone of such fact, confirmed in writing, to Borrower at least one (1) Business Day prior to the Determination Date.  If such notice is given, the Loan shall be converted, from and after the first day of the next succeeding Interest Period, to a Prime Rate Loan bearing interest based on the Prime Rate in effect on the related Determination Date.

(c)    If at any time Lender has determined in good faith (which determination shall be conclusive and binding upon Borrower absent manifest error) that the LIBOR Rate Index has been succeeded by an Alternate Rate Index, the Loan shall be converted from a LIBOR Rate Loan to an Alternate Rate Loan bearing interest based on the Alternate Rate in effect on the related Determination Date, provided that the same does not violate applicable law, and provided that Lender shall have received an opinion of nationally recognized REMIC counsel as to the compliance of such conversion with applicable REMIC requirements (which such opinion shall be, in form and substance and from a provider, in each case, acceptable to Lender in its sole discretion and acceptable to the Rating Agencies). Lender may exercise the foregoing conversion right by giving notice of such determination in writing to Borrower at least one (1) Business Day prior to any Determination Date and, if a Securitization has occurred, Lender shall promptly commence and diligently pursue satisfaction of the REMIC opinion requirement set forth herein. If such notice is given, following satisfaction of the REMIC opinion requirement set forth herein, if applicable, the Loan shall be converted, as of the first day of the next succeeding Interest Period, to an Alternate Rate Loan.  Notwithstanding any provision of this Agreement to the contrary, in no event shall (i) Borrower have the right to convert the Loan to a Prime Rate Loan or an Alternate Rate Loan, (ii) Borrower have the right to convert a LIBOR Rate Loan to an Alternate Rate Loan, or to convert an Alternate Rate Loan to a LIBOR Rate Loan or a Prime

Rate Loan, (iii) the Prime Rate be less than the LIBOR Rate Floor plus the LIBOR Rate Spread as of the Closing Date, or (iv) the Alternate Rate be less than the LIBOR Rate Floor plus the LIBOR Rate Spread as of the Closing Date.

(d)     If, pursuant to the terms of Section 2.2.3(b) above, the Loan has been converted to a Prime Rate Loan but thereafter the LIBOR Rate Index can again be determined as provided in the definition of the LIBOR Rate Index as set forth herein, Lender may give notice thereof to Borrower and convert the Prime Rate Loan back to a LIBOR Loan by delivering to Borrower notice of such conversion no later than 11:00 a.m. (New York City Time), one (1) Business Day prior to the next succeeding Determination Date. If such notice is given, the Loan shall be converted, from and after the first day of the next succeeding Interest Period, to a LIBOR Rate Loan bearing interest based on the LIBOR Rate Index in effect on the related Determination Date.  Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to elect to convert a LIBOR Rate Loan to a Prime Rate Loan.

(e)     Intentionally Omitted.

(f)     If any requirement of law or any change therein or in the interpretation or application thereof, shall hereafter make it unlawful for Lender to make or maintain a LIBOR Rate Loan as contemplated hereunder, (i) the obligation of Lender hereunder to make a LIBOR Rate Loan or to convert a Prime Rate Loan to a LIBOR Rate Loan shall be canceled forthwith and (ii) any outstanding LIBOR Rate Loan shall be converted automatically to a Prime Rate Loan on the first day of the next succeeding Interest Period or within such earlier period as required by law.  Borrower hereby agrees promptly to pay Lender, within ten (10) days after receipt of written demand, any additional amounts necessary to compensate Lender for any costs actually incurred by Lender in making any conversion in accordance with this Agreement, including, without limitation, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain the LIBOR Rate Loan hereunder.  Lender's notice of such costs, as certified to Borrower, shall be conclusive absent manifest error.

(g)     In the event that any change in any requirement of law or in the interpretation or application thereof, or compliance by Lender with any request or directive (whether or not having the force of law) hereafter issued from any central bank or other Governmental Authority:

(i)     shall hereafter impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of the LIBOR Rate Index, the Prime Rate Index or the Alternate Rate Index hereunder;

(ii)     shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material;

(iii)    shall hereafter subject Lender to any Section 2.7 Taxes (other than (A) Indemnified Taxes, (B) Section 2.7 Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iv)    shall hereafter impose on Lender any other condition (other than Section 2.7 Taxes);

and the result of any of the foregoing is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder, then, in any such case, Lender shall immediately notify Borrower in writing of the occurrence of any additional costs and Borrower shall promptly pay Lender, upon demand, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable which Lender deems to be material as determined by Lender in its reasonable discretion.  If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.3(g), Lender shall provide Borrower with not less than thirty (30) days written notice specifying in reasonable detail the event by reason of which it has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount; provided, however, that Lender shall not be entitled to claim the portion of any additional amounts pursuant to this Section 2.2.3(g) accrued more than one hundred eighty (180) days prior to the date of the aforementioned 30-day notice.  A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Lender to Borrower shall be conclusive in the absence of manifest error.  Subject to Section 2.2.3(h) and Section 2.7 hereof, this provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under this Agreement and the Loan Documents.

(h)    Borrower agrees to indemnify Lender and to hold Lender harmless from any loss or expense which Lender sustains or incurs as a consequence of (i) any default by Borrower in payment of the principal of or interest on a LIBOR Rate Loan, a Prime Rate Loan or an Alternate Rate Loan including, without limitation, any such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a LIBOR Rate Loan, a Prime Rate Loan or an Alternate Rate Loan hereunder, (ii) any prepayment (whether voluntary or mandatory) of the LIBOR Rate Loan, Prime Rate Loan or Alternate Rate Loan, as applicable, on a day that (A) is not a Payment Date or (B) is a Payment Date if Borrower did not give the prior written notice of such prepayment required pursuant to the terms of this Agreement, including, without limitation, such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain the LIBOR Rate Loan, a Prime Rate Loan or an Alternate Rate Loan hereunder and (iii) the conversion pursuant to the terms hereof of the LIBOR Rate Loan to the Prime Rate Loan or an Alternate Rate Loan on a date other than the Payment Date, including, without limitation, such loss or expenses arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a LIBOR Rate Loan hereunder (the amounts referred to in clauses (i), (ii) and (iii) are herein referred to collectively as the "**Breakage Costs**"); provided, however, Borrower shall not indemnify Lender from any loss or expense arising from Lender's willful misconduct or gross negligence.  This provision shall survive payment of the Note in full and the satisfaction of all

other obligations (other than contingent obligations) of Borrower under this Agreement and the other Loan Documents.

2.2.4    **Additional Costs.** Lender will use reasonable efforts (consistent with legal and regulatory restrictions) to maintain the availability of the LIBOR Rate Loan and to avoid or reduce any increased or additional costs payable by Borrower under <u>Section 2.2.3</u>, including a transfer or assignment of the Loan to a branch, office or Affiliate of Lender in another jurisdiction, or a redesignation of its lending office with respect to the Loan, in order to maintain the availability of the LIBOR Rate Loan or to avoid or reduce such increased or additional costs, <u>provided</u> that the transfer or assignment or redesignation (a) would not result in any additional costs, expenses or risk to Lender that are not reimbursed by Borrower and (b) would not be disadvantageous in any other respect to Lender (including the effect on any Securitization) as determined by Lender in its reasonable discretion.

2.2.5    **Default Rate.**  In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by law, all accrued and unpaid interest in respect of the Loan and any other amounts due pursuant to the Loan Documents, shall accrue interest at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein.

2.2.6    **Usury Savings.**  This Agreement, the Note and the other Loan Documents are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

2.2.7    **Interest Rate Cap Agreement.**  (a) Prior to or contemporaneously with the Closing Date, Borrower shall enter into an Interest Rate Cap Agreement with a LIBOR Rate Index strike price equal to the Strike Price.  The Interest Rate Cap Agreement (i) shall at all times be in a form and substance reasonably acceptable to Lender, (ii) shall at all times be with an Acceptable Counterparty, (iii) shall direct such Acceptable Counterparty to deposit directly into the Lockbox Account any amounts due Borrower under such Interest Rate Cap Agreement so long as any portion of the Debt exists, <u>provided</u> that the Debt shall be deemed to exist if the Property transferred by judicial or non-judicial foreclosure or deed-in-lieu thereof, (iv) shall be for a period equal to the term of the Loan (through and including the Interest Period immediately following the applicable Maturity Date) and (v) shall at all times have a notional amount equal to

or greater than the principal balance of the Loan and shall at all times provide for the applicable Strike Price. Borrower shall collaterally assign to Lender, pursuant to the Collateral Assignment of Interest Rate Cap Agreement (the "**Assignment of Interest Rate Cap Agreement**"), all of its right, title and interest to receive any and all payments under the Interest Rate Cap Agreement, and shall deliver to Lender an executed counterpart of such Interest Rate Cap Agreement (which shall, by its terms, authorize the assignment to Lender and require that payments be deposited directly into the Cash Management Account) and shall notify the Acceptable Counterparty of such assignment.

(b)    Borrower shall comply with all of its obligations under the terms and provisions of the Interest Rate Cap Agreement. All amounts paid by the Acceptable Counterparty under the Interest Rate Cap Agreement to Borrower or Lender shall be deposited immediately into the Cash Management Account or into such account as specified by Lender. Borrower shall take all actions reasonably requested by Lender to enforce Lender's rights under the Interest Rate Cap Agreement in the event of a default by the Acceptable Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder.

(c)    In the event of any downgrade, withdrawal or qualification of the rating of the Acceptable Counterparty by any Approved Rating Agency, Borrower shall replace the Interest Rate Cap Agreement with a Replacement Interest Rate Cap Agreement not later than ten (10) Business Days following receipt of notice from Lender of such downgrade, withdrawal or qualification.

(d)    In the event that Borrower fails to purchase and deliver to Lender the Interest Rate Cap Agreement or fails to maintain the Interest Rate Cap Agreement in accordance with the terms and provisions of this Agreement, Lender may purchase the Interest Rate Cap Agreement and the cost incurred by Lender in purchasing such Interest Rate Cap Agreement shall be paid by Borrower to Lender with interest thereon at the Default Rate from the date such cost was incurred by Lender until such cost is reimbursed by Borrower to Lender.

(e)    In connection with the Interest Rate Cap Agreement, Borrower shall obtain and deliver to Lender (a) a resolution/consent, as applicable, of the Acceptable Counterparty authorizing the delivery of the Interest Rate Cap Agreement reasonably acceptable to Lender, and (b) an opinion from counsel (which counsel may be in-house counsel for the Acceptable Counterparty) for the Acceptable Counterparty (upon which Lender and its successors and assigns may rely) which shall provide, in relevant part, that:

(i)    the Acceptable Counterparty is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation or formation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap Agreement;

(ii)    the execution and delivery of the Interest Rate Cap Agreement by the Acceptable Counterparty, and any other agreement which the Acceptable Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent

organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(iii)    all consents, authorizations and approvals required for the execution and delivery by the Acceptable Counterparty of the Interest Rate Cap Agreement, and any other agreement which the Acceptable Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(iv)    the Interest Rate Cap Agreement, and any other agreement which the Acceptable Counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the Acceptable Counterparty and constitutes the legal, valid and binding obligation of the Acceptable Counterparty, enforceable against the Acceptable Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(f)    Notwithstanding anything to the contrary contained in this Section 2.2.7 or elsewhere in this Agreement, if, at any time, Lender converts the Loan to either a Prime Rate Loan or an Alternate Rate Loan in accordance with Section 2.2.3 above (each, a "**Rate Conversion**"), then:

(i)    within thirty (30) days after such Rate Conversion, Borrower shall enter into, make all payments under, and satisfy all conditions precedent to the effectiveness of, a Substitute Interest Rate Cap Agreement (and in connection therewith, but not prior to Borrower taking all the actions described in this clause (i), Borrower shall have the right to terminate any then-existing Interest Rate Cap Agreement) and Lender shall take such steps as necessary to evidence its consent to the termination of the then-existing Interest Rate Cap Agreement); and

(ii)    following any Rate Conversion, in lieu of satisfying the condition described in Section 2.3.3(b) with respect to the Interest Rate Cap Agreement relating to any outstanding Extension Term, Borrower shall instead enter into, make all payments under, and satisfy all conditions precedent to the effectiveness of a Substitute Interest Rate Cap Agreement on or prior to the first day of such Extension Term.

(g)    As used herein, "**Substitute Interest Rate Cap Agreement**" shall mean an interest rate cap agreement between an Acceptable Counterparty and Borrower, obtained by Borrower and collaterally assigned to Lender pursuant to an Assignment of Interest Rate Cap Agreement (or substantially similar collateral assignment) and shall contain each of the following:

(i)    a term expiring no earlier than, in the case of clause (f)(i) above, the end of the Interest Period in which the Maturity Date occurs and, in the case of clause (f)(ii)

above, the end of the Interest Period in which the last day of the requested Extension Term occurs;

(ii)    the notional amount of the Substitute Interest Rate Cap Agreement shall be equal to or greater than the then outstanding principal balance of the Loan;

(iii)    it provides that the only monetary and material obligation of Borrower thereunder is the making of a single payment to the Acceptable Counterparty thereunder upon the execution and delivery thereof and there are no other conditions to the effectiveness of such Substitute Interest Rate Cap Agreement;

(iv)    it provides to Lender and Borrower (as determined by Lender in its sole but good faith discretion), for the term of the Substitute Interest Rate Cap Agreement, a protection against rising interest rates that is no less beneficial to Borrower and Lender than (A) in the case of clause (f)(i) above, that which was provided by the Interest Rate Cap Agreement being replaced by the Substitute Interest Rate Cap Agreement and (B) in the case of clause (f)(ii) above, that which was intended to be provided by the Interest Rate Cap Agreement that, but for the operation of this Section 2.2.7(g), would have been required to have been delivered by Borrower pursuant to Section 2.3.3(b) below as a condition to the requested Extension Term; and

(v)    without limiting any of the provisions of the preceding clauses (i) through (iv) above, it satisfies all of the requirements set forth in clauses (i) through (iii) and clause (v) of Section 2.2.7(a) hereof.

From and after the date of any Rate Conversion, all references to "Interest Rate Cap Agreement" and "Replacement Interest Rate Cap Agreement" herein (other than in the definition of "Interest Rate Cap Agreement", the definition of "Replacement Interest Rate Cap Agreement" and as referenced in the first sentence of Section 2.2.7(a) hereof) shall be deemed to refer or relate, as applicable, to a Substitute Interest Rate Cap Agreement. Notwithstanding the foregoing, Lender acknowledges and agrees that Borrower shall have the right, in lieu of delivering a new Substitute Interest Rate Cap Agreement to satisfy the foregoing, to modify the then existing Interest Rate Cap Agreement so that it satisfies the conditions set forth in clauses (i) – (v) of the definition of "Substitute Interest Rate Cap Agreement" herein.

Section 2.3    **Loan Payment.**

2.3.1    **Monthly Debt Service Payments; Amortization Payment**.

(a)    Borrower shall pay to Lender (a) on the Closing Date, an amount equal to interest only on the outstanding principal balance of the Loan from the Closing Date up to and including June 14, 2018, which interest shall be calculated in accordance with the provisions of Section 2.2 hereof and (b) on each Payment Date commencing on the Payment Date occurring in July, 2018 and on each Payment Date thereafter up to and including the Maturity Date, an amount equal to the Monthly Debt Service Payment Amount, which payments shall be applied first to interest due for the related Interest Period at the LIBOR Rate or, if unavailable, at the Prime Rate or the Alternate Rate, as applicable, for such related Interest Period and then to any other amounts due

and unpaid pursuant to the Loan Documents hereto. The Monthly Debt Service Payment Amount paid pursuant to this <u>Section 2.3.1(a)</u> shall be applied (i) first, to the payment of interest due and payable on Component A; (ii) second, to the payment of interest due and payable on Component B; (iii) third, to the payment of interest due and payable on Component C; (iv) fourth, to the payment of interest due and payable on Component D; (v) fifth, to the payment of interest due and payable on Component E; (vi) sixth, to the payment of interest due and payable on Component F and (vii) seventh, to the payment of interest due and payable on Component HRR.

(b)     On July 9, 2019 and on each Payment Date occurring in July during the term of the Loan (each such date, an "**Amortization Payment Date**"), Borrower shall pay to Lender an amount equal to twenty-five percent (25%) of annual Excess Cash Flow for the twelve (12) month period immediately preceding such Amortization Payment Date (each such annual payment, an "**Amortization Payment**"). Each Amortization Payment paid pursuant to this <u>Section 2.3.1(b)</u> shall be applied (i) first, to the reduction of the outstanding principal balance of Component A, until reduced to zero; (ii) second, to the reduction of the outstanding principal balance of Component B, until reduced to zero; (iii) third, to the reduction of the outstanding principal balance of Component C, until reduced to zero; (iv) fourth, to the reduction of the outstanding principal balance of Component D, until reduced to zero; (v) fifth, to the reduction of the outstanding principal balance of Component E, until reduced to zero; (vi) sixth, to the reduction of the outstanding principal balance of Component F, until reduced to zero and (vii) seventh, to the reduction of the outstanding principal balance of Component HRR, until reduced to zero. Following the occurrence and continuance of any Event of Default, any payment of principal from whatever source may be applied by Lender among the Components in Lender's sole discretion.

2.3.2     <u>**Payments Generally**</u>. The first Interest Period hereunder shall commence on and include the Closing Date and shall end on and include June 14, 2018. Thereafter during the term of the Loan, each Interest Period shall commence on the fifteenth (15th) day of the calendar month preceding the calendar month in which the related Payment Date occurs and shall end on and include the fourteenth (14th) day of the calendar month in which the related Payment Date occurs. For purposes of making payments hereunder, but not for purposes of calculating Interest Periods, if the day on which such payment is due is not a Business Day, then amounts due on such date shall be due on the immediately preceding Business Day and with respect to payments of principal due on the Maturity Date, interest shall be payable at the Interest Rate or the Default Rate, as the case may be, through and including the last day of the related Interest Period. All amounts due under this Agreement and the other Loan Documents shall be payable without setoff, counterclaim, defense or any other deduction whatsoever.

2.3.3     <u>**Payment on Maturity Date**</u>. (a) Borrower shall pay to Lender on the Maturity Date the outstanding principal balance of the Loan, all accrued and unpaid interest and all other amounts due hereunder and under the Note, the Mortgage and the other Loan Documents.

(b)     Borrower will have three (3) options to extend the Maturity Date of the Loan for consecutive one (1) year periods (each, an "**Extension Option**"). In order to exercise the first such extension right, Borrower shall deliver to Lender written notice of such extension on or

before the Payment Date occurring in May, 2020, and, upon giving of such notice of extension, and subject to the satisfaction of each of the conditions set forth in <u>Section 2.3.3(c)</u> on or before the applicable date specified below, the Initial Maturity Date as theretofore in effect will be extended to the First Extended Maturity Date.  In order to exercise the second such extension right, Borrower shall deliver to Lender written notice of such extension on or before the Payment Date occurring in May, 2021 and, upon the giving of such notice of extension, and subject to the satisfaction of each of the conditions set forth below in <u>Section 2.3.3(c)</u> on or before the applicable date specified below, the Maturity Date as theretofore in effect will be extended to the Second Extended Maturity Date.  In order to exercise the third such extension right, Borrower shall deliver to Lender written notice of such extension on or before the Payment Date occurring in May, 2022 and, upon the giving of such notice of extension, and subject to the satisfaction of each of the conditions set forth below in <u>Section 2.3.3(c)</u> on or before the applicable date specified below, the Maturity Date as theretofore in effect will be extended to the Third Extended Maturity Date.

     (c)     The Maturity Date shall be extended pursuant to Borrower's notices as set forth in <u>Section 2.3.3(b)</u>, <u>provided</u> that in each case the following conditions are satisfied:  (A) no Event of Default shall be in existence and continuing either on the date of Borrower's notice or on the then current Maturity Date, (B) if the Interest Rate Cap Agreement is scheduled to mature prior to the applicable Extended Maturity Date, Borrower shall (i) obtain and deliver to Lender on or prior to the first day of each Extension Option, one or more Replacement Interest Rate Cap Agreements from an Acceptable Counterparty which Replacement Interest Rate Cap Agreement shall have a LIBOR Rate Index (or a Prime Rate Index or Alternate Rate Index, as applicable) strike price equal to the Strike Price, be effective commencing on the first date of such Extension Option and shall have a maturity date not earlier than the applicable Extended Maturity Date after giving effect to the option then being exercised and (ii) deliver an assignment of interest rate cap agreement with respect to any Replacement Interest Rate Cap Agreement in form and substance substantially similar to the Assignment of Interest Rate Cap Agreement delivered on the Closing Date, together with legal opinions of counsel to the counterparty and Borrower as reasonably required by Lender; (C) with respect to the third Extension Option, the Debt Yield as determined by Lender based upon the period ending on the last day of the second (2nd) calendar month immediately preceding the calendar month in which the then current Maturity Date occurs (as calculated after taking into account any Extension Prepayment made by Borrower pursuant to <u>Section 2.4.4</u> hereof) shall equal or exceed the applicable Required Extension Debt Yield, (D) in the event that any portion of the Mezzanine Loan Debt (other than contingent obligations) is then outstanding, Mezzanine Borrower shall have exercised and complied with all conditions to the applicable Extension Option (as defined in the Mezzanine Loan Agreement) in the Mezzanine Loan Agreement as of the date Borrower exercises such Extension Option (or the Mezzanine Lender has waived such conditions), (E) in connection with the commencement of the second and third Extension Option, the then applicable Spread for each Component shall be increased by fifteen (15) basis points which increase shall be effective as of (1) with respect to the second Extension Option, the Interest Period applicable to the Payment Date in July, 2021 and each Payment Date thereafter and (2) with respect to the third Extension Option, the Interest Period applicable to the Payment Date in July, 2022 and each Payment Date thereafter.

     2.3.4     **<u>Late Payment Charge</u>**.  If any principal, interest or any other sums due under the Loan Documents (excluding the amounts due on the Maturity Date) are not paid by

Borrower on or prior to the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the Maximum Legal Rate in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Mortgage and the other Loan Documents to the extent permitted by applicable law.

2.3.5    **Method and Place of Payment**. Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 11:00 a.m., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or as otherwise directed by Lender, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

Section 2.4    **Prepayments.**

2.4.1    **Voluntary Prepayments.** (a) Except as otherwise provided in this Section 2.4.1 or Section 2.4.2, Borrower shall not have the right to prepay the Loan in whole or in part.

(b)    Borrower may prepay the Loan in whole but, not in part (except that partial prepayments shall be permitted in connection with an Extension Prepayment or in connection with a Transfer Prepayment), provided that (i) no Event of Default exists; (ii) Borrower gives Lender not more than thirty (30) days' prior written notice (or such shorter period of time permitted by Lender in its reasonable discretion) of the amount of the Loan that Borrower intends to prepay; (iii) no prepayment shall be permitted on any date during the period commencing on the first calendar day immediately following a Payment Date to, but not including, the Determination Date in such calendar month; and (iv) Borrower pays Lender, in addition to the outstanding principal amount of the Loan to be prepaid, (A) all interest which would have accrued on the amount of the Loan to be paid through and including the last day of the Interest Period related to the Payment Date next occurring following the date of such prepayment, or, if such prepayment occurs on a Payment Date, through and including the last day of the Interest Period related to such Payment Date; (B) all other sums due and payable under this Agreement, the Note, and the other Loan Documents, including, but not limited to the Breakage Costs and all of Lender's costs and expenses (including reasonable attorney's fees and disbursements) actually incurred by Lender in connection with such prepayment; and (C) if such prepayment is made prior to the Spread Maintenance End Date, the Spread Maintenance Payment. If a notice of prepayment is given by Borrower to Lender pursuant to this Section 2.4.1(b), the amount designated for prepayment and all other sums required under this Section 2.4 shall be due and payable on the proposed prepayment date unless such prepayment notice is revoked or modified by Borrower upon two (2) Business Days' prior written notice to Lender, provided that Borrower shall pay all of Lender's reasonable out-of-pocket expenses incurred in connection with such revocation or modification. If for any reason Borrower prepays the Loan on a date other than a Payment Date, Borrower shall pay Lender, in addition to the Debt, all interest which would have accrued on the amount of the Loan through and including the last day of the Interest Period related to the Payment Date next occurring following the date of such prepayment.

(c)      Provided no Event of Default is continuing, Mezzanine Borrower shall be permitted to make voluntary prepayments of any Mezzanine Loan in accordance with the terms of Section 2.4.1 of the Mezzanine Loan Agreement without making a corresponding voluntary prepayment of the Loan.

2.4.2      **Mandatory Prepayments.**  On the next occurring Payment Date following the date on which Lender actually receives any Net Proceeds, if Lender is not obligated to make such Net Proceeds available to Borrower for the Restoration of the Property or otherwise remit such Net Proceeds to Borrower pursuant to Section 6.4 hereof, Borrower authorizes Lender, at Lender's option, to apply Net Proceeds as a prepayment of all or a portion of the outstanding principal balance of the Loan together with accrued interest and any other sums due hereunder in an amount equal to one hundred percent (100%) of such Net Proceeds; provided, however, if an Event of Default has occurred and is continuing, Lender may apply such Net Proceeds to the Debt (until paid in full) in any order or priority in its sole discretion.  Other than following an Event of Default, no Spread Maintenance Payment or other premium or fee shall be due in connection with any prepayment made pursuant to this Section 2.4.2.  Any amount of such proceeds in excess of the amount required to pay the Debt in full shall be distributed to Borrower.

2.4.3      **Prepayments After Default**.  If, following an Event of Default, payment of all or any part of the Debt is tendered by Borrower or otherwise recovered by Lender (including, without limitation, through application of any Reserve Funds), such tender or recovery shall include (a) interest at the Default Rate on the outstanding principal amount of the Loan from the date such Event of Default occurred through the end of the Interest Period related to the Payment Date next occurring following the date of such tender or recovery, or if such tender or recovery occurs on a Payment Date, through and including the Interest Period related to such Payment Date, and (b) if such tender or recovery occurs prior to the Spread Maintenance End Date, an amount equal to the Spread Maintenance Default Premium.

2.4.4      **Extension Prepayment**.  In connection with the exercise of any Extension Option pursuant to Section 2.3.3(b), in the event that the Debt Yield is otherwise less than the Required Extension Debt Yield, Borrower shall make a prepayment of the Loan in an amount equal to the *pro rata* portion of the Extension Prepayment Amount based on the then outstanding principal amount of the Loan and the Mezzanine Loan shall be prepaid in an amount equal to the applicable *pro rata* portion of the Extension Prepayment Amount based on the then outstanding principal balance of the Mezzanine Loan provided that, with respect to the exercise of each Extension Option (a) all other conditions to such prepayment and extension set forth in Section 2.4.1(b) and Section 2.3.3(b), as applicable, are satisfied as of such Maturity Date, and (b) Borrower pays Lender, in addition to the outstanding principal amount of the Loan to be prepaid, (i) all interest which would have accrued on the amount of the Loan to be paid through and including the last day of the Interest Period related to the Payment Date next occurring following the date of such prepayment (after giving effect to the applicable extension), or, if such prepayment occurs on a Payment Date, through and including the last day of the Interest Period related to such Payment Date; (ii) all other sums then due and payable under this Agreement, the Note, and the other Loan Documents, including, but not limited to the Breakage Costs and all of Lender's costs and expenses (including reasonable attorney's fees and disbursements) actually incurred by Lender in connection with such prepayment and (iii) if such prepayment is made

prior to the Spread Maintenance End Date, the Spread Maintenance Payment.  If a notice of prepayment is given by Borrower to Lender pursuant to this <u>Section 2.4.4</u>, the amount designated for prepayment and all other sums required under this <u>Section 2.4.4</u> shall be due and payable on the proposed prepayment date unless such prepayment is revoked or modified by Borrower upon two (2) Business Days' prior written notice to Lender, <u>provided</u> that Borrower shall pay all of Lender's reasonable costs and expenses actually incurred in connection with such revocation or modification.

2.4.5    **Application of Prepayments to Components.**  Any prepayment of the principal of the Loan, in whole or in part, voluntary or involuntary, when no Event of Default then exists shall be applied by Lender among the Components as follows: (a) first, to the reduction of the outstanding principal balance of Component A, until reduced to zero, (b) second, to the reduction of the outstanding principal balance of Component B, until reduced to zero, (c) third, to the reduction of the outstanding principal balance of Component C, until reduced to zero, (d) fourth, to the reduction of the outstanding principal balance of Component D, until reduced to zero, (e) fifth, to the reduction of the outstanding principal balance of Component E, until reduced to zero; (f) sixth, to the reduction of the outstanding principal balance of Component F, until reduced to zero and (g) seventh, to the reduction of the outstanding principal balance of Component HRR, until reduced to zero.  Following the occurrence and continuance of any Event of Default, any payment of principal from whatever source may be applied by Lender among the Components in Lender's sole discretion.

Section 2.5    **Release of Property.**  Except as set forth in this <u>Section 2.5</u>, no repayment or prepayment of all or any portion of the Loan shall cause, give rise to a right to require, or otherwise result in, the release of any Lien of the Mortgage on the Property.

2.5.1    **Release of Property Upon Payment in Full.**  (a)  If Borrower has elected to prepay the entire Loan and the requirements of <u>Section 2.4</u> and this <u>Section 2.5</u> have been satisfied, all of the Property shall be released from the Lien of the Mortgage.

(b)    In connection with the release of the Mortgage, Borrower shall submit to Lender, not less than thirty (30) days prior to such release, a release of Lien (and related Loan Documents) for the Property for execution by Lender.  Such release shall be in a form appropriate in the jurisdiction in which the Property is located and that would be satisfactory to a prudent lender and contains standard provisions, if any, protecting the rights of the releasing lender .  In addition, Borrower shall provide all other documentation Lender reasonably requires to be delivered by Borrower in connection with such release.  Borrower shall reimburse Lender and Servicer for any costs and expenses Lender and Servicer actually incur arising from such release (including reasonable attorneys' fees and expenses) and Borrower shall pay, in connection with such release, (i) all recording charges, filing fees, taxes or other expenses payable in connection therewith, and (ii) to any Servicer, the current, reasonable fee being assessed by such Servicer to effect such release.

Section 2.6    **Lockbox Account/Cash Management.**

2.6.1    **Lockbox Account.**    (a) During the term of the Loan, Borrower or Operating Lessee shall establish and maintain an account (the "**Lockbox Account**") with

Lockbox Bank in trust for the benefit of Lender, which Lockbox Account shall be under the sole dominion and control of Lender. The Lockbox Account shall be entitled "Thor Palmer House Hotel LLC and Thor Palmer House Hotel & Shops LLC, as Mortgagor, and JPMorgan Chase Bank, National Association, as Lender, pursuant to Loan Agreement dated as of June 8, 2018 – Lockbox Account". Borrower hereby grants to Lender a first-priority security interest in the Lockbox Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Lockbox Account, including, without limitation, filing UCC-1 Financing Statements and continuations thereof. Lender and Servicer shall have the sole right to make withdrawals from the Lockbox Account, in accordance with the Cash Management Agreement and all costs and expenses for establishing and maintaining the Lockbox Account shall be paid by Borrower or Operating Lessee. All monies now or hereafter deposited into the Lockbox Account shall be deemed additional security for the Debt. The Lockbox Agreement and Lockbox Account shall remain in effect until the Loan has been repaid in full.

(b)    Borrower shall, or shall cause Manager or Operating Lessee to, deposit all amounts received directly by Borrower or Operating Lessee or Manager constituting Rents into the Lockbox Account within one (1) Business Day after receipt thereof. Lender acknowledges that Rents deposited with Hilton Manager pursuant to the terms of the Management Agreement shall be deposited by Hilton into the Lockbox Account on the thirteenth (13th) day of each calendar month, or if such day is not a Business Day, on the immediately preceding Business Day.

(c)    Borrower or Operating Lessee shall obtain from Lockbox Bank its agreement to transfer to the Cash Management Account in immediately available funds by federal wire transfer all amounts on deposit in the Lockbox Account once every Business Day throughout the term of the Loan.

(d)    Upon the occurrence and during the continuance of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in the Lockbox Account to the payment of the Debt in any order in its sole discretion.

(e)    The Lockbox Account shall not be commingled with other monies held by Borrower, Operating Lessee, Manager or Lockbox Bank.

(f)    Nether Borrower nor Operating Lessee shall not further pledge, assign or grant any security interest in the Lockbox Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

(g)    Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys' fees and expenses) actually incurred by Lender and arising from or in any way connected with the Lockbox Account and/or the Lockbox Agreement (unless arising from the gross negligence or willful misconduct of Lender) or the performance of the obligations for which the Lockbox Account was established.

2.6.2 **Cash Management Account.** (a) During the term of the Loan, Borrower shall establish and maintain a segregated Eligible Account (the "**Cash Management Account**") to be held by Agent in trust and for the benefit of Lender, which Cash Management Account shall be under the sole dominion and control of Lender. The Cash Management Account shall be entitled "Thor Palmer House Hotel & Shops LLC, as Borrower, and JPMorgan Chase Bank, National Association and its successors and assigns, as Lender, pursuant to Loan Agreement dated as of June 8, 2018 - Cash Management Account". Borrower hereby grants to Lender a first priority security interest in the Cash Management Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Cash Management Account, including, without limitation, filing UCC-1 Financing Statements and continuations thereof. Borrower will not in any way alter or modify the Cash Management Account and will notify Lender of the account number thereof. Lender and Servicer shall have the sole right to make withdrawals from the Cash Management Account and all costs and expenses for establishing and maintaining the Cash Management Account shall be paid by Borrower.

(b) The insufficiency of funds on deposit in the Cash Management Account shall not relieve Borrower from the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

(c) All funds on deposit in the Cash Management Account following the occurrence and continuance of an Event of Default may be applied by Lender in such order and priority as Lender shall determine.

(d) Borrower hereby agrees that Lender may modify the Cash Management Agreement solely for the purpose of establishing additional sub-accounts in connection with any payments otherwise required under this Agreement and the other Loan Documents and Lender shall provide notice thereof to Borrower.

2.6.3 **Payments Received under the Cash Management Agreement.** Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, and provided no Event of Default has occurred and is continuing, Borrower's obligations with respect to the payment of the Monthly Debt Service Payment Amount and amounts required to be deposited into the Reserve Funds, if any, shall be deemed satisfied to the extent sufficient amounts are deposited in the Cash Management Account to satisfy such obligations pursuant to this Agreement on the dates each such payment is required, regardless of whether any of such amounts are so applied by Lender.

Section 2.7 **Withholding Taxes.**

(a) Payments Free of Taxes. Any and all payments by or on account of any obligation of Borrower under any Loan Document shall be made without deduction or withholding for any Section 2.7 Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of Borrower) requires the deduction or withholding of any Section 2.7 Tax from any such payment by Borrower, then Borrower shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or

withheld to the relevant Governmental Authority in accordance with applicable law and, if such Section 2.7 Tax is an Indemnified Tax, then the sum payable by Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this <u>Section 2.7</u>) the Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    <u>Payment of Other Taxes by Borrower</u>.  Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law any Other Taxes.

(c)    <u>Indemnification by Borrower</u>.  Borrower shall indemnify Lender, within fifteen (15) days after receipt of written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Lender or required to be withheld or deducted from a payment to such Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower by a Lender shall be conclusive absent manifest error.

(d)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Section 2.7 Taxes by Borrower to a Governmental Authority pursuant to this  <u>Section 2.7</u>, Borrower shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(e)    <u>Status of Lenders</u>.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Section 2.7 Tax with respect to payments made under any Loan Document shall deliver to Borrower, at the time or times reasonably requested by Borrower, such properly completed and executed documentation reasonably requested by Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower as will enable Borrower to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>Section 2.7(e)(ii)(A)</u>, <u>(ii)(B)</u> and <u>(ii)(D)</u> below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that Borrower is a U.S. Borrower,

(A)    any Lender that is a U.S. Person shall deliver to Borrower on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Section 2.7 Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Section 2.7 Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed originals of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit A-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) executed originals of IRS Form W-8BEN; or

(4)    to the extent a Foreign Lender is a partnership or is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of Exhibit A-2 or Exhibit A-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit A-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Borrower to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower at the time or times prescribed by law and at such time or times reasonably requested by Borrower such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower as may be necessary for Borrower to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower in writing of its legal inability to do so.

(f)     <u>Treatment of Certain Refunds</u>.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Section 2.7 Taxes as to which it has been indemnified pursuant to this <u>Section 2.7</u> (including by the payment of additional amounts pursuant to this <u>Section 2.7</u>, it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Section 2.7 Taxes giving rise to such refund), net of all out-of-pocket expenses (including Section 2.7 Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this <u>paragraph (f)</u> (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this <u>paragraph (f)</u>, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this <u>paragraph (f)</u> the payment of which would place the indemnified party in a less favorable net after-tax position than the indemnified party would have been in if the Section 2.7 Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Section 2.7 Tax had never been paid.  This paragraph

shall not be construed to require any indemnified party to make available its tax returns (or any other information relating to its Section 2.7 Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)    <u>Survival</u>.    Each party's obligations under this <u>Section 2.7</u> shall survive any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction and discharge of all obligations under any Loan Document.    Notwithstanding the foregoing or anything to the contrary set forth in this <u>Section 2.7</u>, Borrower shall not be obligated to pay pursuant to this <u>Section 2.7</u>, and Lender shall not be entitled to claim compensation pursuant to this <u>Section 2.7</u>, for any amounts which were incurred or which accrued more than ninety (90) days before the date Lender notified Borrower in writing of the circumstance on which such claim of compensation is based and delivered to Borrower a written statement setting forth in reasonable detail the basis for calculating the amounts payable by Borrower under this <u>Section 2.7</u>.

**ARTICLE III – CONDITIONS PRECEDENT**

Section 3.1    **Conditions Precedent to Closing**.    The obligation of Lender to make the Loan hereunder is subject to the fulfillment by Borrower or waiver by Lender of all of the conditions precedent to closing set forth in the application or term sheet for the Loan delivered by Borrower to Lender and the commitment or commitment rider, if any, to the application or term sheet for the Loan issued by Lender.    The funding of the Loan shall be de facto evidence that the conditions in <u>Section 3.1</u> have been satisfied.

**ARTICLE IV – REPRESENTATIONS AND WARRANTIES**

Section 4.1    **Borrower Representations.**    Borrower represents and warrants as of the date hereof that:

4.1.1    **Organization.**    Each of Borrower and Operating Lessee has been duly organized and is validly existing and in good standing with requisite power and authority to own or lease the Property, as applicable, and to transact the businesses in which it is now engaged. Each of Borrower and Operating Lessee is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its businesses and operations.    Each of Borrower and Operating Lessee possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own or lease the Property, as applicable, and to transact the businesses in which it is now engaged, and the sole business of Borrower and Operating Lessee is the ownership or lease, management and operation of the Property.    The ownership interests in Borrower and Operating Lessee are as set forth on the organizational chart attached hereto as <u>Schedule III</u>.

4.1.2    **Proceedings.**    Borrower and Operating Lessee have each taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents, as applicable.    This Agreement and such other Loan Documents have been duly executed and delivered by or on behalf of Borrower and Operating Lessee and constitute legal, valid and binding obligations of Borrower and Operating Lessee enforceable against Borrower and Operating Lessee in accordance with their respective terms, subject only to

applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

4.1.3    **No Conflicts.**  The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower and Operating Lessee will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower or Operating Lessee, as applicable, pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement or other agreement or instrument to which Borrower or Operating Lessee is a party or by which any of the Property or Borrower's or Operating Lessee's assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or Operating Lessee or any of Borrower's or Operating Lessee's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any court or any such Governmental Authority required for the execution, delivery and performance by Borrower or Operating Lessee of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

4.1.4    **Litigation.**  There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Borrower's knowledge, threatened against or affecting Borrower, Operating Lessee, Guarantor or the Property, which actions, suits or proceedings, if determined against Borrower, Operating Lessee, Guarantor or the Property, would be reasonably likely to materially adversely affect the condition (financial or otherwise) or business of Borrower, Operating Lessee, Guarantor or the condition or ownership of the Property.

4.1.5    **Agreements.**  Neither Borrower nor Operating Lessee is a party to any agreement or instrument or subject to any restriction which would be reasonably likely to materially and adversely affect Borrower, Operating Lessee or the Property, or Borrower's or Operating Lessee's business, properties or assets, operations or condition, financial or otherwise. Neither Borrower nor Operating Lessee is in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower, Operating Lessee or the Property is bound.  Neither Borrower nor Operating Lessee has any material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower or Operating Lessee is a party or by which Borrower, Operating Lessee or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property as permitted pursuant to clause (xxiii) of the definition of "Special Purpose Entity" set forth in Section 1.1 hereof and (b) obligations under the Loan Documents.

4.1.6    **Title.**  Borrower has good, marketable and insurable fee simple title to the real property comprising part of the Property and good title to the balance of the Property, free and clear of all Liens whatsoever except the Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created by the Loan Documents. Operating Lessee has good and marketable title to the leasehold interest with respect to the

Property granted by the Operating Lease.  The Permitted Encumbrances in the aggregate do not materially and adversely affect the value, operation or use of the Property (as currently used) or Borrower's ability to repay the Loan.  The Mortgage, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (a) a valid, perfected first priority lien on the Property and the Operating Lease, subject only to Permitted Encumbrances and the Liens created by the Loan Documents and (b) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created by the Loan Documents.  There are no claims for payment for work, labor or materials affecting the Property which are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents.

      4.1.7    **Solvency.**  Neither Borrower nor Operating Lessee has entered into this transaction or executed the Note, this Agreement or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor, and Borrower and Operating Lessee have received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the Loan, the fair saleable value of Borrower's and Operating Lessee's respective assets exceeds and will, immediately following the making of the Loan, exceed Borrower's and Operating Lessee's respective total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities.  The fair saleable value of Borrower's and Operating Lessee's respective assets is and will, immediately following the making of the Loan, be greater than Borrower's and Operating Lessee's respective probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured.  Borrower's and Operating Lessee's respective assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Neither Borrower nor Operating Lessee intends to, or believes that it will, incur debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and Operating Lessee and the amounts to be payable on or in respect of obligations of Borrower and Operating Lessee).  No petition in bankruptcy has been filed against Borrower or Operating Lessee or any constituent Person in the last seven (7) years, and neither Borrower nor Operating Lessee nor any constituent Person in the last seven (7) years has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors.  Neither Borrower nor Operating Lessee nor any of its constituent Persons are contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of Borrower's or Operating Lessee's respective assets or property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against it or such constituent Persons.

      4.1.8    **Full and Accurate Disclosure.**  No statement of fact made by Borrower or Operating Lessee in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.  There is no material fact presently known to Borrower which has not been disclosed to Lender which adversely affects, nor as far as Borrower

can foresee, would be reasonably expected to adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower or Operating Lessee.

    4.1.9    **ERISA.**

    (a)    <u>Generally.</u>  Each of the Borrower, Guarantor and their ERISA Affiliates is in compliance in all material respects with the applicable provisions of ERISA, the Code and other applicable law relating to any Plans and the regulations and published interpretations thereunder. Neither Borrower nor Guarantor has incurred or reasonably expects to incur any liability for a Prohibited Transaction (as such term is defined in Section 406 of ERISA or Section 4975 of the Code).  No ERISA Event or termination of any Plan has occurred or is reasonably expected to occur and no notice of termination has been filed by or with the PBGC with respect to any Plan established or maintained by Borrower, Guarantor or any ERISA Affiliate.  Neither Borrower, Guarantor nor any ERISA Affiliate is or was a party to any Multiemployer Plan.  With respect to each Foreign Benefit Arrangement and with respect to each Foreign Plan, (i) any employer and employee contributions required by law or by the terms of any Foreign Benefit Arrangement or any Foreign Plan have been made, or, if applicable, accrued, in accordance with normal accounting practices, (ii) the fair market value of the assets of each funded Foreign Plan, the liability of each insurer for any Foreign Plan funded through insurance or the book reserve established for any Foreign Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations, as of the date hereof, with respect to all current and former participants in such Foreign Plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles, and (iii) each Foreign Plan that is required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities.

    (b)    <u>Plan Assets; Prohibited Transactions.</u>  Neither the Borrower nor the Guarantor is, and neither shall become an entity deemed to hold "plan assets" within the meaning of 29 C.F.R. § 2510.3-101 (as modified by Section 3(42) of ERISA) of an employee benefit plan (as defined in Section 3(3) of ERISA) which is subject to Title I of ERISA or any plan (within the meaning of and subject to Section 4975 of the Code).  Neither the Borrower nor the Guarantor is a "governmental plan" within the meaning of Section 3(32) of ERISA and transactions by or with Borrower or Guarantor are not subject to any state or other statute, regulation or other restriction regulating investments of, or fiduciary obligations with respect to, governmental plans within the meaning of Section 3(32) of ERISA which is similar to Section 406 of ERISA or Section 4975 of the Code ("**Similar Law**").  The execution of this Agreement, the making of the Loan and the other transactions contemplated by the Loan Documents, including but not limited to the exercise by the Lender of its rights under the Loan Documents, are not and will not give rise to an unexempt Prohibited Transaction within the meaning of Section 406 of ERISA or Section 4975 of the Code, and are not prohibited or otherwise restricted by Similar Law.

    4.1.10    **Compliance.**  Except as set forth in the Zoning Report prepared by The Planning & Zoning Resource Corporation and dated as of June 7, 2018, the Property Condition Report and the Environmental Report delivered to Lender in connection with the Loan, Borrower, Operating Lessee and the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, building and zoning

ordinances and codes. Neither Borrower nor Operating Lessee is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority. There has not been committed by Borrower, Operating Lessee or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. On the Closing Date, the Improvements at the Property were in material compliance with applicable law.

4.1.11    **Financial Information.**  All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender by or on behalf of Borrower in connection with the Loan (a) are true, complete and correct in all material respects, (b) accurately represent, in all material respects, the financial condition of Borrower, Operating Lessee and the Property, as applicable, as of the date of such reports, and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with GAAP or the Uniform System of Accounts throughout the periods covered, except as disclosed therein. Except for Permitted Encumbrances, neither Borrower nor Operating Lessee has any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a material adverse effect on Borrower's or Operating Lessee's financial condition, the value of the Property or the Property's Net Operating Income, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no material adverse change in the financial condition, operations or business of Borrower or Operating Lessee from that set forth in said financial statements.

4.1.12    **Condemnation.**  No Condemnation or other similar proceeding has been commenced or, to Borrower's actual knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

4.1.13    **Federal Reserve Regulations.**  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

4.1.14    **Utilities and Public Access.**  The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over other property) or in recorded easements serving the Property and such easements are set forth in and insured by the Title Insurance Policy. All roads necessary for the use of the Property for its current purposes have been completed and dedicated to public use and accepted by all Governmental Authorities.

4.1.15    **Not a Foreign Person.**    Neither Borrower nor Operating Lessee is a "foreign person" within the meaning of §1445(f)(3) of the Code.

4.1.16    **Separate Lots.**    The Property is comprised of one (1) or more parcels which are separately assessed by the Cook County assessor as property identification numbers 17-15-102-018-0000, 17-15-102-019-0000, 17-15-102-020-0000, 17-15-102-021-0000 and 17-15-102-022-0000, which, collectively do not contain any property other than the Property.

4.1.17    **Assessments.**    There are no pending or, to Borrower's knowledge, proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

4.1.18    **Enforceability.**    The Loan Documents are enforceable by Lender (or any subsequent holder thereof) in accordance with their respective terms, subject to principles of equity and bankruptcy, insolvency and other laws generally applicable to creditors' rights and the enforcement of debtors' obligations.    The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, Operating Lessee or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (subject to principles of equity and bankruptcy, insolvency and other laws generally affecting creditors' rights and the enforcement of debtors' obligations), and neither Borrower, Operating Lessee nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

4.1.19    **No Prior Assignment.**    There are no prior assignments of the Leases or any portion of the Rents due and payable or to become due and payable which are presently outstanding.

4.1.20    **Insurance.**    Borrower has obtained and has delivered to Lender certified copies of, or certificates evidencing, the Policies reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.    Except as set forth on <u>Schedule IX</u> hereto, no claims have been made or are currently pending, outstanding or otherwise remain unsatisfied under any such Policy, and neither Borrower nor any other Person, has done, by act or omission, anything which would impair the coverage of any such Policy.

4.1.21    **Use of Property.**    The Property is used exclusively for hotel purposes and other appurtenant and related uses.

4.1.22    **Certificate of Occupancy; Licenses.**    All certifications, permits, licenses and approvals, including without limitation, certificates of completion, occupancy permits, hospitality licenses, and liquor licenses required for the legal use, occupancy and operation of the Property have been obtained and are in full force and effect.    The use being made of the Property is in conformity with the certificate of occupancy issued for the Property.    Borrower shall cause Operating Lessee or Manager to keep and maintain all licenses necessary for the operation of the property as a hotel (including, without limitation, any liquor licenses).

4.1.23    **Flood Zone.**  None of the Improvements on the Property are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards, or, if so located, the flood insurance required pursuant to Section 6.1(a)(i) is in full force and effect with respect to the Property.

4.1.24    **Physical Condition.**  Except as expressly set forth in that certain property condition report prepared by ATC and dated as of March 23, 2018, delivered to Lender in connection with the Loan (the "**Property Condition Report**"), the Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects; there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and neither Borrower nor Operating Lessee has received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

4.1.25    **Intentionally Omitted.**

4.1.26    **Leases.**  The Property is not subject to any leases other than the Leases described in the rent roll attached hereto as Schedule I and made a part hereof, which rent roll is true, complete and accurate in all material respects as of the Closing Date.  Borrower is the owner and lessor of landlord's interest in the Leases.  No Person has any possessory interest in the Property or right to occupy the same except under and pursuant to the provisions of the Leases and the Operating Lease.  Except as set forth on Schedule X, the current Leases are in full force and effect and there are to Borrower's knowledge no defaults thereunder by either party and there are no conditions that, with the passage of time or the giving of notice, or both, would constitute defaults thereunder.  Except as set forth on Schedule X, no Rent has been paid more than one (1) month in advance of its due date.  All security deposits are held by Borrower or Operating Lessee in accordance with applicable law.  Except as set forth on Schedule X, all work to be performed by Borrower or Operating Lessee under each Lease has been performed as required and has been accepted by the applicable Tenant, and any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by Borrower or Operating Lessee to any Tenant has already been received by such Tenant.  To Borrower's knowledge, there has been no prior sale, transfer or assignment, hypothecation or pledge of any Lease or of the Rents received therein which is outstanding.  No Tenant listed on Schedule I has assigned its Lease or sublet all or any portion of the premises demised thereby, no such Tenant holds its leased premises under assignment or sublease, nor does anyone except such Tenant and its employees occupy such leased premises.  No Tenant under any Lease has a right or option pursuant to such Lease or otherwise to purchase all or any part of the leased premises or the building of which the leased premises are a part.  No Tenant under any Lease has any right or option for additional space in the Improvements.

4.1.27    **Survey.**  The Survey for the Property delivered to Lender in connection with this Agreement does not fail to reflect any material matter affecting the Property or the title thereto.

4.1.28    **Inventory.**  Borrower or Operating Lessee is the owner of all of the Equipment, Fixtures and Personal Property (as such terms are defined in the Mortgage) located on or at the Property and shall not lease any Equipment, Fixtures or Personal Property other than as permitted hereunder.  All of the Equipment, Fixtures and Personal Property are sufficient to operate the Property in the manner required hereunder and in the manner in which it is currently operated.

4.1.29    **Filing and Recording Taxes.**  All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements have been paid.  All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Mortgage, have been paid.

4.1.30    **Special Purpose Entity/Separateness.**  (a)  Until the Debt has been paid in full, Borrower hereby represents, warrants and covenants that each of Borrower and Operating Lessee has since the date of its formation been, is, shall be and shall continue to be a Special Purpose Entity.

(b)    The representations, warranties and covenants set forth in Section 4.1.30(a) shall survive for so long as any amount remains payable to Lender under this Agreement or any other Loan Document.

(c)    Any and all of the stated facts and assumptions made in any Insolvency Opinion, including, but not limited to, any exhibits attached thereto, will have been and shall be true and correct in all respects, and Borrower and Operating Lessee will have complied and will comply with all of the stated facts and assumptions made with respect to it in any Insolvency Opinion. Each entity other than Borrower and Operating Lessee with respect to which an assumption is made or a fact stated in any Insolvency Opinion will have complied and will comply with all of the assumptions made and facts stated with respect to it in any such Insolvency Opinion. Borrower covenants that in connection with any Additional Insolvency Opinion delivered in connection with this Agreement it shall provide an updated certification regarding compliance with the facts and assumptions made therein.

(d)    Borrower covenants and agrees that (i) Borrower shall provide Lender with five (5) days' prior written notice prior to the removal of an Independent Director of any of Borrower or Operating Lessee and (ii) no Independent Director shall be removed other than for Cause.

(e)    Borrower hereby represents with respect to Borrower and Operating Lessee that each such entity:

(i)    is and always has been duly formed, validly existing, and in good standing in the state of its formation and in all other jurisdictions where it is qualified to do business;

(ii)    has no judgments or liens of any nature against it or its Property except for tax liens not yet due except as otherwise set forth in the title insurance commitment delivered in connection with the Loan that are being insured by the Title Insurance Policy;

(iii)    is in compliance with all laws, regulations, and orders applicable to it and, except as otherwise disclosed in this Agreement, has received all permits necessary for it to operate;

(iv)    is not involved in any dispute with any taxing authority;

(v)    has paid all taxes which it owes;

(vi)    has never owned any property other than, in the case of Borrower, the Property, the Retail Parcel and the Office Parcel and personal property necessary or incidental to its ownership or operation of the Property, the Retail Parcel and the Office Parcel and in the case of Operating Lessee, its leasehold interests in the Property and has never engaged in any business other than, in the case of Borrower, the ownership and operation of the Property, and in the case of Operating Lessee, leasing the Property pursuant to the Operating Lease and managing and operating the Property;

(vii)    except as set forth on Schedule VIII hereto, is not now, nor has ever been, party to any lawsuit, arbitration, summons, or legal proceeding that is still pending or that resulted in a judgment against it that has not been paid in full;

(viii)    has provided Lender with complete financial statements that reflect a fair and accurate view, in all material respects, of the entity's financial condition;

(ix)    has obtained a current Phase I environmental site assessment (or, if applicable, a current Phase II environmental assessment) (ESA) for the Property, the Retail Parcel and the Office Parcel, each prepared consistent with ASTM Practice E 1527 and the ESA has not identified any recognized environmental conditions that require further investigation or remediation as it relates to the Property, the Retail Parcel or the Office Parcel;

(x)    has no material contingent or actual obligations not related to the Property; and

(xi)    Each amendment and restatement of any organizational document of Borrower and Operating Lessee has been accomplished in accordance with, and was

permitted by, the relevant provisions of said documents prior to its amendment or restatement from time to time.

(f)    The organizational documents for Borrower and Operating Lessee shall provide that:

(i)    except for duties to Borrower as set forth in the organizational documents (including duties to the member and Borrower's creditors solely to the extent of their respective economic interests in Borrower, but excluding (i) all other interests of the member, (ii) the interests of other Affiliates of Borrower, and (iii) the interests of any group of Affiliates of which Borrower is a part), the Independent Directors shall not have any fiduciary duties to the member, any officer or any other Person bound by the applicable Borrower's or Operating Lessee's organizational documents; provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing;

(ii)    to the fullest extent permitted by law, including Section 18-1101(e) of the Delaware Limited Liability Company Act, an Independent Director shall not be liable to Borrower, the member or any other Person bound by Borrower's or Operating Lessee's organizational documents, as applicable, for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director acted in bad faith or engaged in willful misconduct;

(iii)    all right, power and authority of the Independent Directors shall be limited to the extent necessary to exercise those rights and perform those duties specifically set forth in Borrower's or Operating Lessee's organizational documents, as applicable; and

(iv)    notwithstanding any other provision of Borrower's or Operating Lessee's organizational documents, to the contrary, each Independent Director, in its capacity as an Independent Director, may only act, vote or otherwise participate in those matters referred to in Section 9(c)(iii) of Borrower's or Operating Lessee's organizational documents, as applicable, or as otherwise specifically required by the applicable organizational documents, and such Independent Director's act, vote or other participation shall not be required for the validity of any action taken by the board of directors of Borrower or Operating Lessee, as applicable, unless, pursuant to the provisions of Section 9(c)(iii) or as otherwise specifically provided in the applicable organizational documents, such action would be invalid in the absence of the affirmative vote or consent of such Independent Director.

(g)    Borrower hereby represents with respect to itself and Operating Lessee that any amendment or restatement of any organizational document has been accomplished in accordance with, and was permitted by, the relevant provisions of such document prior to its amendment or restatement from time to time.

4.1.31    **Management Agreement.**  The Management Agreement is in full force and effect and there is no default thereunder by any party thereto and to Borrower's knowledge no event has occurred that, with the passage of time and/or the giving of notice would constitute

a default thereunder.  The Management Agreement was entered into on commercially reasonable terms.

4.1.32     **Illegal Activity.**  No portion of the Property has been or will be purchased with proceeds of any illegal activity.

4.1.33     **No Change in Facts or Circumstances; Disclosure.**  All information submitted by and on behalf of Borrower to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are true, complete and correct in all material respects.  There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or would be reasonably expected to materially and adversely affect the use, operation or value of the Property or the business operations or the financial condition of Borrower or Operating Lessee.  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any Provided Information or representation or warranty made herein to be materially misleading.

4.1.34     **Investment Company Act.**  Neither Borrower nor Operating Lessee is (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Energy Policy Act of 2005, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

4.1.35     **Embargoed Person.**  As of the date hereof and at all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, Operating Lessee and Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person; (b) no Embargoed Person has any interest of any nature whatsoever in Borrower, Operating Lessee or Guarantor, as applicable, with the result that the investment in Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower, Operating Lessee or Guarantor, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower, Operating Lessee or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

4.1.36     **Principal Place of Business; State of Organization.**  Borrower's principal place of business as of the date hereof is the address set forth in the introductory paragraph of this Agreement.  The Borrower is organized under the laws of the State of Delaware and its organizational identification number is 397-7260.

4.1.37     **Environmental Representations and Warranties.**

(a)        Except as otherwise disclosed by that certain Phase I environmental report prepared by Partner Engineering and dated as of April 18, 2018 (or Phase II environmental report, if required) delivered to Lender by Borrower in connection with the origination of the Loan (such report is referred to below as the "**Environmental Report**"), (i) to Borrower's knowledge there are no Hazardous Substances or underground storage tanks in, on, or under the Property, except those that are (A) in compliance with Environmental Laws and with permits issued pursuant thereto (to the extent such permits are required under Environmental Law), (B) de-minimis amounts necessary to operate the Property for the purposes set forth in the Loan Agreement which will not result in an environmental condition in, on or under the Property and which are otherwise permitted under and used in compliance with Environmental Law and (C) fully disclosed to Lender in writing pursuant the Environmental Report; (ii) to Borrower's knowledge there are no past, present or threatened Releases of Hazardous Substances in, on, under or from the Property which has not been fully remediated in accordance with Environmental Law; (iii) to Borrower's knowledge there is no threat of any Release of Hazardous Substances migrating to the Property; (iv) to Borrower's knowledge there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with the Property which has not been fully remediated in accordance with Environmental Law; (v) Borrower does not know of, and has not received, any written or oral notice or other communication from any Person (including but not limited to a Governmental Authority) relating to Hazardous Substances or Remediation thereof, of possible liability of any Person pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing; and (vi) Borrower has truthfully and fully disclosed provided to Lender, in writing, any and all information relating to environmental conditions in, on, under or from the Property that is known to Borrower and has provided to Lender all information relating to environmental conditions that is contained in Borrower's files and records, including, but not limited to, any reports relating to Hazardous Substances in, on, under or from the Property and/or to the environmental condition of the Property.

(b)        Except as otherwise disclosed by those certain Phase I environmental reports delivered to Borrower by Lender in connection with the origination of the Loan (such reports are referred to below as the "**Transferred Property Environmental Report**"), as of the date on which Borrower ceased to own, directly or indirectly, any interest in the Retail Parcel or the Office Parcel (collectively, the "**Transferred Property**") (i) there were no Hazardous Substances or underground storage tanks in, on, or under such Transferred Property, except those that were (A) then in compliance with Environmental Laws and with permits issued pursuant thereto (to the extent such permits were then required under Environmental Law), (B) de-minimis amounts necessary to operate such Transferred Property for the purposes for which it was then being operated which would not result in an environmental condition in, on or under such Transferred Property and which were otherwise permitted under and used in compliance with Environmental Law and (C) fully disclosed to Lender in writing pursuant to the Transferred Property Environmental Report; (ii) there were no past, then-present or then-threatened Releases by Borrower or any Affiliate of Borrower, or, to the knowledge of Borrower or any of its Affiliates, any other Person of Hazardous Substances in, on, under or from such Transferred Property which had not then been fully remediated in accordance with Environmental Law; (iii) there was no threat of any Release of Hazardous Substances by Borrower or any Affiliate of Borrower or, to the knowledge of Borrower or any of its Affiliates, any other Person migrating to

such Transferred Property; (iv) there was no past or then-present non-compliance with Environmental Laws, or with permits issued pursuant thereto by Borrower or any Affiliate of Borrower, or, to the knowledge of Borrower or any of its Affiliates, any other Person, in connection with any such Transferred Property which had not then been fully remediated in accordance with Environmental Law; (v) neither Borrower nor any of its Affiliates knows of, and nor has received, any written notice or other communication from any Person (including but not limited to a Governmental Authority) relating to Hazardous Substances or Remediation thereof in connection with such Transferred Property, of possible liability of any Person pursuant to any Environmental Law, other environmental conditions in connection with such Transferred Property, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing; and (vi) Borrower has truthfully and fully provided to Lender, in writing, any and all information relating to environmental conditions in, on, under or from the Property that is known to Borrower or any of its Affiliates or Borrower and has provided to Lender all information relating to environmental conditions that is contained in Borrower's and Borrower's Affiliates' files and records, including, but not limited to, any reports relating to Hazardous Substances in, on, under or from such Transferred Property and/or to the environmental condition of such Transferred Property.

4.1.38    **Cash Management Account.**  Borrower hereby represents and warrants to Lender that:

(a)    This Agreement, together with the other Loan Documents, create a valid and continuing security interest (as defined in the Uniform Commercial Code of the State of New York) in the Lockbox Account and the Cash Management Account in favor of Lender, which security interest is prior to all other Liens, other than Permitted Encumbrances, and is enforceable as such against creditors of and purchasers from Borrower.  Other than in connection with the Loan Documents and except for Permitted Encumbrances, Borrower has not sold, pledged, transferred or otherwise conveyed the Lockbox Account and Cash Management Account;

(b)    Each of the Lockbox Account and Cash Management Account constitutes "deposit accounts" and/or "securities accounts" within the meaning of the Uniform Commercial Code of the State of New York);

(c)    Pursuant and subject to the terms hereof and the other applicable Loan Documents, the Lockbox Bank and Agent have agreed to comply with all instructions originated by Lender, without further consent by Borrower, directing disposition of the Lockbox Account and Cash Management Account and all sums at any time held, deposited or invested therein, together with any interest or other earnings thereon, and all proceeds thereof (including proceeds of sales and other dispositions), whether accounts, general intangibles, chattel paper, deposit accounts, instruments, documents or securities; and

(d)    The Lockbox Account and Cash Management Account are not in the name of any Person other than Borrower or Operating Lessee, as pledgor, or Lender, as pledgee.  Neither Borrower nor Operating Lessee has consented to the Lockbox Bank and Agent complying with instructions with respect to the Lockbox Account and Cash Management Account from any Person other than Lender.

(e)     The Property is not subject to any cash management system (other than pursuant to the Loan Documents), and any and all existing tenant instruction letters issued in connection with any previous financing have been duly terminated prior to the date hereof.

4.1.39     **Operating Lease.**  Borrower is the owner and lessor of landlord's interest in the Operating Lease.  The current Operating Lease is in full force and effect and there are no material defaults thereunder by either party and to Borrower's knowledge, there are no conditions that, with the passage of time or the giving of notice, or both, would constitute defaults thereunder.  No Operating Rent has been paid more than one (1) month in advance of its due date.  All security deposits (if any) are held by Borrower in accordance with applicable law. All work (if any) to be performed by Borrower under the Operating Lease has been performed as required and has been accepted by Operating Lessee, and any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by Borrower to Operating Lessee has already been received by Operating Lessee.  There has been no prior sale, transfer or assignment, hypothecation or pledge of the Operating Lease or of the Operating Rents received therein which is outstanding.  Operating Lessee has not assigned the Operating Lease or sublet all or any portion of the premises demised thereby other than pursuant to a Lease.  Operating Lessee has no right or option pursuant to the Operating Lease or otherwise to purchase all or any part of the leased premises or the building of which the leased premises are a part.

4.1.40     **REA.**  Borrower is a party (either directly, or as a successor-in-interest) to the REA and the REA is in full force and effect and has not been amended or modified  and Borrower's interest therein has not been assigned pursuant to any assignment. There are no set-offs, claims, counterclaims or defenses being asserted or, after giving the requisite notice, if any, required under the REA, capable of being asserted, for the enforcement of the obligations of any party under the REA. No party to the REA has the right to file a Lien for amounts due under the provisions of the REA which, if unpaid, may be asserted as a Lien prior to the Lien of the Mortgage.  All common charges and other sums due from Borrower, if any, under the REA have been paid to the extent they are payable on or prior to the date hereof.

4.1.41     **Class L Deduction**.  The Class L Deduction is in full force and effect and has not been revoked. Borrower has delivered all affidavits required to maintain the Class L Deduction as required pursuant to Applicable Law.

4.1.42     **Taxes.**  Borrower is a disregarded entity for U.S. federal income tax purposes.  Borrower has timely filed or caused to be filed all U.S. federal and other material tax returns and reports required to have been filed by it and has timely paid or caused to be paid all U.S. federal and other material Section 2.7 Taxes required to have been paid by it, except for (a) any such Section 2.7 Taxes that are being contested in good faith by appropriate proceedings and for which Borrower has set aside on its books adequate reserves in accordance with GAAP, and (b) Taxes and Other Charges, the payment of which shall be governed by Section 5.1.2 and Section 7.2 hereof.

4.1.43     **Anti-Corruption.**  Borrower represents and warrants that, in connection with this Agreement, Borrower, Guarantor and each Person  that has an economic interest in Borrower, in each case has complied with and will continue to comply with all applicable anti-

bribery and corruption laws and regulations in the United States, including the U.S. Foreign Corrupt Practices Act of 1977 (the "**Anti-Corruption Obligation**").  Borrower shall, at all times throughout the term of the Loan, maintain and enforce appropriate policies, procedures and controls reasonably designed to ensure compliance with the Anti-Corruption Obligation.

       4.1.44     **PIP.**  There are no PIPs outstanding with respect to the Property other than the PIPs set forth on <u>Schedule IV</u> hereto.  No event has occurred that, with the passage of time and/or giving of notice, would constitute a breach of the PIP requirements.

       Section 4.2    **Survival of Representations.**  Borrower agrees that all of the representations and warranties of Borrower set forth in <u>Section 4.1</u> hereof and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower.  All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## ARTICLE V – BORROWER COVENANTS

       Section 5.1    **Affirmative Covenants.**  From the date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Mortgage encumbering the Property (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lender that (a) in each instance where the covenant relates to Borrower, as to itself, (b) in each instance where the covenant relates to Operating Lessee or the Operating Lease, Borrower shall cause Operating Lessee to and (c) in each instance where the covenant relates to Manager or the Management Agreement, Borrower shall use commercially reasonable efforts to cause Manager to:

       5.1.1     **Existence; Compliance with Legal Requirements.**  Borrower and Operating Lessee shall do or cause to be done all things reasonably necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply with all Legal Requirements applicable to Borrower, Operating Lessee and the Property, including, without limitation, building and zoning codes and certificates of occupancy and the procurement of all necessary and required hospitality, liquor, gaming or innkeeper's licenses. There shall never be committed by Borrower, and Borrower shall never permit any other Person in occupancy of or involved with the operation or use of the Property to commit any act or omission affording the federal government or any state or local government the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.  Borrower shall and shall cause Operating Lessee to, at all times maintain, preserve and protect all franchises and trade names and preserve all the remainder of its property used or useful in the conduct of its business and shall keep the Property in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Loan Documents. Borrower shall keep the Property insured at all times by financially sound and reputable insurers,

to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement. After prior written notice to Lender, Borrower, at Borrower's own expense, may contest or cause Operating Lessee to contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower, Operating Lessee or the Property or any alleged violation of any Legal Requirement, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower or Operating Lessee is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower or Operating Lessee, as applicable, shall promptly upon final determination thereof comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (v) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower, Operating Lessee or the Property; and (vi) Borrower shall or shall cause Operating Lessee to furnish such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith. Lender may apply any such security, as necessary to cause compliance with such Legal Requirement at any time when, in the reasonable judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost.

       5.1.2      **Taxes and Other Charges.** Borrower shall, or shall cause Operating Lessee to, pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable; provided, however, Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower complies with the terms and provisions of Section 7.2 hereof. Borrower will (or will cause Operating Lessee to) deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes and Other Charges have been so paid or are not then delinquent no later than ten (10) days prior to the date on which the Taxes and/or Other Charges would otherwise be delinquent if not paid, provided that Borrower shall not be required to deliver such evidence if Lender pays such Taxes and Other Charges in accordance with Section 7.2 hereof. Borrower shall, or shall cause Operating Lessee to, furnish to Lender receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, neither Borrower nor Operating Lessee is required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to Section 7.2 hereof and Lender has received receipts from the relevant taxing authority). Neither Borrower nor Operating Lessee shall suffer and Borrower shall promptly cause to be paid and discharged any Lien or charge whatsoever which may be or become a Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property. After prior written notice to Lender, Borrower, at Borrower's own expense, may contest or cause Operating Lessee to contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any

other instrument to which Borrower or Operating Lessee is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof pay, or cause Operating Lessee to pay, the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; (vi) Borrower shall, or shall cause Operating Lessee to  furnish such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon.  Lender may pay over any such cash deposit or part thereof held by Lender to the claimant entitled thereto at any time when, in the reasonable judgment of Lender, the entitlement of such claimant is established or the Property (or part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Mortgage being primed by any related Lien; and (vi) Borrower delivers notice to Lender promptly upon commencing such proceedings.

        5.1.3        **Litigation.**  Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened against Borrower, Operating Lessee and/or Guarantor which it is aware of or becomes aware of and which would be reasonably likely to materially adversely affect Borrower's, Operating Lessee's or Guarantor's condition (financial or otherwise) or business or the Property.

        5.1.4        **Access to Property.**  Borrower shall and shall cause Operating Lessee to permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance written notice subject to the terms of the Management Agreement and provided, so long as no Event of Default has occurred and is continuing, the same does not materially and adversely interfere with the reasonable use and operation thereof or business thereof by Borrower, any tenant or occupant.

        5.1.5        **Notice of Default.**  Borrower shall promptly advise Lender of any material adverse change in Borrower's, Operating Lessee's or Guarantor's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

        5.1.6        **Cooperate in Legal Proceedings.**  Borrower shall and shall cause Operating Lessee to cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

        5.1.7        **Perform Loan Documents.**  Borrower shall and shall cause Operating Lessee to observe, perform and satisfy all the terms, provisions, covenants and conditions of, and shall pay when due all costs, fees and expenses to the extent required under the Loan Documents executed and delivered by, or applicable to, Borrower or Operating Lessee, as applicable.

     5.1.8       **Award and Insurance Benefits**.  Borrower shall and shall cause Operating Lessee to cooperate with Lender in obtaining for Lender the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any expenses incurred in connection therewith (including reasonable attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on behalf of Lender in case of Casualty or Condemnation affecting the Property or any part thereof) out of such Insurance Proceeds.

     5.1.9       **Further Assurances**.  Borrower shall and shall cause Operating Lessee to, at Borrower's sole cost and expense:

     (a)      furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower or Operating Lessee pursuant to the terms of the Loan Documents or which are reasonably requested by Lender in connection therewith;

     (b)      execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower and Operating Lessee under the Loan Documents, as Lender may reasonably require, including, without limitation, the execution and delivery of all such writings necessary to transfer any hospitality, liquor or gaming licenses with respect to the Property into the name of Lender or its designee after the occurrence and continuance of an Event of Default; and

     (c)      do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

     5.1.10     **Principal Place of Business, State of Organization**.  Borrower shall not, and shall not cause or permit, any change to be made in its or Operating Lessee's respective name, identity (including its trade name or names), place of organization or formation (as set forth in <u>Section 4.1.36</u> hereof) or Borrower's or Operating Lessee's respective limited liability company or partnership or other structure (except in connection with a transfer permitted (or consented to) pursuant to <u>Section 5.2.10</u> hereof) without Lender's prior written consent; provided that with respect to a change of name only, Borrower shall be permitted to make such change if Borrower shall have first notified Lender in writing of such change at least thirty (30) days prior to the effective date of such change, and shall have first taken all action required by Lender for the purpose of perfecting or protecting the lien and security interests of Lender pursuant to this Agreement, and the other Loan Documents.  Upon Lender's request, Borrower shall, and shall cause Operating Lessee to, at Borrower's sole cost and expense, execute and deliver additional security agreements and other instruments which may be reasonably necessary to effectively evidence or necessary to perfect Lender's security interest in the Property as a result of such change of principal place of business or place of organization approved in accordance with the foregoing sentence.  Borrower's and Operating Lessee's respective principal place of business and chief executive office, and the place where Borrower and Operating Lessee keeps its respective books and records, including recorded data of any kind or nature, regardless of the

medium or recording, including software, writings, plans, specifications and schematics, has been for the preceding four months (or, if less, the entire period of the existence of Borrower or Operating Lessee, as applicable) and will continue to be the address of Borrower set forth at the introductory paragraph of this Agreement (unless Borrower or Operating Lessee, as applicable, notifies Lender in writing at least thirty (30) days prior to the date of such change). Borrower shall not, and shall not cause or permit Operating Lessee to, change its organizational identification number. If Borrower or Operating Lessee, as applicable, does not now have an organizational identification number and later obtains one, Borrower promptly shall notify Lender of such organizational identification number.

   5.1.11 **Financial Reporting.** (a) Borrower will, and will cause Operating Lessee to keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in accordance with the requirements for a Special Purpose Entity set forth herein and the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis acceptable to Lender), proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and Operating Lessee and all items of income and expense in connection with the operation of the Property. Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire. After the occurrence of an Event of Default, Borrower shall pay any out-of-pocket costs and expenses actually incurred by Lender to examine Borrower's and Operating Lessee's accounting records with respect to the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

   (b) Borrower will furnish to Lender annually, within (x) seventy-five (75) days following the end of each Fiscal Year, a copy of unaudited financial statements for Borrower and Operating Lessee and (y) one hundred twenty (120) days following the end of each Fiscal Year, a complete copy of Borrower's and Operating Lessee's annual financial statements audited by an independent certified public accountant acceptable to Lender which shall include Marcum LLP in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis acceptable to Lender) covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower and Operating Lessee and accompanied by an Officer's Certificate stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower, Operating Lessee and the Property as of the relevant date. Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual net operating income, net cash flow, gross income, and operating expenses.

   (c) Borrower will furnish, or cause to be furnished, to Lender on or before thirty (30) days after the end of each calendar quarter the following items, accompanied by an Officer's Certificate stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower, Operating Lessee and the Property (subject to normal year-end adjustments) as applicable: (i) an occupancy report for the subject quarter, including an average daily rate; (ii) quarterly and year-to-date operating statements (including Capital Expenditures) prepared for each calendar quarter, noting net operating

income, gross income, and operating expenses (not including any contributions to the Replacement Reserve Fund and the Required Repair Fund), and other information reasonably necessary and sufficient to fairly represent the financial position and results of operation of the Property during such calendar quarter, and containing a comparison of budgeted income and expenses and the actual income and expenses; and (iii) a calculation reflecting the Debt Yield as of the last day of such quarter based upon the trailing twelve (12) month period immediately preceding such date of determination.  On or before thirty (30) days after the end of each calendar month, Borrower shall furnish, or cause to be furnished, to Lender the most current Smith Travel Research Reports then available to Borrower and Operating Lessee reflecting market penetration and relevant hotel properties competing with the Property.  In addition, such certificate shall also be accompanied by an Officer's Certificate stating that the representations and warranties of Borrower set forth in <u>Section 4.1.30</u> are true and correct in all material respects as of the date of such certificate.

(d)     Borrower will furnish, or cause to be furnished, to Lender on or before thirty (30) days after the end of each calendar month the following items with respect to the Property (subject to normal year-end adjustments) as applicable, together with an Officer's Certificate with respect thereto:  (i) an occupancy report, including an average daily rate, for the subject month; (ii) monthly and year-to-date operating statements (including a Capital Expenditures report) prepared for each calendar month in accordance with the customary management operations reports for the applicable calendar month, year-to-date and trailing twelve (12) months, and containing (A) a comparison of such information for the same calendar month in the immediately preceding calendar year and (B) a comparison between budgeted income and expenses and the actual income and expenses, all in form reasonably satisfactory to Lender; and (iii) a calculation reflecting the Debt Yield as of the last day of such calendar month.  All calculations of the Debt Yield shall be subject to verification by Lender.

(e)     Borrower has prepared and submitted, or caused to be prepared and submitted, and Lender has approved an Annual Budget for the calendar year 2018.  Borrower shall prepare and submit (or shall cause Manager to prepare and submit) to Lender by November 15th of each year thereafter, a proposed Annual Budget for the succeeding calendar year in form reasonably satisfactory to Lender.  The Annual Budget shall be subject to Lender's written approval (each such Annual Budget, an "**Approved Annual Budget**").  In the event that Lender objects to a proposed Annual Budget submitted by Borrower, Lender shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender.  Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Lender approves the Annual Budget; <u>provided</u>, that Lender shall cooperate with Borrower to approve an Annual Budget prior to the earlier to occur of (x) the date required for Borrower to submit (or cause Operating Lessee to submit) such Annual Budget to Manager for approval pursuant to the terms of the Management Agreement and (y) December 1 of the applicable Fiscal Year.  Any approval by Lender to a proposed Annual Budget or a revision to an Annual Budget required under this <u>Section 5.1.11(e)</u> shall be deemed to have given if (w) Borrower submits a proposed Annual Budget (or revisions thereto) to Lender for approval, which includes, the following legend

prominently displayed in bold, all caps and fourteen (14) point or larger font in the transmittal letter requesting approval:  "**THIS IS A REQUEST FOR APPROVAL OF [AN ANNUAL BUDGET / REVISIONS TO AN ANNUAL BUDGET]. LENDER'S RESPONSE IS REQUESTED WITHIN FIFTEEN (15) DAYS**", (x) Lender fails to approve or object (together with a reasonably detailed description of such objections) to the proposed Annual Budget (or any revisions thereto) within fifteen (15) days of receipt of such request, (y) Borrower shall deliver to Lender a second request for approval for such proposed Annual Budget (or revision thereto) containing the following legend in prominently displayed in bold, all caps and fourteen (14) point or larger font in the transmittal letter requesting approval:  "**THIS IS A SECOND REQUEST FOR APPROVAL OF [AN ANNUAL BUDGET / REVISIONS TO AN ANNUAL BUDGET]. LENDER'S RESPONSE IS REQUESTED WITHIN FIVE (5) BUSINESS DAYS.  LENDER'S FAILURE TO RESPOND WITHIN SUCH TIME PERIOD SHALL RESULT IN LENDER'S APPROVAL BEING DEEMED TO HAVE BEEN GRANTED**", and (z) Lender fails to approve or object (together with a reasonably detailed description of such objections) to the proposed Annual Budget (or any revisions thereto) within five (5) Business Days of receipt of such second request.

(f)    In the event that Borrower or Operating Lessee must incur a discretionary operating expense or capital expense not set forth in the Approved Annual Budget and not accounted for under the Management Agreement (each an "**Extraordinary Expense**"), then Borrower shall promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense for Lender's approval, which may be given or denied in Lender's reasonable discretion.

(g)    Borrower shall furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender.

(h)    Borrower shall furnish to Lender, within ten (10) Business Days after Lender's request (or as soon thereafter as may be reasonably possible), financial and sales information from any Tenant designated by Lender (to the extent such financial and sales information is required to be provided under the applicable Lease and same is received by Borrower after request therefor).

(i)    Borrower will cause Guarantor to furnish to Lender financial statements as required pursuant to the terms of the Guaranty, in the form reasonably required by Lender. Lender agrees that financial statements delivered in the same form as those financial statements of the Guarantor delivered on the Closing Date shall be in an acceptable form.

(j)    Any reports, statements or other information required to be delivered under this Agreement shall be delivered (i) in paper form, (ii) on a compact disc, and (iii) if requested by Lender and within the capabilities of Borrower's data systems without change or modification thereto, in electronic form and prepared using Microsoft Word for Windows files (which files may be prepared using a spreadsheet program and saved as word processing files).  Borrower agrees that Lender may disclose information regarding the Property, Borrower and the Operating

Lessee that is provided to Lender pursuant to this <u>Section 5.1.11</u> in connection with the Securitization to such parties requesting such information in connection with such Securitization.

(k)  If requested by Lender, Borrower shall provide Lender, promptly upon request, with any financial statements, financial, statistical or operating information or other information as Lender shall determine reasonably necessary or appropriate (including items required (or items that would be required if the Securitization were offered publicly) pursuant to Regulation AB under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), or any amendment, modification or replacement thereto) or required by any other legal requirements, in each case, in connection with any private placement memorandum, prospectus or other disclosure documents or materials or any filing pursuant to the Exchange Act in connection with the Securitization or as shall otherwise be reasonably requested by Lender.

5.1.12  **Business and Operations**.  Borrower will, and will cause the Operating Lessee to, continue to engage in the businesses presently conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Property. Borrower will, and will cause the Operating Lessee to, qualify to do business and will remain in good standing under the laws of the jurisdiction of its formation as and to the extent the same are required for the ownership, maintenance, management and operation of the Property. Borrower or Operating Lessee shall at all times during the term of the Loan, continue to own all of Equipment, Fixtures and Personal Property, and will cause the Operating Lessee to, which are reasonably necessary to operate the Property in the manner required hereunder and in the manner in which it is currently operated.

5.1.13  **Title to the Property**.  Borrower will, and will cause the Operating Lessee to, warrant and defend (a) the title to the Property and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances) and (b) the validity and priority of the Lien of the Mortgage on the Property, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever.  Borrower shall reimburse Lender for any losses, costs, damages or reasonable out-of-pocket expenses (including reasonable attorneys' fees and expenses) incurred by Lender if an interest in the Property, other than as permitted hereunder, is claimed by another Person.

5.1.14  **Costs of Enforcement**.  In the event (a) that the Mortgage encumbering the Property is foreclosed in whole or in part or that the Mortgage is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of any mortgage encumbering the Property prior to or subsequent to the Mortgage in which proceeding Lender is made a party, or (c) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any of its constituent Persons or an assignment by Borrower or any of its constituent Persons for the benefit of its creditors, Borrower, its successors or assigns, shall be chargeable with and agrees to pay all reasonable costs of collection and defense, including reasonable attorneys' fees and expenses, actually incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

5.1.15    **Estoppel Statement.**  (a)  After request by Lender, Borrower shall within ten (10) days furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the Interest Rate of the Note, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, if any, claimed by Borrower, and (vi) that the Note, this Agreement, the Mortgage and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

(b)    Borrower shall, and shall cause Operating Lessee to, deliver to Lender upon written request, estoppel certificates from (i) any party to the REA and (ii) Operating Lessee, and Borrower shall use or shall cause Operating Lessee to use commercially reasonable efforts (which shall not include the institution of litigation, a declaration of a default under any agreement, payment of a fee or granting of any concession) to deliver to Lender upon written request, estoppel certificates from (i) Tenants, (ii) the City of Chicago Commission on Chicago Landmarks (iii) Systems Parking Inc. and (iv) Manager, and each case in form and substance reasonably satisfactory to Lender <u>provided</u> that Borrower shall not be required to deliver such certificates more frequently than two (2) times in any calendar year.  After request by Borrower, Lender shall, within ten (10) Business Days of written request, furnish Borrower with a statement, duly acknowledged and certified, setting forth (i) the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the Interest Rate of the Note and (iv) the date installments of interest were last paid; <u>provided</u>, that Lender shall not be required to deliver such certificate more frequently than one (1) time per calendar year.

5.1.16    **Loan Proceeds.**  Borrower shall use the proceeds of the Loan received by it on the Closing Date only for the purposes set forth in <u>Section 2.1.4</u> hereof.

5.1.17    **Performance by Borrower.**  Borrower shall, and shall cause Operating Lessee to, in a timely manner observe, perform and fulfill in all material respects each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower, or Operating Lessee and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by, or applicable to, Borrower without the prior written consent of Lender.

5.1.18    **Confirmation of Representations.**  Borrower shall, and shall cause Operating Lessee to deliver, in connection with any Securitization, (a) one (1) or more Officer's Certificates certifying as to the accuracy of all representations made by Borrower and Operating Lessee in the Loan Documents as of the date of the closing of such Securitization in all relevant jurisdictions, and (b) certificates of the relevant Governmental Authorities in all relevant jurisdictions indicating the good standing and qualification of Borrower, Operating Lessee and Guarantor as of the date of the Securitization.

5.1.19    **Environmental Covenants.**  (a) Borrower covenants and agrees that: (i) all uses and operations on or of the Property, whether by Borrower or Operating Lessee shall, and with respect to any other Person, Borrower shall use commercially reasonable efforts to cause such Person to, be in compliance with all Environmental Laws and permits issued pursuant

thereto; (ii) there shall be no Releases of Hazardous Substances in, on, under or from the Property, except for those that are in compliance with all Environmental Laws and with permits issued pursuant thereto; (iii) there shall be no Hazardous Substances in, on, or under the Property, except those that are (A) in compliance with all Environmental Laws and with permits issued pursuant thereto (to the extent such permits are required by Environmental Law), and (B) de-minimis amounts necessary to operate the Property for the purposes set forth in the Loan Agreement which will not result in an environmental condition in, on or under the Property and which are otherwise permitted under and used in compliance with Environmental Law; (iv) Borrower shall, and shall cause Operating Lessee to, keep the Property free and clear of all liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Borrower or any other Person (the "**Environmental Liens**"); (v) Borrower shall, and shall cause Operating Lessee to, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to subsection (b) below, including but not limited to providing all relevant information and making knowledgeable persons available for interviews; (vi) Borrower shall, and shall cause Operating Lessee to, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property, pursuant to any reasonable written request of Lender made in the event that Lender has a good faith reason to believe that an environmental hazard exists on the Property (including but not limited to sampling, testing and analysis of soil, water, air, building materials and other materials and substances whether solid, liquid or gas), and share with Lender the reports and other results thereof, and Lender and other Indemnified Parties shall be entitled to rely on such reports and other results thereof; (vii) Borrower shall, and shall cause Operating Lessee to, at its sole cost and expense, comply with all reasonable written requests of Lender made in the event that Lender has reason to believe that an environmental hazard exists on the Property (A) reasonably effectuate Remediation of any condition (including but not limited to a Release of a Hazardous Substance) in, on, under or from the Property; (B) comply with any Environmental Law; (C) comply with any directive from any Governmental Authority; and (D) take any other reasonable action necessary or appropriate for protection of human health or the environment; (viii) Borrower shall not, nor cause or permit Operating Lessee to, do or allow any Tenant or other user of the Property to do any act that materially increases the dangers to human health or the environment, poses an unreasonable risk of harm to any Person (whether on or off the Property), impairs or may reasonably be likely to impair the value of the Property, is contrary to any requirement of any insurer, constitutes a public or private nuisance, constitutes waste, or violates any covenant, condition, agreement or easement applicable to the Property; and (ix) Borrower shall immediately notify Lender in writing promptly after Borrower becomes aware of (A) any presence or Releases or threatened Releases of Hazardous Substances in, on, under, from or migrating towards the Property in violation of Environmental Laws; (B) any non-compliance with any Environmental Laws related in any way to the Property; (C) any actual or potential Environmental Lien; (D) any required or proposed Remediation of environmental conditions relating to the Property; and (E) any written notice or other written communication of which Borrower or Operating Lessee becomes aware from any source whatsoever (including but not limited to a governmental entity) relating in any way to the release or potential release of Hazardous Substances or Remediation thereof, reasonably likely to result in liability of Borrower, Operating Lessee or any Person using or occupying any portion of the Property, pursuant to any Environmental Law, other environmental conditions in connection with the

Property, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this <u>Section 5.1.19</u>.

(b)      In the event that Lender has a good faith reason to believe that an environmental hazard exists on the Property that may, in Lender's sole discretion, endanger any Tenants or other occupants of the Property or their guests or the general public or may materially and adversely affect the value of the Property, upon reasonable notice from Lender, Borrower shall, at Borrower's expense, promptly cause an engineer or consultant satisfactory to Lender to conduct an environmental assessment or audit (the scope of which shall be determined in Lender's sole and absolute discretion) and take any samples of soil, groundwater or other water, air, or building materials or any other invasive testing requested by Lender and promptly deliver the results of any such assessment, audit, sampling or other testing; <u>provided</u>, <u>however</u>, if such results are not delivered to Lender within a reasonable period or if Lender has a good faith reason to believe that an environmental hazard exists on the Property that, in Lender's sole but reasonable judgment, endangers any Tenant or other occupant of the Property or their guests or the general public or may materially and adversely affect the value of the Property, upon reasonable notice to Borrower, Lender and any other Person designated by Lender, including but not limited to any receiver, any representative of a governmental entity, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Property, subject to the rights of Tenants and other occupants of the Property, at all reasonable times and upon reasonable prior written notice, to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lender's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and reasonably conducting other invasive testing.  Borrower shall, and shall cause Operating Lessee to, cooperate with and provide Lender and any such Person designated by Lender with access to the Property.

(c)      Intentionally Omitted.

(d)      Borrower hereby represents and warrants that attached hereto as <u>Exhibit B</u> is a true and complete copy of that certain Asbestos-Containing Material & Lead Based Paint Operations & Maintenance Plan for the Palmer House Hilton, prepared by Partner Engineering and Science, Inc. and dated April 10, 2018 (the "**O&M Program**"). Borrower hereby covenants and agrees that, during the term of the Loan, including any extension or renewal thereof, Borrower shall comply in all respects with the terms and conditions of the O&M Program.

5.1.20      **Leasing Matters.**  Any Leases with respect to the Property written after the date hereof, for more than five thousand (5,000) square feet shall be subject to the prior written approval of Lender, which approval shall not be unreasonably withheld, conditioned or delayed. Upon written request, Borrower shall furnish Lender with executed copies of all Leases.  All renewals of Leases and all proposed Leases shall provide for rental rates comparable to existing local market rates.  All proposed Leases shall be on commercially reasonable terms and shall not contain any terms which would be reasonably likely to materially and adversely affect Lender's rights under the Loan Documents.  All Leases executed after the date hereof shall provide that they are subordinate to the Mortgage and that the lessee agrees to attorn to Lender or any purchaser at a sale by foreclosure or power of sale, <u>provided</u>, that with respect to any approval

(or deemed approval) by Lender, Lender shall, upon request of Borrower, enter into a subordination, non-disturbance and attornment agreement with any lessee entering into such Lease on Lender's then standard form, subject to such commercially reasonable changes thereto as such lessee and Lender shall mutually agree (each acting reasonably). Borrower or Operating Lessee, as applicable, (i) shall observe and perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall enforce and may amend or terminate the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed in a commercially reasonable manner and in a manner not to impair the value of the Property involved except that no termination by Borrower or Operating Lessee or acceptance of surrender by a Tenant of any Leases shall be permitted unless by reason of a tenant default and then only in a commercially reasonable manner to preserve and protect the Property; provided, however, that no such termination or surrender of any Lease covering more than five thousand (5,000) square feet will be permitted without the prior written consent of Lender, which consent shall not be unreasonably withheld conditioned or delayed; (iii) shall not collect any of the rents more than one (1) month in advance (other than security deposits); (iv) shall not execute any other assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (v) shall not materially alter, modify or change the terms of the Leases in a manner inconsistent with the provisions of the Loan Documents; and (vi) shall execute and deliver at the reasonable request of Lender all such further assurances, confirmations and assignments in connection with the Leases as Lender shall from time to time reasonably require. Notwithstanding anything to the contrary contained herein, Borrower shall not and shall not permit Operating Lessee to enter into a Lease of all or substantially all of the Property without Lender's prior written consent. Notwithstanding anything to the contrary contained herein, all new Leases and all amendments, modifications, extensions, and renewals of existing Leases with Tenants that are Affiliates of Borrower or Operating Lessee shall be subject to the prior written consent of Lender. Any request for Lender's approval of and consent to any new Lease or Lease modification, renewal or termination under this Section 5.1.20 shall contain a legend in capitalized bold letters on the top of the cover page stating: "THIS IS A REQUEST FOR CONSENT TO A [NEW LEASE] [LEASE MODIFICATION/TERMINATION/RENEWAL]. LENDER'S RESPONSE IS REQUESTED WITHIN TEN (10) BUSINESS DAYS". Borrower shall, or shall cause Operating Lessee to, promptly deliver any information reasonably requested by Lender in connection with the review of such Lease or Lease modification, renewal or termination. In the event that Lender fails to approve or object to such request for approval (which shall include a reasonably detailed description of any objections of Lender to such Lease or Lease modification, renewal or termination), within such ten (10) Business Day period, Borrower shall deliver to Lender a second request for approval and consent which shall contain a legend in capitalized bold letters on the top of the cover page stating: "THIS IS A SECOND REQUEST FOR CONSENT TO A [NEW LEASE] [LEASE MODIFICATION/ TERMINATION/RENEWAL]. LENDER'S RESPONSE IS REQUESTED WITHIN FIVE (5) BUSINESS DAYS. LENDER'S FAILURE TO RESPOND WITHIN SUCH TIME PERIOD SHALL RESULT IN LENDER'S APPROVAL BEING DEEMED TO HAVE BEEN GRANTED." In the event that Lender fails to approve or object to such request (which shall include a reasonably detailed description of any objections of Lender to such Lease or Lease modification, renewal or termination) for such new Lease or Lease modification, renewal or termination within such five (5) Business Day period and Borrower has promptly delivered, or

has caused Operating Lessee to promptly deliver to Lender all information reasonably requested by Lender in connection with the review of such Lease or Lease modification, renewal or termination, then Lender's approval shall be deemed to have been granted with respect to such Lease or Lease modification, renewal or termination.

        5.1.21     **Alterations.**  Borrower shall, or shall cause Operating Lessee to obtain Lender's prior written consent to any alterations to any Improvements, which consent shall not be unreasonably withheld, conditioned or delayed except with respect to alterations that are reasonably likely to have a material adverse effect on Borrower's or Operating Lessee's financial condition, the value of the Property or the Property's Net Operating Income.  Notwithstanding the foregoing, Lender's consent shall not be required in connection with any alterations that are not reasonably likely to have a material adverse effect on Borrower's or Operating Lessee's financial condition, the value of the Property or the Property's Net Operating Income, provided that such alterations are made in connection with (a) tenant improvement work performed pursuant to the terms of any Lease executed on or before the date hereof, (b) tenant improvement work performed pursuant to the terms and provisions of a Lease and not adversely affecting any structural component of any Improvements, any utility or HVAC system contained in any Improvements or the exterior of any building constituting a part of any Improvements, (c) alterations performed in connection with the Restoration of the Property after the occurrence of a Casualty or Condemnation in accordance with the terms and provisions of this Agreement, (d) alterations permitted to be performed by Manager without the approval of Borrower or Operating Lessee under the terms of the Management Agreement, (e) alterations performed pursuant to an Approved Annual Budget, or (f) Replacements made in accordance with <u>Section 7.3</u> hereof.  If the total unpaid amounts due and payable with respect to alterations to the Improvements at the Property (other than such amounts to be paid or reimbursed by Tenants under the Leases or amounts otherwise reserved for by Lender for alterations) shall at any time exceed $2,000,000.00 (the "**Threshold Amount**"), Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following:  (A) cash, (B) U.S. Obligations, (C) other securities having a rating acceptable to Lender and that, at Lender's option, the Approved Rating Agencies have provided a Rating Agency Confirmation with respect to or (D) an irrevocable letter of credit (payable on sight draft only) issued by a financial institution having a rating by S&P of not less than "A-1+" (and the equivalent by Moody's if Moody's is rating the Securities) if the term of such letter of credit is no longer than three (3) months or, if such term is in excess of three (3) months, issued by a financial institution having a rating that is reasonably acceptable to Lender and that, at Lender's option, the Approved Rating Agencies have provided a Rating Agency Confirmation with respect to.  Such security shall be in an amount equal to the excess of the total unpaid amounts with respect to alterations to the Improvements on the Property (other than such amounts to be paid or reimbursed by Tenants under the Leases) over the Threshold Amount and Lender shall apply such security from time to time to pay for such alterations at the request of Borrower; provided, that (a) Borrower shall submit a written request to Lender at least ten (10) Business Days prior to the date on which Borrower requests such payment be made and specifies the Alterations to be paid, (b) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured, (c) Lender shall have received an Officers' Certificate (i) stating that all Alterations to be funded by the requested disbursement have been completed in good and workmanlike manner and in accordance with all applicable federal, state and local laws, rules and regulations, such certificate

to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required to commence and/or complete the Alterations, (ii) identifying each Person that supplied materials or labor in connection with the Alterations to be funded by the requested disbursement, and (iii) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such Officers' Certificate to be accompanied by conditioned lien waivers or other evidence of payment or invoice reasonably satisfactory to Lender, and (e) Lender shall have received such other evidence as Lender shall reasonably request that the Alterations to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower.

   5.1.22 **Operation of Property.** (a) Borrower, Operating Lessee and Manager shall cause the Property to be operated, in all material respects, in accordance with the Operating Lease and Management Agreement (or Replacement Management Agreement).  In the event that the Operating Lease expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of the Operating Lease in accordance with the terms and provisions of this Agreement), Borrower shall promptly enter into a Management Agreement directly with Manager.  In the event that the Management Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall, or shall cause Operating Lessee to, promptly enter into a Replacement Management Agreement with Manager or another Qualified Manager, as applicable.

   (b) Borrower shall, and shall cause Operating Lessee, as applicable, to:  (i) promptly perform and/or observe, in all material respects, all of the covenants and agreements required to be performed and observed by it under the Operating Lease and the Management Agreement and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (ii) promptly after they become aware, notify Lender of any material default under the Operating Lease or the Management Agreement; (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, written notice, written report and written estimate received by it under the Operating Lease or the Management Agreement; and (iv) enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed by Operating Lessee under the Operating Lease and/or by Manager under the Management Agreement, in a commercially reasonable manner.

   5.1.23 **Embargoed Person.** Borrower has performed and shall perform reasonable due diligence to insure that at all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, Operating Lessee and Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person; (b) no Embargoed Person has any interest of any nature whatsoever in Borrower, Operating Lessee or Guarantor, as applicable, with the result that the investment in Borrower, Operating Lessee or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower, Operating Lessee or Guarantor, as applicable, have been derived from, or are the proceeds of, any unlawful activity, including money laundering, terrorism or terrorism activities, with the result that the investment in Borrower, Operating

Lessee or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law, or may cause the Property to be subject to forfeiture or seizure.

5.1.24    **Operating Lease.**  Borrower represents, covenants and warrants that it is the express intent of Borrower and Operating Lessee that the Operating Lease constitute a lease under applicable real property laws and laws governing bankruptcy, insolvency and creditors' rights generally, and that the sole interest of Operating Lessee in the Property is as tenant under the Operating Lease.  In the event that it shall be determined that the Operating Lease is not a lease under applicable real property laws or under laws governing bankruptcy, insolvency and creditors' rights generally, and that the interest of Operating Lessee in the Property is other than that of tenant under an Operating Lease, Borrower hereby covenants and agrees that it shall cause Operating Lessee's interest in the Property, however characterized, to continue to be subject and subordinate to the lien of the Mortgage, or Borrower's fee interest in the Property, on all the same terms and conditions as contained in the Operating Lease and the Mortgage.

5.1.25    **REA.**  Borrower hereby covenants and agrees with Lender with respect to the REA as follows:

(a)    Borrower shall pay all charges and other sums to be paid by Borrower pursuant to the terms of the REA as the same shall become due and payable and prior to the expiration of any applicable grace period therein provided.

(b)    Borrower shall perform and observe in all material respects all of the terms, covenants and conditions required to be performed and observed by Borrower pursuant to terms of the REA.

(c)    Borrower shall take all actions from time to time necessary to preserve and maintain the REA in accordance with all applicable Legal Requirements.

(d)    Borrower shall enforce the material terms, covenants and conditions to be performed and observed by the parties to the REA (other than Borrower) in a commercially reasonable manner.

(e)    Borrower shall promptly furnish to Lender any notice of default delivered in connection with the REA by any party to the REA.

(f)    If Lender or its nominee, designee, successor, or assignee acquires title and/or rights of Borrower under the REA by reason of foreclosure of the Mortgage, deed in lieu of foreclosure or otherwise, Lender or such other party shall (i) succeed to all of the rights of and benefits accruing to Borrower under the REA, and (ii) be entitled to exercise all of the rights and benefits accruing to Borrower under the REA.  At such time as Lender shall request, Borrower agrees to execute and deliver to Lender such documents as Lender and its counsel may reasonably require in order to ensure that the provisions of this Section 5.1.25 will be validly and legally enforceable and effective against Borrower and all parties claiming by, though, under or against Borrower.

5.1.26    **Class L Deduction.**  Borrower shall take all actions from time to time to preserve and maintain the Class L Deduction in accordance with all applicable Legal

Requirements.  Borrower shall promptly furnish to Lender any notice of termination delivered in connection with the Class L Deduction.

5.1.27    **Collective Bargaining Agreement**.    Borrower shall (and shall cause Operating Lessee to) comply with all collective bargaining agreements in place at the Property and the terms of that certain Litigation and Grievance Settlement Agreement among Borrower, Hilton Manager and Unite Here Local 1 in all respects.

5.1.28    **License Agreement**.  Borrower shall (and shall cause operating Lessee to) maintain the License Agreement, and prior to any expiration of the License Agreement, shall extend the term of the License Agreement to at least one (1) year following the applicable Maturity Date.

5.1.29    **Quality Assurance Standards**.    Borrower shall use commercially reasonable efforts to correct the conditions resulting in unacceptable quality assurance scores at the Property in connection with the back of the house issues as identified in the Quality Assurance Evaluation dated as of December 12, 2017; provided, however, that Borrower shall not be required to correct such conditions for so long as Borrower and Hilton agree that such correction is not currently necessary.

5.1.30    **Payment of Obligations.**  Borrower will pay its obligations, including tax liabilities, that, if not paid, could reasonably be expected to result in a material adverse effect on Borrower's financial condition, the value of the Property or on Borrower's ability to perform its obligations under the Loan Documents, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) Borrower has set aside on its books adequate reserves with respect thereto in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP, or (c) the failure to make payment pending such contest could not reasonably be expected to result in a material adverse effect on Borrower's financial condition, the value of the Property or on Borrower's ability to perform its obligations under the Loan Documents.

5.1.31    **Taxes.**  Borrower will be treated as a partnership or a disregarded entity for U.S. federal income tax purposes.  The Borrower will timely file or cause to be filed for itself all federal income and other material tax returns and reports required to be filed by it and will pay or cause to be paid all federal income and other material taxes and related liabilities required to be paid by it, except taxes that are being contested in good faith by appropriate proceedings and for which the Borrower sets aside on its books adequate reserves in accordance with GAAP. Borrower will not permit any Liens for Section 2.7 Taxes to be imposed on or with respect to any of its income or assets, other than Liens for Section 2.7 Taxes not yet due and payable and for which Borrower sets aside on its books adequate reserves in accordance with GAAP.

Section 5.2    **Negative Covenants.**    From the date hereof until payment and performance in full of all respective obligations of Borrower and Operating Lessee under the Loan Documents or the earlier release of the Lien of the Mortgage and any other collateral in accordance with the terms of this Agreement and the other Loan Documents, Borrower covenants and agrees with Lender that it will not do, directly or indirectly, any of the following:

5.2.1 **Operation of Property.** (a) Borrower shall not, nor shall it permit Operating Lessee to, without Lender's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed): (i) surrender, terminate, cancel, amend or modify the Management Agreement or waive any material rights thereunder; provided, that Borrower or Operating Lessee may, without Lender's consent, replace the Manager so long as the replacement manager is a Qualified Manager pursuant to a Replacement Management Agreement; and provided further, that any Qualified Manager shall have all the appropriate hospitality and liquor licenses and be in compliance with all applicable Legal Requirements at or prior to the time such Replacement Management Agreement is entered into and Borrower shall take any other actions required to ensure continuous operation of the Property as a hotel; (ii) reduce or consent to the reduction of the term of the Management Agreement; (iii) increase or consent to the increase of the amount of any charges under the Management Agreement, (iv) waive any performance terms or conditions under the Management Agreement or (v) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement in any material respect.

(b) Following the occurrence and during the continuance of an Event of Default, neither Borrower nor Operating Lessee shall exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Management Agreement without the prior written consent of Lender, which consent may be granted, conditioned or withheld in Lender's sole discretion.

(c) Borrower shall not, and shall not permit Operating Lessee to instruct Hilton Manager to hold back any additional amounts for real estate taxes, debt service and insurance costs for the benefit of Operating Lessee pursuant to Section 7.02 of the Management Agreement without the prior written consent of Lender.

5.2.2 **Liens.** Borrower shall not, and shall not permit Operating Lessee to, create, incur, assume or suffer to exist any Lien on any portion of the Property or permit any such action to be taken, except for Permitted Encumbrances.

5.2.3 **Dissolution.** Borrower shall not, and shall not permit Operating Lessee to, (a) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (b) engage in any business activity not related to the ownership or leasing, as applicable, and operation of the Property, (c) transfer, lease or sell, in one transaction or any combination of transactions, the assets or all or substantially all of the properties or assets of Borrower or Operating Lessee except to the extent permitted by the Loan Documents or (d) modify, amend, waive or terminate its organizational documents or its qualification and good standing in any jurisdiction.

5.2.4 **Change In Business.** Borrower shall not, and shall not permit Operating Lessee to, enter into any line of business other than the ownership or leasing, as applicable, and operation of the Property, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business.

5.2.5    **Debt Cancellation.**  Borrower shall not, and shall not permit Operating Lessee to, cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower or Operating Lessee by any Person, except for adequate consideration and in the ordinary course of Borrower's or Operating Lessee's business.

5.2.6    **Zoning.**  Borrower shall not, and shall not permit Operating Lessee to, initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior written consent of Lender.

5.2.7    **No Joint Assessment.**  Borrower shall not suffer, permit or initiate the joint assessment of the Property (a) with any other real property constituting a tax lot separate from the Property, and (b) which constitutes real property with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to such real property portion of the Property.

5.2.8    **Intentionally Omitted.**

5.2.9    **ERISA.**  (a) None of Borrower, Operating Lessee or Guarantor shall engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (including but not limited to the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or Section 4975 of the Code or Similar Law.

(b)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion, that (A) none of Borrower, Operating Lessee or Guarantor is subject to any state statute regulating investment of, or fiduciary obligations with respect to governmental plans which is a Similar Law and (B) one or more of the following circumstances is true:

(i)    Equity interests in each of Borrower, Operating Lessee and Guarantor, are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101 as modified by Section 3(42) of ERISA (the "**Plan Asset Regulations**");

(ii)    Less than twenty-five percent (25%) of each outstanding class of equity interests in each of Borrower, Operating Lessee and Guarantor are held by "benefit plan investors" within the meaning of the Plan Asset Regulations; or

(iii)    Each of Borrower, Operating Lessee and Guarantor qualifies as an "operating company" or a "real estate operating company" within the meaning of the Plan Asset Regulations or another exception to ERISA applies such that each of Borrower's, Operating Lessee's and Guarantor's assets should not constitute "plan assets" of any "benefit plan investor" within the meaning of the Plan Asset Regulations.

(c)     Borrower, Operating Lessee and the Guarantor will fund or cause to be funded each Plan established or maintained by Borrower, Operating Lessee, Guarantor, or any ERISA Affiliate, as the case may be, so that there is never a failure to satisfy the minimum funding standards, within the meaning of Sections 412 or 430 of the Internal Revenue Code or Section 302 of ERISA (whether or not such standards are waived).  As soon as possible and in any event within ten (10) days after the Borrower or Operating Lessee knows that any ERISA Event has occurred with respect to any Plan, Lender will be provided with a statement, signed by an Authorized Representative of Borrower, Operating Lessee and/or the Guarantor, describing said ERISA Event and the action which the Borrower, Operating Lessee and/or the Guarantor proposes to take with respect thereto.

        5.2.10     **Transfers.**  (a) Borrower acknowledges that Lender has examined and relied on the experience of Borrower and Operating Lessee and their respective stockholders, general partners, members, principals and (if Borrower or Operating Lessee is a trust) beneficial owners in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Other Obligations.  Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Other Obligations, Lender can recover the Debt by a sale of the Property.

        (b)     Without the prior written consent of Lender, and except to the extent otherwise set forth in this Section 5.2.10, Borrower shall not, and shall not permit any Restricted Party do any of the following (collectively, a "**Transfer**") until such date as the Debt is indefeasibly paid in full:  (i) sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein, (ii) enter into any PACE Loan, or (iii) permit a Sale or Pledge of an interest in any Restricted Party, other than (A) pursuant to Leases of space in the Improvements to Tenants in accordance with the provisions of Section 5.1.20 and (B) Permitted Transfers.

        (c)     A Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space Tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interest or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing

member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; or (vii) the removal or the resignation of the managing agent (including, without limitation, an Affiliated Manager) other than in accordance with Section 5.1.22 hereof.

(d)    Notwithstanding the provisions of this Section 5.2.10, (i) Lender's consent shall not be required in connection with one or a series of Transfers of limited partnership interests in Guarantor that are made pursuant to the terms of the limited partnership agreement of Guarantor as in effect on the Closing Date (without taking into account any amendments after the Closing Date);

(ii)    Lender's sole and absolute consent shall not be unreasonably withheld with respect to one or a series of direct or indirect Transfers in Mezzanine Borrower; that meet the following conditions (for the avoidance of doubt Transfers of any direct interests in the Property or Borrower shall not be permitted without the sole and absolute consent of Lender):

(A)    such Transfer shall not constitute more than ninety percent (90%) of the direct or indirect interests in Borrower;

(B)    such Transfer is made to a Qualified Transferee and either (I) there is no change in Control of Borrower or (II) Borrower is, after giving effect to such Transfer, Controlled by a Qualified Transferee;

(C)    the Qualified Transferee pays a purchase price equal to or greater than $450,000,000 (including cash and any portion of the Mortgage Loan or Mezzanine Loan assumed by such Qualified Transferee or Qualified Transferee's Principals) as consideration for such Transfer;

(D)    Guarantor shall be released from the Guaranty and Environmental Indemnity for all liability accruing after the date of a Transfer, if, in connection with such Transfer,  (I) one (1) or more substitute guarantors acceptable to Lender in its sole discretion, shall have assumed all of the liabilities and obligations of Guarantor under the Guaranty and Environmental Indemnity or shall have executed a replacement guaranty and replacement environmental indemnity satisfactory to Lender in its sole discretion, in each case covering all liability accruing after the date of such assumption or execution and (II) Lender shall have received customary legal opinions relating to authorization and enforceability of the additional guaranty and environmental indemnity contemplated above, substantially similar in form and substance to the opinions delivered to Lender on the Closing Date relating to the Guaranty and Environmental Indemnity, or otherwise in form and substance acceptable to Lender in its sole discretion, including, to the extent the Guarantor being released was included in the

Insolvency Opinion delivered at closing, an Additional Insolvency Opinion with respect to any replacement guarantor.

(E)     the Debt Yield at the time of such Transfer shall be equal to or greater than 8.00%; provided, that Borrower shall make a prepayment of the Loan in an amount equal to the *pro rata* portion of the Transfer Debt Yield Prepayment Amount based on the then outstanding principal amount of the Loan and the Mezzanine Loan shall be prepaid in an amount equal to the applicable *pro rata* portion of the Transfer Debt Yield Prepayment Amount based on the then outstanding principal amount of the Mezzanine Loan, and all other conditions to such prepayment set forth in Section 2.4.1(b) of this Agreement and the Mezzanine Loan Agreement including without limitation payment of any Spread Maintenance Payment are satisfied (collectively, a "**Transfer Prepayment**");

(F)     the provisions relating to governance contained in any joint venture, partnership, or other similar agreement or arrangement involving the transferor and the Qualified Transferee to whom interests are transferred are reasonably acceptable to Lender;

(G)     no Event of Default has occurred and is continuing;

(H)     if after giving effect to any Transfer, more than forty-nine percent (49%) in the aggregate of direct or indirect interests of any Restricted Party is owned by any Person and its Affiliates that owned less than forty-nine percent (49%) direct or indirect equity interests in such Restricted Party as of the Closing Date, Borrower shall, no less than thirty (30) days prior to the effective date of any such Transfer, deliver to Lender an Additional Insolvency Opinion;

(I)     Borrower shall give Lender notice of such Transfer together with copies of all instruments effectuating such Transfer not less than ten (10) days prior to the date of such Transfer;

(J)     Borrower shall, after giving effect to such Transfer, continue to be a Special Purpose Entity and Borrower and any transferee shall comply with Sections 4.1.9, 4.1.35, 5.1.23 and 5.2.9 hereof;

(K)     the proposed Qualified Transferee shall be an entity that, directly or indirectly, (I) has not been the subject of any Bankruptcy Action, governmental or regulatory investigation which resulted in a final, nonappealable conviction for criminal acts, or has been alleged to have attempted to hinder, delay or defraud their creditors in each case in the past seven (7) years and has no material governmental or regulatory investigation pending or threatened in writing that if adversely determined would result in a material adverse effect on Borrower's or Operating Lessee's financial condition, the value of the Property or the Property's Net Operating Income, as reasonably determined by Lender and (II) is not an Embargoed Person;

(L) the Property will be continue to be managed by a Qualified Manager pursuant to the Management Agreement or a Replacement Management Agreement after giving effect to such Transfer;

(M) Borrower shall deliver a Rating Agency Confirmation to Lender with respect to such Transfer; and

(N) Borrower shall pay all reasonable out-of-pocket costs actually incurred in connection with such Transfer (including, without limitation, reasonable Lender's counsel fees and disbursements, and all recording fees, title insurance premiums and mortgage and intangible taxes and the fees and expenses of the Approved Rating Agencies).

Lender shall have the right to perform searches and/or received other diligence such that Lender is in compliance with Lender's then current "know your customer" requirements, and to the extent that any Transfer will result in the transferee (either itself or collectively with its affiliates) owning a twenty-five percent (25%) or greater equity interest (directly or indirectly) in Borrower, Lender's receipt of the Satisfactory Search Results, at Borrower's cost and expense, shall be a condition precedent to such Transfer.

(e) No Transfer of the Property and assumption of the Loan shall occur during the period that is sixty (60) days prior to and sixty (60) days after a Securitization. Otherwise, Lender shall consent to a Transfer of the Property or 100% of the legal or beneficial ownership interests therein or in Borrower and assumption of the entire Loan not otherwise permitted by Section 5.2.10(d) to a Qualified Transferee, which consent shall not be unreasonably withheld, conditioned or delayed, provided that Lender receives thirty (30) days prior written notice of such Transfer and no Event of Default has occurred and is continuing, and further provided that the following additional requirements are satisfied:

(i) Borrower shall pay Lender a transfer fee equal to (A) one tenth percent (0.10%) of the outstanding principal balance of the Loan at the time of the first such Transfer and (B) one-half percent (0.50%) of the outstanding principal balance of the Loan at the time of the any subsequent Transfer;

(ii) Borrower shall pay any and all reasonable out-of-pocket costs actually incurred in connection with such Transfer (including, without limitation, reasonable Lender's counsel fees and disbursements and all recording fees, title insurance premiums and mortgage and intangible taxes and the fees and expenses of the Approved Rating Agencies pursuant to clause (x) below);

(iii) Qualified Transferee, Qualified Transferee's Principals and all other entities which may be owned or Controlled directly or indirectly by Qualified Transferee's Principals ("**Related Entities**") must not have been the subject of any Bankruptcy Action within seven (7) years prior to the date of the proposed Transfer;

(iv) With respect to a Transfer of the Property, Qualified Transferee shall assume all of the obligations of Borrower under the Loan Documents in a manner

satisfactory to Lender in all respects, including, without limitation, by entering into an assumption agreement in form and substance satisfactory to Lender;

(v)     There shall be no material litigation or regulatory action pending or threatened against Qualified Transferee, Qualified Transferee's Principals or any Related Entities which would have a material adverse effect on any of Qualified Transferee, Qualified Transferee's Principals or any Relate Entity's financial condition, the value of the Property or Net Operating Income which is not reasonably acceptable to Lender;

(vi)    Lender shall have performed searches and/or received other diligence such that Lender is in compliance with Lender's then current "know your customer" requirements, and Lender shall have received Satisfactory Search Results for any owner of Transferee which will own a twenty-five percent (25%) or greater equity interest (directly or indirectly) in Borrower after giving effect to such Transfer;

(vii)   With respect to any Transfer of the Property, Qualified Transferee must be able to satisfy all representations and covenants in Section 4.1.30 and in all cases Qualified Transferee and Qualified Transferee's Principals must be able to satisfy all the representations and covenants set forth in Sections 4.1.30, 4.1.35, 5.1.23 and 5.2.9 of this Agreement, no Default or Event of Default shall otherwise occur as a result of such Transfer, and Qualified Transferee and Qualified Transferee's Principals shall deliver (A) all organizational documentation reasonably requested by Lender, which shall be reasonably satisfactory to Lender and, following a Securitization, satisfactory to the Approved Rating Agencies and (B) all certificates, agreements, covenants and legal opinions reasonably required by Lender;

(viii)  If required by Lender, Qualified Transferee shall be approved by the Approved Rating Agencies, which approval, if required by Lender, shall take the form of a Rating Agency Confirmation with respect to such Transfer;

(ix)    Guarantor shall be released from the Guaranty and Environmental Indemnity for all liability accruing after the date of a Transfer, if, in connection with such Transfer,  (I) one (1) or more substitute guarantors acceptable to Lender in its sole discretion with similar or better net worth and liquidity to the net worth and liquidity of Guarantor on the Closing Date, shall have assumed all of the liabilities and obligations of Guarantor under the Guaranty and Environmental Indemnity or shall have executed a replacement guaranty and replacement environmental indemnity satisfactory to Lender in its sole discretion, in each case covering all liability accruing after the date of such assumption or execution and (II) Lender shall have received customary legal opinions relating to authorization and enforceability of the additional guaranty and environmental indemnity contemplated above, substantially similar in form and substance to the opinions delivered to Lender on the Closing Date relating to the Guaranty and Environmental Indemnity, or otherwise in form and substance acceptable to Lender in its sole discretion, including, to the extent the Guarantor being released was included in the Insolvency Opinion delivered at closing, an Additional Insolvency Opinion with respect to any replacement guarantor.

(x)      Borrower shall deliver, at its sole cost and expense, an endorsement to the Title Insurance Policy, as modified by the assumption agreement, as a valid first lien on the Property and naming the Qualified Transferee as owner of the Property, which endorsement shall insure that, as of the date of the recording of the assumption agreement, the Property shall not be subject to any additional exceptions or liens other than those contained in the Title Policy issued on the date hereof and the Permitted Encumbrances;

(xi)      The Property shall continue to be managed by Manager or by a Qualified Manager pursuant to the Management Agreement or a Replacement Management Agreement; and

(xii)      Borrower or Qualified Transferee, at its sole cost and expense, shall deliver to Lender an Additional Insolvency Opinion reflecting such Transfer reasonably satisfactory in form and substance to Lender.

(xiii)      Qualified Transferee shall be an entity that, directly or indirectly, (I) has not been the subject of any Bankruptcy Action, governmental or regulatory investigation which resulted in a final, nonappealable conviction for criminal acts, or has been alleged to have attempted to hinder, delay or defraud their creditors in each case in the past seven (7) years and has no material governmental or regulatory investigation pending or threatened in writing that if adversely determined would result in a material adverse effect on Borrower's or Operating Lessee's financial condition, the value of the Property or the Property's Net Operating Income, as reasonably determined by Lender and (II) is not an Embargoed Person;

(xiv)      Mezzanine Lender (to the extent the Mezzanine Loan is outstanding) approves of such Transfer and assumption in their sole and absolute discretion; and

(xv)      Qualified Transferee has not been convicted in a criminal proceeding for a felony or any crime involving moral turpitude or is an organized crime figure or is reputed to have substantial business or other affiliations with any organized crime figure;

(xvi)      Transfer satisfied the conditions set forth in Section 5.2.10(d)(ii)(C) through (H) above; and

(xvii)      A newly formed entity that owns one hundred percent of the issued and outstanding ownership interests in the Qualified Transferee (the "**New Mezzanine Borrower**") shall assume the Mezzanine Loan (provided that the Mezzanine Loan is still outstanding) and pledge such ownership interests to Mezzanine Lender.  The New Mezzanine Borrower shall be a bankruptcy remote Special Purpose Entity.  The substitute guarantor referenced above must exercise directive control of New Mezzanine Borrower and own not less than fifty one percent (51%) of the issued and outstanding equity interests in New Mezzanine Borrower.  The legal and ownership structure following the assumption, taken as a whole, shall in all material respects replicate the legal and ownership structure in place prior to the assumption.

Immediately upon a Transfer to such Qualified Transferee and the satisfaction of all of the above requirements, the named Borrower and Guarantor herein shall be released from all liability under this Agreement, the Note, the Mortgage and the other Loan Documents accruing after such Transfer.  The foregoing release shall be effective upon the date of such Transfer, but Lender agrees to provide written evidence thereof reasonably requested by Borrower.

(f)     Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Borrower's Transfer without Lender's consent.  This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer.

5.2.11     **Operating Lease.**  (a) Except as provided in <u>Section 5.1.22</u> of this Agreement, Borrower shall not, nor shall it permit Operating Lessee to, as applicable (i) breach beyond applicable notice and cure period, any material covenants, agreements and obligations required to be performed and observed by Operating Lessee under the Operating Lease, (ii) enter into an assignment or sublease of Operating Lessee's interest in the Operating Lease without Lender's prior written consent, not to be unreasonably withheld, conditioned or delayed, (iii) surrender, terminate, cancel, amend or modify in any material respect the Operating Lease, (iv) reduce or consent to the reduction of the term of (or permit the reduction or consent to the reduction) the Operating Lease; (v) increase or consent to the increase of the amount of any rent, fees or other charges payable under any Operating Lease or permit Operating Lessee to accrue rent under the Operating Lease (except for any accrual of rent during the Low Season Period as in effect as of the Closing Date); or (vi) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Operating Lease in any material respect.

(b)     Following the occurrence and during the continuance of an Event of Default, Borrower shall not, nor shall it permit Operating Lessee to, exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Operating Lease without the prior written consent of Lender, which consent may be granted, conditioned or withheld in Lender's sole discretion.

(c)     Notwithstanding anything contained to the contrary in subsection (a)(iii) to the contrary, Borrower shall be entitled to terminate or modify any Operating Lease upon satisfaction of the following conditions:  (i) in connection with a termination, Operating Lessee shall transfer to Borrower any property, licenses, contracts, the Management Agreement and Equipment pertaining to Operating Lessee's business conducted at the Property, and Borrower shall provide evidence reasonably satisfactory to Lender (which shall include, but not be limited to an Officer's Certificate) indicating that such transfer shall have been in accordance with any applicable Legal Requirements, and contractual provisions of the Management Agreement and/or contracts and where the consent to such transfer shall be required by any third parties, Borrower shall obtain such consents and provide copies of the same to Lender; (ii) Borrower shall, at its own expense, execute such documents as Lender may reasonably require to spread the Lien of the Mortgage to cover such assets or separately encumber such assets through another appropriate security instrument, and Borrower further agrees to pay Lender's costs and expenses (including, without limitation, reasonable counsel fees) in connection with preparing

and reviewing the aforesaid amendment documents; (iii) in connection with a termination, Borrower shall provide evidence reasonably satisfactory to Lender that the transfer described in clause (i) above shall not constitute a fraudulent conveyance under any applicable Legal Requirements, (d) in connection with a termination, Borrower shall deliver, at its sole expense, executed amendments to any Loan Document to which Operating Lessee was a party reflecting the termination of the Operating Lease and Borrower further agrees to pay Lender's reasonable costs and expenses actually incurred (including, without limitation, reasonable counsel fees) in connection with preparing and reviewing the aforesaid amendment documents; (iv) Borrower shall deliver reasonably satisfactory evidence to Lender indicating that such modification is due solely to the existence of one of the following circumstances: (A) damage or destruction to a sufficient portion of an Property to change the operating profile or potential, (B) an expansion or significant capital investment that would result in a significant change in operations at the Property (and as may be permitted pursuant to this Agreement), (C) the replacement of Manager at the Property (as permitted pursuant to this Agreement), or (D) such modification is necessary to comply with the REIT requirements and standards of the Code; and (v) Borrower shall deliver reasonably satisfactory evidence to Lender indicating that any such termination of the Operating Lease shall not be likely to cause a material adverse effect on Borrower's or Operating Lessee's financial condition, the value of the Property or the Property's Net Operating Income, as determined by Lender.

### ARTICLE VI– INSURANCE; CASUALTY; CONDEMNATION;

Section 6.1 **Insurance.** (a) Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower, Operating Lessee and the Property providing at least the following coverages:

(i) comprehensive all risk "special form" insurance including, but not limited to, loss caused by any type of windstorm or hail on the Improvements and the Personal Property, (A) in an amount equal to one hundred percent (100%) of the "**Full Replacement Cost**," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation; (B) containing an agreed amount endorsement with respect to the Improvements and Personal Property waiving all co-insurance provisions or to be written on a no co-insurance form; (C) providing for no deductible in excess of $100,000.00 for all such insurance coverage; provided however with respect to windstorm and earthquake coverage, providing for a deductible not to exceed five percent (5%) of the total insurable value of the Property; and (D) if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses, coverage for loss due to operation of law in an amount equal to the full Replacement Cost, coverage for demolition costs and coverage for increased costs of construction in amounts acceptable to Lender. In addition, Borrower shall obtain, or cause Operating Lessee to obtain: (y) if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area", flood hazard insurance in an amount equal to (1) the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as

each may be amended plus (2) such greater amount as Lender shall require, and (z) earthquake insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity; provided that the insurance pursuant to clauses (y) and (z) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this Section 6.1(a)(i);

(ii)      business income or rental loss insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in Subsection 6.1(a)(i) above; (C) in an amount equal to one hundred percent (100%) of the projected gross revenues from the operation of the Property (as reduced to reflect expenses not incurred during a period of Restoration) for a period of at least twenty-four (24) months after the date of the Casualty; and (D) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period.  The amount of such business income or rental loss insurance shall be determined prior to the date hereof and at least once each year thereafter based on the "Business Interruption Loss Worksheet" completed by Borrower for the Property for the succeeding twelve (12) month period .  Notwithstanding the provisions of Section 2.6.1 hereof, all proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied to the obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in this Agreement and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iii)      at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the property and liability coverage forms do not otherwise apply, (A) commercial general liability and umbrella/excess liability insurance, covering claims related to the structural construction, repairs or alterations being made at the Property which are not covered by or under the terms or provisions of the below mentioned commercial general liability and umbrella/excess liability insurance policies and (B) the insurance provided for in Section 6.1(a)(i) above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above, (3) including permission to occupy the Property and (4) with an agreed amount endorsement waiving co-insurance provisions;

(iv)      boiler and machinery insurance, if steam boilers or other pressure-fixed vessels are in operation, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under Section 6.1(a)(i) above;

(v)      commercial general liability insurance, including liquor liability, against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined limit of not less than $2,000,000.00 in the aggregate and $1,000,000.00 per occurrence; (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) contractual liability for all insured contracts and (5) contractual liability covering the indemnities contained in Article 9 of the Mortgage to the extent the same is available;

(vi)      if applicable, commercial automobile liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of $1,000,000.00;

(vii)      if applicable, worker's compensation and employee's liability subject to the worker's compensation laws of the applicable state and any union collective bargaining agreement;

(viii)      umbrella and excess liability insurance in an amount not less than $100,000,000.00 per occurrence on terms consistent with the commercial general liability insurance policy required under Section 6.1(a)(v) above, including, but not limited to, supplemental coverage for employer liability and automobile liability, if applicable, which umbrella liability coverage shall apply in excess of the automobile liability coverage in clause (vi) above;

(ix)      the insurance required under this Section 6.1(a)(i), (ii), (v) and (viii) above shall cover perils of terrorism and acts of terrorism and Borrower shall maintain, or cause Operating Lessee to maintain insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with those required under this Section 6.1(a)(i), (ii), (v) and (viii) above at all times during the term of the Loan; and

(x)      upon sixty (60) days written notice, such other reasonable insurance, including, but not limited to, sinkhole or land subsidence insurance, and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

(b)      All insurance provided for in Section 6.1(a) hereof, shall be obtained under valid and enforceable policies (collectively, the "**Policies**" or in the singular, the "**Policy**"), and shall be subject to the approval of Lender as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies shall be issued by (1) financially sound and responsible insurance companies authorized to do business in the State and having a rating of (x) "A" or better by S&P and (y) "A2" or better by Moody's, if Moody's rates the Securities and rates the applicable insurance company, and (z) "A" or better by Fitch, to the extent Fitch rates the Securities and rates the applicable insurance company (provided, however for multi-layered

policies, (A) if four (4) or fewer insurance companies issue the Policies, then at least 75% of the insurance coverage represented by the Policies must be provided by insurance companies with a rating of "A" or better by S&P and "A2" or better by Moody's, to the extent Moody's rates the Securities and rates the applicable insurance company, and "A" or better by Fitch, to the extent Fitch rates the Securities and rates the applicable insurance company, with no carrier below "BBB" by S&P and "Baa2" or better by Moody's, to the extent Moody's rates the Securities and rates the applicable insurance company, and "BBB" or better by Fitch, to the extent Fitch rates the Securities and rates the applicable insurance company, or (B) if five (5) or more insurance companies issue the Policies, then at least sixty percent (60%) of the insurance coverage represented by the Policies must be provided by insurance companies with a rating of "A" or better by S&P and "A2" or better by Moody's, to the extent Moody's rates the Securities and rates the applicable insurance company, and "A" or better by Fitch, to the extent Fitch rates the Securities and rates the applicable insurance company, with no carrier below "BBB" by S&P and "Baa2" or better by Moody's, to the extent Moody's rates the Securities and rates the applicable insurance company, and "BBB" or better by Fitch, to the extent Fitch rates the Securities and rates the applicable insurance company, and (2) a rating of A:X or better in the current Best's Insurance Reports.  The Policies described in Section 6.1 hereof (other than those strictly limited to liability protection) shall designate Lender as loss payee.  Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the Policies, to be followed by complete copies of the Policies upon issuance, accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "**Insurance Premiums**"), shall be delivered by Borrower to Lender.  Borrower shall, within three (3) Business Days, forward to Lender a copy of each written notice received by Borrower of any proposed or actual modification, reduction or cancellation of any of the Policies or of any of the coverages afforded under any of the Policies.

(c)    Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder or shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 6.1(a) hereof.  To the extent that the Policies are maintained pursuant to a blanket insurance Policy that covers more than one location within a one thousand foot radius of the Property (the "**Radius**"), the limits of such blanket insurance Policy shall be sufficient to maintain coverage on a total insured value basis in compliance with the provisions of Section 6.1(a) for each such location within the Radius, including the Property.

(d)    All Policies provided for or contemplated by Section 6.1(a) hereof, shall name Borrower as a named insured and, with respect to liability policies, except for the Policies referenced in Section 6.1(a)(vi) and (viii) of this Agreement, shall name Lender, and its successors and/or assigns, as the additional insured, as its interests may appear, and in the case of property policies, including, but not limited to terrorism, boiler and machinery, flood and earthquake insurance, shall contain a standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall,  to the extent of Lender's interest in the Policy, be payable to Lender.

(e)     All property Policies shall contain clauses or endorsements to the effect that:

(i)     no act or negligence of Borrower, or anyone acting for Borrower, or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, or foreclosure or similar action, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii)     the Policy shall not be canceled without at least thirty (30) days written notice to Lender, except ten (10) days' notice for non-payment of premiums;

(iii)     the issuers thereof shall give written notice to Lender if the issuers elect not to renew the Policy prior to its expiration; and

(iv)     Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(f)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate after three (3) Business Days' notice to Borrower if prior to the date upon which any such coverage will lapse or at any time Lender deems necessary (regardless of prior notice to Borrower) to avoid the lapse of any such coverage.  All premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and, until paid, shall be secured by the Mortgage and shall bear interest at the Default Rate.

Section 6.2     **Casualty.**  If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt written notice of such damage to Lender and shall, or shall cause Operating Lessee to, promptly commence and diligently prosecute the completion of the Restoration of the Property pursuant to Section 6.4 hereof as nearly as possible to the condition the Property was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Lender and otherwise in accordance with Section 6.4 hereof.  Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance.  Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower.  In addition, Lender may participate in any settlement discussions with any insurance companies (and shall approve the final settlement, which approval shall not be unreasonably withheld or delayed) with respect to any Casualty in which the Net Proceeds or the costs of completing the Restoration are equal to or greater than $1,500,000.00 and Borrower shall, or shall cause Operating Lessee to, deliver to Lender all instruments reasonably required by Lender to permit such participation.

Section 6.3     **Condemnation.**  (a)  Borrower shall,  promptly give Lender notice of the actual or threatened (in writing) commencement of any proceeding for the Condemnation of the Property and shall deliver to Lender copies of any and all papers served in connection with such proceedings.  Lender may participate in any such proceedings, and Borrower shall, or shall cause

Operating Lessee to, from time to time deliver to Lender all instruments reasonably requested by it to permit such participation. Borrower shall, or shall cause Operating Lessee to, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If any portion of the Property is taken by a condemning authority, Borrower shall or shall cause Operating Lessee to, promptly commence and diligently prosecute the Restoration of the Property pursuant to Section 6.4 hereof and otherwise comply with the provisions of Section 6.4 hereof. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

(b) Notwithstanding anything to the contrary contained herein or in any other Loan Document, if the Loan or any portion thereof is included in a REMIC Trust and, immediately following a release of any portion of the Lien of the Mortgage in connection with a Condemnation of a Property (but taking into account any proposed Restoration on the remaining portion the Property) (based solely on real property and excluding any personal property or going concern value), the Loan-to-Value Ratio is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust), the principal balance of the Loan must be prepaid down by an amount not less than the least of the following amounts (in each case without penalty or premium): (i) the Condemnation Proceeds, (ii) the fair market value of the released property at the time of the release, or (iii) an amount such that the Loan-to-Value Ratio (as so determined by Lender) does not increase after the release, unless Lender receives an opinion of counsel that if such amount is not paid, the Securitization will not fail to maintain its status as a REMIC Trust as a result of the related release of such portion of the Lien of the Mortgage. Any such prepayment shall be deemed a voluntary prepayment and shall be subject to Section 2.4.1 hereof (other than the requirements to prepay the Debt in full and provide thirty (30) days' notice to Lender).

Section 6.4    **Restoration.** The following provisions shall apply in connection with the Restoration of the Property:

(a) If the Net Proceeds shall be less than $1,500,000.00 and the costs of completing the Restoration shall be less than $1,500,000.00, the Net Proceeds will be disbursed by Lender to Borrower upon receipt, provided that all of the conditions set forth in Section 6.4(b)(i) hereof are met and Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

(b)     If the Net Proceeds are equal to or greater than $1,500,000.00 or the costs of completing the Restoration is equal to or greater than $1,500,000.00 Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section 6.4.  The term "Net Proceeds" for purposes of this Section 6.4 shall mean:  (i) the net amount of all insurance proceeds received by Lender pursuant to Section 6.1(a)(i), (iv), (ix) and (x) as a result of such damage or destruction, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees actually incurred), if any, in collecting same ("**Insurance Proceeds**"), or (ii) the net amount of the Award, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("**Condemnation Proceeds**"), whichever the case may be.

(i)     The Net Proceeds shall be made available to Borrower for Restoration provided that each of the following conditions are met:

(A)     no Event of Default shall have occurred and be continuing;

(B)     (1) in the event the Net Proceeds are Insurance Proceeds, less than thirty-five percent (35%) of the total floor area of the Improvements on the Property has been damaged, destroyed or rendered unusable as a result of such Casualty or (2) in the event the Net Proceeds are Condemnation Proceeds, less than ten percent (10%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is located on such land;

(C)     Intentionally Omitted;

(D)     Borrower shall, or shall cause Operating Lessee to, commence the Restoration as soon as reasonably practicable (but in no event later than sixty (60) days after such Casualty or Condemnation, whichever the case may be, occurs); provided, that if Lender's approval is required pursuant to this Section 6.4, Borrower shall, or shall cause Operating Lessee to commence the Restoration as soon as reasonably practicable after receiving such approval and shall diligently pursue the same to satisfactory completion;

(E)     Lender shall be reasonably satisfied that any operating deficits, including all scheduled payments of interest under the Note and all Mezzanine Debt Service, which will be incurred with respect to the Property as a result of the occurrence of any such Casualty or Condemnation, whichever the case may be, will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in Section 6.1(a)(ii) hereof, if applicable, or (3) by other funds of Borrower;

(F)     Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) six (6) months prior to the Maturity Date, (2) the earliest date required for such completion under the terms of the Management Agreement; (3) such time as may be required under all applicable Legal Requirements in order to repair and restore the Property to the condition it

was in immediately prior to such Casualty or to as nearly as possible the condition it was in immediately prior to such Condemnation, as applicable, or (4) the expiration of the insurance coverage referred to in Section 6.1(a)(ii) hereof;

(G)     the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements;

(H)     the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements;

(I)     such Casualty or Condemnation, as applicable, does not result in the loss of access to the Property or the Improvements;

(J)     the Debt Yield for the Property, after giving effect to the Restoration, shall be equal to or exceed (i) if determined on or prior to the commencement of the first Extension Option, seven percent (7.0%), (b) if determined after the commencement of the first Extension Option, but prior to the commencement of the second Extension Option, seven percent (7.0%), (c) if determined on or after the commencement of the second Extension Option, but prior to the commencement of the third Extension Option, eight percent (8.0%), and (c) if determined on or after the commencement of the third Extension Option, eight and one-half percent (8.50%).

(K)     Borrower shall deliver, or cause to be delivered, to Lender a signed detailed budget approved in writing by Borrower's architect or engineer stating the entire cost of completing the Restoration, which budget shall be subject to Lender's approval, which approval shall not be unreasonably withheld, conditioned or delayed; and

(L)     the Net Proceeds together with any cash or cash equivalent deposited by Borrower with Lender are sufficient in Lender's reasonable discretion to cover the cost of the Restoration.

(ii)     The Net Proceeds shall be held by Lender in an interest-bearing Eligible Account and, until disbursed in accordance with the provisions of this Section 6.4(b), shall constitute additional security for the Debt and Other Obligations under the Loan Documents.  The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence reasonably satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances (other than Permitted Encumbrances) of any nature whatsoever on the Property which have not either been fully bonded to the reasonable satisfaction of Lender and discharged of record or in the

alternative fully insured to the reasonable satisfaction of Lender by the title company issuing the Title Insurance Policy.

(iii)    All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender (which review and approval shall not be unreasonably withheld, conditioned or delayed) and by an independent consulting engineer selected by Lender (the "**Casualty Consultant**"). Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration.  The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and approval by Lender and the Casualty Consultant (which review and approval shall not be unreasonably withheld, conditioned or delayed).  All out-of-pocket costs and expenses actually incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's reasonable fees, shall be paid by Borrower.

(iv)    In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Casualty Retainage.  The term "**Casualty Retainage**" (a) prior to the date that the restoration has been fifty percent completed, an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, and (b) after the Restoration has been fifty percent (50%) completed, as determined by Lender, an amount equal to five percent (5%) of the costs actually incurred for work in place as part of the Restoration.  The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 6.4(b), be less than the amount actually held back by Borrower, or Operating Lessee, as applicable, from contractors, subcontractors and materialmen engaged in the Restoration.  The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 6.4(b) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate governmental and quasi-governmental authorities, and Lender receives evidence reasonably satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company issuing the Title Insurance Policy, and Lender receives an endorsement to the Title Insurance Policy insuring the continued priority of the lien of the Mortgage and evidence of payment of any premium payable for such endorsement.  If required by Lender, the release of any such portion of the Casualty

Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of Lender in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 6.4(b) shall constitute additional security for the Debt and Other Obligations under the Loan Documents.

(vii)     The excess, if any, of the Net Proceeds (and the remaining balance, if any, of the Net Proceeds Deficiency) deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 6.4(b), and the receipt by Lender of evidence reasonably satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be deposited in the Cash Management Account to be disbursed in accordance with this Agreement, provided no Event of Default shall have occurred and shall be continuing under the Note, this Agreement or any of the other Loan Documents.

(c)     All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Section 6.4(b)(vii) hereof may be retained and applied by Lender toward the payment of the Debt (without prepayment penalty or premium) in accordance with Section 2.4.2 hereof, whether or not then due and payable in such order, priority and proportions as Lender in its sole discretion shall deem proper, or, at the reasonable discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall approve, in its reasonable discretion.

(d)     In the event of foreclosure of the Mortgage, or other transfer of title to the Property in extinguishment in whole or in part of the Debt all right, title and interest of Borrower in and to the Policies that are not blanket Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

### ARTICLE VII – RESERVE FUNDS

Section 7.1     **Required Repairs.**

7.1.1     **Deposits.**  Borrower shall perform the repairs at the Property, as more particularly set forth on Schedule II hereto (such repairs hereinafter referred to as "**Required**

**Repairs**").  Borrower shall complete the Required Repairs on or before the required deadline for each repair as set forth on <u>Schedule II</u>.  It shall be an Event of Default under this Agreement if (a) Borrower does not complete the Required Repairs at the Property by the required deadline for each repair as set forth on <u>Schedule II</u>, or (b) Borrower does not satisfy each condition contained in <u>Section 7.1.2</u> hereof.  Upon the occurrence of such an Event of Default, Lender, at its option, may withdraw all Required Repair Funds from the Required Repair Account and Lender may apply such funds either to completion of the Required Repairs at the Property or toward payment of the Debt in such order, proportion and priority as Lender may determine in its sole discretion. Lender's right to withdraw and apply Required Repair Funds shall be in addition to all other rights and remedies provided to Lender under this Agreement and the other Loan Documents. On the Closing Date, Borrower shall deposit with Lender the amount for the Property set forth on such <u>Schedule II</u> hereto to perform the Required Repairs for the Property.  Amounts so deposited with Lender shall be held by Lender in accordance with <u>Section 7.5</u> hereof.  Amounts so deposited shall hereinafter be referred to as Borrower's "**Required Repair Fund**" and the account in which such amounts are held shall hereinafter be referred to as Borrower's "**Required Repair Account**".

   7.1.2  **Release of Required Repair Funds.**  Lender shall disburse to Borrower the Required Repair Funds from the Required Repair Account from time to time upon satisfaction by Borrower of each of the following conditions:  (a) Borrower shall submit a written request for payment to Lender at least ten (10) Business Days prior to the date on which Borrower requests such payment be made and specifies the Required Repairs to be paid, (b) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured, (c) Lender shall have received an Officers' Certificate (i) stating that all Required Repairs to be funded by the requested disbursement have been completed in good and workmanlike manner and in accordance with all applicable federal, state and local laws, rules and regulations, such certificate to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required to commence and/or complete the Required Repairs, (ii) identifying each Person that supplied materials or labor in connection with the Required Repairs to be funded by the requested disbursement, and (iii) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such Officers' Certificate to be accompanied by lien waivers or other evidence of payment satisfactory to Lender, (d) if such disbursement request exceeds $100,000.00, or, to the extent that such disbursement, when aggregated with previous disbursements, exceeds $100,000.00 at Lender's option, a title search for the Property indicating that the Property is free from all liens, claims and other encumbrances not previously approved by Lender, and (e) Lender shall have received such other evidence as Lender shall reasonably request that the Required Repairs to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower.  Lender shall not be required to make disbursements from the Required Repair Account with respect to the Property (i) more than once a month and (ii) unless such requested disbursement is in an amount greater than $25,000.00 (or a lesser amount if the total amount in the Required Repair Account is less than $25,000.00), in which case only one disbursement of the amount remaining in the account shall be made) and such disbursement shall be made only upon satisfaction of each condition contained in this <u>Section 7.1.2</u>.

   Section 7.2  **Tax and Insurance Escrow Fund.**  (a)  To the extent not reserved for in a Manager-Held Reserve maintained by Manager as set forth in the applicable Operating Budget

(provided, that to the extent so reserved, Borrower delivers to Lender the invoices and other evidence of payment required under Section 5.1.2 hereof and Section 6.1 hereof), Borrower shall pay to Lender (a) on the Closing Date an initial deposit and (b) on each Payment Date thereafter (i) one-twelfth (1/12) of the Taxes and Other Charges that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes and Other Charges at least thirty (30) days prior to their respective due dates, and (ii) one-twelfth (1/12) of the Insurance Premiums that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (said amounts in (a) and (b) above hereinafter called the "**Tax and Insurance Escrow Fund**"). Lender will apply the Tax and Insurance Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Section 5.1.2 hereof and under the Mortgage. In making any payment relating to the Tax and Insurance Escrow Fund, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If the amount of the Tax and Insurance Escrow Fund shall exceed the amounts due for Taxes, Other Charges and Insurance Premiums pursuant to Section 5.1.2 hereof, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Escrow Fund. If at any time Lender reasonably determines that the Tax and Insurance Escrow Fund is not or will not be sufficient to pay Taxes, Other Charges and Insurance Premiums by the dates set forth in (a) and (b) above, Lender shall notify Borrower of such determination and Borrower shall increase its monthly payments to Lender by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to the due date of the Taxes and Other Charges and/or thirty (30) days prior to expiration of the Policies, as the case may be. All interest on the Tax and Insurance Escrow Fund shall be added to and become a part thereof and disbursed in accordance with this Section 7.2.

(c)     Notwithstanding anything herein to the contrary, provided that no Event of Default has occurred and is continuing, to the extent that any of the insurance required to be maintained by Borrower or Operating Lessee under this Agreement and/or any other Loan Document is effected under a blanket policy reasonably acceptable to Lender insuring substantially all of the real property owned, directly or indirectly, by Guarantor, Borrower shall not be required to make deposits pursuant to the foregoing with respect to Insurance Premiums.

Section 7.3     **Replacements and Replacement Reserve.**

7.3.1     **Deposits to Replacement Reserve.** Borrower shall pay to Lender on each Payment Date after the Closing Date an amount equal to the Replacement Reserve Monthly Deposit to fund the costs of Replacements and PIP; provided, that for so long as Borrower is or is causing Operating Lessee to maintain the Property in accordance with the Management Agreement, the Replacement Reserve Monthly Deposit shall be reduced on a dollar-for-dollar basis by any amounts deposited into a Manager-Held Reserve for Replacements or PIP for the applicable calendar month as set forth in the Capital Renewals Budget delivered pursuant to the Management Agreement, to the extent that Lender shall have received evidence reasonably

satisfactory to Lender that such deposit has been made.  Amounts so deposited shall hereinafter be referred to as Borrower's "**Replacement Reserve Fund**" and the account in which such amounts are held shall hereinafter be referred to as Borrower's "**Replacement Reserve Account**".  All interest on the Replacement Reserve Fund shall be added to and become a part thereof and disbursed in accordance with Section 7.3.2.

7.3.2    **Disbursements from Replacement Reserve Account.**  (a) Lender shall make disbursements from the Replacement Reserve Account to pay Borrower only for the costs of the Replacements.    Lender shall not be obligated to make disbursements from the Replacement Reserve Account (i) until all amounts in the Manager-Held Reserve for Replacements or PIP have been expended in accordance with the Management Agreement or (ii) to reimburse Borrower for the costs of routine maintenance to the Property or replacements of inventory.

(b)    Lender shall, upon written request from Borrower and satisfaction of the requirements set forth in this Section 7.3.2, disburse to Borrower amounts from the Replacement Reserve Account necessary to pay for the actual approved costs of Replacements or to reimburse Borrower therefor, upon completion of such Replacements (or, upon partial completion in the case of Replacements made pursuant to Section 7.3.2(e) hereof) as determined by Lender.  In no event shall Lender be obligated to disburse funds from the Replacement Reserve Account if an Event of Default exists and is continuing.

(c)    Each request for disbursement from the Replacement Reserve Account shall be in a form specified or approved by Lender and shall specify (i) the specific Replacements for which the disbursement is requested, (ii) the quantity and price of each item purchased, if the Replacement includes the purchase or replacement of specific items, (iii) the price of all materials (grouped by type or category) used in any Replacement other than the purchase or replacement of specific items, and (iv) the cost of all contracted labor or other services applicable to each Replacement for which such request for disbursement is made.  With each request Borrower shall certify that all Replacements have been made in accordance with all applicable Legal Requirements of any Governmental Authority having jurisdiction over the Property.  Each request for disbursement shall include copies of invoices for all items or materials purchased and all contracted labor or services provided and, unless Borrower has requested and Lender has agreed to issue joint checks as described below in connection with a particular Replacement, each request shall include evidence satisfactory to Lender of payment of all such amounts.  Except as provided in Section 7.3.2(e) hereof, each request for disbursement from the Replacement Reserve Account shall be made only after completion of the Replacement for which disbursement is requested.  Borrower shall provide Lender evidence of completion of the subject Replacement satisfactory to Lender in its reasonable judgment.

(d)    Borrower shall (or shall cause Operating Lessee to) pay all invoices in connection with the Replacements with respect to which a disbursement is requested prior to submitting such request for disbursement from the Replacement Reserve Account or, at the request of Borrower, Lender will issue joint checks, payable to Borrower (or Operating Lessee, as applicable) and the contractor, supplier, materialman, mechanic, subcontractor or other party to whom payment is due in connection with a Replacement.  In the case of payments made by joint check, Lender may require a conditional waiver of lien from each Person receiving payment

prior to Lender's disbursement from the Replacement Reserve Account. In addition, as a condition to any disbursement, Lender may require Borrower to obtain (or cause Operating Lessee to obtain) lien waivers (which may be conditioned upon payment) from each contractor, supplier, materialman, mechanic or subcontractor who receives payment in an amount equal to or greater than $100,000.00 for completion of its work or delivery of its materials. Any lien waiver delivered hereunder shall conform to the requirements of applicable law and shall cover all work performed and materials supplied (including equipment and fixtures) for the Property by that contractor, supplier, subcontractor, mechanic or materialman through the date covered by the current reimbursement request (or, in the event that payment to such contractor, supplier, subcontractor, mechanic or materialmen is to be made by a joint check, the release of lien shall be effective through the date covered by the previous release of funds request).

(e)     If (i) the cost of a Replacement exceeds $100,000.00, (ii) the contractor performing such Replacement requires periodic payments pursuant to terms of a written contract, and (iii) (x) Lender has approved in writing in advance such periodic payments and such periodic payments were not expressly set forth in a contract approved by Lender (which approval shall not be unreasonably withheld, conditioned or delayed) or (y) Lender has previously approved a written contract for the which expressly provides for periodic payments, a request for reimbursement from the Replacement Reserve Account may be made after completion of a portion of the work under such contract, provided (A) such contract requires payment upon completion of such portion of the work, (B) the materials for which the request is made are on site at the Property and are properly secured or have been installed in the Property, (C) all other conditions in this Agreement for disbursement have been satisfied, (D) funds remaining in the Replacement Reserve Account are, in Lender's judgment, sufficient to complete such Replacement and other Replacements when required, and (E) if required by Lender, each contractor or subcontractor receiving payments under such contract shall provide a waiver of lien with respect to amounts which have been paid to that contractor or subcontractor.

(f)     Borrower shall not make a request for disbursement from the Replacement Reserve Account more frequently than once in any calendar month and (except in connection with the final disbursement) the total cost of all Replacements in any request shall not be less than $25,000.00.

7.3.3     **Performance of Replacements.**     (a) Borrower shall (or shall cause Operating Lessee to) make Replacements when required in order to keep the Property in condition and repair consistent with other comparable properties in the same market segment in the metropolitan area in which the Property is located, and to keep the Property or any portion thereof from deteriorating. Borrower shall (or shall cause Operating Lessee to) complete all Replacements in a good and workmanlike manner as soon as practicable following the commencement of making each such Replacement.

(b)     Lender reserves the right, at its option, to approve all contracts or work orders with materialmen, mechanics, suppliers, subcontractors, contractors or other parties providing labor or materials in connection with the Replacements. Upon Lender's request, Borrower shall (or shall cause Operating Lessee to) assign any contract or subcontract to Lender.

(c)    In the event Lender determines in its reasonable discretion that any Replacement is not being performed in a workmanlike or timely manner or that any Replacement has not been completed in a workmanlike or timely manner, Lender shall have the option to withhold disbursement for such unsatisfactory Replacement and to proceed under existing contracts or to contract with third parties to complete such Replacement and to apply the Replacement Reserve Fund toward the labor and materials necessary to complete such Replacement, without providing any prior notice to Borrower and to exercise any and all other remedies available to Lender upon an Event of Default hereunder.

(d)    In order to facilitate Lender's completion or making of such Replacements pursuant to Section 7.3.3(c) above, Borrower grants (and shall cause Operating Lessee to grant) from and after an Event of Default Lender the right to enter onto the Property and perform any and all work and labor necessary to complete or make such Replacements and/or employ watchmen to protect the Property from damage.  All sums so expended by Lender, to the extent not from the Replacement Reserve Fund, shall be deemed to have been advanced under the Loan to Borrower and secured by the Mortgage.  For this purpose Borrower constitutes and appoints (and shall cause Operating Lessee to constitute and appoint) Lender its true and lawful attorney-in-fact with full power of substitution to complete or undertake such Replacements in the name of Borrower, or Operating Lessee, as applicable.  Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked.  Borrower empowers (and shall cause Operating Lessee to empower) said attorney-in-fact as follows:  (i) to use any funds in the Replacement Reserve Account for the purpose of making or completing such Replacements; (ii) to make such additions, changes and corrections to such Replacements as shall be necessary or desirable to complete such Replacements; (iii) to employ such contractors, subcontractors, agents, architects and inspectors as shall be required for such purposes; (iv) to pay, settle or compromise all existing bills and claims which are or may become Liens against the Property, or as may be reasonably necessary or desirable for the completion of such Replacements, or for clearance of title; (v) to execute all applications and certificates in the name of Borrower which may be required by any of the contract documents; (vi) to prosecute and defend all actions or proceedings in connection with the Property or the rehabilitation and repair of the Property; and (vii) to do any and every act which Borrower might do in its own behalf to fulfill the terms of this Agreement.

(e)    Nothing in this Section 7.3.3 shall:  (i) make Lender responsible for making or completing any Replacements; (ii) require Lender to expend funds in addition to the Replacement Reserve Fund to make or complete any Replacement; (iii) obligate Lender to proceed with any Replacements; or (iv) obligate Lender to demand from Borrower additional sums to make or complete any Replacement.

(f)    Borrower shall (or shall cause Operating Lessee to) permit, upon prior written notice, Lender and Lender's agents and representatives (including, without limitation, Lender's engineer, architect, or inspector) or third parties making Replacements pursuant to this Section 7.3.3 to enter onto the Property during normal business hours (subject to the rights of Tenants under their Leases) to inspect the progress of any Replacements and all materials being used in connection therewith, to examine all plans and shop drawings relating to such Replacements which are or may be kept at the Property, and to complete any Replacements made pursuant to this Section 7.3.3.  Borrower shall cause all contractors and subcontractors to

cooperate with Lender or Lender's representatives or such other persons described above in connection with inspections described in this <u>Section 7.3.3(f)</u> or the completion of Replacements pursuant to this <u>Section 7.3.3</u>.

(g)      Lender may require an inspection of the Property at Borrower's expense prior to making a monthly disbursement from the Replacement Reserve Account in order to verify completion of the Replacements for which reimbursement is sought.  Lender may require that such inspection be conducted by an appropriate independent qualified professional selected by Lender and/or may require a copy of a certificate of completion by an independent qualified professional reasonably acceptable to Lender prior to the disbursement of any amounts from the Replacement Reserve Account.  Borrower shall pay the out-of-pocket expense of the inspection as required hereunder, whether such inspection is conducted by Lender or by an independent qualified professional.

(h)      The Replacements and all materials, equipment, fixtures, or any other item comprising a part of any Replacement shall be constructed, installed or completed, as applicable, free and clear of all mechanic's, materialmen's or other liens (except for those Liens existing on the date of this Agreement which have been approved in writing by Lender).

(i)      Before each disbursement from the Replacement Reserve Account, Lender may require Borrower to provide Lender with a search of title to the Property effective to the date of the disbursement, which search shows that no mechanic's or materialmen's liens or other liens of any nature have been placed against the Property since the date of recordation of the related Mortgage and that title to the Property is free and clear of all Liens (other than the lien of the related Mortgage and any other Liens previously approved in writing by Lender, if any).

(j)      All Replacements shall comply with all applicable Legal Requirements of all Governmental Authorities having jurisdiction over the Property and applicable insurance requirements including, without limitation, applicable building codes, special use permits, environmental regulations, and requirements of insurance underwriters.

(k)      In addition to any insurance required under the Loan Documents, Borrower shall provide or cause to be provided workmen's compensation insurance, builder's risk, and public liability insurance and other insurance to the extent required under applicable law in connection with a particular Replacement.  All such policies shall be in form and amount reasonably satisfactory to Lender.  All such policies which can be endorsed with standard mortgagee clauses making loss payable to Lender or its assigns shall be so endorsed.  Certified copies of such policies shall be delivered to Lender.

7.3.4      **Failure to Make Replacements.**  (a)  It shall be an Event of Default under this Agreement if Borrower or Operating Lessee fails to materially comply with any provision of this <u>Section 7.3</u> and Borrower does not commence and diligently pursue a cure within thirty (30) days after notice from Lender.  Upon the occurrence and continuance of such an Event of Default, Lender may use the Replacement Reserve Fund (or any portion thereof) for any purpose, including but not limited to completion of the Replacements as provided in <u>Section 7.3.3</u>, or for any other repair or replacement to the Property or toward payment of the Debt in such order, proportion and priority as Lender may determine in its sole discretion.

Lender's right to withdraw and apply the Replacement Reserve Fund shall be in addition to all other rights and remedies provided to Lender under this Agreement and the other Loan Documents.

(b)     Nothing in this Agreement shall obligate Lender to apply all or any portion of the Replacement Reserve Fund on account of an Event of Default to payment of the Debt or in any specific order or priority.

7.3.5     **Balance in the Replacement Reserve Account.**  The insufficiency of any balance in the Replacement Reserve Account shall not relieve Borrower from its obligation to fulfill all preservation and maintenance covenants in the Loan Documents.

Section 7.4     **Amortization Reserve Fund**.

7.4.1     **Deposits to Amortization Reserve Fund**.  On each Payment Date, Borrower shall deposit with Lender an amount equal to twenty-five percent (25%) of Excess Cash Flow, which shall be held  as additional security for the Loan to be applied in accordance with Section 7.4.2 and amounts so held shall be hereinafter referred to as the "**Amortization Reserve Fund**" and the account to which such amounts are held shall hereinafter be referred to as the "**Amortization Reserve Account**").  Upon written request from Borrower, Lender shall disburse funds necessary to pay (i) any Operating Expenses pursuant to the Approved Annual Budget, only to the extent there are insufficient funds to pay the same in the Excess Cash Flow Reserve Account or in the Cash Management Account, on such Payment Date or (ii) Debt Service, only to the extent there are insufficient funds to pay the same in the Cash Management Account on such Payment Date.  To the extent any such disbursements are made from the Amortization Reserve Fund, Borrower shall deposit the aggregate amount of such disbursements back into the Amortization Reserve Account prior to the next Amortization Payment Date, and such amounts shall be held as part of the Amortization Reserve Fund and such amounts shall be aggregated with the balance of the Aggregate Reserve Funds to pay the Amortization Payment required pursuant to Section 7.4.2 below.

7.4.2     **Disbursements from Amortization Reserve Fund.**  On each Amortization Payment Date, Lender shall apply all amounts in the Amortization Reserve Account to pay the Amortization Payment in accordance with Section 2.3.1(b) hereof.  For the avoidance of doubt, provided that no Event of Default has occurred and is continuing and no Cash Sweep Period is then in effect, if the amount in the Amortization Reserve Account exceeds the amount required for the applicable Amortization Payment on the respective Amortization Payment Date, such excess shall be returned to Borrower.

Section 7.5     **Excess Cash Flow Reserve Fund.**

7.5.1     **Deposits to Excess Cash Flow Reserve Fund.**  During a Cash Sweep Period, Borrower shall deposit with Lender all Excess Cash Flow (subject to deposits required to be made into the Amortization Reserve Account in accordance with Section 7.4 hereof) in the Cash Management Account, which shall be held by Lender as additional security for the Loan and amounts so held shall be hereinafter referred to as the "**Excess Cash Flow Reserve Fund**" and the account to which such amounts are held shall hereinafter be referred to as the "**Excess**

**Cash Flow Reserve Account**", provided, however, that during a Cash Sweep Period caused by (i) a Bankruptcy Action of Manager, (ii) a Hilton Trigger Event or (iii) Debt Yield Trigger Event, Lender shall disburse funds to Borrower to pay for Operating Expenses pursuant to the Approved Annual Budget, including, without limitation, actual, out-of-pocket expenses for audits and appraisals, asset management fees in an amount not to exceed $125,000, reasonable legal fees, travel expenses, expenses required to keep entities in good standing, management fees payable under the Management Agreement and Insurance Premiums.

7.5.2    **Release of Excess Cash Flow Reserve Funds**.  Upon the occurrence of a Cash Sweep Event Cure, all Excess Cash Flow Reserve Funds shall be deposited into the Cash Management Account to be disbursed in accordance with the Cash Management Agreement. Any Excess Cash Flow Reserve Funds remaining after the Debt has been paid in full shall be returned (A) if any portion of the Mezzanine Loan Debt (other than any contingent liabilities under the Mezzanine Loan Documents) is then outstanding, to Mezzanine Lender or (B) if no portion of the Mezzanine Loan Debt (other than any contingent liabilities under the Mezzanine Loan Documents) is then outstanding, to Borrower.

Section 7.6    **Intentionally Omitted**.

Section 7.7    **Reserve Funds, Generally.**  (a)  Borrower grants to Lender a first-priority perfected security interest in each of the Reserve Funds and any and all monies now or hereafter deposited in each Reserve Fund as additional security for payment of the Debt.  Until expended or applied in accordance herewith, the Reserve Funds shall constitute additional security for the Debt.

(b)    Upon the occurrence and continuance of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Reserve Funds to the payment of the Debt in any order in its sole discretion.

(c)    The Reserve Funds shall not constitute trust funds and may be commingled with other monies held by Lender.  The Reserve Funds shall be held in an Eligible Account in Permitted Investments as directed by Lender or Lender's Servicer.  Borrower shall be responsible for payment of any federal, state or local income or other tax applicable to the interest earned on the Reserve Funds credited or paid to Borrower.

(d)    Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Reserve Fund or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

(e)    Lender and Servicer shall not be liable for any loss sustained on the investment of any funds constituting the Reserve Funds.  Borrower shall indemnify Lender and Servicer and hold Lender and Servicer harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys' fees and expenses) arising from or in any way connected with the Reserve

Funds or the performance of the obligations for which the Reserve Funds were established. Borrower shall assign to Lender all rights and claims Borrower may have against all persons or entities supplying labor, materials or other services which are to be paid from or secured by the Reserve Funds; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

(f)     The required monthly deposits into the Reserve Funds and the Monthly Debt Service Payment Amount, shall be added together and shall be paid as an aggregate sum by Borrower to Lender.

(g)     Any amount remaining in the Reserve Funds after the Debt has been paid in full shall be returned (A) if any portion of the Mezzanine Loan Debt (other than any contingent liabilities under the Mezzanine Loan Documents) is then outstanding, to Mezzanine Lender or (B) if no portion of the Mezzanine Loan Debt (other than any contingent liabilities under the Mezzanine Loan Documents) is then outstanding, to Borrower.

## ARTICLE VIII– DEFAULTS

Section 8.1     **Event of Default.**     (a) Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

(i)     if any portion of the Debt is not paid when due;

(ii)     if any of the Taxes or Other Charges are not paid when the same are due and payable, provided that it shall not be an Event of Default if sufficient Tax Funds are on deposit with Agent to pay Taxes and Other Charges when due and no Event of Default then exists;

(iii)     subject to Borrower's right to contest in accordance with the terms and provisions hereof, if the Policies are not kept in full force and effect, or if certified copies of the Policies are not delivered to Lender upon request within the applicable time periods as provided herein, provided, that Borrower shall have the right to cure such failure to deliver the certified copies of the Policies to Lender within five (5) business Days of receipt of notice from Lender;

(iv)     if Borrower or Operating Lessee Transfers or otherwise encumbers any portion of the Property without Lender's prior written consent in violation of the provisions of this Agreement or Article 6 of the Mortgage;

(v)     if any representation or warranty made by Borrower or Operating Lessee herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made;

(vi)     if Borrower or Operating Lessee shall make an assignment for the benefit of creditors;

(vii)     if a receiver, liquidator or trustee shall be appointed for Borrower, Operating Lessee or any other guarantor under any guarantee issued in connection with the Loan or if Borrower or Operating Lessee shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower or Operating Lessee, or if any proceeding for the dissolution or liquidation of Borrower or Operating Lessee shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower or Operating Lessee upon the same not being discharged, stayed or dismissed within ninety (90) days;

(viii)     if Borrower or Operating Lessee attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(ix)     if Guarantor or any guarantor or indemnitor under any guaranty or indemnity issued in connection with the Loan shall make an assignment for the benefit of creditors or if a receiver, liquidator or trustee shall be appointed for Guarantor or any guarantor or indemnitor under any guarantee or indemnity issued in connection with the Loan or if Guarantor or such other guarantor or indemnitor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Guarantor or such other guarantor or indemnitor, or if any proceeding for the dissolution or liquidation of Guarantor or such other guarantor or indemnitor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Guarantor or such other guarantor or indemnitor, upon the same not being discharged, stayed or dismissed within ninety (90) days; provided, further, however, it shall be at Lender's option to determine whether any of the foregoing shall be an Event of Default;

(x)     if Borrower breaches any representation or warranty as of the date made or any covenant contained in Section 4.1.30 (provided, however, that any such breach shall not constitute an Event of Default (A) if such breach is de minimis, inadvertent and non-recurring, (B) if such breach is curable, if Borrower shall promptly cure such breach within five (5) Business Days after notice of such breach and (C) upon the written request of Lender, if Borrower promptly delivers to Lender an Additional Insolvency Opinion or a modification of the Insolvency Opinion, as applicable, to the effect that such breach shall not in any way impair, negate or amend the opinions rendered in the Insolvency Opinion, which opinion or modification and the counsel delivering such opinion and modification shall be acceptable to Lender in its reasonable discretion), or any of its respective negative covenants contained in Section 5.2 hereof;

(xi)     with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(xii)      if any of the assumptions contained in the Insolvency Opinion delivered to Lender in connection with the Loan, or in any Additional Insolvency Opinion delivered subsequent to the closing of the Loan, is or shall become untrue in any material respect;

(xiii)      if a material default by Borrower or Operating Lessee has occurred and continues beyond any applicable cure period under the Management Agreement (or any Replacement Management Agreement) and if such default permits the Manager thereunder to terminate or cancel the Management Agreement (or any Replacement Management Agreement);

(xiv)      if Borrower shall continue to be in Default under any of the terms, covenants or conditions of Section 9.1 hereof, or fails to cooperate with Lender in connection with a Securitization pursuant to the provisions of Section 9.1 hereof, for five (5) Business Days after notice to Borrower from Lender;

(xv)      Borrower shall fail to obtain and/or maintain the Interest Rate Cap Agreement or Replacement Interest Rate Cap Agreement, as applicable, as required pursuant to Section 2.2.7 hereof;

(xvi)      if Borrower or Operating Lessee, as applicable, shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (xv) above, for ten (10) days after notice to Borrower or Operating Lessee, as applicable, from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower or Operating Lessee, as applicable, shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower or Operating Lessee in the exercise of due diligence to cure such Default, such additional period not to exceed ninety (90) days;

(xvii)      if an ERISA Event shall have occurred that, when taken together with all other such ERISA Events, would reasonably be expected to result in a material adverse effect;

(xviii)      if there shall be material default under any of the other Loan Documents beyond any applicable cure periods contained in such documents, whether as to Borrower, Operating Lessee, Guarantor or the Property;

(xix)      if Guarantor breaches any covenant in Section 5.2(ii), Section 5.3 or Article VI of the Guaranty;

(xx)      if a material default by Borrower or Operating Lessee has occurred and continues beyond any applicable cure period under the Operating Lease or the REA;

(xxi)      if Borrower or Operating Lessee instructs Hilton Manager to hold back any amounts in violation of Section 5.2.1(c) hereof; or

(xxii)    if Borrower fails to maintain the Class L Deduction, provided that, in the event the Class L Deduction expires and Borrower uses good faith efforts to obtain a renewal of the same, such expiration shall not constitute an Event of Default hereunder.

(b)    Upon the occurrence and continuance of an Event of Default (other than an Event of Default described in <u>clauses (vi)</u>, <u>(vii)</u> or <u>(viii)</u> above) and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower, Operating Lessee and the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower, Operating Lessee and any or all of the Property, including, without limitation, all rights or remedies available at law or in equity; and upon the continuance of any Event of Default described in <u>clauses (vi)</u>, <u>(vii)</u> or <u>(viii)</u> above, the Debt and Other Obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower and Operating Lessee hereby expressly waive any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

Section 8.2    **<u>Remedies.</u>**  (a) Upon the occurrence and continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or Operating Lessee, as applicable, or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any part of the Property.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the Mortgage has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

(b)    With respect to Borrower, Operating Lessee and the Property, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property for the satisfaction of any of the Debt in any preference or priority, and Lender may seek satisfaction out of the Property, or any part thereof, in its absolute discretion in respect of the Debt.  In addition, Lender shall have the right from time to time to partially foreclose the Mortgage in any manner and for any amounts secured by the Mortgage then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances:  (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the

Mortgage to recover such delinquent payments or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Mortgage to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Mortgage as Lender may elect.  Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Mortgage to secure payment of sums secured by the Mortgage and not previously recovered.

(c)    Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (the "**Severed Loan Documents**") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder. In furtherance of such right, Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints (and shall cause Operating Lessee to appoint) Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower and Operating Lessee ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until five (5) Business Days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.  Borrower shall be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents and the Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

(d)    As used in this Section 8.2, a "foreclosure" shall include, without limitation, any sale by power of sale.

Section 8.3    **Remedies Cumulative; Waivers.**  The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower or Operating Lessee pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

# ARTICLE IX – SPECIAL PROVISIONS

Section 9.1    **Securitization.**

9.1.1    **Sale of Notes and Securitization.**  (a)  Borrower acknowledges and agrees that Lender may syndicate all or any portion of the Loan or the Loan Documents, sell all or any portion of the Loan and the Loan Documents, or issue one or more participations therein, or consummate one or more private or public securitizations of rated single- or multi-class securities (the "**Securities**") secured by or evidencing ownership interests in all or any portion of the Loan and the Loan Documents or a pool of assets that include the Loan and the Loan Documents (such syndications, sales, participations and/or securitizations, collectively, a "**Securitization**").

(b)    At the request of Lender, and to the extent not already required to be provided by or on behalf of Borrower under this Agreement, Borrower shall use reasonable efforts to provide information not in the possession of Lender or which may be reasonably required by Lender or take other actions reasonably required by Lender, in each case in order to satisfy the market standards to which Lender customarily adheres or which may be reasonably required by prospective investors and/or the Rating Agencies in connection with any such Securitization. Lender shall have the right to provide to prospective investors and the Rating Agencies any information in its possession, including, without limitation, financial statements relating to Borrower, Operating Lessee, Guarantor, if any, the Property and any Tenant of the Improvements.  Borrower acknowledges that certain information regarding the Loan and the parties thereto and the Property may be included in a private placement memorandum, prospectus or other disclosure documents.  Borrower agrees that each of Borrower, Operating Lessee, Guarantor and their respective officers and representatives, shall, at Lender's reasonable request, at its sole cost and expense, cooperate with Lender's efforts to arrange for a Securitization in accordance with the market standards to which Lender customarily adheres and/or which may be required by prospective investors and/or the Rating Agencies in connection with any such Securitization (including, without limitation, the placement of an administrative agent in connection with a syndication of all or any portion of the Loan and the Loan Documents). Borrower and Guarantor agree to review, at Lender's request in connection with the Securitization, the Disclosure Documents as such Disclosure Documents relate to Borrower, Operating Lessee, Guarantor, the Property and the Loan, including without limitation, the sections entitled "Risk Factors," "Special Considerations," "Description of the Mortgage," "Description of the Mortgage Loan and Mortgaged Property," "The Manager," "The Borrower," "Operating Lessee," and "Certain Legal Aspects of the Mortgage Loan" (or sections similarly titled or covering similar subject matters), and shall confirm that the factual statements and representations contained in such sections and such other information in the Disclosure Documents (to the extent such information relates to, or is based on, or includes any information regarding the Property, Borrower, Operating Lessee, Guarantor, Manager and/or the Loan) do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Borrower shall review and provide to Lender in writing any revisions to any Disclosure Documents  within three (3) Business Days following Borrower's initial receipt thereof and within one (1) Business Day with respect to interim drafts thereof.

(c)     Borrower agrees to make upon Lender's written request, without limitation, all structural or other changes to the Loan (including, without limitation, (i) the placement of an administrative agent in connection with a syndication of all or any portion of the Loan and the Loan Documents, and (ii) delivery of one or more new component notes to replace the original note or modify the original note to reflect multiple components of the Loan and such new notes or modified note may have different interest rates and amortization schedules), modifications to any documents evidencing or securing the Loan, creation of one or more mezzanine loans (including amending Borrower's organizational structure to provide for one or more mezzanine borrowers), delivery of opinions of counsel acceptable to the Approved Rating Agencies or potential investors and addressing such matters as the Approved Rating Agencies or potential investors may require; provided, however, that in creating such new notes or modified notes or mezzanine notes Borrower shall not be required to modify (i) the initial weighted average interest rate payable under the Note, provided further that no "rate creep" shall occur (except as such interest rate may increase in connection with a Casualty or Condemnation or following an Event of Default) (ii) the stated maturity of the Note, (iii) the aggregate amortization of principal of the Note, (iv) any other material economic term of the Loan, or (v) decrease the time periods during which Borrower is permitted to perform its obligations under the Loan Documents.  In connection with the foregoing, Borrower covenants and agrees to modify the Cash Management Agreement and the Interest Rate Cap Agreements to reflect the newly created components and/or mezzanine loans.

(d)     Borrower agrees that each participant pursuant to Section 9.1.1(a) shall be entitled to the benefits of Section 2.2.3(f) and (g) and Section 2.7 (subject to the requirements and limitations therein, including the requirements under Section 2.7(e) (it being understood that the documentation required under Section 2.7(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment; provided that such participant shall not be entitled to receive any greater payment under Section 2.2.3(f) or Section 2.7, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a change in a requirement of law or in the interpretation or application thereof, or compliance by such participant or the participating Lender with any request or directive (whether or not having the force of law) issued from any central bank or other Governmental Authority, in each case after the participant acquired the applicable participation.

(e)     JPMorgan Chase Bank, National Association, or an agent appointed by it, in either case acting solely for this purpose as an agent of the Borrower, shall maintain a register for the recordation of the names and addresses of each Lender, and the principal amounts (and stated interest) of the Loan owing to each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest error, and the Borrower and each Lender shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(f)     Each Lender that sells a participation pursuant to Section 9.1.1(a) shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each

participant's interest in the Loan or other Obligations under the Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any Obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

> 9.1.2    **Securitization Costs.**  All reasonable third party costs and expenses incurred by Borrower and Guarantors in connection with Borrower's complying with requests made under this Section 9.1 shall be paid by Borrower.

> 9.1.3    **Loan Components.** Borrower covenants and agrees that in connection with any Securitization of the Loan, upon Lender's request Borrower shall deliver one or more new component notes to replace the original note or modify the original note to reflect multiple components of the Loan or allocate spread or principal among or adjust the application of payments among any existing or additional components in Lender's sole discretion or create one or more mezzanine loans to one or more newly formed special purpose, bankruptcy remote entities (including amending Borrower's organizational structure to provide for one or more mezzanine borrowers) (each a "Resizing Event").  Lender agrees that such new or modified notes or mezzanine notes shall immediately after the Resizing Event have the same initial weighted average spread of the original note or notes as immediately prior to such Resizing Event (except such changes which are a result of a repayment or prepayment of principal).  In connection with any Resizing Event, Borrower covenants and agrees to modify the Cash Management Agreement to reflect the newly created or modified components and/or mezzanine loans.

> 9.1.4    **Loan Components**.  (a)  Borrower covenants and agrees that prior to a Securitization of the Loan, upon Lender's request Borrower shall (i) deliver one or more new notes to replace the original note or modify the original note and other loan documents, as reasonably required, to reflect additional components of the Loan or allocate spread or principal among or adjust the application of payments among any existing or additional components in Lender's sole discretion, provided, (A) such new or modified note shall at all times have the same weighted average spread of the original Note and shall have the same stated maturity date of the original Note, provided, that the interest rate payable under the Note may change or increase in connection with a prepayment of the Loan in accordance with Section 2.4 hereof or following an Event of Default and (B) no amortization of principal of the Loan will be required and (ii) modify the Cash Management Agreement to reflect such new components.

> (b)  Notwithstanding the provisions of Section 9.1 to the contrary, Borrower covenants and agrees that prior to a Securitization, Lender shall have the right to create one or more additional mezzanine loans (each, a "**New Mezzanine Loan**"), to establish different interest rates and to reallocate the principal balances (including, without limitation, the reallocation of the Release Amounts on a pro rata basis) of each of the Loan, the Mezzanine Loan and any New Mezzanine Loan(s) amongst each other and to require the payment of the Loan, the Mezzanine

Loan and any New Mezzanine Loan(s) in such order of priority as may be designated by Lender; provided, that in no event shall the weighted average spread of the Loan, the Mezzanine Loan and any New Mezzanine Loan(s) immediately following any such reallocation or modification change from the weighted average spread for all such loans in effect immediately preceding such reallocation, modification or creation of any New Mezzanine Loan(s) (except for changes to the weighted average spread due to involuntary prepayments or prepayment or repayments of principal). Borrower shall execute and deliver such documents as shall reasonably be required by Lender as promptly as possible under the circumstances in connection with this Section 9.1.4, all in form and substance reasonably satisfactory to Borrower, Lender and the Rating Agencies, including, without limitation, in connection with the creation of any New Mezzanine Loan, a promissory note and loan documents necessary to evidence such New Mezzanine Loan, and Borrower shall execute such amendments to the Loan Documents and the Mezzanine Loan Documents as are necessary in connection with the creation of such New Mezzanine Loan, provided, that such amendments or other documents shall have no economic effect, other than non-material changes on any of Borrower's obligations, rights or remedies hereunder. In addition, Borrower shall either use the existing special purpose entities (subject to satisfying rating agency criteria for recycled entities) or cause the formation of one or more newly formed special purpose, bankruptcy remote entities as reasonably required by Lender in order to serve as the borrower under any New Mezzanine Loan (each, a "**New Mezzanine Borrower**") and the applicable organizational documents of Borrower and Mezzanine Borrower shall be amended and modified as necessary or required in the formation of any New Mezzanine Borrower. Further, in connection with any New Mezzanine Loan, Borrower shall deliver to Lender (i) opinions of legal counsel with respect to due execution, authority and enforceability of the New Mezzanine Loan and the Loan Documents and Mezzanine Loan Documents, as amended, in substantially the same form as the opinion delivered at Closing and (ii) an Additional Non-Consolidation Opinion for the Loan and the Mezzanine Loan and a substantive non-consolidation opinion with respect to any New Mezzanine Loan, each as reasonably acceptable to Lender, prospective investors and/or the Rating Agencies.

Section 9.2    **Securitization Indemnification**. (a) Borrower understands that certain of the Provided Information may be included in Disclosure Documents in connection with the Securitization and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "**Securities Act**"), or the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), or provided or made available to investors or prospective investors in the Securities, the Rating Agencies, and service providers relating to the Securitization. In the event that the Disclosure Document is required to be revised prior to the sale of all Securities, Borrower will cooperate with the holder of the Note in updating the Disclosure Document by providing all current information necessary to keep the Disclosure Document accurate and complete in all material respects.

(b)    The Indemnifying Persons agree to provide, in connection with the Securitization, an indemnification agreement (A) certifying that (i) the Indemnifying Persons have carefully examined the Disclosure Documents, including without limitation, the sections entitled "Risk Factors," "Special Considerations," "Description of the Mortgages," "Description of the Mortgage Loans and Mortgaged Properties," "The Manager," "The Borrower" and "Certain Legal Aspects of the Mortgage Loan," and (ii) such sections and such other information in the Disclosure Documents (to the extent such information relates to or includes any Provided

Information or any information regarding the Properties, Borrower, Manager and/or the Loan) (collectively with the Provided Information, the "**Covered Disclosure Information**") do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) jointly and severally indemnifying Lender, any Affiliate of Lender that has filed any registration statement relating to the Securitization or has acted as the sponsor or depositor in connection with the Securitization, any Affiliate of Lender that acts as an underwriter, placement agent or initial purchaser of Securities issued in the Securitization, any other co-underwriters, co-placement agents or co-initial purchasers of Securities issued in the Securitization, and each of their respective officers, directors, partners, employees, representatives, agents and Affiliates and each Person or entity who Controls any such Person within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "**Indemnified Persons**"), for any losses, claims, damages, liabilities, costs or expenses (including without limitation legal fees and expenses for enforcement of these obligations (collectively, the "**Liabilities**") to which any such Indemnified Person is subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Covered Disclosure Information or arise out of or are based upon the omission or alleged omission to state in the Covered Disclosure Information a material fact required to be stated therein or necessary in order to make the statements in the Covered Disclosure Information, in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse each Indemnified Person for any reasonable third party legal or other out-of-pocket expenses actually incurred by such Indemnified Person, as they are actually incurred, in connection with investigating or defending the Liabilities.  This indemnity agreement will be in addition to any liability which Borrower may otherwise have.    Moreover, the indemnification and reimbursement obligations provided for in clauses (B) and (C) above shall be effective, valid and binding obligations of the Indemnifying Persons, whether or not an indemnification agreement described in clause (A) above is provided.

(c)    In connection with Exchange Act Filings, the Indemnifying Persons jointly and severally agree to indemnify (i) the Indemnified Persons for Liabilities to which any such Indemnified Person may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact in the Covered Disclosure Information, or the omission or alleged omission to state in the Covered Disclosure Information a material fact required to be stated therein or necessary in order to make the statements in the Covered Disclosure Information, in light of the circumstances under which they were made, not misleading and (ii) reimburse each Indemnified Person for any legal or other expenses incurred by such Indemnified Persons, as they are incurred, in connection with defending or investigating the Liabilities.

(d)    Promptly after receipt by an Indemnified Person of notice of any claim or the commencement of any action, the Indemnified Person shall, if a claim in respect thereof is to be made against any Indemnifying Person, notify such Indemnifying Person in writing of the claim or the commencement of that action; provided, however, that the failure to notify such Indemnifying Person shall not relieve it from any liability which it may have under the indemnification provisions of this Section 9.2 except to the extent that it has been materially prejudiced by such failure and, provided further that the failure to notify such Indemnifying Person shall not relieve it from any liability which it may have to an Indemnified Person

otherwise than under the provisions of this <u>Section 9.2</u>.  If any such claim or action shall be brought against an Indemnified Person, and it shall notify any Indemnifying Person thereof, such Indemnifying Person shall be entitled to participate therein and, to the extent that it wishes, assume the defense thereof with counsel reasonably satisfactory to the Indemnified Person. After notice from any Indemnifying Person to the Indemnified Person of its election to assume the defense of such claim or action, such Indemnifying Person shall not be liable to the Indemnified Person for any legal or other expenses subsequently incurred by the Indemnified Person in connection with the defense thereof except as provided in the following sentence; <u>provided</u>, <u>however</u>, if the defendants in any such action include both an Indemnifying Person, on the one hand, and one or more Indemnified Persons on the other hand, and an Indemnified Person shall have reasonably concluded that there are any legal defenses available to it and/or other Indemnified Persons that are different or in addition to those available to the Indemnifying Person, the Indemnified Person or Persons shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such Indemnified Person or Persons.  The Indemnified Person shall instruct its counsel to maintain reasonably detailed billing records for fees and disbursements for which such Indemnified Person is seeking reimbursement hereunder and shall submit copies of such detailed billing records to substantiate that such counsel's fees and disbursements are solely related to the defense of a claim for which the Indemnifying Person is required hereunder to indemnify such Indemnified Person.  No Indemnifying Person shall be liable for the expenses of more than one (1) such separate counsel unless such Indemnified Person shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another Indemnified Person.

(e)    Without the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed), no Indemnifying Person shall settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any Indemnified Person is an actual or potential party to such claim, action, suit or proceeding) unless the Indemnifying Person shall have given Lender reasonable prior written notice thereof and shall have obtained an unconditional release of each Indemnified Person hereunder from all liability arising out of such claim, action, suit or proceedings.  As long as an Indemnifying Person has complied with its obligations to defend and indemnify hereunder, such Indemnifying Person shall not be liable for any settlement made by any Indemnified Person without the consent of such Indemnifying Person (which consent shall not be unreasonably withheld or delayed).

(f)    The Indemnifying Persons agree that if any indemnification or reimbursement sought pursuant to this <u>Section 9.2</u> is finally judicially determined to be unavailable for any reason or is insufficient to hold any Indemnified Person harmless (with respect only to the Liabilities that are the subject of this <u>Section 9.2</u>), then the Indemnifying Persons, on the one hand, and such Indemnified Person, on the other hand, shall contribute to the Liabilities for which such indemnification or reimbursement is held unavailable or is insufficient:  (x) in such proportion as is appropriate to reflect the relative benefits to the Indemnifying Persons, on the one hand, and such Indemnified Person, on the other hand, from the transactions to which such indemnification or reimbursement relates; or (y) if the allocation provided by clause (x) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the

relative benefits referred to in clause (x) but also the relative faults of the Indemnifying Persons, on the one hand, and all Indemnified Persons, on the other hand, as well as any other equitable considerations. Notwithstanding the provisions of this Section 9.2, (A) no party found liable for a fraudulent misrepresentation shall be entitled to contribution from any other party who is not also found liable for such fraudulent misrepresentation, and (B) the Indemnifying Persons agree that in no event shall the amount to be contributed by the Indemnified Persons collectively pursuant to this paragraph exceed the amount of the fees actually received by the Indemnified Persons in connection with the closing of the Loan.

(g)    The Indemnifying Persons agree that the indemnification, contribution and reimbursement obligations set forth in this Section 9.2 shall apply whether or not any Indemnified Person is a formal party to any lawsuits, claims or other proceedings. The Indemnifying Persons further agree that the Indemnified Persons are intended third party beneficiaries under this Section 9.2.

(h)    The liabilities and obligations of the Indemnified Persons and the Indemnifying Persons under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

(i)    Notwithstanding anything to the contrary contained herein, Borrower shall have no obligation to act as depositor with respect to the Loan or an issuer or registrant with respect to the Securities issued in any Securitization.

Section 9.3    **Exculpation.**

(a)    Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower or Operating Lessee to perform and observe the obligations contained in the Note, this Agreement, the Mortgage or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower or Operating Lessee, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Mortgage and the other Loan Documents, or in the Property, the Rents, or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower or Operating Lessee only to the extent of Borrower's or Operating Lessee's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Mortgage and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Borrower or Operating Lessee in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement, the Mortgage or the other Loan Documents. The provisions of this Section 9.3 shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Borrower or Operating Lessee as a party defendant in any action or suit for foreclosure and sale under the Mortgage; (iii) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of any assignment of leases contained in the Mortgage; (vi) constitute a prohibition

against Lender to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Mortgage or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against the Property.

(b)     Nothing contained herein shall in any manner or way release, affect or impair any right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation to the extent actually incurred by Lender (including reasonable attorneys' fees and costs reasonably incurred) arising out of or incurred in connection with the following:

(i)     fraud or intentional misrepresentation by Borrower, Operating Lessee or Guarantor in connection with the Loan;

(ii)     the gross negligence or willful misconduct of Borrower, Operating Lessee or Guarantor;

(iii)     material physical waste of the Property caused by intentional acts or intentional omissions of Borrower or Operating Lessee;

(iv)     the removal or disposal of any portion of the Property after an Event of Default;

(v)     the misapplication or conversion by Borrower, Operating Lessee or Guarantor of (A) any Insurance Proceeds paid by reason of any loss, damage or destruction to the Property, (B) any Awards received in connection with a Condemnation of all or a portion of the Property, (C) any Rents following an Event of Default, (D) any Rents paid more than one month in advance or (E) any funds required to be deposited into the Indemnitor Security Account;

(vi)     failure to pay charges for labor or materials or other charges or judgments that can create Liens on any portion of the Property, subject to Borrower's right to contest such charges pursuant to Section 5.1.1 hereof.

(vii)     any security deposits, advance deposits or any other deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(viii)     failure to maintain the Class L Deduction, except in the event the Class L Deduction expired and Borrower was unable to obtain a renewal of the same after using good faith efforts to do so;

(ix)     Borrower's failure to obtain and/or maintain the Interest Rate Cap Agreement or Replacement Interest Rate Cap Agreement, as applicable, as required pursuant to Section 2.2.7 hereof;

(x)      any amendment, modification or termination of the Management Agreement in violation of this Agreement or the Assignment of Management Agreement, without Lender's consent, including, without limitation, if there shall be no Management Agreement in full force and effect;

(xi)      any amounts payable to Manager in connection with a termination of the Management Agreement prior to the Renewal Incentive Expiration Date (as such term is defined in the Management Agreement), including, without limitation, any amount withdrawn from the Manager Accounts by Hilton Manager to satisfy Borrower's obligations under the Management Agreement with respect to the Renewal Incentive pursuant to the Management Agreement; provided, that for the purposes of this Section 9.3(b)(xi), Losses shall be deemed to be equal to then applicable Renewal Incentive (as defined in the Management Agreement);

(xii)      any breach of Section 5.2(ii), Section 5.3 or Article VI of the Guaranty;

(xiii)      any breach of Borrower's obligation to deliver financial statements as required pursuant to Section 5.1.11 hereof; and

(xiv)      any breach of  Section 5.2.1(c) hereof.

(c)      Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt secured by the Mortgage or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Borrower (i) in the event of: (a) Borrower or Operating Lessee filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (b) the filing of an involuntary petition against Borrower or Operating Lessee under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law in which Borrower, Operating Lessee or Guarantor colludes with, or otherwise voluntarily assists such Person, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower or Operating Lessee from any Person; (c) Borrower or Operating Lessee filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law (other than a petition filed by or on behalf of Lender in connection with Lender's enforcement of its remedies hereunder); (d) Borrower or Operating Lessee consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower, Operating Lessee or any portion of the Property (other than an application by or on behalf of Lender in connection with Lender enforcing its remedies); (e) Borrower or Operating Lessee making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due (unless failure to make such admission would be a violation of law) to any Person other than Lender or Servicer in connection with the appointment of a special servicer; (ii) if the first full monthly payment of principal and interest on the Note is not paid when due; (iii) if Borrower or Operating Lessee fails to maintain its status as a Special Purpose Entity or comply with any representation, warranty or covenant set forth in Section

<u>4.1.30</u> hereof (except to the extent resulting from the insufficiency of Rents or Borrower failing to remain solvent or maintain adequate capital) each as required by, and in accordance with, the terms and provisions of this Agreement or the Mortgage and such failure is cited as a factor in the substantive consolidation of Borrower or Operating Lessee into the bankruptcy estate of another Person; (iv) if Borrower or Operating Lessee fails to obtain Lender's prior written consent to any Indebtedness or any voluntary Lien (other than a mechanic's or materialman's lien) encumbering the Property; or (v) if Borrower or Operating Lessee fails to obtain Lender's prior written consent to any Transfer as required by this Agreement or the Mortgage.

Section 9.4    **Matters Concerning Manager.**  If (a) Manager shall become subject to a Bankruptcy Action or (b) a default occurs under the Management Agreement by Manager beyond applicable notice and/or cure periods, Borrower shall, at the request of Lender, terminate the Management Agreement and replace the Manager with a Qualified Manager pursuant to a Replacement Management Agreement, it being understood and agreed that the management fee for such Qualified Manager shall not exceed then prevailing market rates.

Section 9.5    **Servicer.**  At the option of Lender, the Loan may be serviced by a master servicer, primary servicer, special servicer and/or trustee (any such master servicer, primary servicer, special servicer, and trustee, together with its agents, nominees or designees, are collectively referred to as "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to Servicer pursuant to a pooling and servicing agreement, servicing agreement, special servicing agreement or other agreement providing for the servicing of one or more mortgage loans (collectively, the "**Servicing Agreement**") between Lender and Servicer.  Borrower shall be responsible for any reasonable set up fees or any other initial costs relating to or arising under the Servicing Agreement, but Borrower shall not be responsible for payment of the regular monthly master servicing fee or trustee fee due to Servicer under the Servicing Agreement or any fees or expenses required to be borne by, and not reimbursable to, Servicer.  Notwithstanding the foregoing, Borrower shall promptly reimburse Lender on demand for (a) interest payable on advances made by Servicer with respect to delinquent debt service payments (to the extent charges are due pursuant to <u>Section 2.3.4</u> and interest at the Default Rate actually paid by Borrower in respect of such payments are insufficient to pay the same) or expenses paid by Servicer or trustee in respect of the protection and preservation of the Properties (including, without limitation, payments of Taxes and Insurance Premiums) and (b) all costs and expenses, liquidation fees, workout fees, special servicing fees, operating advisor fees or any other similar fees payable by Lender to Servicer:  (i) as a result of an Event of Default under the Loan or the Loan becoming specially serviced, an enforcement, refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" of the Loan Documents or of any insolvency or bankruptcy proceeding; (ii) any liquidation fees, workout fees, special servicing fees, operating advisor fees or any other similar fees that are due and payable to Servicer under the Servicing Agreement or the trustee, which fees may be due and payable under the Servicing Agreement on a periodic or continuing basis; (iii) the costs of all property inspections and/or appraisals of the Properties (or any updates to any existing inspection or appraisal) that Servicer or the trustee may be required to obtain (other than the cost of regular annual inspections required to be borne by Servicer under the Servicing Agreement);  or (iv) any special requests made by Borrower or Guarantor during the term of the Loan including, without limitation, in connection with a prepayment, assumption or modification of the Loan.

## ARTICLE X – MISCELLANEOUS

Section 10.1  **Survival.**  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

Section 10.2  **Lender's Discretion.**  Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

Section 10.3  **Governing Law.**  **(a) THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN**

ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  BORROWER DOES HEREBY DESIGNATE AND APPOINT:

> Wachtel Missry LLP
> One Dag Hammarskjold Plaza
> 885 Second Avenue, 47th Floor
> New York, New York 10017

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

Section 10.4  **Modification, Waiver in Writing**.    No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower or Operating Lessee therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Section 10.5  **Delay Not a Waiver.**  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 10.6  **Notices.**  All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested or (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, and by telecopier (with answer back acknowledged), addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section):

If to Lender:           JPMorgan Chase Bank, National Association
                        383 Madison Avenue
                        New York, New York 10179
                        Attention:  Thomas Nicholas Cassino
                        Facsimile No.:  (212) 834-6029

with a copy to:         JPMorgan Chase Bank, National Association
                        SPG Middle Office/CIB
                        4 Chase Metrotech Center, 4th Floor
                        Brooklyn, New York 11245-0001
                        Attention:  Nancy Alto
                        Facsimile No.:  (917) 546-2564

                        and

                        Cadwalader, Wickersham & Taft LLP
                        One World Financial Center
                        New York, New York  10281
                        Attention:  William P. McInerney, Esq.
                        Facsimile No.: (212) 504-6666

|                     |                                                              |
|---------------------|--------------------------------------------------------------|
| If to Borrower:     | c/o Thor Equities, LLC                                       |
|                     | 25 West 39th Street                                          |
|                     | New York, New York 10018                                    |
|                     | Attention:  Joseph J. Sitt, Chief Financial Officer         |
|                     | Facsimile No.:  (212) 460-9200                              |
|                     |                (212) 460-9243                               |
|                     |                                                              |
| With a copy to:     | Wachtel Missry LLP                                          |
|                     | One Dag Hammarskjold Plaza                                  |
|                     | 885 Second Avenue, 47th Floor                              |
|                     | Attention:  Morns Missry, Esq.                             |
|                     | Facsimile No.: (212)909-9448                                |

A notice shall be deemed to have been given:  in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or in the case of expedited prepaid delivery and telecopy, upon the first attempted delivery on a Business Day; or in the case of telecopy, upon sender's receipt of a machine-generated confirmation of successful transmission after advice by telephone to recipient that a telecopy notice is forthcoming.

Section 10.7  **Trial by Jury**.  BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

Section 10.8  **Headings**.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 10.9  **Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 10.10 **Preferences**.  Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder.  To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent

or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

Section 10.11 **Waiver of Notice.** Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 10.12 **Remedies of Borrower.** In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 10.13 **Expenses; Indemnity.** (a) Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse, Lender upon receipt of written notice from Lender for all costs and expenses (including reasonable attorneys' fees and expenses) actually incurred by Lender in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower and Operating Lessee (including without limitation any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property); (ii) Borrower's and Operating Lessee's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (iii) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Borrower or Operating Lessee; (v) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement; (vi) the filing and recording fees and expenses, title insurance and fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Lien in favor of Lender pursuant to this Agreement and the other Loan Documents; (vii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other

litigation, in each case against, under or affecting Borrower, Operating Lessee, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; and (viii) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property (including any fees and expenses reasonably incurred by or payable to Servicer or a trustee in connection with the transfer of the Loan to a special servicer upon Servicer's anticipation of a Default or Event of Default, liquidation fees, workout fees, special servicing fees, operating advisor fees or any other similar fees and interest payable on advances made by the Servicer with respect to delinquent debt service payments or expenses of curing Borrower's or Operating Lessee's defaults under the Loan Documents), or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings or any other amounts required under Section 9.5; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender. Any cost and expenses due and payable to Lender may be paid from any amounts in the Lockbox Account or Cash Management Account, as applicable.

(b)     Borrower shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not an Indemnified Party shall be designated a party thereto), that may be imposed on, incurred by, or asserted against any Indemnified Party in any manner relating to or arising out of (i) any breach by Borrower of its obligations under, or any material misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, or (ii) the use or intended use of the proceeds of the Loan (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to any Indemnified Party hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnified Parties.

(c)     Borrower covenants and agrees to pay for or, if Borrower fails to pay, to reimburse Lender for, any fees and expenses incurred by any Rating Agency in connection with any Rating Agency review of the Loan, the Loan Documents or any transaction contemplated thereby or any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of this Agreement or any other Loan Document and Lender shall be entitled to require payment of such fees and expenses as a condition precedent to the obtaining of any such consent, approval, waiver or confirmation.

(d)     Borrower shall jointly and severally indemnify the Lender and each of its respective officers, directors, partners, employees, representatives, agents and Affiliates against any liabilities to which Lender, each of its respective officers, directors, partners, employees, representatives, agents and Affiliates, may become subject in connection with any

indemnification to the Rating Agencies in connection with issuing, monitoring or maintaining the Securities insofar as the liabilities arise out of or are based upon any untrue statement of any material fact in any information provided by or on behalf of the Borrowers to the Rating Agencies (the "**Covered Rating Agency Information**") or arise out of or are based upon the omission to state a material fact in the Covered Rating Agency Information required to be stated therein or necessary in order to make the statements in the Covered Rating Agency Information, in light of the circumstances under which they were made, not misleading.

Section 10.14 **Schedules Incorporated.**    The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 10.15 **Offsets, Counterclaims and Defenses.**    Any assignee of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 10.16 **No Joint Venture or Partnership; No Third Party; Beneficiaries.** (a)   Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)    This Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein.  All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

Section 10.17 **Publicity.**    All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender, JPMorgan Chase Bank, National Association or any of their Affiliates shall be subject to the prior written approval of Lender and JPMorgan Chase Bank, National Association in their sole discretion.  All news releases, publicity or advertising by Lender or its Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan

Documents, to Borrower or any of its Affiliates shall be subject to the prior approval of Borrower, provided, that, any news releases, publicity or advertising required by applicable law or in any judicial or administrative proceeding, shall not require the prior written approval of Borrower.  In no event shall this Section 10.17 be deemed to limit Lender's rights to provide information to third parties in connection with a Securitization or otherwise limit its disclosure in Disclosure Documents or otherwise related to such Securitization.

Section 10.18  **Waiver of Marshalling of Assets.**  To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Property, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

Section 10.19  **Waiver of Counterclaim.**  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

Section 10.20  **Conflict; Construction of Documents; Reliance.**  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 10.21  **Brokers and Financial Advisors.**  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement other than Jones Lang LaSalle ("**Broker**").  Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions

contemplated herein. The provisions of this <u>Section 10.21</u> shall survive the expiration and termination of this Agreement and the payment of the Debt.

Section 10.22 **Prior Agreements.** This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, between Borrower and Lender are superseded by the terms of this Agreement and the other Loan Documents.

Section 10.23 **Joint and Several Liability.** If Borrower consists of more than one (1) Person the obligations and liabilities of each Person shall be joint and several.

Section 10.24 **Certain Additional Rights of Lender (VCOC).** Notwithstanding anything to the contrary contained in this Agreement, Lender shall have:

(a) the right to routinely consult with and advise Borrower's management regarding the significant business activities and business and financial developments of Borrower; <u>provided</u>, <u>however</u>, that such consultations shall not include discussions of environmental compliance programs or disposal of hazardous substances. Consultation meetings should occur on a regular basis (no less frequently than quarterly) with Lender having the right to call special meetings at any reasonable times and upon reasonable advance notice;

(b) the right, in accordance with the terms of this Agreement, to examine the books and records of Borrower at any reasonable times upon reasonable notice;

(c) the right, in accordance with the terms of this Agreement, including, without limitation, <u>Section 5.1.11</u> hereof, to receive monthly, quarterly and year-end financial reports, including balance sheets, statements of income, shareholder's equity and cash flow, a management report and schedules of outstanding indebtedness; and

(d) the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any acquisition by Borrower of any other significant property (other than personal property required for the day to day operation of the Property).

The rights described above in this <u>Section 10.24</u> may be exercised by any entity which owns and controls, directly or indirectly, substantially all of the interests in Lender.

Section 10.25 **Acknowledgement and Consent to Bail-In of EEA Financial Institutions.** (a) Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the respective parties thereto, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(i) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(ii)     the effects of any Bail-in Action on any such liability, including, if applicable:

(A)     a reduction in full or in part or cancellation of any such liability;

(B)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

(b)     As used in this Section 10.25 the following terms have the following meanings ascribed thereto:  (i) "**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution; (ii) "**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule; (iii) "**EEA Financial Institution**" means (x) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority; (y) any entity established in an EEA Member Country which is a parent of an institution described in clause (x) of this definition, or (x) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (x) or (y) of this definition and is subject to consolidated supervision with its parent; (iv) "**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway; (v) "**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution; (vi) "**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time; and (vii) "**Write Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

THOR PALMER HOUSE HOTEL & SHOPS LLC

By: _____
     Name: Morris Missry
     Title: Vice President

LENDER:

JPMORGAN CHASE BANK, NATIONAL
   ASSOCIATION, a banking association
   chartered under the laws of the United States
   of America

By: _____

Name:

Title:    Anthony Shaskus
       Vice President

**<u>SCHEDULE I</u>**

**(RENT ROLL)**

| Database: | THOREQ | Rent Roll | | | | | | | Page: | | 1 |
| Bldg Status: | Active only | Thor Palmer House Hotel & Shop | | | | | | | Date: | | 6/7/2018 |
| | | 5/31/2018 | | | | | | | Time: | | 03:33 PM |

| Bldg Id | Suit Id | Occupant Name | Rent Start | Expiration | GLA Sqft | Monthly Base Rent | Annual Rate PSF | Monthly Cost Recovery | Expense Stop | Monthly Other Income | -- Future Rent Increases --- Cat | Date | Monthly Amount | PSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Occupied Suites** | | | | | | | | | | | | | | |
| PAMHS | 5A | Balanced Flow Wellness LLC | 1/1/2018 | 1/31/2028 | 8,443 | 7,500.00 | 10.66 | | | | BRO | 6/1/2018 | 7,500.00 | 10.66 |
| | | | | | | | | | | | BRO | 2/1/2023 | 8,250.00 | 11.73 |
| PAMHS | ATM | Expedia Cash (ATMs) | 8/15/2006 | 8/31/2021 | 1 | 3,000.00 | 36,000.00 | | | | | | | |
| PAMHS | M | Kelly Coatroom | 1/1/1996 | 12/31/2005 | 100 | 833.33 | 100.00 | | | | | | | |
| PAMHS | O | Landau Jewelers | 11/15/1997 | 12/31/2016 | 180 | 2,184.00 | 145.60 | | | | | | | |
| PAMHS | Y | Clear Wireless LLC | 7/1/2010 | 6/30/2015 | 0 | 1,913.36 | | | | | | | | |
| **Totals:** | | Occupied Sqft: | 100.00% | 4 Units | 8,724 | 15,430.69 | | 0.00 | | 0.00 | | | | |
| | | Leased/Unoccupied Sqft: | | 0 Units | 0 | | | | | | | | | |
| | | Vacant Sqft: | | 0 Units | 0 | | | | | | | | | |
| | | Total Sqft: | | 4 Units | 8,724 | 15,430.69 | | | | | | | | |
| **Grand Total:** | | Occupied Sqft: | 100.00% | 4 Units | 8,724 | 15,430.69 | | 0.00 | | 0.00 | | | | |
| | | Leased/Unoccupied Sqft: | | 0 Units | 0 | | | | | | | | | |
| | | Vacant Sqft: | | 0 Units | 0 | | | | | | | | | |
| | | Total Sqft: | | 4 Units | 8,724 | 15,430.69 | | | | | | | | |

## <u>SCHEDULE II</u>

## (REQUIRED REPAIRS - DEADLINES FOR COMPLETION)

| Immediate Repair | Cost | Completion Date |
|---|---|---|
| Roof system repairs (lap joints, flashing, termination bars, sealants, pitch pockets, parapet wall coping, etc.) | $10,000 (with $12,500 being escrowed on the Closing Date) | 90 days from Closing Date |

SCH. II-1

## SCHEDULE III

## (ORGANIZATIONAL CHART OF BORROWER)



**<u>SCHEDULE IV</u>**

**(PIP)**

None.

SCH. IV-1

**SCHEDULE VI**

**(RETAIL PARCEL)**

**(ATTACHED)**

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

## EXHIBIT "A"
Legal Description

**PARCEL 1:**

**BASEMENT 2**

**RETAIL PARCEL A**

UPPER LIMIT 1.15 FEET LOWER LIMIT -9.67 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS:  PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:  BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5-7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C, HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCKS AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOTS; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOTS, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT LYING BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 1.15 FEET CHICAGO CITY DATUM AND LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF -9.67 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL, PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00° 04' 03" WEST ALONG THE WEST LINE OF SAID TRACT, 136.85 FEET TO THE POINT OF BEGINNING: THENCE

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

## EXHIBIT "A"
Legal Description

NORTH 90° 00' 00" EAST, 34.33 FEET; THENCE SOUTH 00° 00' 00" EAST, 18.19 FEET; THENCE NORTH 90° 00' 00" WEST, 34.35 FEET TO THE WEST LINE OF SAID TRACT; THENCE NORTH 00° 04' 03" EAST ALONG SAID WEST LINE, 18.19 FEET TO THE POINT OF BEGINNING, IN SAID COOK COUNTY, ILLINOIS.

**BASEMENT 2**

**RETAIL PARCEL B**

UPPER LIMIT 1.15 FEET LOWER LIMIT -9.67 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5-7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOTS, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT LYING BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 1.15 FEET CHICAGO CITY DATUM AND LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF - 9.67 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00° 04' 03" WEST ALONG THE WEST LINE OF SAID TRACT, 128.41 FEET;

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent: Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

THENCE SOUTH 89° 55' 57" EAST 91.25 FEET TO THE POINT OF BEGINNING; THENCE NORTH 90° 00' 00" EAST, 7.27 FEET; THENCE SOUTH 00° 00' 00" EAST, 17.11 FEET; THENCE NORTH 90° 00' 00" WEST, 7.27 FEET TO THE; THENCE NORTH 00° 00' 00" EAST 17.11 FEET TO THE POINT OF BEGINNING, IN SAID COOK COUNTY, ILLINOIS.

**BASEMENT 1**

**RETAIL PARCEL C**

UPPER LIMIT 14.68 FEET LOWER LIMIT 1.15 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS:

PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5-7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM N. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144,52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3 5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 1.15 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent: Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number:  **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

FOLLOWS:  BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00° 04' 03" WEST ALONG THE WEST LINE OF SAID TRACT, 254.51 FEET TO THE SOUTHWEST CORNER OF SAID TRACT; THENCE NORTH 89° 32' 49" EAST ALONG THE SOUTH LINE OF SAID TRACT, 94.92 FEET; THENCE NORTH 00° 04' 03" EAST, 18.54 FEET; THENCE SOUTH 89° 55' 57" EAST, 22.96 FEET; THENCE NORTH 00° 04' 03" EAST, 9.36 FEET; THENCE NORTH 89° 55' 57" WEST 23.08 FEET; THENCE NORTH 00° 04' 03" EAST, 8.78 FEET; THENCE SOUTH 89° 55' 57" EAST, 7.31 FEET; THENCE NORTH 00° 04' 03" EAST, 18.50 FEET; THENCE SOUTH 89° 55' 57" EAST, 33.90 FEET; THENCE NORTH 00° 04' 03" EAST, 7.27 FEET; THENCE SOUTH 89° 55'57" EAST, 99.58 FEET; THENCE NORTH 45° 03' 50" EAST, 6.82 FEET; THENCE NORTH 00° 03' 50" EAST, 8.91 FEET; THENCE SOUTH 89° 56' 10" EAST, 7.88 FEET; THENCE SOUTH 00° 03' 50" WEST, 11.68 FEET; THENCE SOUTH 44° 56' 10" EAST, 12.20 FEET; THENCE SOUTH 00° 03' 50" WEST, 1.87 FEET; THENCE SOUTH 89° 55' 57" EAST, 42.35 FEET; THENCE SOUTH 00° 04' 03" WEST, 18.44 FEET; THENCE SOUTH 89° 55' 57" EAST, 35.34 FEET TO THE EAST LINE OF SAID TRACT; THENCE NORTH 00° 00' 27" EAST, ALONG SAID EAST LINE 119.61 FEET; THENCE SOUTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE NORTH LINE OF SAID TRACT; THENCE SOUTH 89° 42' 31" WEST ALONG THE NORTH LINE OF SAID TRACT, 249.17 FEET TO THE POINT BEGINNING, (EXCEPT THAT PART DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT; THENCE NORTH 00° 04' 03" WEST ALONG THE WEST LINE OF SAID TRACT, 89.81 FEET; THENCE SOUTH 89° 55' 57" EAST, 110.73 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00° 03' 51" EAST, 9.08 FEET; THENCE SOUTH 89° 56' 10" EAST, 3.91 FEET; THENCE SOUTH 00° 03' 51" WEST, 9.08 FEET; THENCE NORTH 89° 56' 06" WEST, 3.91 FEET TO THE POINT OF BEGINNING, ALSO EXCEPT THAT PART COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT; THENCE NORTH 89° 42' 31" EAST ALONG THE NORTH LINE OF SAID TRACT, 97.90 FEET, THENCE SOUTH 00° 17' 29" EAST, 39.99 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 89° 56' 10" EAST, 12.16 FEET; THENCE SOUTH 00° 03' 50" WEST, 5.91 FEET; THENCE SOUTH 89° 56' 10" EAST, 2.75 FEET; THENCE SOUTH 00° 03' 50" WEST, 4.15 FEET; THENCE NORTH 89° 56' 10" WEST, 2.75 FEET; THENCE SOUTH 00° 03' 50" WEST, 11.16 FEET; THENCE NORTH 89° 56' 10" WEST, 9.31 FEET; THENCE NORTH 00° 03' 50" EAST, 9.40 FEET; THENCE NORTH 89° 56' 10" WEST, 4.68 FEET; THENCE NORTH 00° 03' 50" EAST, 7.03 FEET; THENCE SOUTH 89° 56 10' EAST, 1.83 FEET; THENCE NORTH 00° 03' 50" EAST, 4.79 FEET TO THE POINT OF BEGINNING, ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 42' 31" EAST ALONG THE NORTH LINE OF SAID TRACT, 151.73 FEET, THENCE SOUTH 00° 17' 29" EAST, 54.62 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 89° 56' 10" EAST, 5.67 FEET; THENCE SOUTH 00° 03' 50" WEST, 21.12 FEET; THENCE SOUTH 89° 56' 10" EAST, 11.99 FEET; THENCE SOUTH 00°03' 50" WEST, 6.81 FEET; THENCE NORTH 89° 56' 10" WEST, 17.66 FEET; THENCE NORTH 00° 03' 50" EAST, 27.93 FEET TO THE POINT OF BEGINNING, ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS:  COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT; THENCE NORTH 89° 42' 31" EAST ALONG THE NORTH LINE OF SAID TRACT, 190.01 FEET, THENCE SOUTH 00° 17' 29" EAST, 76.94 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 89° 56' 10" EAST, 10.96 FEET; THENCE SOUTH 00° 03' 50" WEST, 8.38 FEET; THENCE NORTH 81° 01' 51" WEST, 11.10 FEET; THENCE NORTH 00° 03' 50" EAST, 6.66 FEET TO THE POINT OF BEGINNING ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS:  COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 42' 31" EAST ALONG THE NORTH LINE OF SAID TRACT, 249.17 FEET,

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

THENCE SOUTH 00° 00' 27" WEST, 20.40 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 00° 00' 27" EAST, 12.27 FEET; THENCE NORTH 89° 59' 53" WEST, 10.54 FEET; THENCE NORTH 00° 03' 50" EAST, 12.77 FEET; THENCE SOUTH 89° 59' 33" EAST, 10.53 FEET TO THE POINT OF BEGINNING, ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 42' 31" EAST ALONG THE NORTH LINE OF SAID TRACT, 232.49 FEET, THENCE SOUTH 00° 17' 29" EAST, 78.15 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 00° 03' 50" WEST, 4.19 FEET; THENCE NORTH 89° 56' 10" WEST, 1.18 FEET; THENCE SOUTH 00° 03' 50" WEST, 21.16 FEET; THENCE NORTH 89° 56' 10" WEST, 2.71 FEET; THENCE SOUTH 00° 03' 50" WEST, 1.06 FEET; THENCE NORTH 89° 56' 10" WEST, 4.38 FEET; THENCE NORTH 00° 03' 50" EAST, 1.06 FEET; THENCE NORTH 89° 56' 10" WEST, 6.08 FEET; THENCE NORTH 00° 03' 50" EAST, 10.33 FEET; THENCE SOUTH 89° 56' 10" EAST 3.78 FEET; THENCE NORTH 00° 03' 50" EAST, 13.85 FEET; THENCE SOUTH 89° 56' 10" EAST, 3.70 FEET; THENCE NORTH 00° 03' 50" EAST, 1.17 FEET; THENCE SOUTH 89° 56' 10" EAST, 6.87 FEET TO THE POINT OF BEGINNING, ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID TRACT, THENCE NORTH 00° 00' 27" EAST ALONG THE EAST LINE OF SAID TRACT, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 74.48 FEET; THENCE SOUTH 00° 00' 27" WEST, 16.03 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 89° 56' 10" EAST, 4.09 FEET; THENCE SOUTH 00° 03' 50" WEST, 5.39 FEET; THENCE NORTH 89° 56' 10" WEST, 4.09 FEET; THENCE NORTH 00° 03' 50" EAST, 5.39 FEET TO THE POINT OF BEGINNING, IN SAID COOK COUNTY, ILLINOIS.

**STREET LEVEL**

**RETAIL PARCEL D**

UPPER LIMIT 26.12 FEET LOWER LIMIT 14.68 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5-7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM N. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOTS IN SAID BLOCK 3

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent: Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOTS, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 183.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 42' 31" EAST, 152.39 FEET ALONG THE NORTH LINE OF SAID TRACT; THENCE SOUTH 00° 04' 07" WEST, 56.27 FEET; THENCE SOUTH 89° 55' 53" EAST, 3.64 FEET; THENCE SOUTH 00° 04' 07" WEST, 26.73 FEET; THENCE NORTH 89° 55' 53" WEST, 3.64 FEET; THENCE SOUTH 00° 04' 07" WEST, 96.12 FEET; THENCE NORTH 89° 55' 53" WEST, 107.73 FEET; THENCE NORTH 00° 04' 07" EAST, 0.75 FEET; THENCE NORTH 89° 55' 53" WEST, 10.74 FEET; THENCE SOUTH 00° 04' 07" WEST, 0.75 FEET; THENCE NORTH 89° 55' 53" WEST, 33.92 FEET TO THE WEST LINE OF SAID TRACT; THENCE NORTH 00° 04' 03" EAST ALONG SAID WEST LINE OF SAID TRACT, 122.31 FEET; THENCE SOUTH 89° 55' 57" EAST, 30.52 FEET; THENCE NORTH 00° 04' 03" EAST, 16.21 FEET; THENCE NORTH 89° 55' 57" WEST, 30.52 FEET TO THE WEST LINE OF SAID TRACT; THENCE NORTH 00° 04' 03" EAST ALONG SAID WEST LINE OF SAID TRACT, 39.55 FELT TO THE POINT OF BEGINNING, (EXCEPT THAT PART DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT; THENCE NORTH 89° 42' 31" EAST ALONG THE NORTH LINE OF SAID TRACT, 100.76 FEET; THENCE SOUTH 00° 17' 29" EAST, 40.24 FEET TO THE POINT OF BEGINNING; THENCE NORTH 90° 00' 00" EAST, 11.10 FEET; THENCE SOUTH 00° 00' 00" WEST, 23.42 FEET; THENCE SOUTH 90°00' 00" WEST, 11.10 FEET; THENCE NORTH 00° 00' 00" EAST, 23.42 FEET TO THE POINT OF BEGINNING, ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT; THENCE SOUTH 00° 04' 03" WEST, 118.97 FEET; THENCE SOUTH 89° 55' 57" EAST, 100.70 FEET; TO THE POINT OF BEGINNING; THENCE NORTH 90° 00' 00" EAST, 12.50 FEET THENCE SOUTH 00° 00' 00" WEST, 5.50 FEET; THENCE NORTH 90° 00' 00" WEST, 3.09 FEET THENCE SOUTH 00° 00' 00" WEST 10.80 FEET; THENCE NORTH 90° 00' 00" WEST, 9.42 FEET; THENCE NORTH 00° 00' 00" EAST, 16.30 FEET TO THE POINT OF BEGINNING), IN SAID COUNTY, ILLINOIS.

**STREET LEVEL**

**RETAIL PARCEL E:**

UPPER LIMIT 26.12 FEET LOWER UMIT 14.68 FEET

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent: Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number:  **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS  THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBUC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT  10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE1, TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST UNE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20  FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 42' 31" EAST ALONG THE NORTH LINE OF SAID TRACT, 167.71 FEET; THENCE SOUTH 00° 17' 29" EAST, 83.14 FEET; TO THE POINT OF BEGINNING; THENCE SOUTH 89° 53' 12" EAST, 5.10 FEET; THENCE NORTH 00° 06' 48" EAST, 1.25 FEET; THENCE SOUTH 89° 53' 12" EAST, 11.50 FEET; THENCE SOUTH 00° 06' 48" WEST, 1.25 FEET; THENCE SOUTH 89° 53' 12" EAST, 5.72 FEET; THENCE SOUTH 00° 06' 48" WEST, 21.71 FEET; THENCE NORTH 89° 53' 12" WEST 0.36 FEET; THENCE SOUTH 00° 06' 48" WEST, 36.17 FEET; THENCE SOUTH 89° 53' 12" EAST, 4.42 FEET; THENCE SOUTH 00° 06' 48" WEST, 11.61 FEET; THENCE NORTH 89° 53' 12" WEST, 4.97 FEET; THENCE SOUTH 00° 06' 48" WEST, 26.64 FEET; THENCE NORTH 89° 53' 12" WEST, 20.24 FEET; THENCE NORTH 00° 06' 48" EAST, 26.45 FEET; THENCE NORTH 89° 53' 12" WEST, 4.93 FEET; THENCE NORTH 00° 06' 48" EAST, 11.56 FEET; THENCE SOUTH 89° 53' 12" EAST 3.55 FEET; THENCE NORTH 00° 06' 48" EAST, 4.92 FEET; THENCE SOUTH 89° 53' 12" EAST, 2.99 FEET; THENCE NORTH 00° 06' 48" EAST, 4.79 FEET; THENCE NORTH 89° 53' 12" WEST, 2.29 FEET;

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

THENCE NORTH 00° 06' 48" EAST, 26.55 FEET; THENCE NORTH 89° 53' 12" WEST, 0.50 FEET; THENCE NORTH 00° 06' 48" EAST, 21.88 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**STREET LEVEL**

**RETAIL PARCEL F:**

UPPER LIMIT 26.12 FEET LOWER LIMIT 14.68 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH  PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01" 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 89° 42' 31" WEST ALONG THE NORTH LINE OF SAID TRACT, 206.25 FEET; TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID NORTH LINE AFORESAID NORTH 89° 42' 31" EAST, 33.67 FEET; THENCE SOUTH 00° 00' 27" WEST, 32.00 FEET; THENCE NORTH 89° 42' 31" EAST, 9.25 FEET; THENCE

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

SOUTH 00° 00' 27" WEST, 35.00 FEET; THENCE NORTH 45° 00' 00" WEST, 11.07 FEET; THENCE NORTH 89° 55' 53" WEST, 35.16 FEET; THENCE NORTH 00° 04' 07" EAST, 58.91 FEET TO THE INTERSECTION WITH NORTH LINE OF SAID TRACT ALSO BEING THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**STREET LEVEL**

**RETAIL PARCEL G:**

UPPER LIMIT 26.12 FEET LOWER LIMIT 14.68 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID TRACT, THENCE NORTH 00° 00' 27" EAST ALONG THE EAST LINE OF SAID TRACT, 83.30 FEET; TO THE POINT OF BEGINNING;

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent: Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

THENCE NORTH 89° 53' 12" WEST, 128.31 FEET; THENCE NORTH 00° 04' 07" EAST, 66.46 FEET; THENCE SOUTH 89° 55' 53" EAST, 2.60 FEET; THENCE NORTH 00° 04' 07" EAST, 7.58 FEET; THENCE NORTH 89° 55' 53" WEST, 2.60 FEET; THENCE NORTH 00° 04' 07" EAST, 23.51 FEET; THENCE SOUTH 89° 55' 53" EAST, 15.39 FEET; THENCE SOUTH 00° 04' 07" WEST, 21.74 FEET; THENCE SOUTH 89° 55' 53" EAST, 12.26 FEET; THENCE SOUTH 00° 04' 07" WEST, 16.17 FEET; THENCE SOUTH 89° 55' 53" EAST, 15.39 FEET; THENCE NORTH 00° 00' 27" EAST, 19.91 FEET; THENCE SOUTH 89° 59' 33" EAST, 48.06 FEET; THENCE SOUTH 00° 00' 27" WEST, 21.61 FEET; THENCE SOUTH 89° 59' 33" EAST, 19.24 FEET; THENCE NORTH 00° 00' 27" EAST, 7.94 FEET; THENCE SOUTH 89° 55' 53" EAST, 8.57 FEET; THENCE NORTH 00° 04' 07" EAST, 3.00 FEET; THENCE SOUTH 89° 55' 53" EAST, 9.33 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00° 00' 27" WEST ALONG SAID EAST LINE, 69.05 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**STREET LEVEL**

**RETAIL PARCEL H:**

UPPER LIMIT 26.12 FEET LOWER LIMIT 14.68 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent: Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number:  **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHEAST CORNER OF SAID TRACT, THENCE SOUTH 89° 35' 37" WEST ALONG THE SOUTH LINE OF SAID TRACT, 36.87 FEET; THENCE NORTH 00° 00' 27" EAST, 63.14 FEET; THENCE SOUTH 89° 53' 12" EAST, 36.87 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00° 00' 27" WEST ALONG THE EAST LINE OF SAID TRACT, 62.80 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**STREET LEVEL**

**RETAIL PARCEL I:**

UPPER LIMIT 26.12 FEET LOWER LIMIT 14.68 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH.STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04" 03" WEST, 254 FEET 5-7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00° 04' 03" WEST, 198.17 FEET; TO THE POINT OF BEGINNING; THENCE SOUTH 89° 55' 53" EAST, 25.12 FEET; THENCE SOUTH 00° 00' 00" EAST, 0.50 FEET; THENCE SOUTH 89° 55' 53" EAST, 77.15 FEET; THENCE SOUTH 00° 04' 07" WEST, 18.74 FEET; THENCE SOUTH 89° 55' 53" EAST, 7.92 FEET; THENCE SOUTH 00° 04' 07" WEST, 0.71 FEET; THENCE SOUTH 89° 55' 53" EAST, 7.14 FEET; THENCE SOUTH 00° 04' 07" WEST, 17.47 FEET; THENCE NORTH 89° 55' 53" WEST, 21.91 FEET; THENCE SOUTH 00° 04' 07" WEST, 18.05 FEET TO THE SOUTH LINE OF SAID TRACT; THENCE SOUTH 89° 32' 49" WEST, ALONG SAID SOUTH LINE 64.71 FEET; THENCE NORTH 00° 27' 11" WEST, 18.32 FEET; THENCE NORTH 89° 55' 57" WEST, 30.54 FEET TO THE WEST LINE OF SAID TRACT; THENCE NORTH 00° 04' 03" EAST ALONG SAID WEST LINE OF SAID TRACT, 37.74 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**LOBBY LEVEL**

**RETAIL PARCEL J:**

UPPER LIMIT 32.40 FEET LOWER LIMIT 26.12 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent: Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
### Legal Description

NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 42' 31" EAST, ALONG THE NORTH LINE OF SAID TRACT 152.39 FEET; THENCE SOUTH 00° 04' 07" WEST, 57.12 FEET; THENCE NORTH 89° 55' 53" WEST, 42.23 FEET; THENCE NORTH 00° 00' 00" EAST, 11.43 FEET; THENCE NORTH 90° 00' 00" WEST, 9.15 FEET; THENCE SOUTH 00° 00' 00" WEST, 33.80 FEET; THENCE NORTH 90° 00' 00" WEST, 5.59 FEET; THENCE SOUTH 00° 04' 03" WEST, 41.20 FEET; THENCE NORTH 90° 00' 00" EAST, 5.31 FEET; THENCE SOUTH 00° 04' 03" WEST, 18.17 FEET; THENCE SOUTH 89° 55' 57" EAST, 1.67 FEET; THENCE SOUTH 00° 00' 00" WEST, 31.10 FEET; THENCE NORTH 89° 55' 57" WEST, 25.66 FEET; THENCE SOUTH 00° 04' 03" WEST, 8.92 FEET; THENCE NORTH 89° 55' 57" WEST, 76.80 FEET TO A POINT ON THE WEST LINE OF SAID TRACT; THENCE NORTH 00° 04' 03" EAST ALONG SAID WEST LINE OF SAID TRACT, 122.07 FEET; THENCE SOUTH 89° 55' 57" EAST, 30.52 FEET; THENCE NORTH 00° 04' 03" EAST, 16.21 FEET; THENCE NORTH 89° 55' 57" WEST, 30.52 FEET TO A POINT ON THE WEST LINE OF SAID TRACT; THENCE NORTH 00° 04' 03" EAST ALONG SAID WEST LINE OF SAID TRACT, 39.65 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**LOBBY LEVEL**

**RETAIL PARCEL K:**

UPPER LIMIT 32.40 FEET LOWER UMIT 26.12 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A UNE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBUC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDERS OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent: Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144,52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO  THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 42' 31" EAST, ALONG THE NORTH LINE OF SAID TRACT 206.25 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG THE NORTH LINE OF SAID TRACT NORTH 89° 42' 31" EAST, 33.67 FEET; THENCE SOUTH 00° 00' 27" WEST, 32.00 FEET; THENCE NORTH 89° 42' 31" EAST, 9.25 FEET; THENCE SOUTH 00° 00' 27" WEST, 25.73 FEET; THENCE NORTH 89° 55' 53" WEST, 42.98 FEET; THENCE NORTH 00° 04' 07" EAST, 57.46 FEET TO THE INTERSECTION WITH THE NORTH LINE OF SAID TRACT TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**LOBBY LEVEL**

**RETAIL PARCEL L:**

UPPER LIMIT 32.40 FEET LOWER LIMIT 26.12 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY,

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number:  **822762 (S-IL-CR-KU)**

## EXHIBIT "A"
Legal Description

ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID TRACT, THENCE NORTH 00° 00' 27" EAST ALONG THE EAST LINE OF SAID TRACT, 83.30 FEET, TO THE POINT OF BEGINNING; THENCE NORTH 89° 53' 12" WEST, 37.25 FEET; THENCE NORTH 00° 00' 27" EAST, 53.67 FEET; THENCE SOUTH 89° 59' 33" EAST, 37.25 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00° 00' 27" WEST ALONG THE EAST LINE OF SAID TRACT, 53.74 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**LOBBY LEVEL**

**RETAIL PARCEL M:**

UPPER LIMIT 32.40 FEET LOWER LIMIT 26.12 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 041 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 321 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY,

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE  INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT  8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHEAST CORNER OF SAID TRACT, THENCE SOUTH 89° 35' 37" WEST ALONG THE SOUTHERN MOST SOUTH LINE OF SAID TRACT, 37.25 FEET; THENCE NORTH 00° 00' 27" EAST, 63.14 FEET; THENCE SOUTH  89° 53' 12" EAST, 37.25 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00° 00' 27" WEST ALONG THE EAST LINE OF SAID TRACT, 62.80 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**LOBBY LEVEL**

**RETAIL PARCEL N:**

UPPER LIMIT 32.40 FEET LOWER LIMIT 26.12 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:  BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number:  **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH UNE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37"  EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID  PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 111.86 FEET; THENCE NORTH 00° 00' 00" EAST 18.70 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00° 00' 00" EAST, 3.49 FEET; THENCE NORTH 90° 00' 00" EAST, 5.40 FEET; THENCE SOUTH 00° 00' 00" EAST, 3.49 FEET; THENCE NORTH 90° 00' 00" WEST, 5.40 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILUNOIS.

## LOBBY LEVEL

## RETAIL PARCEL O:

UPPER LIMIT 32.40 FEET LOWER UMIT 26.12 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:  BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144,52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINTS FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOTS, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 90.97 FEET; THENCE NORTH 00° 00' 00" EAST 18.37 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00° 00' 00" WEST, 1.90 FEET; THENCE NORTH 90° 00' 00" EAST, 3.85 FEET; THENCE SOUTH 00° 00' 00" EAST, 1.90 FEET; THENCE NORTH 90° 00' 00" WEST, 3.85 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**LOBBY LEVEL**

**RETAIL PARCEL P:**

UPPER LIMIT 32.40 FEET LOWER LIMIT 26.12 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY,

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent: Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE SOUTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT, 18.59 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT, 37.27 FEET; THENCE SOUTH 89° 55' 57" EAST, 67.50 FEET; THENCE SOUTH 00° 04' 03" WEST, 19.13 FEET; THENCE SOUTH 89° 55' 57" EAST, 11.63 FEET; THENCE SOUTH 00° 04' 03" WEST, 36.01 FEET TO THE NORTHERN MOST SOUTH LINE OF SAID TRACT; THENCE SOUTH 89° 32' 49" WEST ALONG SAID SOUTH LINE OF SAID TRACT, 48.59 FEET; THENCE NORTH 00° 04' 03" EAST, 18.31 FEET; THENCE NORTH 89° 55' 57" WEST, 30.54 FEET TO THE INTERSECTION WITH THE WEST LINE OF SAID TRACT ALSO BEING THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**LOBBY LEVEL**

**RETAIL PARCEL Q:**

UPPER LIMIT 33.66 FEET LOWER LIMIT 32.40 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES. TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 42' 31" EAST, ALONG THE NORTH LINE OF SAID TRACT 110.09 FEET; THENCE SOUTH 00° 00' 00" WEST, 45.43 FEET; THENCE NORTH 90° 00' 00" WEST, 9.15 FEET; THENCE SOUTH 00° 00' 00" WEST, 33.80 FEET; THENCE SOUTH 90° 00' 00" WEST, 5.59 FEET; THENCE SOUTH 00° 04' 03" WEST, 41.20 FEET; THENCE NORTH 90° 00' 00" EAST, 5.31 FEET; THENCE SOUTH 00° 04' 03" WEST, 18.17 FEET; THENCE SOUTH 89° 55' 57" EAST, 1.67 FEET; THENCE SOUTH 00° 00' 00" WEST, 31.10 FEET; THENCE NORTH 89° 55' 57" WEST, 25.66 FEET; THENCE SOUTH 00° 04' 03" WEST, 8.92 FEET; THENCE NORTH 89° 55' 57" WEST, 76.80 FEET TO A POINT ON THE WEST LINE OF SAID TRACT; THENCE NORTH 00° 04' 03" EAST ALONG SAID WEST LINE OF SAID TRACT, 122.07 FEET; THENCE SOUTH 89° 55' 57" EAST, 30.52 FEET; THENCE NORTH 00° 04' 03" EAST, 16.21 FEET; THENCE NORTH 89° 55' 57" WEST, 30.52 FEET TO A POINT ON THE WEST LINE OF SAID TRACT ; THENCE NORTH 00° 04' 03" EAST, 39.65 FEET ALONG SAID WEST LINE OF SAID TRACT TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**LOBBY LEVEL**

**RETAIL PARCEL R:**

UPPER LIMIT 33.66 FEET LOWER LIMIT 32.40 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent: Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number:  **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET;  THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID TRACT, THENCE NORTH 00° 00' 27" EAST ALONG THE EAST LINE OF SAID TRACT, 83.30 FEET, TO THE POINT OF BEGINNING; THENCE NORTH 89° 53' 12" WEST, 37.25 FEET; THENCE NORTH 00° 00' 27" EAST, 53.67 FEET; THENCE SOUTH 89° 59' 33" EAST, 37.25 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00° 00' 27" WEST ALONG THE EAST LINE OF SAID TRACT, 53.74 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**LOBBY LEVEL**

**RETAIL PARCEL S:**

UPPER LIMIT 33.66 FEET LOWER LIMIT 32.40 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

## EXHIBIT "A"
Legal Description

WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE  INTERSECTING THE WEST UNE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST UNE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHEAST CORNER OF SAID TRACT, THENCE SOUTH 89° 35' 37" WEST ALONG THE SOUTHERN MOST SOUTH LINE, 37.25 FEET; THENCE NORTH 00° 00' 27" EAST, 63.14 FEET; THENCE SOUTH 89° 53' 12" EAST, 37.25 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00° 00' 27" WEST ALONG THE EAST LINE OF SAID TRACT, 62.80 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLNOIS.

**LOBBY LEVEL**

**RETAIL PARCEL T:**

UPPER LIMIT 33.66 FEET LOWER LIMIT 32.40 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number:  **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00C 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH  LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET;  THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 111.86 FEET; THENCE NORTH 00° 00' 00" EAST 18.70 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00° 00' 00" EAST, 349 FEET; THENCE NORTH 90° 00' 00" EAST, 5.40 FEET; THENCE SOUTH 00° 00' 00" EAST, 3.49 FEET; THENCE NORTH 90° 00' 00" WEST, 5.40 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**LOBBY LEVEL**

**RETAIL PARCEL U:**

UPPER LIMIT 33.66 FEET LOWER LIMIT 32.40 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCKS AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A UNE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59" 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 90.97 FEET; THENCE NORTH 00° 00' 00" EAST 18.37 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00° 00' 00" WEST, 1.90 FEET; THENCE NORTH 90° 00' 00" EAST 3.85 FEET THENCE SOUTH 00° 00' 00" EAST, 1.90 FEET; THENCE NORTH 90° 00' 00" WEST, 3.85 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**LOBBY LEVEL**

**RETAIL PARCEL V:**

UPPER LIMIT 33.66 FEET LOWER LIMIT 32.40 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent: Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

## EXHIBIT "A"
Legal Description

PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE  INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT  8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT, 18.59 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT, 37.27 FEET; THENCE SOUTH 89° 55' 57" EAST, 67.50 FEET; THENCE SOUTH 00° 04' 03" WEST, 19.13 FEET; THENCE SOUTH 89° 55' 57" EAST, 11.63 FEET; THENCE SOUTH 00° 04' 03" WEST, 36.01 FEET TO THE NORTHERN MOST SOUTH LINE OF SAID TRACT; THENCE SOUTH 89° 32' 49" WEST ALONG SAID SOUTH LINE OF SAID TRACT, 48.59 FEET; THENCE NORTH 00° 04' 03" EAST, 18.31 FEET; THENCE NORTH 89° 55' 57" WEST, 30.54 FEET TO THE INTERSECTION WITH THE WEST LINE OF SAID TRACT ALSO BEING THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**LOBBY LEVEL**

**RETAIL PARCEL W:**

UPPER LIMIT 36.00 FEET LOWER LIMIT 33.66 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE'PALMER AND ANDREA C. HONORE1, TRUSTEES OF THE ESTATE OF POTTER PALMER1 DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 351 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 42' 31" EAST, ALONG THE NORTH LINE OF SAID TRACT 110.09 FEET; THENCE SOUTH 00° 00' 00" WEST, 45.43 FEET; THENCE NORTH 90° 00' 00" WEST, 9.15 FEET; THENCE SOUTH 00° 00' 00" WEST 33.80 FEET THENCE SOUTH 90° 00' 00" WEST, 5.59 FEET; THENCE SOUTH 00° 04' 03" WEST, 41.20 FEET; THENCE NORTH 90° 00' 00" EAST, 5.31 FEET; THENCE SOUTH 00° 04' 03" WEST, 18.17 FEET; THENCE SOUTH 89° 55' 57" EAST 1.67 FEET; THENCE SOUTH 00° 00' 00" WEST, 31.10 FEET THENCE NORTH 89° 55' 57" WEST, 25.66 FEET; THENCE SOUTH 00° 04' 03" WEST, 8.92 FEET; THENCE NORTH 89° 55' 57" WEST, 76.80 FEET TO A POINT ON THE WEST LINE OF SAID TRACT; THENCE NORTH 00° 04' 03" EAST ALONG SAID WEST LINE OF SAID TRACT, 122.07 FEET; THENCE SOUTH 89° 55' 57" EAST, 30.52 FEET; THENCE NORTH 00° 04' 03" EAST, 16.21 FEET; THENCE NORTH 89° 55' 57" WEST, 30.52 FEET TO A POINT ON THE WEST LINE OF SAID TRACT; THENCE NORTH 00° 04' 03" EAST, ALONG SAID WEST LINE OF SAID TRACT 39.65 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**LOBBY LEVEL**

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent: Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number:  **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

**RETAIL PARCEL X:**

UPPER LIMIT 36.00 FEET LOWER LIMIT 33.66 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM. DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 59° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00° 04' 03" EAST ALONG THE  WEST LINE OF SAID TRACT, 18.59 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT, 37.27 FEET; THENCE SOUTH 89° 55' 57" EAST, 67.50 FEET; THENCE SOUTH 00° 04' 03" WEST, 19.13 FEET; THENCE SOUTH 89° 55' 57" EAST, 11.63 FEET; THENCE SOUTH 00° 04' 03" WEST, 36.01 FEET TO THE NORTHERN MOST SOUTH LINE OF SAID TRACT; THENCE SOUTH 89° 32' 49" WEST ALONG SAID SOUTH LINE OF SAID TRACT, 48.59 FEET; THENCE NORTH 00° 04' 03" EAST, 18.31 FEET; THENCE NORTH 89° 55' 57" WEST, 30.54 FEET TO THE INTERSECTION WITH THE WEST LINE OF SAID TRACT ALSO BEING THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

## EXHIBIT "A"
Legal Description

**LOBBY LEVEL**

**RETAIL PARCEL Y:**

UPPER LIMIT 36.00 FEET LOWER LIMIT 33.66 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH UNE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 111.86 FEET; THENCE NORTH 00° 00' 00" EAST 18.70 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00° 00' 00" EAST, 3.49 FEET; THENCE NORTH 90° 00' 00" EAST, 5.40 FEET; THENCE SOUTH 00° 00' 00" WEST, 3.49 FEET; THENCE SOUTH 90° 00' 00" WEST, 5.40 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent: Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number:  **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

**LOBBY LEVEL**

**RETAIL PARCEL Z:**

UPPER LIMIT 36.00 FEET LOWER LIMIT 33.66 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A UNE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23. 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 90.97 FEET; THENCE NORTH 00° 00' 00" EAST 18.37 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00° 00' 00" EAST, 1.90 FEET THENCE NORTH 90° 00' 00" EAST, 3.85 FEET; THENCE SOUTH 00° 00' 00" WEST, 1.90 FEET; THENCE SOUTH 90° 00' 00" WEST, 3.85 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number:  **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

**SECOND LEVEL**

**RETAIL PARCEL AA:**

UPPER LIMIT 49.30 FEET LOWER LIMIT 36.00 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH UNE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY. 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 42' 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 49.30 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT, 18.56 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT, 180.08 FEET; THENCE SOUTH 89° 55' 57" EAST, 30.52 FEET; THENCE NORTH 00° 04' 03" EAST, 16.21 FEET; THENCE NORTH 89° 55' 57" WEST, 30.52 FEET TO THE WEST LINE OF SAID TRACT; THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT, 39.65 FEET TO THE NORTHWEST CORNER OF SAID TRACT; THENCE NORTH 89° 42' 31" EAST ALONG THE NORTH LINE OF SAID TRACT, 110.40 FEET; THENCE

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

## EXHIBIT "A"
Legal Description

SOUTH 00° 04' 03" WEST, 39.61 FEET; THENCE NORTH 89° 48' 52" WEST, 9.39 FEET; THENCE SOUTH 00° 11' 08" WEST 24.18 FEET THENCE SOUTH 89° 48' 52" EAST, 11.00 FEET; THENCE SOUTH 00° 11' 08" WEST, 16.85 FEET; THENCE SOUTH 89° 48' 52" EAST, 5.73 FEET; THENCE SOUTH 00° 04' 03" WEST, 22 15 FEET; THENCE NORTH 89° 55' 57" WEST, 3.17 FEET THENCE SOUTH 00° 04' 03" WEST, 10.16 FEET; THENCE NORTH 89° 55' 57" WEST, 13.74 FEET; THENCE SOUTH 00° 04' 03" WEST, 21.52 FEET; THENCE SOUTH 89° 55' 57" EAST, 4.14 FEET; THENCE SOUTH 00° 04' 03" WEST, 32.90 FEET; THENCE SOUTH 89° 48' 52" EAST, 9.62 FEET; THENCE SOUTH 00° 11' 08" WEST, 9.40 FEET; THENCE SOUTH 89° 48' 52" EAST, 3.18 FEET; THENCE SOUTH 00° 04' 03" WEST, 17.31 FEET; THENCE NORTH 89° 55' 57" WEST, 12.79 FEET; THENCE SOUTH 00° 04' 03" WEST, 5.66 FEET; THENCE NORTH 89° 55' 57" WEST, 2.65 FEET; THENCE SOUTH 00° 04' 03" WEST, 23.23 FEET; THENCE NORTH 89° 55' 57" WEST, 12.58 FEET; THENCE SOUTH 00° 04' 03" WEST, 25.05 FEET: THENCE NORTH 89° 55' 57" WEST, 57.10 FEET; THENCE NORTH 00° 04' 03" EAST, 11.44 FEET; THENCE NORTH 89° 55' 57" WEST, 32.56 FEET TO THE INTERSECTION WITH THE WEST LINE OF SAID TRACT ALSO BEING THE POINT OF BEGINNING, (EXCEPT THAT PART DESCRIBED AS FOLLOWS; COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT; THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT 42.63 FEET; THENCE SOUTH 89° 55' 57" EAST 67.71 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00° 11' 08" EAST, 18.23 FEET; THENCE NORTH 89° 48' 52" WEST, 4.70 FEET; THENCE NORTH 00° 11' 08" EAST, 3.73 FEET; THENCE SOUTH 89° 48' 52" EAST, 6.78 FEET; THENCE SOUTH 00° 11' 08" WEST, 21.96 FEET; THENCE NORTH 89° 48' 52" WEST, 2.08 FEET TO THE POINT OF BEGINNING,

ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS; COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT; THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT 52.20; THENCE SOUTH 89° 55' 57" EAST 41.14 TO THE POINT OF BEGINNING; THENCE NORTH 00° 11' 08" EAST, 3.62 FEET; THENCE SOUTH 89° 48' 52" EAST, 7.20 FEET; THENCE SOUTH 00° 11' 08" WEST, 3.62 FEET; THENCE NORTH 89° 48' 52" WEST, 7.20 FEET TO THE POINT OF BEGINNING,

ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS; COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT; THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT 151.07; THENCE SOUTH 89° 55' 57" EAST 40.44 TO THE POINT OF BEGINNING; THENCE NORTH 00° 11' 08" EAST, 3.15 FEET; THENCE SOUTH 89° 48' 52" EAST, 5.20 FEET; THENCE SOUTH 00° 11' 08" WEST, 3.15 FEET; THENCE NORTH 89° 48' 52" WEST, 5.20 FEET TO THE POINT OF BEGINNING), IN COOK COUNTY, ILLINOIS.

**SECOND LEVEL**

**RETAIL PARCEL AB:**

UPPER LIMIT 49.30 FEET LOWER LIMIT 36.00 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS; PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH UNE OF EAST MONROE STREET

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number: **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00° 04' 03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBUC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89° 32' 49" EAST ALONG A LINE ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 1/2 INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00° 01' 23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89° 35' 37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00° 00' 27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89° 59' 33" WEST, 85.20 FEET; THENCE NORTH 00° 00' 27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89° 421 31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 49.30 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 94.60 FEET; THENCE NORTH 00° 00' 00" EAST 18.47 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00° 04' 03" EAST, 5.35 FEET THENCE SOUTH 89° 55' 57" EAST, 8.04 FEET; THENCE NORTH 00° 04' 03" EAST, 2.99 FEET; THENCE SOUTH 89° 55' 57" EAST, 14.12 FEET; THENCE SOUTH 00° 04' 03" WEST, 8.34 FEET; THENCE NORTH 89° 55' 57" WEST, 22.16 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

**PARCEL 2:**

NON-EXCLUSIVE EASEMENTS FOR THE BENEFIT OF PARCEL 1 AS CREATED BY PALMER HOUSE HOTEL, CHICAGO ILLINOIS RECIPROCAL EASEMENT AND OPERATING AGREEMENT DATED DECEMBER 11, 2006 AND RECORDED DECEMBER 12, 2006 DOCUMENT 0634644078 BY THOR PALMER HOUSE HOTEL & SHOPS LLC, THOR PALMER HOUSE OFFICE LLC, AND THOR PALMER HOUSE RETAIL LLC FOR THE PURPOSE OF INGRESS AND EGRESS; USE AND MAINTENACE OF PIPES AND FACILITIES; COMMON WALLS, FLOORS AND CEILINGS; UTILITY SERVICES; ENCROACHMENTS; STRUCTURAL SUPPORT; RETAIL OWNED FACILITIES; PARKING GARAGE RAMP; RENOVATION EASEMENT; LOADING DOCKS AND GARBAGE DUMPSTER; EMERGENCY EGRESS; ELEVATOR

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT

Commitment Number:  **822762 (S-IL-CR-KU)**

### EXHIBIT "A"
Legal Description

SERVICE; ESCALATOR SERVICE; RETAIL COMMUNICATION AND ANTENNA FACILITES; SIGNAGE EASEMENT; STREET LEVEL CONCOURSE AND ENTRANCE/EXITS AT STREET LEVEL.

Underwriter: **STEWART TITLE GUARANTY COMPANY**
Agent:  Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
212-532-8686

This commitment is invalid unless the Insuring Provisions and Schedules A and B are attached.

# SCHEDULE VII

## (OFFICE PARCEL)

### LEGAL DESCRIPTION OF OFFICE/ANNEX PARCEL

THAT PART OF LOTS 1 AND 4 OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO, BOUNDED IN FRACTIONAL SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: COMMENCING AT A POINT ON  A LINE  PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF LOT 8 IN BLOCK 3 AFORESAID, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, AND THE WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET TO THE POINT OF BEGINNING; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE NORTH 89°42'31" EAST ALONG SAID SOUTH LINE 85.20 FEET TO THE WEST LINE OF SOUTH WABASH AVENUE; THENCE SOUTH 00° 00'27" WEST ALONG SAID WEST LINE 100.56 FEET TO THE PLACE OF BEGINNING; IN COOK COUNTY, ILLINOIS

## SCHEDULE VIII

## (LITIGATION)

| Claim # | Claimant | | Adjuster | | Accident Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 008074-000570-GB-01 | BARBA, SUZANNE | THOR PALMER HOUSE HOTEL & SHOPS | BREWER, WILLIAM | | 12/13/17 | 12/13/17 | 1/11/18 | Strike against,stationary or moving object | Hand, left | Laceration, open wound | Alleged inadequate warnings, labels, etc. | CHICAGO | IL | IL - Illinois |
| 008074-000571-GB-01 | PINARD, JODIE | THOR PALMER HOUSE HOTEL & SHOPS | LAHME, JANET | | 9/21/17 | 1/18/18 | 1/18/18 | Strike against,stationary or moving object | Hand, right | Contusion, bruise | Elevator/Escalator | CHICAGO | IL | IL - Illinois |
| 008074-000573-GB-01 | REED, SUZANNE | THOR PALMER HOUSE HOTEL & SHOPS | BREWER, WILLIAM | | 12/21/17 | 2/5/18 | 2/7/18 | Slip,trip or fall- same level | Multiple Body Parts | Contusion, bruise | Alleged inadequate warnings, labels, etc. | CHICAGO | IL | IL - Illinois |
| 008074-000576-GB-01 | HEPP, JOHN | THOR PALMER HOUSE HOTEL & SHOPS | BREWER, WILLIAM | | 10/27/17 | 4/13/18 | 4/16/18 | Slip,trip or fall- same level | Shoulder, left | Fracture | Alleged inadequate warnings, labels, etc. | CHICAGO | IL | IL - Illinois |

| LINE_TYPE | WC_CLAIM_TYPE | DATE_OF_LOSS | CLAIM_STATUS | DATE_CLOSED | CLAIM_NUM | CLAIMANT_NAME | TOTAL_INCURRED | TOTAL_PAID | TOTAL_OUTSTANDING | TOTAL_RECOVERIES | EVENT_DESCRIPTION | CLM_NOT_USED_FOR_ALL_OC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WC | IN | 8/11/2005 | Open | | YUN C06690 | MINAS ARMIRAS | 1,221,483.82 | 897,318.54 | 324,165.28 | (218.79) | lifted a tray of food that weighed approximately 50-pounds when he noted pain around the right upper cervical regions as well as the right trapezius region. | X |
| WC | IN | 6/12/2010 | Open | | YSH C01523 | LUZ VILLAR | 118,822.09 | 54,239.38 | 64,582.71 | - | EE TWISTED RIGHT RING FINGER EE WAS CLEANING A MIRROR AND TWISTED HER RIGHT RING FINGER | X |
| WC | IN | 5/15/2011 | Open | | YSH C01760 | EUSEBIA HERNANDEZ | 95,191.19 | 51,279.69 | 43,911.50 | - | SLIP AND FALL  INJURED KNEE EE WAS CLEANING WHEN SHE SLIPPED ON SHAMPOO ON CARPET | X |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| WC | IN | 2/15/20 13 | Open | | 30130 26823 2- 0001 | Antonio Aranda | 428,358. 59 | 338,0 00.62 | 90,357.97 | - | STRIKING HER RIGHT KNEE AGAINST BATHROOM TILE THE EE STATED HE HIT HIS RIGHT KNEE ON A PIECE THAT WAS STICKING OUT THE LAUNDRY CONVEYOR BELT.  THE RIGHT KNEE SUSTAINED A POSSIBLE CONTUSION AND WILL SEEK TREATMENT. | X |
| WC | IN | 11/1/20 14 | Open | | 30143 00400 1- 0001 | DWAYN E MCCRA Y | 24,565.0 0 | 15,71 2.07 | 8,852.93 | - | THE EE WAS PICKING UP A MARBLE TABLE AND IT FELL ON HIS LEFT HAND. HE SUFFERED SWELLING IN THE THUMB ON HIS LEFT HAND. HE HAD FIRST AID. HE SAID HE WOULD GO TO THE DOCTOR TOMORROW. | X |
| WC | IN | 7/30/20 15 | Open | | 30154 34172 8- 0001 | LOUIS PEOPLE S | 156,777. 34 | 117,8 72.40 | 38,904.94 | - | DISCOMFORT IN LEFT SHOULDER | X |
| WC | IN | 9/2/201 5 | Open | | 30154 52268 3- 0001 | BREND A CLAVEL LE- ROSS | 20,723.1 4 | 10,56 0.13 | 10,163.01 | - | THE CALLER ADVISED THAT THE EE WAS WALKING DOWN A RAMP FROM WHICH THE EE STATED OF SLIPPING AND FALLING SUSTAINED PAIN TO RIGHT KNEE. THE EE SUSTAINED INFLAMMATION TO THAT KNEE. THE EE DID GET MINOR MEDICAL TREATMENT AT THE WORK LOCATION SUCH AS AN ICE PA | X |
| WC | IN | 11/7/20 15 | Open | | 30154 85514 6- 0001 | ADAMA WULU | 47,305.2 2 | 31,81 9.98 | 15,485.24 | - | THE EE SLIPPED WHILE CLEANING SHOWER HEAD CAUSING HER TO STRIKE HER LOWER LEFT LEG OFF THE TOILET. THE EE SUFFERED A SMALL CONTUSION TO LOWER LEFT LEG. THE EE DID NOT SEEK MEDICAL TREATMENT. | X |
| WC | IN | 1/19/20 16 | Open | 7/29/20 16 | 30165 20205 3- 0001 | DEREK J COLLIN S | 64,607.1 7 | 34,71 1.22 | 29,895.95 | - | THE EE WAS ON THE CURB WHEN A GUESS PULLED UP IN THEIR CAR. HE STEPPED OFF THE CURB AND STEPPED IN A POT HOLE THAT HE DIDN T SEE. HE FELL AND TWISTED HIS |  |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| WC | IN | 5/13/2016 | Open | | 301659572 30-0001 | SCOTT JACKSON | 235,589.56 | 176,788.54 | 58,801.02 | - | ANKLE. HE SPRAINED HIS RIGHT ANKLE. MEDICAL WAS SOUGHT. |
| WC | IN | 9/7/2016 | Open | 10/14/2016 | 301664761 53-0001 | SANTA BENITEZ | 33,327.28 | 9,280.12 | 24,047.16 | - | HIS RIGHT HAND BECAME SWOLLEN AND HE WAS HAVING PAIN ON THE TOP OF HIS HAND |
| WC | IN | 6/10/2017 | Open | | 301780319 27-0001 | ZAIA GILIANA | 51,702.71 | 32,852.46 | 18,850.25 | - | EE WAS CARRYING DIRTY LINEN AND SHE STEPPED OUT OF THE ROOM AND SHE TRIPPED AND FELL TO THE FLOOR. EE INJURED RIGHT KNEE AND LEFT ARM. EE DID SEEK MEDICAL TREATMENT |
| WC | IN | 8/19/2017 | Open | | 301788939 06-0001 | DOUGLAS BROWN | 713.00 | 108.13 | 604.87 | - | GAIA WAS WALKING BACK TO THE IN ROOM DINING AREA THROUGH THE KITCHEN. HE SLIPPED ON A WET FLOOR RIGHT BY THE DISHWASHER AREA AND LANDED ON HIS BACK. A MINOR CUT WAS CAUSED TO HIS RIGHT HAND. FIRST AID TREATEMENT WAS GIVEN AND HE IS TO FOLLOW UP WITH THE |
| WC | IN | 9/12/2017 | Open | | 301785791 76-0001 | SHATANA L PRIDE | 59,042.02 | 33,383.36 | 25,658.66 | - | DOUG WAS DISPATCHED TO A CALL OF A INTOXICATED MALE WHICH RESULTED IN THE SUBJECT BEING DETAINED. DURING THE ALTERCATION DOUG FELL TO THE GROUND WITH THE SUBJECT  INJURING HIS RIGHT ARM. |
| WC | IN | 11/16/2017 | Open | | 301789813 00-0001 | ELZETTIE LEVERSTON | 2,987.71 | 217.87 | 2,769.84 | - | EE WAS WALKING DOWN THE STAIRS TO CHANGE AFTER HER DUE TO ELEVATORS BEING OVER CROWDED. THE STAIRS WERE WET AND THE EE SLIPPED. EE SUSTAINED INJURIES OF CONTUSIONS TO HER RIGHT UPPER ARM AND THIGH. EE WENT TO THE MEDICAL CENTER TO BE EVALUATED. |
| | | | | | | | | | | | ON THURSDAY NOVEMBER 16  2017 AT APPROXIMATELY 9:45AM DISPATCH RECEIVED A CALL ABOUT AN INJURED HOUSEKEEPER IN ROOM |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 20143 WHO COULD STAND UP. UPON MY ARRIVAL OFFICER HORTON WAS HELPING ELZETTIE LEVERSTON UP TO HER FEET SHE WAS IN TEARS SAYING SHE COULDNT |
| WC | IN | 2/8/2018 | Open | 30189 48933 1-0001 | LARRY LEWIS | 3,418.44 | 549.95 | 2,868.49 | - LARRY IS CLAIMING BACK PAIN FROM PICKING UP A MINI FRIDGE |
| WC | IN | 2/21/2018 | Open | 30189 59159 0-0001 | CARLOS FIGUEROA | 67,186.00 | 35,898.77 | 31,287.23 | - CARLOS INJURED HIS LEFT SHOULDER WHILE ASSISTING A SECURITY OFFICER WHO WAS BEING ASSAULTED THE EE WAS COMING DOWN THE STAIRS  TRIPPED OVER A RIP IN THE CARPET ON THE STAIRS. HE FELL HITTING THE LEFT SIDE OF HIS FACE |
| WC | IN | 3/9/2018 | Open | 30189 67603 4-0001 | MIRSAD FERIZOVIC | 55,669.08 | 16,703.87 | 38,965.21 | - AND HIS RIGHT KNEE. HE SUFFERS FROM KNEE STRAIN. HE DECLINES MEDICAL TREATMENT AT THIS TIME. |
| WC | IN | 3/23/2018 | Open | 30189 90304 9-0001 | JOSE R TOVAR | 665.00 | 11.20 | 653.80 | - JOSE STATED THAT HE HURT HIS SHOULDER WHILE MOVING A BOX OF CHICKEN HE WAS GOING TO BUTCHER |
| WC | IN | 3/28/2018 | Open | 30189 79571 9-0001 | JASON M LIBBEY | 14,915.00 | 8,489.70 | 6,425.30 | - On Wednesday March 28  2018 at approximately 8:07am Prop Ops employee Jason Libbey arrived at dispatch to report an accident to his left hand index finger knuckle.  Upon my arrival he informed me that he was outside room 11260  cutting a bucket so he can |
| WC | IN | 4/5/2018 | Open | 30189 85292 3-0001 | AHMED ZAIBAL | 8,821.20 | 96.53 | 8,724.67 | - AHMED WAS MOVING SOME TABLES AND HIT HIS LEFT FOREARM FROM THE MOMENTUM. THIS IS AN INCIDENT ONLY REPORT AS FIRST AID WAS GIVEN AND THE NURSE HOTLINE STATED HE COULD RETURN TO WORK IMMEDIATELY. |
| WC | IN | 4/13/2018 | Open | 30189 89982 2- | SANTOSHA CURTIS | 4,015.00 | 932.73 | 3,082.27 | - SANTOSHA WAS ENTERING INTO ROOM 20141 AND SHE TRIPPED OVER THE LINEN |

SCH. VIII-4

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 0001 | | | | | SHE HAD PULLED OFF THE BED AND TWISTED HER RIGHT ANKLE |
| WC | IN | 4/28/2018 | Open | 30180 08960 5-0001 | JONE D CHAVERS | 6,115.00 | 1,066.54 | 5,048.46 | - | JONE CHAVERS STRAINS HER LOWER BACK CLEANING IN A ROOM |
| WC | IN | 5/2/2018 | Open | 30180 11121 4-0001 | MARIE KABBA | 4,700.00 | 822.43 | 3,877.57 | - | EMPLOYEE CLAIMS THAT ANOTHER EMPLOYEE STRUCK HER FOOT WITH THE CART CAUSING HER PAIN IN HER RIGHT FOOT |
| WC | IN | 5/3/2018 | Open | 30180 12181 3-0001 | LARRY LEWIS | 550.00 | 11.20 | 538.80 | - | PRE EXISTING CONDITION - HERNIA |

**SCHEDULE IX**

**(INSURANCE)**

| Claim # | Claimant | | Adjuster | Accident Date | | | | | | | | |
|---------|----------|--|---------|---------------|--|--|--|--|--|--|--|--|
| 008074 -000570 -GB-01 | BARBA, SUZANNE | THOR PALMER HOUSE HOTEL & SHOPS | BREWER, WILLIAM | 12/13/17 | 12/13/17 | | 1/11/18 | Strike against,stationary or moving object | Hand, left | Laceration, open wound | Alleged inadequate warnings, labels, etc. | CHICAGO | IL | IL - Illinois |
| 008074 -000571 -GB-01 | PINARD, JODIE | THOR PALMER HOUSE HOTEL & SHOPS | LAHME, JANET | 9/21/17 | 1/18/18 | | 1/18/18 | Strike against,stationary or moving object | Hand, right | Contusion, bruise | Elevator/Escalator | CHICAGO | IL | IL - Illinois |
| 008074 -000573 -GB-01 | REED, SUZANNE | THOR PALMER HOUSE HOTEL & SHOPS | BREWER, WILLIAM | 12/21/17 | 2/5/18 | 2/7/18 | Slip,trip or fall-same level | Multiple Body Parts | Contusion, bruise | Alleged inadequate warnings, labels, etc. | CHICAGO | IL | IL - Illinois |
| 008074 -000576 -GB-01 | HEPP, JOHN | THOR PALMER HOUSE HOTEL & SHOPS | BREWER, WILLIAM | 10/27/17 | 4/13/18 | 4/16/18 | Slip,trip or fall-same level | Shoulder, left | Fracture | Alleged inadequate warnings, labels, etc. | CHICAGO | IL | IL - Illinois |

SCH. IX-1

## SCHEDULE X

## (LEASE EXCEPTIONS AND WARRANTIES)

| Database: | THOREQ | | | Aged Delinquencies<br>Thor Equities<br>Date: 6/7/2018 | | | | | Page:<br>Date:<br>Time: | 1<br>6/7/2018<br>02:03 PM |
|---|---|---|---|---|---|---|---|---|---|---|
| Invoice Date | | Category | Description | | Source | Amount | Current | 30 | 60 | 90 | 120 |

| Invoice Date | | Category | Description | | Source | Amount | Current | 30 | 60 | 90 | 120 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PAMHS-HO6877 | | **Balanced Flow Wellness LLC** | Master Occupant Id: Balance0-1<br>5A     Current | | | Day Due:      1  Delq Day:    10<br>Last Payment:      6/4/2018    5,000.00 | | | | | |
| 6/4/2018 | PPR | Prepaid Rent | prepaid | | CR | -5,000.00 | -5,000.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | PPR | Prepaid Rent | | | | -5,000.00 | -5,000.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | **Balanced Flow Wellness LLC Total:** | | | | -5,000.00 | -5,000.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| PAMHS-003598 | | **Clear Wireless LLC**<br>Lisa<br>(913) 253-7536 | Master Occupant Id: Clearwir-1<br>Y     Current | | | Day Due:      1  Delq Day:    10<br>Last Payment:      6/1/2018    2,090.79 | | | | | |
| 4/2/2018 | PPR | Prepaid Rent | prepaid | | CR | -2,090.79 | 0.00 | 0.00 | -2,090.79 | 0.00 | 0.00 |
| 6/1/2018 | PPR | Prepaid Rent | prepaid | | CR | -1,089.84 | -1,089.84 | 0.00 | 0.00 | 0.00 | 0.00 |
| | PPR | Prepaid Rent | | | | -3,180.63 | -1,089.84 | 0.00 | -2,090.79 | 0.00 | 0.00 |
| | | **Clear Wireless LLC Total:** | | | | -3,180.63 | -1,089.84 | 0.00 | -2,090.79 | 0.00 | 0.00 |
| | PPR | Prepaid Rent | | | | -8,180.63 | -6,089.84 | 0.00 | -2,090.79 | 0.00 | 0.00 |
| | | **Grand Total:** | | | | -8,180.63 | -6,089.84 | 0.00 | -2,090.79 | 0.00 | 0.00 |

SCH. X-1

## EXHIBIT A

### TAX COMPLIANCE CERTIFICATES

### EXHIBIT A-I

### U.S. TAX COMPLIANCE CERTIFICATE

**(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to the Loan Agreement dated as of June 8, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Agreement**"), among JPMorgan Chase Bank, National Association, as Lender, and Thor Palmer House Hotel & Shops LLC, as Borrower.

Pursuant to the provisions of <u>Section 2.7</u> of the Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan (as well as any Note evidencing such Loan) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower, and (2) the undersigned shall have at all times furnished the Borrower with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Agreement and used herein shall have the meanings given to them in the Agreement.

**JPMORGAN CHASE BANK, NATIONAL
   ASSOCIATION**, a banking association
chartered under the laws of the United States of
America

By:_____
            Name:
            Title:

**EXHIBIT A-II**

**U.S. TAX COMPLIANCE CERTIFICATE**

**(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to the Loan Agreement dated as of June 8, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Agreement**"), among JPMorgan Chase Bank, National Association, as Lender, and Thor Palmer House Hotel & Shops LLC, as Borrower.

Pursuant to the provisions of Section 2.7 of the Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Agreement and used herein shall have the meanings given to them in the Agreement.

**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**, a banking association chartered under the laws of the United States of America

By:_____
            Name:
            Title:

## EXHIBIT A-III

## U.S. TAX COMPLIANCE CERTIFICATE

**(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to the Loan Agreement dated as of June 8, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Agreement**"), among JPMorgan Chase Bank, National Association, as Lender, and Thor Palmer House Hotel & Shops LLC, as Borrower.

Pursuant to the provisions of Section 2.7 of the Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption:  (i) an IRS Form W-8BEN or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Agreement and used herein shall have the meanings given to them in the Agreement.

**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**, a banking association chartered under the laws of the United States of America

By:_____
                 Name:
                 Title:

Exhibit A-III-2

## EXHIBIT A-IV

## U.S. TAX COMPLIANCE CERTIFICATE

**(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to the Loan Agreement dated as of June 8, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Agreement**"), among JPMorgan Chase Bank, National Association, as Lender, and Thor Palmer House Hotel & Shops LLC, as Borrower.

Pursuant to the provisions of Section 2.7 of the Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan (as well as any Note evidencing such Loan) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan (as well as any Note evidencing such Loan), (iii) with respect to the extension of credit pursuant to this Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption:  (i) an IRS Form W-8BEN or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower, and (2) the undersigned shall have at all times furnished the Borrower with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Agreement and used herein shall have the meanings given to them in the Agreement.

**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**, a banking association chartered under the laws of the United States of America

Exhibit A-IV-1

By:_____
          Name:
          Title:

Exhibit A-IV-2

**<u>EXHIBIT B</u>**

**O&M PROGRAM**

**(ATTACHED)**



# ASBESTOS-CONTAINING MATERIALS & LEAD BASED PAINT OPERATIONS & MAINTENANCE PLAN

Palmer House Hilton
17 East Monroe Street
Chicago, Illinois 60603

April 10, 2018
Partner Project Number: 18-212808.1

Prepared for:

**J.P. Morgan Chase Bank, N.A.**
Chicago, Illinois 60603



Engineers who understand your business

**PARTNER**
Engineering and Science, Inc.

April 10, 2018

Mr. Peter Wolff
J.P. Morgan Chase Bank, N.A.
10 S. Dearborn Street
Chicago, Illinois 60603

Subject:     Asbestos-Containing Materials & Lead Based Paint
             Operations & Maintenance Plan
             Palmer House Hilton
             17 East Monroe Street
             Chicago, Illinois 60603
             Partner Project No. 18-212808.1

Dear Mr. Peter Wolff:

Partner Engineering and Science, Inc. (Partner) is pleased to provide the results of the *Asbestos-Containing Materials & Lead Based Paint Operations & Maintenance Plan* (O&M Plan) report of the Palmer House Hilton at the abovementioned address (the "subject property").

We appreciate the opportunity to provide our services to J.P. Morgan Chase Bank, N.A.. If you have any questions concerning this report, or if we can assist you in any other matter, please contact me at (773) 840-5070 or bgeiger@partneresi.com.

Sincerely,
Partner Engineering and Science, Inc.

Bob Geiger
National Client Manager

# TABLE OF CONTENTS

1.0     INTRODUCTION.................................................................................................................1
2.0     Occupant Notification ..................................................................................................2
3.0     Training ...........................................................................................................................4
3.1     TRAINING PROGRAM ....................................................................................................4
3.1.1     Asbestos Awareness Training.................................................................................4
3.1.2     Lead Awareness Training .......................................................................................5
3.2     Lead Renovation, Repair, and Painting Rule (RRP) ...........................................5
3.3     O&M PLAN MANAGER RESPONSIBILITIES.....................................................................6
4.0     Appropriate Work Practices ........................................................................................9
4.1     Routine Maintenance or Repair Activities in Asbestos-Containing Environments ........9
4.1.1     Preparation Prior to Renovation or Maintenance Activities & Emergency Response to
Damaged Asbestos Containing Acoustical Ceiling Materials ....................................................9
4.1.2     Presumed Asbestos Containing Building Materials ...............................................9
4.2     Lead Containing Paint ...........................................................................................11
5.0     Inspection program .....................................................................................................13
5.1     Responsibilities ..........................................................................................................13
5.2     Semiannual Inspection .............................................................................................13
5.3     Survey Results.............................................................................................................13
5.4     Air Monitoring ............................................................................................................13
5.5     Training .......................................................................................................................13
6.0     Employee Protection ...................................................................................................15
7.0     RESPIRATORY PROGRAM .............................................................................................16
8.0     RecordKeeping..............................................................................................................17
9.0     Definitions .....................................................................................................................18
9.1     Asbestos......................................................................................................................18
9.2     Lead Based Paint Definitions ....................................................................................20
10.0     References ..................................................................................................................23
10.1     Asbestos Regulations:.............................................................................................23
10.2     GUIDANCE DOCUMENTS:........................................................................................23

FIGURES AND APPENDICES

**Appendix A** – General Safety Considerations

**Appendix B** – ACM Inspection Form

**Appendix C** – Waste Tracking Form

**Appendix D** – Job Request Form (Maintenance Work)

**Appendix E** – Maintenance Work Authorization Forms

**Appendix F** – Evaluation of Work Affecting ACM

**Appendix G** – Previous Surveys



# 1.0   INTRODUCTION

This Operations and Maintenance (O&M) Plan addresses activities that may involve or disturb asbestos-containing materials (ACM) and lead-based paint (LBP) at 17 East Monroe Street, located in Chicago, Illinois. See Section 4.0 for examples of ACM.   An O&M Plan minimizes the potential for facility/maintenance personnel, tenants, contractors/vendors, and the general public to be exposed to ACM, airborne asbestos fibers, and LBP.  Asbestos is a naturally occurring mineral silicate whose fiber-like particles are known to cause mesothelioma, asbestosis, and lung cancer.  Exposure to lead particulates through ingestion or inhalation may cause elevated blood lead levels, attention deficit disorder, and damage the reproductive system.  Through the development and implementation of a procedural manual for company associates outlining the necessary procedures for emergency situations, associate training, periodic inspections, testing and record keeping, an O&M Plan can meet the needs of the facility in the management of ACM and LBP.

An implemented O&M Plan can provide a level of assurance that prudent measures are being taken to minimize the potential exposure to ACM and LBP.  Furthermore, this plan may serve as evidence that the owner is aware of the liabilities and outlines the steps that will be actively taken to minimize exposure potential.

It is important to note that this O&M Plan is based on the original date of construction and/or provided information indicating the presence or potential presence of ACM and LBP.  Furthermore, Partner has not performed either a limited or comprehensive asbestos survey of the subject property; therefore, Partner recommends that all previously untested suspect ACM, surface applied materials, and thermal insulation are presumed to contain asbestos and all paints presumed to be lead-based paints until analytical results indicate otherwise.



## 2.0    OCCUPANT NOTIFICATION

It is the obligation of the property owner to notify appropriate persons as required by law, to take necessary steps to minimize the potential for asbestos and lead based paint exposure.

It is the obligation of the property owner that only trained and qualified individuals are authorized to disturb or remove any ACM and/or LBP.

It is the obligation of the property owner that maintenance/custodial staff receive appropriate O&M training, as deemed necessary by the owner.

**Action for Owners**

Building owners, in addition to informing building workers as required by the Occupational Safety and Health Administration (OSHA), should also inform occupants and tenants about the location and physical condition of the ACM/LBP, and stress the need to avoid disturbing the material.



Building owners should inform occupants about the presence of ACM/LBP by distributing written notices, posting signs or labels in a central location where affected occupants can see them, and holding awareness or information sessions. Some states and localities have "right-to-know" laws that may require that all occupants, workers, and visitors in buildings with ACM/LBP be informed that these materials are present. OSHA also requires warning signs to be displayed at each regulated area so that an employee may read the signs and take necessary protective steps before entering the area.

Building owners should inform new employees about the presence of ACM/LBP before they begin work. OSHA requires this notification for employees who will perform housekeeping activities where ACM/LBP may be disturbed. Additional steps may be needed for illiterate or non-English speaking workers and other occupants who may encounter language difficulties. For example, owners should consider providing information sessions in languages other than English where a significant number of workers, occupants, or visitors do not speak English. Furthermore OSHA regulations require that employers ensure employees can comprehend the warning signs posted. Owners may wish to consider developing a warning label system for illiterate workers showing them pictures about potential hazards of disturbing ACM/LBP and showing them where ACM/LBP is located. Translations of the warning labels should be provided by the owner for non-English speaking personnel.

O&M workers should receive the training necessary for them to perform their tasks safely.

**Information for Occupants (workers, tenants and others)**

Occupants should be notified for two reasons: (1) There may be a potential hazard in their vicinity; and (2) informed persons are less likely to disturb the material and cause fibers to be released into the air. All employees and tenants or tenant representatives likely to disturb ACM/LBP should be included in the



notification program on a continuing basis. The specific information given to types of building occupants will vary. For example, because building maintenance and service workers carry out certain tasks that office workers or tenants do not perform, they should receive additional information. Most important, operations and maintenance workers should receive the training they need to perform their tasks safely. For information on training requirements, see the OSHA regulations at 29 CFR § 1910.1001(j)(7) (PDF) (53 pp, 408K, about PDF).

Whatever its form, the information given to building occupants and workers should address the following points to the extent they reflect building conditions:

- ACM/LBP has been found in the building and is located in areas where the material could be disturbed.
- The condition of the ACM/LBP, and the response that is appropriate for that condition.
- Asbestos only presents a health risk when fibers become airborne and are inhaled. The mere presence of intact ACM/LBP may not represent a health risk.
- The ACM/LBP is found in the following locations (e.g., ceilings in Rooms 101 and G-323, walls in the lobby, above suspended ceilings in the first floor corridor, on columns in the main entry, on pipes in the boiler room).
- Do not disturb the ACM/LBP [e.g., do not push furniture against the ACM/LBP, do not damage thermal system insulation (TSI)].
- Report any evidence of disturbance or damage of ACM/LBP to [name, location, and phone number of the O&M Plan Manager (APM)].
- Report any dust or debris that might come from the ACM/LBP or suspect ACM/LBP, any change in the condition of the ACM/LBP, or any improper action (relative to ACM/LBP) of building personnel to (name, location, and phone number of the O&M Plan Manager).
- Cleaning and maintenance personnel are taking special precautions during their work to properly clean up any asbestos debris and to avoid disturbing ACM/LBP.
- All ACM/LBP is inspected periodically and additional measures will be taken if needed to protect the health of building occupants.



## 3.0    TRAINING

In order to ensure that all ACM/LBP are handled properly, this facility has created a collateral position entitled O&M Plan Manager, to be assigned by the Owner.  All activities related to the handling of ACM/LBP are to be coordinated through this individual or management company.

## 3.1    TRAINING PROGRAM

A key element in initiating and carrying out this Asbestos and Lead Based Paint O&M Plan is a properly trained building maintenance staff. This group is responsible for daily awareness/inspection of ACM and LBP as they perform their tasks. The maintenance staff will report any indication of potential problems resulting from changes of, ACM and LBP condition, area use, or maintenance practices.  The maintenance staff will receive the two-hour General Asbestos Awareness training.  The operations staff which will be working in direct contact with asbestos materials for repair operations will receive the 16 hour operations and maintenance training. A two-hour Lead Awareness training is suggested for anyone who will be working in the local of lead based paints.

The following elements should be presented in the Asbestos training programs:

**Building Maintenance Staff Training**

### 3.1.1    Asbestos Awareness Training

a.  Introduction - General background on asbestos, common uses of asbestos in building materials, explanation of the Asbestos O&M Plan, and abatement activities to date, etc.

b.  Medical/Mechanisms for Exposure - Condensed version of medical review from the 16-hour "Operations and Maintenance" training, along with similar mechanisms for exposure, with emphasis on fiber entrainment mechanisms.

c.  Use of High-Efficiency Particulate Air (HEPA) Technology – Discussion and use of HEPA filtration, vacuums, and filter changes, etc.

d.  Cleaning Techniques – Implementation of specialized cleaning methods, dusting techniques, wet cleaning methods, and proper disposal, etc.

e.  Daily Awareness/Inspection - Training to focus an awareness of the indications of potential problems, chain of command and notification, and general techniques to avoid exposure.

f.  Mechanisms to Reduce Exposure
   Proper use of mechanical engineering control systems
   Protection or removal of exposed material in high traffic areas
   Construction of temporary barriers
   Minimization of air circulation
   Use of water during maintenance
   Use of specialized equipment: HEPA - vacuum filtration
   Others

g.  Coordination with O&M Plan Manager - Schedules for cleaning, mopping, stripping, buffing, etc.

h.  Continued Employee Education - Periodic training sessions, discussion of issues arisen between sessions, required attendance of senior maintenance staff, etc.



### 3.1.2   Lead Awareness Training

a.   <u>Introduction</u> - General background on common <u>uses</u> of lead paints, and abatement or stabilization activities to date, etc.

b.   <u>Medical/Mechanisms for Exposure</u> - Mechanisms for exposure.

c.   <u>Use of HEPA Technology</u> – Discussion and use <u>of</u> HEPA filtration, vacuums, and filter changes, etc.

d.   This certification is for anyone working around lead-based paint that may be exposed to lead-containing dust.

e.   According to OSHA (Occupational Safety and Health Administration) and the EPA (Environmental Protection Agency), a worker certificate is required for those who plan to do lead abatement activities under the direction of a supervisor. These certificates are also for those who plan to do repainting or general <u>construction</u> on surfaces painted with lead-based paint.

## 3.2   Lead Renovation, Repair, and Painting Rule (RRP)

Common renovation activities like sanding, cutting, and demolition can create hazardous lead dust and chips by disturbing lead-based paint, which can be harmful to adults and children.

On April 22, 2008, EPA issued a rule requiring the use of lead-safe practices and other actions aimed at preventing lead poisoning. Under the rule, beginning on April 22, 2010, contractors performing renovation, repair and painting projects that disturb lead-based paint in homes, child care facilities, and schools built before 1978 must be certified and must follow specific work practices to prevent lead contamination. Until that time, HUD and EPA recommend that anyone performing renovation, repair, and painting projects that disturb lead-based paint in pre-1978 homes, child care facilities and schools follow lead-safe work practices.

There are some differences between the EPA RRP Rule and the HUD Lead Safe Housing Rule (LSHR). A major difference is that the LSHR requires clearance examinations. All housing receiving federal assistance must still comply with the LSHR. All contractors should follow these three simple procedures:

- Contain the work area.
- Minimize dust.
- Clean up thoroughly.

From December 2008, the rule has required that contractors performing renovation, repair and painting projects that disturb lead-based paint provide to owners and occupants of child care facilities and to parents and guardians of children under age six that attend child care facilities built prior to 1978 the lead hazard information pamphlet Renovate Right: Important Lead Hazard Information for Families, Child Care Providers, and Schools.

Starting on April 22, 2010, the rule will affect paid renovators who work in pre-1978 housing and child-occupied facilities, including:

- Renovation contractors
- Maintenance workers in multi-family housing
- Painters and other specialty trades.



Under the rule, child-occupied facilities are defined as residential, public or commercial buildings where children under age six are present on a regular basis. The requirements apply to renovation, repair or painting activities. The rule does not apply to minor maintenance or repair activities where less than six square feet of lead-based paint is disturbed in a room or where less than 20 square feet of lead-based paint is disturbed on the exterior. Window replacement is not minor maintenance or repair. Contractors must become accredited and at least one worker on staff must take the Lead Renovator course to become an EPA-certified Renovator.

## 3.3   O&M PLAN MANAGER RESPONSIBILITIES

The O&M Plan Manager shall be responsible for the following tasks:

- Implement and monitor the ACM/LBP control program.
- Coordinate all activities with ACM/LBP consultants/contractors.
- Review specifications for services or work; retain consultant, and evaluate bids and proposals; and monitor contractor's performance of related work.
- Provide access to training and technical assistance to construction and property managers to ensure material control.
- Keep adequate records of asbestos exposure assessments, medical exam records (if required), abatement plans and actions, and ensure regional compliance with 29 CFR 1910.1001(m)(3), 29 CFR 1910.20, and 1926.1101
- Ensure that all personnel tasked to handle ACM/LBP are qualified and certified in accordance with applicable federal, state, and local standards.
- Incorporate, schedule, monitor, and maintain records of the periodic ACM and LBP inspection program.
- Review all planned construction and maintenance activities in areas known to have asbestos-containing materials to prevent unnecessary damage to the material, occupant exposure, and contamination of the building.
- Monitor the above work while it is in progress to ensure that it complies with contract specifications.
- Ensure that a record is kept, and that the property owner is informed of all applicable incidents, situations, or accidents involving asbestos-containing material.

| Owner Designated O&M Plan Manager: | |
|---|---|
| O&M Plan Manager | |
| Address: | |
| Telephone: | |



**The Management Company** (if no management company is assigned, the following duties shall remain the responsibility of the O&M Plan Manager) shall be responsible for the following tasks:

- Ensure that only authorized persons repair, replace, or handle ACM.
- Maintain an on-site record of O&M Plan inspection reports as received.
- Report all damaged suspect or known ACM immediately to the O&M Plan Manager.
- Direct all unauthorized personnel to remain clear of asbestos-containing materials.
- Review all planned construction and maintenance activities in areas known to have ACM to prevent unnecessary damage to the material, occupant exposure and contamination of the building.
- Monitor the above work while it is in progress to ensure that it complies with contract specifications.
- Report and coordinate all asbestos-related issues through the O&M Plan Manager.
- Coordinate the response to all inquiries relative to asbestos through the O&M Plan Manager.
- Ensure that a record is kept and that the property owner is informed of all applicable incidents, situations or accidents involving asbestos-containing materials.

| Owner Designated Management Company: | |
|---|---|
| Company Name: | |
| Contact Person: | |
| Address: | |
| Telephone: | |

**SUGGESTED TRAINING COURSES FOR EMPLOYEES INVOLVED IN THE O&M PLAN**

| | | |
|---|---|---|
| Custodial & Maintenance | General Awareness | 2 hours |
| Maintenance Supervisor /Installation Head | O & M (includes hands on train) | 16 hours |
| Maintenance Supervisor /Installation Head | Inspector | 3 days |
| Asbestos O&M Plan Manager | Project Designer | 3 days |
| Lead/Asbestos Awareness | General Awareness | 2 hours |
| EPA-Lead Renovator Training | Contractors | 8 hours |



**CLASSIFICATION OF ASBESTOS WORK PRACTICES BY OSHA AND ASSOCIATED TRAINING**

The following work practice classifications are appropriate for maintenance personnel under this O&M Plan.

**Class III**    **Repair and Maintenance activities where ACM or Presumed ACM (PACM) is disturbed, does not include activities designed to remove ACM.**

    a.  Requires an EPA 16-hour Operations and Maintenance course, which is inclusive of the 2 hour General Awareness course.

    b.  May require participation in a Respiratory Protection Program

    c.  May require participation in a Medical Surveillance Program

**Class IV**    **Maintenance and Custodial work where employees contact, but do not disturb ACM and PACM, including activities which include cleanup of ACM and PACM waste and debris.**

    a.  Requires two-hour General Awareness training

    b.  May require participation in a Respiratory Protection program

    c.  May require  participation in a Medical Surveillance program



## 4.0    APPROPRIATE WORK PRACTICES

The following work practices are included for general information, and these materials may or may not be present in the facility.  A general safety article by the EPA has been included in Appendix A covering a variety of work practices. Additional ACM/LBP may be located in your facility which is not outlined below. All building materials must be tested prior to disturbance.  All paints should be presumed to be lead-based paint.

The following forms have been appended to this O&M Plan:

- A Waste Tracking Form is provided in Appendix C.
- A Job Request Form is provided in Appendix D.
- A Maintenance Work Authorization Form is provided in Appendix E.
- An Evaluation of Work Affecting ACM/LBP is provided in Appendix F.
- A hyperlink for asbestos regulations covering various work practices is included in Section 10.0 References.

### 4.1    Routine Maintenance or Repair Activities in Asbestos-Containing Environments

Maintenance or repair activities in the local of asbestos-containing resilient floor tiles or sheet flooring should not disturb ACM.  Where maintenance activities cannot be avoided, special procedures must be introduced to limit the potential for damage and contamination of the surrounding areas. Work practices include, but are not limited, to the following:

- Use of wet methods;
- Use of HEPA vacuums;
- Prompt action to clean up ACM/PACM debris;
- Following OSHA respirator requirements; and
- Assume waste and debris in areas with accessible (friable) TSI and surfacing materials contains asbestos. A Waste Tracking Form has been provided in Appendix C.

#### 4.1.1    Preparation Prior to Renovation or Maintenance Activities & Emergency Response to Damaged Asbestos Containing Acoustical Ceiling Materials

- Notify supervisor and cordon off area using appropriate signage (per 29 CFR 1910.1001(j)(3)).
- O&M Plan Manager will contract an asbestos abatement contractor to remove ACM.
- O&M Plan Manager will contract a third-party asbestos consultant to perform ambient air sampling upon completion of response action.
- Waste material should be properly manifested and disposed.

#### 4.1.2    Presumed Asbestos Containing Building Materials

The following asbestos containing building materials (ACMs) are suggested materials that are typically encountered in buildings.  The list should not be construed as being representative of all materials that may be present in a building or property.  Therefore, if a prior or subsequent survey is performed, the identified ACMs should be incorporated for the purposes of this Operations & Maintenance Plan.



**Plaster and Spray-Applied Acoustical Texture or Fireproofing**

- Asbestos-containing plaster is generally considered to be friable if it is damaged or disturbed. Plaster is often applied to interior ceilings and walls and over irregularities, such as nail penetrations, to provide a textured, acoustically absorbent finish to the ceiling. It can be rough or smooth to the touch. It is not possible by sight or by touch to determine if plaster is asbestos-containing.
- Spray-applied acoustical ceiling texture is generally considered to be friable and could present a potential health hazard if disturbed. Acoustical ceiling plaster usually has a rough (popcorn like) finish and can be soft or hard to the touch. It is usually spray-applied, however, trowel-applied material is also observed.
- Asbestos-containing spray-applied fireproofing is generally considered to be friable and present a potential health hazard if it is disturbed. Fireproofing is often applied to steel structural members, and to the interior of elevator shafts. Spray-applied fireproofing is generally rough in appearance, and can be "cottage-cheese" like or firm and somewhat cement like in texture.

  These materials are susceptible to water damage and are evident via discoloration. If water damage continues, delaminating will occur, resulting in an increased potential for asbestos fiber exposure. All potential sources of water leakage should be immediately addressed to prevent further water damage to the ACM.

**Vinyl Composite Floor Tiles (VFT), Sheet Flooring (VSF), and Mastics**

Vinyl floor tiles, sheet flooring, and associated mastics are generally considered to be non-friable materials, provided that they remain undisturbed on floor surfaces. It is not possible by sight or touch to determine if floor coverings are asbestos containing. Sheet flooring is typically composed of two layers, a top protective layer and a bottom paper-like insulating layer. A mastic material, often asbestos-containing, adheres the floor tile or sheet flooring to the substrate.

**Drywall and Drywall Joint Compound (DWJC)**

Drywall and drywall joint compound are generally considered to be friable materials if damaged or disturbed. DWJC is applied to interior drywall seams and over irregularities, such as nail penetrations, to provide a smooth finish to the wall system prior to painting. Because of the absence of rough edges and the typically painted surfaces, this material generally has a low propensity for disturbance under normal use and wear. It is usually hard to the touch. It is not possible by sight or by touch to determine if DWJC is asbestos-containing.

**Thermal System / Transite Pipe Insulation**

Asbestos-containing transite vent pipes are commonly used as exhaust flues for heaters, water heaters, and boilers. These materials are unlikely to pose a health threat if left undisturbed and should be monitored for damage.

Asbestos-containing thermal and transite pipe insulation is commonly applied to heating vessels such as boilers, hot water tanks, and the associated piping. Thermal insulation is generally considered to be friable, although it is commonly enclosed in a canvas jacket. It is very important the jacket material remain free from tears or rips that can expose the underlying ACM. Other types of thermal insulation in



use include a paper-type insulation.  These materials are unlikely to pose a health threat if left undisturbed and should be monitored for damage.  Often, the hard, mudded elbows and hanger supports used with fiberglass pipe insulation contains asbestos.  Thermal insulation is particularly susceptible to water damage.  Plumbing and roof leaks should be immediately repaired when determined to have caused water damage to ACM.

**"Stucco"**

Asbestos-containing "stucco" is commonly used as an exterior finish.  "Stucco" is generally considered to be friable.  These materials are unlikely to pose a health threat if left undisturbed and should be monitored for damage.

**Black Roof Seal/Mastic and Roofing Materials (Shingles, Asphaltic Roofing)**

Asbestos-containing roof seal/mastics are still in use today.  The material is considered to be non-friable and the fibers are unlikely to be released from the asphaltic matrix.  These materials are unlikely to pose a health threat if left undisturbed and should be monitored for damage.

Under normal conditions of use, asbestos fibers are bound into the matrix of the previously discussed materials as well as roof shingles and asphaltic roofing, and may pose a hazard to building occupants should the material become friable (pulverized or airborne).  Mechanical disturbance of these materials should be avoided as activities such as cutting, drilling, grinding, sanding, or hammering may cause significant damage and lead to airborne fiber release.

## 4.2   Lead Containing Paint

Lead O&M activities are limited to small-scale projects that generally involve disturbance of less than two square feet of LBP per room.  These could include replacing a windowpane, general grounds keeping, and repairing a door.  A summary of protective measures suggested for these activities can be found in Chapter 17 of the HUD Guidelines (Appendix I). Good work practices include the use of plastic coverings to protect surfaces, wet methods to reduce dust/debris generation, and use of a HEPA-filtered vacuum to collect paint dust and debris. For most maintenance projects, wet cleaning of surfaces with a cleaning agent is effective in removing lead-contaminated dust.

An example of an O&M activity is the systematic repair of damaged paint is called "Paint Film Stabilization."  This is a process of wet scraping, priming, and repainting surfaces that are coated with deteriorated LBP.  Further information regarding various work activities can be found in the HUD Guidelines:

http://www.hud.gov/offices/lead/lbp/hudguidelines/index.cfm

A copy of HUD Chapter 17 O&M Work Practices is provided in Appendix I.

Lead-safe work practices might include the following:

- Using wet methods.
- Placing a plastic drop cloth underneath the work area extending up to two feet beyond the work area.
- Using protective clothing such as foot coverings or dedicated footwear to minimize tracking leaded dust out of the work area.



- Sealing rooms to avoid contamination of adjacent areas either by closing doors or using a plastic curtain wall.
- Using approved respirators.



# 5.0   INSPECTION PROGRAM

## 5.1   Responsibilities

In order to maintain that the facility is in the best possible condition, the following tasks must be performed:

## 5.2   Semiannual Inspection

The O&M Plan Manager will coordinate the inspection process, analyze and consolidate results, and report any problems or necessary corrective recommendations to the proper authority.  Each facility containing friable asbestos must have a semiannual physical "walkthrough" by a qualified inspector (using the original survey report and subsequent re-inspection reports as a guideline) to confirm that all ACM in the facility is intact and manageable.  If new damage is identified, it must be noted so that remedial action can be arranged.

Posting of warning signs and labels in areas with known ACM/LBP should be performed upon confirmation of the presence of ACM in the building (29 CFR 1926.58).  Labeling is intended to prevent damage or disturbance of ACM by unprotected individuals and to prevent such persons from entering areas where there is potential exposure from ACM.

## 5.3   Survey Results

Testing for the presence of LBP is recommended for all suspect surfaces. All inspection or survey results should be part of the O&M. Program. X-Ray Fluorescence (XRF) reports, laboratory analyses results, spot-testing results, field sheets, and field notes should be organized in a section of the document. Survey results should be easily accessible for reference. LBP surfaces should be visually inspected periodically depending on conditions. This section should be updated when additional lead surveys are performed.

The survey results provide a description of the location of LBP. An easy way to compile these results is to mark the locations on construction (as-built) drawings. The location of ACM/LBP should be updated as new survey results are obtained and when ACM/LBP is removed. Any enclosures around ACM/LBP should also be noted on the construction drawings. Any Prior Surveys should be appended in Appendix G.

## 5.4   Air Monitoring

Upon disturbance of confirmed or suspected ACM/LBP and/ or if required by law, air sampling must be conducted by qualified professionals to determine the airborne fiber concentration in the area.

## 5.5   Training

The reverse side of the inspection form is to document the initial training and annual re-training of all personnel who are exposed to ACM/LBP as part of their job tasks.  This group would typically include persons specifically trained in emergency cleanup techniques; building maintenance/engineering/trades personnel, etc.

Other persons (including contractor personnel) who may work in or around ACM environments (but not handle or maintain ACM) should receive the appropriate training under the guidelines delineated in the applicable regulations.



All training programs must inform employees about the following:

- Methods of recognizing asbestos;
- Health hazards of asbestos exposure;
- Relationship between asbestos and smoking in producing lung cancer;
- Operations that could result in asbestos exposure;
- Importance of necessary protective controls to minimize exposure including, as applicable, engineering controls, work practices, respirators, housekeeping procedures, emergency procedures, and waste disposal procedures;
- Purpose , proper use and limitations of respirators; and
- The medical surveillance program;
- A complete review of the OSHA standard(s) including appendices.



## 6.0    EMPLOYEE PROTECTION

It is the express policy of the property owner that ACM/LBP present in this facility shall be maintained in such a way as to preclude the necessity of using personal protection equipment (PPE). No employees or tenants of the subject site or outside contractor employee shall disturb any ACM without proper training. Anyone working in the vicinity of identified ACM/LBP shall receive the proper training consisting of the two-hour Asbestos and/or Lead Awareness Class.

Any asbestos-related abatement/removal conducted at the subject site will be performed by a licensed contractor.

At a minimum, the following elements should be included in the employer's worker protection program:

- Hazard determination, including exposure assessment;
- Engineering and work practice controls;
- Respiratory protection;
- Protective clothing and equipment;
- Housekeeping;
- Hygiene facilities and practices;
- Medical surveillance and provisions for medical removal;
- Training;
- Signs; and
- Recordkeeping.

To implement the worker protection program properly, the employer needs to designate a competent person (i.e., one who is capable of identifying existing and predictable hazards or working conditions which are hazardous or dangerous to employees) in accordance with the general safety and health provisions of OSHA standards. The competent person must have the authorization to take prompt corrective measures to eliminate such problems. Qualified medical personnel must be available to advise the employer and employees on the health effects of employee asbestos exposure and supervise the medical surveillance program.

When conducting construction or demolition activities which disturb lead <u>in any amount</u> or create an exposure to workers, the employer is required to provide worker protection and conduct exposure assessments. Employers should consult Federal OSHA Regulations at 29 CFR 1926.62, "Lead in Construction" standards for complete requirements prior to construction or demolition activities. This regulation requires initial employee exposure monitoring to evaluate worker exposure during work that disturbs lead-containing materials (lead present in detectable levels). It is suggested that engineering controls, respiratory protection, and personal protective equipment be employed at the start of a project that could disturb lead-containing materials.



## 7.0   RESPIRATORY PROGRAM

As no subject site employee, occupant, or outside contractor shall be authorized to disturb ACM/LBP, no respiratory program is required at the subject site property.  However, custodial and maintenance workers will receive the appropriate training according to daily activities.

Any asbestos-related abatement/removal or lead-based paint stabilization or removal conducted at the subject site will be performed by a licensed contractor.

The employer must provide respirators that will be used by employees under the following conditions:

- Periods when an employee's exposure to lead exceeds the PEL;

- Work operations for which engineering controls and work practices are not sufficient to reduce exposures to or below the PEL;

- Periods when an employee requests a respirator; and

- Periods when respirators are required to provide interim protection for employees while they perform asbestos and/or lead-related construction activities.

Employees must receive proper training in the use of respirators. This includes how to wear a respirator, to know why it is needed, and to understand its limitations.

Respirators must be selected according to the provisions of Title 42, CFR Part 84.



## 8.0    RECORDKEEPING

All the building documents should be stored in permanent files, including:

- Inspection and assessment reports
- The O&M Plan
- Work practices and procedures
- Respirator use procedures
- Fiber release reports
- Application for maintenance work and work approval forms
- Evaluations of work affecting ACM/LBP
- Reinspection/surveillance of ACM/LBP

EPA recommends that building owners make available all written elements of the O&M Plan to the building's O&M staff as well as to tenants and other building occupants, if applicable. Building owners are also encouraged to consult with their legal counsel concerning appropriate recordkeeping strategies as a standard part of their O&M programs.

Occupational Safety and Health Administration (OSHA) standards require that employers with employees engaged in asbestos-related work retain the following records:

- Personal air sampling records, for at least 30 years; personal air samples are those collected in the worker's breathing zone during performance of work involving asbestos exposures.
- The data used to qualify for exemptions from OSHA's initial monitoring requirements for the duration of the exemption.
- Medical records for each employee subject to the medical surveillance program for the duration of their employment plus 30 years.
- All employee training records for one year beyond the last date of each worker's employment.

Additional OSHA recordkeeping requirements are listed below for reference:

- Access to employee exposure and medical records (29 CFR 1910.1020)
- Hazard Communication (29 CFR 1910.1200).
- Also see the OSHA Construction Rule (29 CFR 1926.1101) or the EPA Worker Protection Rule (40 CFR 763 Subpart G) which incorporates the OSHA regulations by reference for certain state and local employees) for more details of recordkeeping requirements.



# 9.0    DEFINITIONS

## 9.1    Asbestos

**Accessible Material** - any material access to which can be gained by any means other than significant destruction of building components, or, for the purposes of describing building occupant activities, a material subject to disturbance by routine use or maintenance activities

**Asbestos** - the general name given to a number of naturally occurring hydrated mineral silicates each of which possesses a specific crystalline structure, is incombustible in air, and is separable into fibers; asbestos includes the asbestiform varieties of Chrysotile (serpentine), Crocidolite (riebeckite), Amosite (cummingtonite-grunerite), Anthophyllite, and Actinolite.

**Asbestos Containing Material (ACM)** - may be defined, as by the EPA, as any friable material or product containing greater than one percent asbestos or, by convention, as any material or product which contains >1% asbestos

**Asbestos Debris** - pieces of material that can reasonably be identified by color, texture or composition as being traceable to a known asbestos containing application; may mean dust, if the dust is determined by analysis to be ACM

**Bulk Samples** - samples of bulk material; in the case of asbestos, suspect asbestos containing material; Chain-of-Custody (COC) - formal procedures for tracking samples and ensuring their integrity

**Encapsulation** - treatment of ACM with a material that surrounds or embeds asbestos fibers in an adhesive or cementitious matrix to inhibit the release of fibers; the encapsulant creates a membrane over the surface of the material (bridging encapsulant) or penetrates the material or binds its components together (penetrating encapsulant).

**Enclosure** - an airtight, impermeable, permanent barrier around ACM to prevent the release of asbestos fibers into the air

**EPA** - United States Environmental Protection Agency

**Fair** - as used to describe material condition, damage is more prevalent or severe than on materials rated as good

**Fiber Release Episode** - any uncontrolled or unintentional disturbance of ACM resulting in airborne asbestos fiber emission

**Friability** - the physical characteristic of any solid that describes its ability to be broken down to a powder or dust; a highly friable material is one that can be easily crumbled by hand pressure; a moderately friable material is one that can be crumbled with some difficulty by hand pressure or by mechanical means; a low friability material is one that may require mechanical means to crumble; while the condition of a material does not constitute a measure of its friability, weathering and deterioration can increase the friability of a material

**Glovebag** - a plastic enclosure with built-in gloves which is placed with an airtight seal around asbestos containing pipe lagging or other materials such that they may be removed or repaired without generating airborne fibers



**Good** - as used in the context of material condition, integrity of the material is generally complete, with possible small areas of delamination or indications of limited contact or water damage; the mechanism to retain the insulation in its original position (e.g. cloth wrapping over pipe insulation) is still present

**Heating Ventilation and Air Conditioning (HVAC) system** - the system of pipes, ducts, and equipment, (air conditioners, chillers, heaters, boilers, pumps, fans) used to heat, cool and filter air and move it through a building; the HVAC system is one of several mechanical systems found in most buildings

**High Efficiency Particulate Air (HEPA) Filter** - a filtering system capable of trapping and retaining at least 99.97 percent of all particles 0.3 micrometers in diameter or larger

**Homogeneous Application** - an application of surfacing material, thermal system insulation material, or miscellaneous material that is uniform in color, texture, and vintage of application

**Lock-down** - application of a sealing material to ensure that any residual microscopic fibers remaining following asbestos removal are prevented from becoming airborne

**Mechanical System** - a building component system:  can include the plumbing system, elevator system, and others (see Heating Ventilation and Air Conditioning system (HVAC)

**NIOSH** - United States National Institute of Occupational Safety and Health

**Operations and Maintenance (O&M) Plan** - a program of work practices and training and management procedures designed to maintain ACM in good condition; an O&M Plan ensures clean-up of asbestos fibers previously released and prevention of further release by minimizing and controlling ACM disturbance or damage; an O&M Plan should be implemented at all buildings with ACM

**Optical Microscope** - a microscope that uses the transmission of light through lenses to magnify a specimen for examination; capable of resolution of fibers or other materials down to approximately 0.25 micrometers in diameter

**OSHA** - United States Occupational Safety and Health Administration

## Permissible Exposure Limits (PELs)

1. Time-weighted average limit (TWA).  The employer shall ensure that no employee is exposed to an airborne concentration of asbestos in excess of 0.1 fiber per cubic centimeter of air as an eight (8) hour time-weighted average (TWA), as determined by PCM, or by an equivalent method.
2. Excursion limit.  The employer shall ensure that no employee is exposed to an airborne concentration of asbestos in excess of 1.0 fiber per cubic centimeter of air (1 f/cc) as averaged over a sampling period of thirty (30) minutes, as determined by PCM, or by an equivalent method.

**Phase Contrast Microscopy (PCM)** - an optical microscopic technique used for counting fibers in air samples; PCM does not distinguish between asbestos and non-asbestos fiber types; the PCM method currently recognized is referred to as NIOSH 7400

**Physical Assessment** - evaluating asbestos containing material to determine its current condition and potential for future disturbance

**Plenum** - a space in a building, other than a duct or shaft, designed to transport air; plenums are commonly the space between a suspended ceiling and the floor above



**Polarized Light Microscopy (PLM)** - an optical microscopic method for the identification of asbestos in bulk samples in which the sample is illuminated with polarized light

**Poor** - as used in the context of material condition, material is obviously damaged with evidence of delamination or inadequate adhesion of the material to its substrate

**Presumed Asbestos Containing Material (PACM)** - Presumed Asbestos Containing Material means thermal system insulation and surfacing material found in buildings constructed no later than 1980; the designation of a material as "PACM" may be rebutted pursuant to paragraph (k)(5) of 29 CFR 1926.1101

**Quality Assurance (QA)** - a process designed to provide confidence that the quality control program is being applied effectively; the process includes an auditing procedure designed to evaluate all known policies and procedures that affect the quality of results

**Quality Control (QC)** - a program comprised of the operational procedures to ensure that data are of known and acceptable precision and accuracy

**Regulated Area** – an area established by the employer to demarcate areas where airborne concentrations of asbestos exceed (or there is a reasonable possibility they may exceed) the permissible exposure limits.

**Response Action** - any method, including removal, encapsulation, enclosure, repair, or Operations and Maintenance Program that minimizes harm to human health and the environment from the hazards and effects of ACM

**Scanning Electron Microscopy (SEM)** - magnification 450-15,000x; analytical technique used for air and bulk sample analysis; may use Energy Dispersive Spectroscopy (EDS) to positively identify chemical elements present in the sample; method involves counting fibers (discriminating between fibers less than and greater than 5.0 microns length) in a known surface area of a filter or bulk material

**Specifications** - a written set of standards, procedures, and materials for the abatement of asbestos; includes contract documents detailing the Scope of Work of the project and defining Contractor, Building Owner and Consultant responsibilities

**Transite** - a trade name for asbestos cement wallboard or pipe

**Transmission Electron Microscopy (TEM)** - State-of-the-art analytical method for air and bulk sample analysis; uses high magnification (typically 15,000x) to identify asbestos fibers; may utilize Energy Dispersive Spectroscopy (EDS) and/or Selected Area Electron Diffraction (SAED) to confirm asbestos and to identify the type of asbestos present; recommended for final clearance air samples and for bulk analysis of samples with difficult-to-analyze matrices (e.g., plaster, vinyl tile); provides the most definitive analysis of asbestos currently available.

## 9.2 Lead Based Paint Definitions

**Abatement -** any set of measures designed to permanently eliminate lead-based paint hazards in accordance with standards established by appropriate Federal agencies. Such term includes --

(A) The removal of lead-based paint and lead-contaminated dust, the permanent containment or encapsulation of lead-based paint, the replacement of lead-painted surfaces or fixtures, and the removal or covering of lead contaminated soil; and



(B) All preparation, cleanup, disposal, and post-abatement clearance testing activities associated with such measures.

**Accessible surface -** an interior or exterior surface painted with lead-based paint that is accessible for a young child to mouth or chew.

**Certified contractor:** The term "certified contractor" means:

(A) a contractor, inspector, or supervisor who has completed a training program certified by the appropriate Federal agency and has met any other requirements for certification or licensure established by such agency or who has been certified by any State through a program which has been found by such Federal agency to be at least as rigorous as the Federal certification program; and

(B) workers or designers who have fully met training requirements established by the appropriate Federal agency.

**Deteriorated paint -** any interior or exterior paint that is peeling, chipping, chalking or cracking or any paint located on an interior or exterior surface or fixture that is damaged or deteriorated.

**Evaluation -** a risk assessment, inspection, or risk assessment and inspection.

**Federally assisted housing -** residential dwellings receiving project-based assistance under programs including:

(A) section 221(d)(3) or 236 of the National Housing Act;

(B) section 1 of the Housing and Urban Development Act of 1965;

(C) section 8 of the United States Housing Act of 1937; or

(D) sections 502(a), 504, 514, 515, 516 and 533 of the Housing Act of 1949.

**Friction surface -** an interior or exterior surface that is subject to abrasion or friction, including certain window, floor, and stair surfaces.

**Impact surface -** an interior or exterior surface that is subject to damage by repeated impacts, for example, certain parts of door frames.

**Inspection -** a surface-by-surface investigation to determine the presence of lead-based paint as provided in section 302(c) of the Lead-Based Paint Poisoning Prevention Act and the provision of a report explaining the results of the investigation.

**Interim controls -** a set of measures designed to reduce temporarily human exposure or likely exposure to lead-based paint hazards, including specialized cleaning, repairs, maintenance, painting, temporary containment, ongoing monitoring of lead-based paint hazards or potential hazards, and the establishment and operation of management and resident education programs.

**Lead-based paint -** paint or other surface coatings that contain lead in excess of limits established by HUD/EPA. The term "lead-based paint" addresses the layers of paint on an applicable surface having lead equal to or greater than 1.0 mg/cm$^2$ or 0.5% by weight.

**Lead-based paint hazard -** any condition that causes exposure to lead from lead-contaminated dust, lead-contaminated soil, lead-contaminated paint that is deteriorated or present in accessible surfaces,



friction surfaces, or impact surfaces that would result in adverse human health effects as established by the appropriate Federal agency.

**Lead-contaminated dust -** A dust-lead hazard is surface dust in a residential dwelling or child-occupied facility that contains a mass-per-area concentration of lead equal to or exceeding 40 µg/ft$^2$ on floors or 250 µg/ft$^2$ on interior window sills based on wipe samples (40 CFR 745.65).

**Permissible Exposure Limit (PEL) –** The standard sets a permissible exposure limit (PEL) of 50 micrograms of lead per cubic meter of air (50 ug/m$^3$), averaged over an 8-hour workday which is referred to as a time-weighted average (TWA). This is the highest level of lead in air to which an employee may be permissibly exposed over an 8-hour workday. The standard contains a formula (400 divided by the number hours worked) which reduces the permissible exposure when an employee is exposed more than 8 hours. For example, if a worker is exposed to lead for 10 hours a day, the maximum permitted average exposure would be 40 ug/m$^3$.

**Public housing -** has the same meaning given the term in section 3(b) of the United States Housing Act of 1937 (42 U.S.C. 1437a(b)(1)).

**Reduction -** measures designed to reduce or eliminate human exposure to lead-based paint hazards through methods including interim controls and abatement.

**Residential dwelling:** The term "residential dwelling" means:

a.  a single-family dwelling, including attached structures such as porches and stoops; or
b.  a single-family dwelling unit in a structure that contains more than one separate residential dwelling unit, and in which each such unit is used or occupied, or intended to be used or occupied, in whole or in part, as the home or residence of 1 or more persons.

**Risk assessment -** an on-site investigation to determine and report the existence, nature, severity and location of lead-based paint hazards in the residential dwellings, including --

a.  Information gathering regarding the age and history of the housing and occupancy by children under age 6;
b.  Visual inspection;
c.  Limited wipe sampling or other environmental sampling techniques;
d.  Other activity as may be appropriate; and
e.  Provision of a report explaining the results of the investigation.

**Target housing -** any housing constructed prior to 1978, except housing for the elderly or persons with disabilities (unless any child who is less than 6 years of age resides or is expected to reside in such housing for the elderly or persons with disabilities) or any 0-bedroom dwelling. In the case of jurisdictions which banned the sale or use of lead-based paint prior to 1978, the Secretary, at the Secretary's discretion, may designate an earlier date.



# 10.0  REFERENCES

## 10.1  Asbestos Regulations:

In the case of conflict between federal and state regulations, the more stringent regulations apply.

**OSHA**

29 CFR 1910.1001 Occupational Exposure to Asbestos; General Industry

29 CFR 1926.1101 Occupational Exposure to Asbestos; Construction Industry

**USEPA (United States Environmental Protection Agency)**

40 CFR 61, Subpart M

National Emission Standard for Hazardous Air Pollutants (NESHAP); Asbestos Regulations

40 CFR 763, Appendix C to Subpart E

Asbestos School Hazard Abatement Reauthorization Act (ASHARA) / Asbestos Model Accreditation Plan

## 10.2  GUIDANCE DOCUMENTS:

USEPA Guidance for Controlling Asbestos Containing Materials in Buildings ("Purple Book")

USEPA Managing Asbestos in Place: A Building Owner's Guide to Operations and Maintenance Programs ("Green Book")

United States Department of Labor – Occupational Safety & Health Administration (OSHA) for Standard 29 CFR 1926.1101 (asbestos):
www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=STANDARDS&p_id=10862

Building Maintenance Guidelines (HUD Chapter 17): Chapter 17: Routine Building Maintenance and Lead-Based Paint



## APPENDIX A: GENERAL SAFETY CONSIDERATIONS



General Safety Considerations

**(This section is reprinted from Appendix D of the EPA's White Book for use by personnel performing O & M activities, and is supplied for informational purposes only)**

**Ronald L. Stanevich**

**NIOSH Division of Safety Research**

This guide was primarily developed to provide recommendations concerning worker respiratory protection within the asbestos abatement industry. However, employers must not lose sight of the safety hazards their employees are exposed to in performance of their work. Asbestos abatement operations can take place in a variety of industrial, commercial and public settings. Each has unique potential safety hazards that the employer must control. However, nearly all abatement operations have some common safety hazards. With proper job planning and supervision, the employer can control both the health hazards and the safety hazards faced by their workers. The more common safety hazards associated with abatement operations and general recommendations to control them are discussed below. Sources for more specific safety information are listed to supplement and support the applicable OSHA regulatory standards.

**I.    ELEVATED WORK SURFACES**

The nature of asbestos abatement tasks usually requires workers to work from ladders, scaffolds, lifts, or other elevated surfaces, which creates the potential for fall injuries. Slips and falls from ladders, scaffolds, and other elevated surfaces result in a major portion of the construction industry injuries. Many of these can be prevented by implementing a few control measures:

**A.    General**

1. Avoid use of makeshift work platforms by providing portable ladders and scaffolds.
2. Ensure that job built elevated work surfaces are inspected by a competent person <u>other</u> than the individual who erects it.
3. Avoid working from elevated surfaces where possible. Consider use of wands for spraying amended water or scrapers with extended handles.

**B.    Ladders**

Eighty percent of ladder related accidents result from improper use or application:

1. Workers should face the ladder when climbing up, down, or working from it.
2. Workers should not carry objects in their hands while ascending or descending ladders. While working from a ladder they should hold on with at least one hand.
3. Ladders should not be used as a substitute for planks, runways, or walkboards.
4. Ladders should be maintained in good condition. Defective ladders should be destroyed so that no one uses them by mistake.
5. Ladders should have safety feet in good condition to keep the ladder from slipping and cutting through floor covers.
6. Ladder rungs/steps should be kept free of contaminates such as amended water and buildup of asbestos waste.
7. Employees should work no higher than the fourth step/rung from the top of the ladder.

8. Employees should not attempt to "reach" distant objects from a ladder; other platforms should be used.
9. Wood or fiberglass ladders should be provided to help control exposure to electrical hazards.
10. Employees should not straddle the space between a ladder and another object.
11. Employees should make a visual inspection of ladders before each shift.

**Additional information sources:**

>    ***Ladders --*** publication no. ISBN 0-919465-05-6
>
>    Construction Safety Association of Ontario, 74 Victoria Street, Toronto. Ontario Canada M5C 2A5
>
>    ***Safety Requirements for Portable Wood Ladders" --*** ANSI A14.1 - 1982
>
>    ***Safety Requirements for Job Made Ladders --*** ANSI A14.4 - 1979
>
>    ***Safety Requirements for Portable Reinforced Plastic Ladders –*** ANSI A14.5 - 1982
>
>    American National Standards Institute, Inc., 1430 Broadway, New York, NY 10018
>
>    ***Portable Ladders*** -- Industrial Safety Data Sheet #665, National Safety Council, 444 North Michigan Avenue, Chicago Illinois 60611

**C.    Scaffolds**

Falls from scaffolds result in about 2,000 injuries per month in the United States.  These can be reduced by:

1. providing guardrails around the perimeter of the work surface regardless of scaffold height
2. securing scaffold decks against slippage
3. keeping scaffold uprights vertical and pinned together when stacked
4. ensuring vertical members are braced to keep the scaffold plumb and level
5. decking the entire top portion of the work surface in lieu of using minimum planking dimensions
6. extending planks at least 6" (150 mm) over their support and securing them from movement
7. ensuring that manufacturer built in ladders are in good condition
8. maintaining mobile scaffold casters in good condition with position locking devices secured when employees are working from the scaffold
9. keeping mobile scaffolding height less than four times the minimum base dimension and with adequate cross bracing
10. never interchanging scaffolding pans from different units
11. never using defective scaffolding
12. designating only "competent" persons to perform scaffolding repairs.

**Additional information sources:**

>    ***Manually Propelled Mobile Ladder Stands and Scaffolds***"--ANSI A92.1 - 1977
>
>    ***Manually Propelled Elevating Work Platforms*** -- ANSI A92.3 - 1980
>
>    ***Self-propelled Elevating Work Platforms*** -- ANSI A92.6, American National Standards Institute, Inc., 1430 Broadway, New York, NY 10018

## II.    ELECTRICAL HAZARDS

Asbestos abatement is often related to renovation or remodeling activities. Normally the equipment, machinery, overhead lighting fixtures, and auxiliary furnishings are removed to facilitate the abatement work.  However, it is becoming more common that industrial and commercial buildings remain partially occupied while abatement operations are performed.  In either situation, the abatement operator must take positive actions to protect employees from accidentally coming into contact with energized electrical circuits.

**A.    General**

1. Perform am initial walk-through of the abatement area to look for pre-existing electrical hazards involved with the work
2. De-energize as many circuits as possible
3. Verify that the circuits have been de-energized with a "Field Current Sensing Device" circuit tester. Either lock out/tag out all de-energized circuits to prevent them from accidentally being energized.
4. Use non-conductive tools such as scrapers and vacuum attachments made of wood, plastic, or rubber.
5. Provide workers with non-conductive rubber boots and/or gloves when work must be done around energized wiring or equipment.
6. Prohibit accumulation of puddles of water on the floor.  Workers should be trained in the intelligent use of amended water.  No water should be used around energized circuits.

**B.    Permanent Building Circuitry**

1. Ensure that all permanent circuits are provided with a grounding system.  This can be determined with a portable ground tester.
2. Ensure that electrical outlets are tightly sealed and taped to avoid water spray.
3. Determine what equipment must remain energized during the abatement process.
4. Insulate or guard energized equipment and wiring from employee contact and other conductive objects.
5. Avoid damaging permanent building wiring during the work.
6. Consider dry removal methods in the vicinity of electrical equipment which must remain energized.

**C.    Temporary Power**

1. All temporary circuits provided by the abatement operator must be provided with a grounding system and protected by ground fault circuit interrupters.
2. Avoid stringing temporary wiring across floors
3. Elevated wiring should not be fastened with staples, nails, or wire.
4. Use care, not to damage the wiring insulation during Installation or abatement work.

**D.    Electrical Cords and Tools**

1. Provide extension cords which have a ground conductor.
2. Ensure that cords are not damaged, contain no splices, and that the grounding lug on the male plug is intact.

3.  Position extension cords to eliminate stumbling/tripping hazards and to protect them from damage by moving scaffolds.

4.  Provide electrical tools which are either grounded or of the double insulated type

5.  Use shatterproof, guarded bulbs and heavy duty wiring for temporary lighting.

6.  Where plugs enter receptacles, ensure that the connection is protected by use of duct tape or by other means.

**Additional information sources:**

*National Electrical Safety Code* -- ANSI C2-1984

*National Electrical Code* -- ANSI/NFPA 70-1984, American National Standards Institute, Inc.,1430 Broadway, New York, NY 10018

*Temporary Electric Wiring for Construction Sites* -- Industrial Safety Data Sheet #515, National Safety Council, 444 North Michigan Avenue, Chicago, Illinois 60611

## APPENDIX B: ACM INSPECTION FORM

| ANNUAL INSPECTION FORM | | | | | | |
|---|---|---|---|---|---|---|
| **DATE** | | | | | | |
| **ROOM** | | | | | | |
| **INSPECTOR** | | | | | | |

| | STATUS OF MATERIAL | | | | | |
|---|---|---|---|---|---|---|
| **ASBESTOS MATERIALS** | UNCHANGED | | CONTACT DAMAGE | | WATER DAMAGE | |
| | YES | NO | YES | NO | YES | NO |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| COMMENTS: | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| ACTION TAKEN: | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| ACTION APPROVED BY: |
|---|
| **DATE:** |

# APPENDIX C: WASTE TRACKING FORM

## WASTE TRACKING FORM

### PART 1 – TO BE COMPLETED BY WORKERS

Maintenance Work Authorization No.

| Work Location: | Building: | Room # or Area: |
|---|---|---|

Type of ACM Removed: | Quantity of Waste Generated:

No. of Bags: | Other Containers:

Waste Transported To:

Transported By: | Tracking Form Given to:

### PART 2 – TO BE COMPLETED BY ASBESTOS O&M PLAN MANAGER

Waste Properly Packaged & Labeled:

☐ Yes    ☐ No

Exceptions:

Waste Storage Location: | Waste Disposal Location

Waste Shipment Records Received | Date:

Signed:  (O&M Plan Manager) | Date:

**APPENDIX D: JOB REQUEST FORM (MAINTENANCE WORK)**

| JOB REQUEST FORM FOR MAINTENANCE WORK | |
|---|---|
| Name | Date |
| Telephone No. | Job Request No. |
| Requested Starting Date: | Anticipated Finish Date |
| Address, Building, & Room Number(s) (or description of area) where work is to be performed | |
| Description of Work: | |
| Description of any asbestos-containing material (ACM) or lead-based paint (LPB) that might be affected, if known (include location and type | |
| Name of Requestor | Telephone No of Requestor |
| Name of Supervisor | Telephone No. of Supervisor |

**SUBMIT THIS APPLICATION TO THE O&M PLAN MANAGER**

NOTE:  An application must be submitted for all maintenance work whether or not ACM/LPB might be affected. An authorization must be received before any work can proceed.

| ☐ Granted ☐ With Conditions ☐ Denied | Job Request No. |
|---|---|
| | Conditions |

| O&M Plan Manager: | Signature | Date |
|---|---|---|

# APPENDIX E: MAINTENANCE WORK AUTHORIZATION FORM

| MAINTENANCE WORK AUTHORIZATION FORM | Authorization No. |
|---|---|

**AUTHORIZATION IS GIVEN TO PROCEED WITH THE FOLLOWING MAINTENANCE WORK**

**PRESENCE OF SUSPECT ACM, PRESUMED ACM (PACM), ASBESTOS CONTAINING MATERIAL (ACM) OR LEAD-BASED PAINT (LPB)**

☐   Suspect ACM, PACM, ACM and/or LPB is NOT present in the vicinity of the maintenance work.

☐   Suspect ACM, PACM, ACM and/or LPB is present but its disturbance is not anticipated; however, if conditions change the Asbestos Plan Manager will re-evaluate the work request prior to proceeding.

☐   Suspect ACM, PACM, ACM and/or LPB is present and may be disturbed.

**WORK PRACTICE IF SUSPECT ACM, PACM, ACM AND/OR LPB ARE PRESENT**

The following work practices shall be employed to avoid or minimize disturbing asbestos:

**PERSONAL PROTECTION IF SUSPECT ACM, PACM, ACM AND/OR LPB ARE PRESENT.**

The following equipment/clothes shall be used/worn during the work to protect workers

**SPECIAL PRACTICES AND/OR EQUIPMENT REQUIRED**

| O&M Plan Manager | Signature | Date |
|---|---|---|

# APPENDIX F: EVALUATION OF WORK AFFECTING ACM OR LPB

## EVALUATION OF WORK AFFECTING
## SUSPECT ACM, PACM, ACM AND/OR LPB

This evaluation covers the following maintenance work:

|  |
|--|
|  |
|  |

Location of work (address, building, room number(s), or general description)

|  |
|--|
|  |
|  |

| Date(s) of work | Description of work | Work Approval Form # |
|---|---|---|
|  |  |  |

Evaluation of work practices employed to minimize disturbance of asbestos

|  |
|--|
|  |
|  |
|  |

Evaluation of work practices employed to contain released fibers and to clean up to the work area

|  |
|--|
|  |
|  |
|  |

Evaluation of equipment and procedures used to protect workers

|  |
|--|
|  |
|  |
|  |

Personal air monitoring results (licensed asbestos or lead-paint contractor to supply)

| Worker Name | Results | |
|---|---|---|
| Worker Name | Results | |
| O&M Plan Manager | Signature | Date |

# APPENDIX G: PREVIOUS SURVEYS

**NOT APPLICABLE FOR THIS REPORT**